IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JACKIE FISHER,                    )
                                  )
          Plaintiff,              )
                                  )
VS.                               )   C.A. NO. 4:08-cv-01273
                                  )
UNIVERSITY OF TEXAS MEDICAL       )
BRANCH and DAVID WATSON,          )
                                  )
          Defendants.             )

*****************************************************

ORAL DEPOSITION OF
DAVID W. WATSON
AUGUST 28, 2009

*****************************************************

ORAL DEPOSITION OF DAVID W. WATSON, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered
cause on August 28, 2009, from 10:43 a.m. to 4:13
p.m., before Lorri Lucas, CSR in and for the State
of Texas, reported by machine shorthand, at the
offices of TDCJ Conference Center, Huntsville,
Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.



**Bayou City Reporting inc.**

1135 East 11th Street ● Houston, TX 77009
Phone: (713) 861-8589 ●Toll Free: (888) 577-5048 ● Fax: (713) 861-1729 ● Email: bcrdepo@sbcglobal.net

Deposition of David W. Watson

1                     A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:
          Ms. Jo Miller
4         Law Office of Jo Miller, PLLC
          505 North Main
5         Carriage House
          Conroe, Texas   77301
6         (936) 539-4400

7

8

9    FOR THE DEFENDANTS:
          Mr. Sam Lively
10        Assistant Attorney General
          General Litigation Division
11        P.O. Box 12548
          Austin, Texas   78711-2548
12        (512) 463-2120

13        Ms. Cari G. Bernstein,
          Department of Legal Affairs
14        Rebecca Sealy Hospital, Room 4.254
          301 University Boulevard
15        Galveston, Texas   77555-0171
          (409) 747-8735

16

17

18   ALSO PRESENT:
19        Ms. Jackie Fisher

20

21

22

23

24

25

Deposition of David W. Watson

Page   3

1                          INDEX

2                                           PAGE

3    Appearances...................................    2

4    Stipulations..................................   170

5    DAVID W. WATSON:

6        Examination by Ms. Miller.................    5

7    Signature and Changes.........................   173

8    Reporter's Certificate........................   175

9                         EXHIBITS

10   NO.   DESCRIPTION                            PAGE

11   1     Document numbered Fisher 200699-200718    100

12   2     Document numbered 200204-200221           103

13   3     Memo dated 12/10/04 Fisher-100087-100088  112

14   4     Memo dated 9/17/04, Fisher-101190-101191  114

15   5     Memo dated 12/1/03 Fisher 100089          115

16   6     Memo with attachment Fisher-100843-100844 117

17   7     Memo dated 5/30/03 Fisher-100090          118

18   8     Candidate Evaluation Form dated 8/19/03   119
           Fisher-100850-100855
19
     9     (Withdrawn)                               120
20
     10    Document titled "Mary Gotcher Director    121
21         of Nurses, Northern Division"
           Fisher-200690-200692
22
     11    UTMB Employee General Information         121
23         dated 6/25/04 Fisher-10077-10082

24   12    Memo dated 8/31/05 Fisher-100487          123

25   13    Memo dated 9/18/05 Fisher-200257-200259   124

Deposition of David W. Watson

Page   4

 1   14   Memo dated 10/22/05 Fisher-200261              125

 2   15   Death Summary dated 12/15/05                   125
          Fisher-101245-101246
 3
     16   Memo dated 1/9/06 Fisher-200320                128
 4
     17   E-mail dated 1/12/06 Fisher-200263,            130
 5        200265, 200267, 200269, 200271, 200273,
          200275, 200277
 6
     18   Memo dated 1/27/06 Fisher 200249-200251        132
 7
     19   Memo dated 2/8/06 Fisher-100522                133
 8
     20   Memo dated 3/1/06 Fisher-100526                133
 9
     21   Memo/Quarterly Evaluation dated 3/7/06         135
10        Fisher-100068-100070

11   22   E-mail dated 3/25/06 UTMB-1369-1370            137

12   23   Memo dated 4/7/06 UTMB-1351                    138

13   24   E-mail dated 4/3/06 Fisher-200202-200203       148

14   25   Letter dated 4/11/06 Fisher-200068-200071      150

15   26   Letter dated 5/2/06 Fisher-100212              156

16   27   E-mail dated 8/17/06 Fisher-100562             161

17   28   UTMB-CMC Employee Task Force Report of         164
          Recommendations August 2006 Executive
18        Summary Fisher-100435-100442

19

20

21

22

23

24

25

Bayou City Reporting, Inc.

Deposition of David W. Watson

Page  5

1          DAVID W. WATSON,

2    having been first duly sworn, testified as follows:

3                    EXAMINATION

4    BY MS. MILLER:

5          Q    Mr. Watson, my name's Jo Miller and I

6    represent Jackie Fisher, as you know.  We just met

7    for the first time this morning.  Correct?

8          A    Yes, ma'am.

9          Q    And I appreciate you nodding your head, as

10   well as answering out loud, because the --

11         A    I'll try to be --

12         Q    -- court reporter is here --

13         A    Sure.

14         Q    -- and she's going to need you to do that.

15         A    Sure.

16         Q    But if you don't and I remind you --

17         A    Please.

18         Q    -- it's so that we can have a complete

19   record.

20         A    Of course.

21         Q    Have you had your deposition taken before?

22         A    No.

23         Q    And I'm sure you had a chance to review

24   some of the ground rules with Mr. Lively, but if you

25   don't understand my question, ask me to repeat it or

Deposition of David W. Watson

1    A    We may have met informally when I first

2  came here but I don't have any recollection of

3  anything specific.

4    Q    And in your position, you wouldn't have

5  the opportunity or wouldn't have a necessity,

6  really, to get to know all the assistant cluster

7  nurse managers.

8    A    Well, ultimately, yeah, I would want to

9  know all the cluster nurses and cluster nurse

10  managers.  I would speculate if she stayed in that

11  position, I would have gotten to know her, anyway.

12    Q    Okay.  And about -- do you recall how many

13  assistant cluster nurse managers you had in -- over

14  your supervisory role?

15    A    Maybe nine.  There might have been a few

16  more.  I'm not sure.

17    Q    And of those nine, was she the first one

18  that you hired as a cluster nurse manager or had you

19  hired cluster nurse managers prior to hiring

20  Ms. Fisher?

21    A    She was the first, I believe.

22    Q    So essentially the -- at the time you

23  hired her, you had inherited the rest of the staff.

24    A    Correct.

25    Q    Okay.  And how about the -- were you

Bayou City Reporting, Inc.

Deposition of David W. Watson

Page 33

1      A     Okay.

2      Q     -- so you have one.  You indicated, oh,

3   yes, you recalled that instance.

4      A     Yes.  I do.

5      Q     Can you tell me what happened during that

6   meeting?  We think the date is January 4th and we'll

7   go with that for the time being.

8      A     In order to explain, may I step back in

9   time just a little?

10      Q     Surely.

11      A     Ms. Ford had left UTMB and she had done

12   whatever she did and she wanted to come back and

13   come back to work.  Ms. Wright approached me about

14   that and explained that -- because Ms. Ford was

15   problematic, quite frankly.  She was rude.  She was

16   brusk.  She was, in my opinion, a know-it-all, and

17   somewhat abrasive.  So Ms. Wright explained that,

18   "Oh, she's changed.  You know, her lifestyle, things

19   have changed.  She's a better person," blah blah

20   blah.  Okay.  Fine.

21              So we were in the -- in the meeting.

22   It was the -- it was the nurse managers for the

23   cluster.  And I don't remember exactly how the topic

24   came up, but it came up, and I had originally been

25   persuaded to allow Ms. Wright to rehire Ms. Ford.

Deposition of David W. Watson

Page 34

1   And Ms. Fisher pointed out quite correctly some

2   things I had forgotten, i.e., Ms. Ford was, in fact,

3   abrasive and she was problematic, and once she

4   reminded me of that, I realized she was right and I

5   stopped the hiring process.

6          Q    Okay.  And did Ms. Ford have an

7   opportunity to interview again for -- during the

8   rehire process?

9          A    I'm not sure.

10         Q    Okay.  And when you said you'd been

11  persuaded by someone, who was it that persuaded you

12  that Ms. Ford had changed?

13         A    Well, Ms. Wright was attempting to.  She

14  had a personal relationship, as I understand it,

15  with Ms. Ford, and so she had more knowledge about

16  her, you know, personal situation.  I had no

17  knowledge of it.

18         Q    Okay.  And just for the record, Ms. Wright

19  is Caucasian.  Correct?

20         A    She is, yes.

21         Q    And Ms. Ford is Caucasian?

22         A    She is.

23         Q    Ms. Freeman is African American?

24         A    She is.

25         Q    And for the record -- obviously, it's

Deposition of David W. Watson

Page 35

1   racial discrimination -- Ms. Fisher is African

2   American also.

3        A    She is.

4        Q    It was during that meeting, I believe,

5   that Ms. Fisher made some allegations to you and

6   suggested that -- or stated that she thought it was

7   racially discriminatory.  Do you recall that

8   conversation?

9        A    I don't recall any conversation about

10  racial discrimination.  She was against Ms. Ford's

11  rehiring and Ms. Fisher was right and, I mean,

12  there's just no two bones about it.  I had

13  forgotten.  She reminded me.  She was right.  I

14  agree with her.

15       Q    And was it during that meeting that you

16  made that decision to rethink your decision to hire

17  Ms. Ford?

18       A    Well, I began rethinking the process.  I

19  don't know if I made the decision immediately on the

20  spot or shortly thereafter, but I do remember

21  telling Ms. Wright that -- that Jackie was right and

22  that I wasn't going to change my mind.  She made a

23  good call, she reminded me, and I appreciated it.

24       Q    And when did -- did you, at some point,

25  learn that Ms. Fisher made allegations that that was

Deposition of David W. Watson

Page 43

1    Q    (BY MS. MILLER)   And who was that?

2    A    That would have been Ms. Gotcher by that

3  time.

4    Q    Ms. Gotcher.   Okay.   So we got level -- we

5  got the facility level, we have the cluster level,

6  and the mortality -- and what kind of time frame was

7  all this taking?   Do you recall?

8    A    Oh, my goodness.   You know, those -- those

9  things could straggle out for, believe it or not,

10  more than a year.   I don't think this one was that

11  long.   Maybe -- I don't know -- four to six months.

12  I just don't recall.   Maybe.

13    Q    But it's something that you would want

14  to -- at your cluster and your facility level, you

15  would want to get on something right away while you

16  have the evidence available.

17    A    If I felt there was something done wrong

18  on the part of nursing, I would have taken action

19  immediately.

20    Q    Okay.   And did you take any action against

21  Ms. Fisher for that incident?

22    A    I didn't take any action against

23  Mrs. Fisher.   I put up -- I wrote -- I wrote a

24  letter and put in her file that addressed it and I

25  believe we developed a corrective action plan,

Deposition of David W. Watson

Page 44

1   not -- I don't think it was specifically at her but

2   it was more of a to show something that we realized

3   that maybe there had been a small oversight and we

4   were going to educate the staff and make sure it

5   didn't happen again, and in that letter, I was

6   concerned that after I left, if somebody else

7   reviewed it, that it could be interpreted as

8   punitive and it was not, and I specifically wrote in

9   the letter this was not a punitive letter or a

10  letter of reprimand.  I wanted that to be very

11  clear.

12      Q    And you wrote that in the letter?

13      A    Yes.

14      Q    Was there only one letter or did you write

15  a second letter to fix the first letter?

16      A    My recollection is there was only one

17  letter that went into her file and -- oh, there was

18  something else.  Let me think for just a second.

19  Oh, I remember.  The reason -- the reason that I

20  wrote that letter was, for lack of a better term, to

21  protect her in case TDC took a dim view of this

22  because, by doing so, I could say that it was an

23  internal matter with UTMB, it had been addressed,

24  and then that wouldn't really leave TDC much room to

25  say anything.  Now, if we hadn't taken any action or

Deposition of David W. Watson

1    nothing had been done or no letter had been written,

2    I felt like they could come back and say, "Well,

3    what did you do?"  Now, once the letter was written

4    and we started some sort of, you know, proactive

5    effort not to make the same mistake again, in

6    general, not Ms. Fisher in particular, that they

7    couldn't really say much.  If they said something,

8    we could say, "You know what?  We've addressed that.

9    It's an internal matter.  You don't need to be

10   concerned about it."

11        Q    And a small matter.  Right?  A small

12   matter.

13        A    Yeah.  I think so.

14        Q    And from there, it goes to the mortality

15   review committee?

16        A    At some point in time, yes.

17        Q    All right.

18        A    They do an independent review.  I don't

19   know if they even look at our stuff.  I think they

20   just start from scratch.

21        Q    And did they seek out any information from

22   you when that was done?

23        A    I don't recall.

24        Q    And tell me about the mortality review

25   committee.  How is that selected, if you know?

Deposition of David W. Watson

Page 46

1          A     I suppose one could volunteer for it.   I

2    think the -- the nurse managers, the director of

3    nurses or somebody, selects local representatives if

4    they want to and the -- and there's no objection.

5    However, it's a -- it's a multipart committee.

6    There are representatives from Texas Tech.   There

7    are representatives from UTMB.   There are

8    representatives from TDCJ on the committee and each

9    one of them is responsible for reviewing a certain

10   number of charts, however many they're assigned per

11   month.   It wasn't uncommon that I'd get a stack of

12   charts, you know, sometimes to this tall.

13         Q     And were you on the committee?

14         A     I had been at one point in time when I was

15   with TDC.   Once I went to UTMB, I was no longer on

16   the committee.

17         Q     And the members of UTMB who were selected

18   were essentially selected by Ms. Gotcher?

19         A     I'm not sure.   I don't think that's an

20   unreasonable supposition but I'm just not certain.

21         Q     But -- if you're not sure, that's fine.

22   And did you have any part or any activity involved

23   in the mortality committee review?

24         A     None whatever.

25         Q     All right.   And are you aware of the

Deposition of David W. Watson

Page 47

1    result of the mortality committee review on this

2    particular instance.

3         A    Can you be more specific?

4         Q    Um-hmm.  Was there -- does there --

5              MS. MILLER:  It's not protected.

6    It's not peer-reviewed.

7              MR. LIVELY:  I'm just trying to

8    figure --

9              MS. MILLER:  It's not peer review

10   yet.

11             MR. LIVELY:  Yeah.  I'm just also a

12   little confused about the question.

13             MS. MILLER:  Okay.  Well, I can

14   rephrase the question.

15        Q    (BY MS. MILLER)  As a result of the

16   mortality review committee, are there

17   recommendations made by that committee?

18        A    Yes.  There could be.

19        Q    And in Ms. Fisher's case, was there a

20   recommendation made?

21        A    Yeah, there was a -- excuse me.  There was

22   a recommendation to go to peer review.

23        Q    A recommendation that it go to peer

24   review.

25        A    Yes.

Deposition of David W. Watson

1      Q      Okay.  And who makes the decision of

2   whether or not it does go to peer review?

3      A      At that point in time, I don't think there

4   was any decision to be made.  It went.  In the peer

5   review committee, they would -- they would do a

6   preliminary review of the case, not a formal review,

7   and they would look at it and say, "This doesn't

8   merit peer review," and they won't look at it, or

9   they can look at it and say, "We will peer review

10  this.  We have concerns."  And there will be a

11  formal process initiated.

12     Q      And you were the facilitator on that peer

13  review committee.  Is that correct?

14     A      I was one of two facilitators or two

15  agents.

16     Q      Who were the other facilitators?

17     A      One other facilitator was Kathy Jones, who

18  was a manager at my level in some southern area

19  around Houston, Sugar Land.

20     Q      And by "facilitators," you -- these were

21  not members of the peer review committee.  Is that

22  correct?  Or these were members?

23     A      They weren't voting members.  We --

24  essentially my job as a facilitator was to gather

25  documentation.  If the peer review committee looked

Deposition of David W. Watson

Page 49

1    at that documentation and decided they wanted more,

2    I would go get it.  I was the keeper -- in this

3    particular instance, the keeper of the records at

4    the -- at the Estelle facility.  They had to be

5    stored behind, I believe it was, two locks.

6         Q    And what was Kathy Jones' role in being a

7    facilitator, if that was your role?

8         A    It was the same as mine but we would take

9    turns and she would -- she might even investigate

10   some of the cases too.

11        Q    Did you investigate cases?

12        A    Well, let me rephrase.  Perhaps not

13   investigate but gather documentation.

14        Q    Did you make presentations of sorts to

15   the -- to the peer review committee in terms of

16   "Here are the documents"?  Any kind of explanation

17   with them?

18        A    I would present the documents to them and

19   give them a brief summary of the case, and if they

20   had any questions, I would try to answer them.

21        Q    Okay.  Now, at some point, Ms. Gotcher had

22   authority over selecting which cases came from the

23   mortality review committee and she had some ability

24   to select and choose those that were gone -- that

25   went to the peer review committee.  Do you recall

Deposition of David W. Watson

1    Q    How about a bathtub drowning in 2005?

2    A    I can't call it.

3    Q    Okay.  At some point, the peer review --

4 or the -- or Ms. -- this incident of the hanging

5 suicide was referred to the Board of Nursing

6 Examiners.  Are you aware of that?

7    A    Um-hmm.

8    Q    You're aware that Ms. Fisher was under

9 examination.

10    A    Yes.

11    Q    Do you have an understanding as to whether

12 or not her license was ever encumbered in any

13 manner?

14    A    I do not know.

15    Q    Did you have any communication with the

16 Board of Nursing Examiners?

17    A    Yes.  When I found out this was going to

18 the board, I called one of the investigators, who I

19 cannot name at this point, and explained that I had

20 conducted an investigation and that I was her

21 supervisor and I wanted to know if it would be, I

22 guess you could say, kosher to write a letter on her

23 behalf, in support of Ms. Fisher to the board, and

24 if Ms. Fisher requested it, she said that that would

25 not be -- that would be fine.

Deposition of David W. Watson

Page 52

1      So I approached Ms. Fisher and told
2  her what I had found out and asked her if she would
3  be okay with that and she said she would.  I drafted
4  a letter to the Board of Nurse Examiners.  I showed
5  it to Ms. Fisher.  In fact, I remember very
6  distinctly.  It was right over here on 12th Street.
7  We were sitting in my car and I gave her a copy --
8  it was two or three pages, I think -- and said, "I
9  would like you to look at this.  If you have any
10  concerns of the wording, let me know right now and
11  we'll see if we can't fix it.  I want you to be
12  satisfied with it."  She looked at it and said, "No.
13  It looks okay."  I took the letter, put it on
14  letterhead, signed it, sent her a copy of the actual
15  letter, and then I sent the rest of the letter, the
16  original, to the board.
17      Q    Okay.  Did it help?
18      A    Have no way of knowing that for sure.
19      Q    Okay.  Other than that communication, did
20  you have any communication with the Board of Nursing
21  Examiners in -- regarding Ms. Fisher's cases?
22      A    No.  I don't think so.
23      Q    Did you receive any communication from the
24  Board of Nursing Examiners directly -- directed to
25  you?

Deposition of David W. Watson

Page 56

1       Q       That -- the whole part of that process.

2       A       Okay.  I had been having conversations

3   with Ms. Gotcher about the RMF and how things --

4       Q       Will you define "RMF" for me, please?

5       A       Regional medical facility?

6       Q       Thank you.  And --

7       A       Also known as the Estelle Unit.

8       Q       And is that in -- is that a unit all

9   self-standing -- self-contained unit?

10      A       Well, the Estelle Unit is -- is kind of a

11  mishmash of different things.  There is a building

12  that is an old-fashioned-type prison which I think

13  preexisted most everything else, and then they

14  created -- I don't know what order, but they created

15  a high-security unit that's on the same campus and

16  it's maybe a few hundred yards away.  And then they

17  created the regional medical facility itself, which

18  is more of a hospital-type environment.  And then

19  somewhere in that mix, they also created a geriatric

20  unit, which is basically one big tin building that

21  had low security inside the building.

22      Q       Okay.  So there was a regional medical

23  facility which was more like a hospital?

24      A       Well, I think of the whole complex -- and

25  maybe not correctly so, but I think of the whole

Deposition of David W. Watson

Page 57

1    complex as the Estelle unit, the RMF.  But -- but --

2        Q    So the RMF was all that was at the Estelle

3    Unit, including the geriatric unit and what -- what

4    other little specialized units were there?

5        A    Oh, there was also like a drug rehab

6    program over there.  I forgot about that.

7        Q    Was that -- would you consider that part

8    of the RMF?

9        A    Well, from a nursing standpoint, yes,

10   because if someone got sick or there was sick call,

11   then it was the responsibility of the nurses to

12   handle that.  The building had its own nursing

13   staff, but in -- if there were an emergency in the

14   middle of the night and they were shorthanded, then

15   somebody from the RMF may have to go over there and

16   lend a hand.  The RMF crew was also responsible for

17   nursing care at the high-security unit, for staffing

18   it.  And I think that's it.

19       Q    And the high-security unit was different

20   than the hospital.

21       A    Yes.  It was a free-standing facility with

22   its own security fence.

23       Q    And did the nurses -- the same nurses

24   rotate among the -- I'm going to call it the

25   hospital and the geriatric unit and the drug rehab

Deposition of David W. Watson

Page 58

1    unit and the high-security unit?

2         A    I'm sorry.  Say it again.

3         Q    Did the same nurses rotate?  Would they

4    have -- they have touched and worked in all those

5    independent subunits, so to speak?

6         A    Probably not so much the building, but the

7    other three, yes, I think so.

8         Q    The building?

9              MS. FISHER:  It's the main building.

10   It's an independent building.

11        Q    (BY MS. MILLER)  And that's different than

12   the hospital?

13        A    It's a different structure, yes.  It's --

14   they got a connected walkway over there to it.

15        Q    All right.  So let's talk -- and the

16   building -- which facilities would the same nurses

17   have worked among?

18        A    The regional medical facility,

19   high-security, and the SAFP, which is -- I forget

20   what it stands for, substance -- substance abuse

21   something program.

22        Q    Right.  And SAFP was the drug rehab.

23        A    I believe so, yes.

24        Q    Okay.  So the same nurses would have had

25   exposure to drug rehab, RMF, and the high-security

Deposition of David W. Watson

Page 59

1    portion.  The building itself and the hospital and

2    the geriatric unit would have been no crossover in

3    the employees other than the nurse manager.

4         A    The building, yes.  The geriatric unit

5    was -- it's hard to describe but it wasn't inside

6    but it was part of the -- it was and it wasn't.  It

7    was kind of a hybrid.  It was a free-standing

8    building right next to the regional medical

9    facility.  Now, as regarding the high security, if I

10   remember correctly, they had nurses that were

11   routinely assigned over there, but if we were

12   short-staffed or whatever, then some nurses may have

13   had to float and help cover.

14        Q    Okay.  And the hospital is different than

15   the regional medical facility.

16        A    They're one and the same, basically.

17        Q    Okay.

18        A    There was 106 or 110 beds.  There was a

19   dialysis unit there, three -- three pods.  I think

20   it was north, south, and something else.

21        Q    And was Ms. -- at this time, was

22   Ms. Fisher in charge of all of these units at the

23   Estelle facility?

24        A    At what time?

25        Q    In January of 2006.

Bayou City Reporting, Inc.

Deposition of David W. Watson

Page 61

1        A      On the --

2        Q      At Estelle.

3        A      At Estelle.  I know it's kind of --

4        Q      But she didn't have another facility

5   somewhere else --

6        A      No.

7        Q      -- that she had to drive to and --

8        A      No.

9        Q      Okay.  All right.  So got the RMF and I

10  interrupted my -- your answer to my question was:

11  What precipitated the investigation that was

12  initiated on a -- into Ms. Fisher's work that began

13  on January 9th of 2006?

14       A      Well, as I said, I had been having

15  conversations with Ms. Gotcher fairly regularly and

16  I had discussed with her concerns that I had, so

17  forth, over the preceding few months and she had

18  offered to come down and take a look, if I wanted

19  to, and I declined.  I wanted to try to do

20  everything I could myself to resolve any issues or

21  concerns.  And finally one day, I had a phone

22  conversation with her and she made an offer again

23  and -- and I said, "Sure.  Why not?"  I said, "I

24  need an -- I need just somebody -- maybe I'm too

25  close to the problem.  Maybe I'm not seeing the

Deposition of David W. Watson

Page 62

1    forest for the trees but, you know, feel -- come

2    down and have a look and tell me what you think."

3         Q     Well, if you were close to the problem,

4    could you identify the problem?

5         A     I feel like I could --

6         Q     And --

7         A     -- but I wanted, you know, external

8    verification.

9         Q     And what did you identify as the problem?

10        A     Well, there was a general lack of morale.

11   People were leaving, turning over, requesting to

12   transfer.  In fact, I denied two requests from the

13   assistant nurse managers there at Estelle who wanted

14   to leave out from under Ms. Fisher and I told them,

15   no, they needed to stay and try work with her and

16   give her a chance.  And I've had -- I would have a

17   nurse -- in fact, I can remember one incident fairly

18   clearly where two nurses met me in the hallway and

19   they had complaints.  Ms. Fisher wasn't treating

20   them right or whatever.  And I said, "Well, are you

21   willing to put that in writing?"  "No."  I said,

22   "Well, then you're just whining.  I don't want to

23   hear it."  And so the ER nurses were up in arms

24   because Ms. Fisher had made some changes at the ER

25   and the turnover rate was -- was a concern.  I think

Deposition of David W. Watson

1    that's largely it.

2         Q    And so those were the concerns or the

3    problems that you had identified?

4         A    Well, yes.  And also there was -- in my

5    opinion, there was a problem with the communication

6    between Ms. Fisher and her nurse managers.  I met

7    with them on March 10th and I don't -- I guess it

8    would probably have to be '06, just by process of

9    elimination, and we sat down as a group and they

10   expressed their concerns and she expressed her

11   concerns and I thought, to a large degree, it was a

12   lack of communication.  And I directed them to try

13   to meet at least weekly and keep up with each other

14   on any changes and problems and so forth, and more

15   often, if needed.

16        Q    Okay.  I'm going to stop you there just

17   for a minute because you got ahead of me.  I was

18   back in January and you went to March already,

19   Mr. Watson.

20        A    I'm sorry.  I'll try to slow down.  Just

21   rein me in.

22        Q    Okay.  All right.  So back in January, you

23   said you had spoken -- if I can -- can understand,

24   you had spoken to Ms. Gotcher on a number of

25   occasions about your concerns of -- in the Estelle

Deposition of David W. Watson

Page 64

1  Unit.

2       A    Yes.

3       Q    And on January 9th, again, she offered to

4  provide her assistance and that's when the

5  investigation of -- into Ms. Fisher began.

6       A    I'm not sure of the date but -- but, yes,

7  as far as the transaction goes, yes, that's correct.

8       Q    Okay.  And you indicated that you had told

9  Ms. Gotcher that -- about the concerns and that you

10 had done everything you could do and you needed some

11 outside assistance.  Is that -- am I fairly

12 summarizing what you said?

13      A    I just wanted an outside perspective to

14 either come in and look and validate that, "Yes,

15 I've looked at this and I agree with your concerns,"

16 or "No, Mr. Watson.  You're completely off and

17 here's what we think we see."

18      Q    So if we agree that at least this happened

19 in January of 2006 -- let's leave the March

20 conversation till later -- what had you done to help

21 Ms. Fisher or to identify concerns with her or to

22 instruct her or review with her how she might

23 improve?

24      A    Well, I talked about being better

25 communication.

Deposition of David W. Watson

Page 66

1    you had with Ms. Fisher.  Did you have any written

2    expectations or any written consultations with her

3    prior to the time this investigation --

4         A    I don't think so.  I was --

5         Q    -- was begun?

6         A    I don't think so.  I was very motivated to

7    be able to coach and encourage her.  And when I say

8    "coach," I don't mean in a punitive sort of way.  I

9    mean in a, you know, "I know you've got the talent.

10   You can do this.  Let's go get them, you know."

11        Q    And she is very talented.

12        A    She's very talented.

13        Q    And she's pretty no-nonsense; isn't she?

14        A    She can be.

15        Q    So those were the things that you had

16   tried and then Ms. Gotcher got involved.  Is that

17   correct?

18        A    Yes.

19        Q    All right.  Tell me what happened when

20   Ms. Gotcher got involved.

21        A    She came to the unit.  She did some

22   walking around.  I don't know how extensive it was.

23   I don't think I went with her.  She and

24   Ms. Melton -- Ms. Melton from HR came too, which I

25   guess I didn't really know she was coming till at

Deposition of David W. Watson

Page 69

1    Q    Okay.  Was there any pretense or -- strike

2    that.  That's a bad word.  Was there any effort to

3    extend this investigation to Ms. Bonds' employees?

4    A    No.  Because that was a separate staffing

5    over in the building.

6    Q    Okay.  Was that e-mail sent to her

7    employees?

8    A    I don't recall.

9    Q    So this was clearly focused only on

10   Ms. Fisher.

11   A    This was clearly focused on the regional

12   medical facility and the -- yes.  The people that --

13   under her supervision.

14   Q    Okay.  And do you -- they were there for

15   two days?  Is that correct?

16   A    It was at least two, maybe three.

17   Q    Okay.  Did you work with them while they

18   were there?

19   A    No, ma'am.

20   Q    Okay.  Did you -- did you speak with any

21   employees yourself while -- during their visit

22   there?

23   A    I spoke with two.  There was Dr. Vincent.

24   I went to Dr. Vincent personally and said that I was

25   aware that there were certain members of the staff

Deposition of David W. Watson

Page 70

1   who were disgruntled and unhappy and may want to

2   talk to, you know, Ms. Gotcher, but I was also aware

3   of the fact that there were probably some people

4   that were quite happy, and I felt like it was

5   important that both sides of the story be told and

6   would he mind spreading the word to go and speak.

7   If they were happy, go and let Ms. Gotcher know.  He

8   said he would.

9          And then there was another -- there

10  was another lady.  She -- I'm sorry.  I can't think

11  of her name.  She was a med tech, I think, in the

12  pharmacy.  I mean, when I say "I think," I think she

13  was a med tech.  I know she was assigned to the

14  pharmacy.  And in my mind, she had a good reputation

15  for being unbiased and didn't get, as far as I could

16  tell, into petty jealousies.  I thought she would

17  give a good or fair assessment and I went to her and

18  approached her and asked her if she would be

19  interested in going and talking and she said, "As a

20  matter of fact, I just came back."

21     Q    Okay.  And, in fact, there were -- there

22  was a lot of pettiness that went on at the Estelle

23  Unit; wasn't there?

24     A    I'm not comfortable commenting on that

25  without knowing "pettiness."

Bayou City Reporting, Inc.

Deposition of David W. Watson

Page 72

1    guess, that she played favorites, and -- and I

2    thought it was important that both sides of the

3    story be told and I thought Ms. Fisher needed to get

4    every benefit of the doubt.

5         Q    Who did Ms. Fisher replace at the Estelle

6    Unit?

7         A    Mary Adams.

8         Q    Okay.  And, in fact, there were complaints

9    against Ms. Adams, too; weren't there?  Similar to

10   those against Ms. Fisher.

11        A    I don't believe they were to the degree.

12   Every nurse manager from time to time, I would get

13   complaints, "I didn't like the way she said this.

14   You know, I didn't like the way she made the

15   schedule out."  But they were -- they tended to be

16   more isolated, and if I detected a pattern, I might

17   look into it more.  I don't remember there being

18   such a pattern with Ms. Adams.

19        Q    And who replaced Ms. Fisher in the Estelle

20   Unit?

21        A    Ultimately it was Judy Upshaw.

22        Q    And in the -- immediately, who was it?

23        A    Ms. McCartney.  I assigned Ms. McCartney

24   to be the front-line supervisor with me backing her

25   up.

Deposition of David W. Watson

Page 76

1    supervision and any other nurse manager ever demoted

2    over a turnover rate or vacancy rate?

3          A     Not that I can recall.

4          Q     Okay.  Now, you talked about people

5    that -- people had complained to you prior to this

6    investigation being initiated.

7          A     Yes.

8          Q     All right.  And these were staff members

9    that reported to Ms. Fisher.  Is that correct?

10         A     Yes.

11         Q     Can you tell me specific names of staff

12   members who reported to Ms. Fisher who had directly

13   complained to you?

14         A     Well, Mr. Aguilar was one.  Ms. McCartney

15   was another one.  Ms. Gossett was another one.  I'm

16   sorry.  Am I going too fast?

17         Q     You are.  I can't write very fast.  Okay.

18   Aguilar.

19         A     Um-hmm.

20         Q     McCartney.

21         A     Yes.  Gossett.

22         Q     Gossett.

23         A     Franks, Darby, Moreau, Lauder, Anderson.

24   That was at the Estelle Unit and there may have been

25   more but those are the ones I can recall.

Deposition of David W. Watson

1     Q     From Estelle?

2     A     Yes, ma'am.

3     Q     And are all these RNs or LVNs?

4     A     I'm not sure what Ms. Franks is.  Yeah.

5  Yeah.  I think that's true.  I think they're either

6  RNs or LVNs.

7     Q     Okay.  And is -- are any, Mr. Aguilar,

8  Ms. McCartney, Ms. Gossett, Ms. Franks, Ms. Darby,

9  Ms. Moreau, Ms. Lauder, and Ms. Anderson, are any of

10  those African Americans?

11     A     Think about that one for a minute.  No.  I

12  don't believe so.

13     Q     Okay.  And I believe that-- you indicated

14  you encouraged two employees to talk to Ms. Gotcher

15  and Ms. Melton when they were there and that was

16  Dr. Vincent and a med tech you didn't recall the

17  name of, but you can probably visualize her in your

18  mind; can't you?  Was she African American?

19     A     Yes.

20     Q     And Dr. Vincent is also African American.

21     A     Yes.

22     Q     Any white employees that you encouraged to

23  go talk to Ms. Gotcher?

24     A     Well, Ms. Franks was one of those that

25  came to me and there was another nurse with her

Deposition of David W. Watson

Page 83

1    about this same time?

2         A    No.  I don't recall it.

3         Q    As long as --

4         A    If you had documents I could review, I

5    would, maybe.

6         Q    Okay.  Well, we'll get to that.  As her

7    supervisor, you were the one responsible for her

8    evaluations, her performance evaluations.  Right?

9         A    Yes.

10        Q    And did you review the notes of the

11   investigation?

12        A    Did not.

13        Q    Okay.  And were there -- was there a

14   written report ever made of the investigation, to

15   your knowledge?

16        A    Not to my knowledge.

17        Q    Now, at some point, you made the decision

18   to demote Ms. Fisher.  Is that correct?

19        A    At some point in time, a decision was

20   made, yes.

21        Q    And tell me how that decision came about.

22        A    It was -- it was made in conjunction

23   between myself, Ms. Gotcher, and I believe

24   Ms. Melton.

25        Q    And Ms. Melton's position was?

Deposition of David W. Watson

Page 84

1    A    It was a fairly new position created.  It
2  was the northern division HR supervisor, I guess.
3    Q    But she was part of the HR --
4    A    Oh, yes.
5    Q    -- contingent?
6    A    Absolutely.
7    Q    So it was a mutual decision among the
8  three of you.  How did you arrive at that decision?
9    A    It was -- it was arrived at by discussion.
10 Ms. Melton wanted to demote Ms. Fisher to a staff
11 nurse.  I didn't agree with that.  I didn't think it
12 was appropriate or fair and I voiced that concern
13 and it was taken under advisement, and I don't think
14 a decision was -- a final decision was made right
15 then.  A day or so later -- because we -- we met in
16 person for this discussion.  So a day or so later, I
17 thought about it and I had looked over Ms. Fisher's
18 evaluations when she was an assistant nurse manager
19 and I didn't see anything in there that I felt like
20 would preclude her functioning in that capacity.  So
21 I called Ms. Gotcher back again and said, "I am not
22 comfortable with this, a staff nurse."  And
23 ultimately, I guess HR signed off on it.
24    Q    Okay.  Did you not issue a letter of
25 expectation telling Ms. Fisher that you intended to

Deposition of David W. Watson

Page 86

```
 1    the time frame expired.
 2         A    Okay.
 3         Q    I'm asking you if you recall that.
 4         A    I don't know how to answer.  I don't
 5    remember what the time frame was but I do recall she
 6    was demoted, yes.
 7         Q    Okay.  And wouldn't you, in terms of --
 8    did you intend to demote her when you had this
 9    meeting with the staff and gave her the
10    expectations?
11         A    I didn't.
12         Q    Do you -- did -- as far as you know, did
13    Ms. Gotcher or Ms. Melton?
14         A    Not as far as I know, no.
15         Q    So I want to go through these steps pretty
16    clearly.  You had the meeting with the staff and
17    with Ms. Fisher, and the staff and Ms. Fisher both
18    got expectations.
19         A    That's my recollection.
20         Q    Okay.  And then sometime after that, you
21    and Ms. Gotcher and Ms. Melton had a meeting.
22         A    Correct.
23         Q    And where was that meeting?  Where did
24    that meeting take place?
25         A    There was a series but the one that comes
```

Deposition of David W. Watson

Page 87

1    to my mind where I didn't agree with the demotion

2    was in Palestine.

3         Q    Okay.  And you had a series of meetings --

4    you had a series of meetings with Ms. Melton and

5    Ms. Gotcher regarding Ms. Fisher?

6         A    Yes.

7         Q    All right.  Did anybody take notes of

8    those meetings?

9         A    Not sure.  I don't think I did.  Ms. --

10   Ms. Melton was very note -- a big note taker.  She

11   may have.

12        Q    Okay.  And what happened in the interim

13   between the time that you had the meeting with the

14   staff and Ms. Fisher and the time that it was

15   determined that she should be demoted to whatever

16   level?

17        A    Um-hmm.

18        Q    What happened in the interim of that time

19   frame to have you take that next step of demoting

20   her?

21        A    There weren't any changes -- there weren't

22   any positive changes at the RMF.  I believe the

23   vacancy rate either remained the same or continued

24   to grow.  The nurse -- assistant nurse managers were

25   consistently unhappy working in that environment.

Deposition of David W. Watson

Page 88

1    In fact, one of them transferred; one of them quit.

2         Q    Aguilar?

3         A    Aguilar transferred --

4         Q    Aguilar?

5         A    -- outside the cluster.  I couldn't stop

6    that.  In fact, he may have promoted.  I'm not sure.

7    Ms. Gossett quit.  There was a concern that the --

8    their RMF could -- could fail at some point in time.

9    Four of the ER nurses came forward and essentially

10   told me that "It's either Ms. Fisher or us, we're

11   going to leave," and --

12        Q    And who were those four nurses?

13        A    Darby, Lauder, Moreau, and Anderson.

14        Q    Do you know if they're still there?

15        A    I know Darby is not.

16        Q    Do you know what happened to Darby?

17        A    She works at the hospital where I work.

18   That's why I know she's not there.

19        Q    Oh, okay.  Do you know what happened to

20   her at UTMB?

21        A    I'm not for sure.  I think she retired but

22   I wouldn't swear to it.

23        Q    Okay.  So four nurses came forward.  They

24   come to you?

25        A    Yes.

Bayou City Reporting, Inc.

Deposition of David W. Watson

Page 90

1    basically just dealt with their complaints.

2        Q    You would have wanted to inquire about

3    that.  That would be important; wouldn't it?

4        A    I would want them to try that first.

5        Q    And did you inquire of -- as to what

6    efforts they had made prior to coming to you to

7    complain?

8        A    I don't remember.  I just remember they

9    had a long list of complaints.

10       Q    Okay.  So there were no positive changes

11   that you had outlined in the expectations.  Is that

12   correct?

13       A    Not that I recall.

14       Q    And the vacancy rates had remained high?

15       A    I believe so.

16       Q    And you had additional complaints that may

17   or may not have followed the chain of command.

18       A    That's fair, I guess.

19       Q    You said, "Yes"?

20       A    That is fair, I guess.  I -- I'm sorry.

21   My recollection, it's been a while.

22       Q    Okay.  Well, that's why I said may or may

23   not have.

24       A    Yeah.

25       Q    You don't recall --

Deposition of David W. Watson

Page 91

1     A     Okay.  I don't.  I'm sorry.

2     Q     -- if they followed the chain of command.

3 I'm not trying to put words in your mouth.

4     A     Sure.

5     Q     I was trying to give you a little latitude

6 on that one.

7     A     I appreciate it.  I need a lot of

8 latitude.  Old, fat, and I forget more.

9     Q     And so based on those three things,

10 the positive -- no positive changes, vacancy rate

11 remained the same or increased, I believe you said,

12 and then four nurses who had still -- still had

13 complaints might have -- not have or may have

14 followed the chain of command, and I believe

15 Assistant Nurse Managers Aguilar and Gossett both

16 left.

17     A     Yes.

18     Q     All right.  So those four things.  And I

19 missed one the first time.  Those four things were

20 what occurred in the interim time period of the

21 meeting with the staff and the meeting with

22 Ms. Fisher and the decision to terminate her.

23     A     I'm not sure --

24     Q     To demote her.  Sorry.

25     A     I'm not sure exactly where all that fell

Deposition of David W. Watson

Page 92

1    but, yes, as far as the -- I'm -- I believe that the

2    vacancy rate -- I'm -- I'm comfortable with that.

3    The complaints continued to come.  I'm not sure

4    exactly where the meeting between the four -- or,

5    yeah, the four nurses -- in the time line, I'm not

6    clear on exactly where that happened.

7         Q    Okay.  But you did have a meeting with the

8    four nurses or you just had communication --

9         A    Four of them -- four of them wanted to

10   come and meet with me.  Three of them showed up.

11   Anderson, I think it was.  Anderson?  I think she

12   had an appointment.  Ms. Darby, Ms. Lauder, and I

13   think it was Ms. Moreau that showed up.

14        Q    Okay.  And you and Ms. Gotcher and

15   Ms. Melton had the opportunity to meet at least on

16   more than one occasion regarding Ms. Fisher during

17   this time period.

18        A    Yes.

19        Q    Did you and Ms. Gotcher and Ms. Melton

20   ever meet with Ms. Fisher to try to help her?

21        A    I don't recall.  There were a lot of

22   meetings, so I'm --

23        Q    But you don't know if you met --

24        A    I don't know.

25        Q    You met about her, but did you meet with

*I'm glad to hear that you have found other employment, I was somewhat disappointed that you resigned but I had the feeling you found yourself in the middle of things and had no alternative. I'm not exactly sure how I reached that conclusion without ever having to spoke to you but when I heard the news based on what I had learned up to that point that was my reaction.*

My decision to resign was of multiple origins. I was tired of defending my actions (in particular in these cases) especially when I knew they were the right actions to take. I have taken such actions many times with white employees (and black) and there has never been a problem in the five years that I have been with UTMB and now suddenly there is. It also just happens that these three individuals are pretty close to one another by more than coincidence. If these were three totally individual cases, separated in time and place, with similar instances then even I would have to concede they would be more believable, but that is just not the case.

I was also tired of working 50+ hours a week and having few resources to resolve problems. I was tired of looking exhausted Nurse Mangers in the face and not being able to get them the resources they needed to run their units effectively. I was tired of living my life with three or four email accounts and a cell phone that never seemed to be quiet and wondering when I was going to get a full restful night sleep? My wife was beginning to ask me when I was going to spend some time with the family and leave work at work. So yes I had alternatives, and this time I chose the one that seemed best for me, my family and my health. And in spite of all of this I still have some faith in the system and I think your investigation will show I was right in my actions.

I also would like to point out that in cases where significant disciplinary actions are taken there are multiple levels of review. By way of an example in the cases of Ms. Fisher, and Ms. Kelly this was scrutinized by myself, Ms. Gotcher the Divisional DON, Ms. Rader the District HR Administrator, Ms. Melton the District HR Administrator and Mr. Pemberton, the HR Director for the CMC. Now, think about it. These are ALL experienced and trustworthy individuals. What is the possibility that even if I did have some occult agenda (which I did not) that I could have fooled all of them? What is the chance this could have all been a conspiracy? That is the reason we have checks and balances built into the system. Of all of the disciplinary cases I have ever been involved in at any level they have always met the scrutiny. Sir, I submit to you if there is a conspiracy here it resides with the three complainants. If in this case I have failed in my job then the whole system has failed.

However, I have to say that since you have never even spoken to me or heard my side of the story yet you have already concluded that you feel I "had no alternative" it concerns me deeply. It sounds as if you have already reached your conclusion without hearing my side of things and interviewing some people whose views I think could be crucial. I certainly hope that is not the case Mr. Williams. Your professional reputation within the UTMB is that of a fair and unbiased man. I sincerely hope that continues to be true in my case.



Watson

EXHIBIT NO. 1

**Fisher-200699**

1

*When you Gotcher and Melton conducted the investigation of Fisher, whose idea was it to conduct the investigation?  Why wasn't the facility management included in the investigation?  Why was Melton included in the investigation rather than Rader?  and Why wasn't notes kept of the investigation?*

I conducted no investigation whatever. Ms Gotcher suggested that she come to the RMF and conduct interviews with the staff.  I can not say one way or the other whether she considered it an "investigation", I however, did not. I would characterize it as more of an objective inquiry by an outside and uninvolved third party.

Problems surrounding Ms. Fisher's conduct and leadership style seemed to have followed her from her previous units.  I had supported her and her efforts at the other facilities tirelessly up till the time I reassigned her to the RMF.  I reassigned her in part to see how she interacted with the staff and felt if the problems/complaints I had experienced previously such as being condescending, retaliatory and short with staff, were to continue in a new environment, that would lend some measure of support to the claims.  This pattern did in fact reemerge there.  I kept Ms. Gotcher abreast of the situation and confessed that I was unsure of what to do.  Four of the ER RNs (Anderson, Lowder, Darby and Moreau) came to me and essentially told me I was going to have to choose between them or Ms. Fisher and if she remained they would not. They were tired of her abuse and actions.  It was about this time that that Ms. Gotcher offered to come have a look with a fresh outside perspective.  She had offered several times prior to this but I wanted to resolve my own concerns and had resisted up till that time.  Finally feeling at wits end I agreed for her to come.

As for who/why Ms. Melton came I don't know and can not address that question.  You should take that up with Ms. Melton/ Ms. Gotcher.

As far as notes go I have known Ms. Melton for some years and I would be shocked to find that she didn't keep meticulous notes, but I have no first hand knowledge one way or the other. I made every effort to remove myself from the whole affair in order not to have any question of internal bias. I had no direct knowledge of who all they spoke with.

*Who determined who would be interviewed?  Why?*

I can not provide you with the names of those interviewed.  I was not present for the interviews. Participation in the interviews was completely voluntary.  I sent out a unit wide email to the staff saying that the DON was coming and anyone who wanted to meet with her was free to do so. No one was selected or called per se.  I was approached by two staff members who had complained about Ms. Fisher in the past and said they were afraid to talk with Ms. Gotcher and speak openly of their concerns about Ms. Fisher for fear of retaliation from her.  I told them that if they had a problem this was an opportunity to express their concerns and if THEY chose not to do so, that was their decision, but if so not to continue to complain to me.  If they were unwilling to stand up and speak openly about what they considered to be actual problems then as far as I was concerned they were just complaining.

*[handwritten: Never copies of the ???]*

**Fisher-200700**

2

I had noted that most of the people who seemed to have issues with Ms. Fisher were white. I was concerned that what was presented to Ms. Gotcher would not be balanced. As a result of this I went to the Medical Director, Dr. Bobby Vincent (African American) who seemed to have a close working relationship with Ms. Fisher. I told him I was aware of a certain amount of descent in the staff and I also knew there were two sides to every story and I wanted an unbiased presentation. I asked him if he might let some of the staff know that the people who were satisfied with the situation might also be encouraged to go speak up (including himself). He agreed to share this with staff. I also spoke with Ms. Proctor (African American). Ms. Proctor has a reputation of being very unbiased and honest. I encouraged her to share her views of the workplace with Ms. Gotcher. As it turned out she had just returned from the interview. I am also aware that Dr. Vincent did go and share his views with Ms. Gotcher.

One of the people who was verbal to me but was initially reluctant to speak openly was Victor Aguilar, Assistant Nurse Manger under Ms. Fisher. After he departed and I felt he would feel safe to say what he felt, I sent him an email and asked that he describe his concerns based upon things he experienced while he was there. I am pretty sure I can find his response (document). I was unable to locate those from Ms. MacCartney. They were very damning of Ms. Fisher. I think you will see that they support her poor behaviors.

So I had at least 2 staff nurses complain to me about Ms. Fisher and the manner she treated them, 4 ER nurses and three assistant Nurse Managers. Ms. Gossett came to me when she learned that Ms. Fisher was coning to the RMF. She stated that she wanted to transfer and go with Ms. Adams. She went on to say that when she had worked with Fisher before she was mean, crude, retaliatory and conniving. I told Ms. Gossett that I was not aware of Fisher's past behaviors but even it all of that were true we all grow and I felt she should give Fisher the benefit of the doubt. She reluctantly agreed and later resigned which I got the impression was because Fisher was running her off. Mr. Aguilar told me shortly after Ms. Fisher came that he felt he could not learn from her and wanted to transfer with Ms. Adams. I told him about the same thing I had told Gossett. He later was more candid and said he felt that Fisher was trying to run him off, that she undermined his authority with the nursing staff and failed to keep him apprised of operational decisions that affected his job. In retrospect I feel he was correct. Later I had conversations with Ms. MacCartney and she related similar feelings. In my mind this more than constituted a problem and a pattern of behavior which was in fact very similar to concerns I had heard from employees from Ms. Fisher's previous assignments.

My experience was that once Ms. Fisher made up her mind about something there was no changing it. As an example I received several complaints about her from the staff that she would get into verbal disputes with them. When they would try to explain themselves she would just talk louder and talk over them. I mentioned this to her on several occasion and asked her to try to be more sensitive when having conversations with staff. In every case she denied it was happening at all and that the staff were just whining. This continued to be a pattern. One day in my office I was having such a conversation and she continued to interrupt and talk over me (her own supervisor). At one point I held up a hand and interrupted her and pointed out what she was doing and if she was doing this to me, AND this was exactly the same behavior pattern reported to me why would I now believe her when she denied doing the same to her subordinates. She

Fisher-200701

paused for a while and agreed that maybe she should pay more attention to listening as opposed to talking. She later presented a goal to me for her annual evaluation that reflected this. About a year after, when the complains were resurfacing, I suggested that she again use this or a similar goal, but this time she maintained I was making it a personal attack.

I am aware that it tends to be people who are not satisfied with circumstances who speak up. As you can see I was motivated to have a balanced view point shared and took what actions I felt I could to see that was done. I had no ax to grind with anyone, but I did want a fair and unbiased viewpoint so that employees who were satisfied with the situation had an opportunity to have their say.

*I could be totally off base in my belief that any problems with the health delivery would involve the medical director, yet he was not included in the investigation. Why?*

This was principally a nursing issue and as you can see from the above answer the medical director was involved. I don't see this as a "health delivery" issue so much as an esprit de corps and/or quality of management issue. While I believe there was some racial division that existed at the RMF, which I feel Ms. Fisher made worse, I also feel there were cliques and there were the "Pro Fisher" and "Con Fisher" cliques. Ms. Adams, another Cluster Nurse Manager, informed me that she had personally overhead a conversation take place between Ms. Fisher and another black manager wherein they agreed to make a pact between themselves to protect black employees. This further supports my belief that Ms. Fisher had an agenda based or racism rather than performance. I specifically asked Ms. Adams if she would relate this to you as she did me and she assured me she would. Feel free to contact Mary Adams to verify this.

*What was the racial makeup of those persons interviewed? Can you give me the names of all the persons who were interviewed?*

(see previous answers)

*When the facility management, i.e., Samarneh and Vincent requested a meeting regarding the issues on the unit, why wasn't a meeting held?*

I have no recollection of any such request. What I did find when going through old documents was an email requesting for them to meet with me and fill them in on what direction we were going to be taking at the RMF in Ms. Fisher's absence. I am uncertain, but I think I did speak with them either individually or perhaps together. I believe I explained that I was unable to discuss the situation regarding Ms. Fisher as it was then in a disciplinary state and I seem to recall they both stated they understood completely. I seem to recall I told them that Ms. MacCartney would be first line supervision with my backup until such time I could hire another CNM or another resolution was reached. I can produce that email if needed but the date will show it was after action had been taken with Ms. Fisher.

Fisher-200702

4

*Were you included in the meeting held with Fisher that included Gotcher and Melton?  What was your impression of that meeting, i.e., the end result?  If you were not included, why not?*

I was not present for any such meeting.  It is my recollection that the decision as to who would attend that meeting was made by Ms. Melton and Ms. Gotcher.  Please feel free to consult with them.

*Whose decision was it to demote Fisher?  Why was she initially scheduled to go back to a Clinician III?*

When Ms. Gotcher and I consulted with HR (Melton) she suggested that we demote Ms. Fisher to Clinician III.  I was not comfortable with this and neither was Ms. Gotcher.  I didn't feel that there was sufficient evidence to support such a demotion.  I saw nothing in her past performance evaluations when she was an ANM that would support that she could not perform as an Assistant Nurse Manager.  It was after her initial demotion letter that both Ms. Gotcher and I again approached Ms. Melton and pushed for an ANM position rather than a clinician position.

Ultimately I felt I had the responsibility to make the decision, but I needed to feel it was an equitable move.  I was not comfortable that a demotion to CN-III was equitable.  On the other hand I felt she had now demonstrated that she did not possess the leadership abilities to continue on as a full blown Cluster Nurse Manager.

*Were the complaints that were raised about her any different than complaints raised about other Nurse Managers on other units under your jurisdiction?*

Yes and no.  From time to time I would hear complaints of a similar nature about the other Nurse Managers.  Without exception when I looked into them they were isolated and typically a generally disgruntled employee.  Only on one such occasion in my career did I find such a pattern and it was Jennie McClain, (caucasian) Nurse Manager over the Texas City, SRMF, I moved to terminate her and she resigned in lieu of termination.  I found there was a similar pattern and prevalence of complaints against Ms. Fisher.

By way of a single example, shortly after she was assigned to her initial posting as the CNM of the Huntsville, Goree Ferguson units, members of her team requested a meeting to discuss their concerns with her actions.  My memory is not crystal clear but I believe those in attendance were Jean McMasters (Practice Manager), Julie Lawson, (PA), Dr. Earnestine Julye, Ferguson Medical Director (African American), Dr. Glenda Adams, Denise Box, Sandy Rader and myself.  Complaints presented by the team included that Ms. Fisher acted as a rebel and made changes to unit processes without consulting with her team, was running off old, established and well liked nursing staff, that she was confrontational and argumentative with both members of her team and toward her nursing staff etc.  All through this process I defended Ms. Fisher and refused to remove her or reassign her.  While I felt as if some of the complaints I heard may have been valid, I wrote it off to being a new and overzealous manager.  I elected instead to advise her and consult with her and support her.  Sadly over the coming months the pattern persisted to one

**Fisher-200703**

degree or another and when it again manifested itself at the RMF I felt I had no other choice but to take some sort of decisive action. This was additionally supported from what I was told from the interview held by Ms. Gotcher and Melton, i.e. that my conclusions were supported through the interviews conducted.

If you have any questions regarding the veracity of my claims of defending and supporting Ms. Fisher throughout this process I would strongly suggest you visit with Dr. Glenda Adams, Northern Division Medical Director and Julia Lawson, HV unit PA. I believe they will verify that I fully and completely supported Ms. Fisher for a long time until I felt I had no other alternative but to see that the complaints were in fact supported. I think Dr. Adams will also verify that no other Nurse Manager in our area had a similar reputation as did Ms. Fisher.

*Why was it decided not to go to the III but to take her down to an Assistant Nurse Manager? Whose idea was that?*

It was my decision. (see above)

*Was anyone pushing for Ford's rehire? If so, who?*

Ms. Wright desired to rehire Ms. Ford. I don't think I would go so far to say that she was 'pushing' for it. I initially agreed to it as I knew she (Wright) was in a dire staffing situation. Ms. Fisher brought out some issues I had not previously known about as well as reminded me of other issues I had in fact forgotten. I felt that it would set a bad precedent to rehire Ford and I was in agreement with Ms. Fisher when she pointed out the issues I had forgotten. In short she was right and I was glad she reminded me of that. It was not a point of contention or hard feelings for me. In fact I think you can verify through Ms. Wright that I told her that Ms. Fisher was correct and I respected that.

*Whose decision was it not to interview the nurses at the Estelle High Security, SAFP and the Estelle Building? What was the rationale for the decision?*

As previously stated there was no selection criteria. Conversations were completely voluntary based upon a desire to participate by the staff themselves. I am pretty sure the SAFP and High Security nurses received the email. Ms. Fisher didn't oversee the Estelle Building, Ms. Bonds was administratively responsible for nursing leadership at the building.

*In your opinion, why didn't the planned mediation between yourself and Fisher take place?*

I don't fully recall, so I hope this answer will be weighted accordingly, but I think it was Ms. Melton's decision. However, I would make the following observation. It took me a while to realize that Ms. Fisher wanted control without the responsibility and/or accountability that goes with it. By way of an example, the Kelly CAP. She admitted on multiple occasions (both privately and publicly) that she well knew the deficiencies that plagued Ms. Kelly, but she

6

**Fisher-200704**

wanted no part of admitting to Kelly that she was accountable for being a part of that. She at first tried to put it off on some meeting and some vague "someone" that felt Kelly was not performing up to par.

Another example of this and where her anger controlled her objectivity as a profession was when she tried to get me to make decision about sending nurses to Peer Review. She had two nurses that could have technically been sent to Peer Review. If we, as nurses, sent every single nurse to Peer Review that 'technically' met the current standard we would all have been before peer review at some point. There is a certain amount of good judgment to be used in deciding such cases. In this case she was short nurses and the spirit of her team was so low that sending the nurses before PR may well have caused even greater harm to her unit as a whole. Other alternatives were available such as coaching and training, mentoring, disciplinary, CAPs etc. She tried to get me to decide and I told her it was her place to make a recommendation, but that I would accept her recommendation. She continued to try to word it so I would make the decision and I still would not. This seemed to cause her great anxiety but she finally made her decision based upon *personal* feelings and not the "big picture". Yet another example of her essentially refusing to give up any control goes back to something as simple as providing an alternate contact to the Supplemental agency when requested to do so.

My experience with Ms. Fisher led me to see that as cited elsewhere in this document once she makes up her mind there is no changing it. An example of this is the Freeman transfer versus the Ford rehire. She just insisted that taking Ford back was the same as not allowing Freeman to transfer back to Estelle. All of the nurse managers present in the room at the time (and myself) tried to get her to see it was apples and oranges. Ford was not allowed back because of a precedent I tried to set earlier in my administration of not rehiring people with bad attitudes and behaviors. Freeman's transfer was stopped due to Freeman lack of rationale for the transfer. I even produced Freeman's own email where she admitted that she didn't provide any reason and that Freeman also admitted in the same email that **SHE** assumed that I would refuse her off hand. Nevertheless Ms. Fisher refused to accept this and was so ardent in her speech and actions that three of the CNM admitted to me later they considered her actions to me were insubordinate. The reason I ever agreed to mediation in the first place was to give one last shot at trying to improve our communication. That was prior to the refusal of a contact person above for the agency. Once that took place it demonstrated to me (yet again) that she was willing to place operations at risk for the benefit of her own desire to control things and that is not what a manager is supposed to do. It was at that point, given all else I had seen and knew, that I pretty well decided to begin disciplinary actions. From that point forward I don't think mediation would have accomplished anything. I would also point out that I had tried and tried to work with her and improve our communication and coach her (not in a punitive sense) but to get her to be sensitive to her people and motivate them and so forth. There was the usual lip service but no interest or real action.

*Why was all the information from as far back as 2003 included in the letter of demotion to Fisher?*

Because it was based upon a long standing pattern of behavior. As mentioned previously I had initially assumed that this was not a pattern, but essentially a growth experience. It finally became clear to me after many attempts to redirect her behaviors that it was in fact a pattern

**Fisher-200705**

which continued under a different set of circumstances it was not growth in the position. It also became clear that she had no intention of changing her approach to staff and leadership.

*Why wasn't the written complaints against Fisher ever provided to her. If the complaints exist, where might I get copies of them, apparently Sandy Rader does not have them either?*

Most of the complaints were either verbal or I received them after the fact (as with Aguilar). They were not forthcoming as they were afraid of retaliation. Another example was that a nurse would ask for a transfer. The official reason would be (X-Y-Z) but after the fact they would share confidentially it was because they couldn't take Ms. Fisher any more. Just because the complaints were not in writing didn't invalidate them.

However there is one formal grievance submitted by Ann Darby against Ms. Fisher. When I investigated it I initially gave Ms. Fisher the benefit of the doubt, but learned that is was in fact substantiated. Sandy should have the results of this. I also have a memo of record from Kim Roddey concerning Ms. Fisher's actions after her transfer to the Wynne unit. I will include the MEMO in the documentation. I did locate some independent documentation of complaints when digging through old records. Please review them for substantiation of my position on this.

*Additionally, I would like to know where I might get any written communication that was provided to her regarding the referenced complaints in #14 above.*

Refer to answer above.

*What do you think changed Fisher so drastically, i.e., when I compare the '05 evaluation to the '06 quarterly? The change is very significant based on the information provided on the two evaluations.*

When I initially came to the Huntsville District I noted that Assistant Nurse Manager Ms. Kelley's performance was lacking. She was forgetful, unorganized, prioritized poorly etc. When I hired Ms. Fisher to be her supervisor I pointed out the concerns I had with Kelley's performance. I asked Ms. Fisher to evaluate it personally and verify if I was correct in my assessment. She told me on numerous occasions that Ms. Kelly's performance was lacking but that she would work with her to improve it. After many months Ms. Fisher finally admitted that while Ms. Kelley was a nice person and a hard worker she would never be able to do the job to the level of that the organization expected. She made these admission on more than one occasion before witnesses (in meetings before the other CNMs) I asked Ms. Fisher to create a corrective action plan for Ms. Kelley and eventually she would be expected to come up to the level of performance expected or be demoted to staff nurse. I asked Ms. Fisher on several occasions what improvement was forthcoming and it was always the same answer; little or none. I told Ms. Fisher that sooner or later she would have to do something about the situation and she would always agree but never actually take any formal steps. This went on for approximately 18 months. I kept hoping she would move on her own and take appropriate steps. I don't like to micromanage and have to tell a supervisor to take steps that should be readily apparent. To leave

8

**Fisher-200706**

Kelly in that position was not fair to her or anyone else who had to work with her. It was not fair to others in the organization that might have the ability to do well at this job and never have the ability to promote due to her filling the position and finally it was not what was best for the organization as a whole.

Finally, one day I asked her (Fisher) and received the same old answer. I grew tired of the situation and I formerly directed her to formulate a CAP and to include Ms. Kelly in the creation of same. I waited a few days and I asked her if she had spoken to Kelly about the CAP. She said she did but was very vague about how she had gone about it. I went to Ms. Kelly personally and inquired about this. Ms. Kelly told me that Fisher had related that there had been a meeting and apparently "someone at that meeting" had said they were not satisfied with her (Kelly's) performance and therefore she would have to improve. I asked Kelly if Fisher had explained what was expected, i.e. improve or demote. She said Fisher she had not.

I was more than astounded that Fisher would use such an approach. She and I had spoken so many times and she herself had agreed that Kelly's performance was always and continually substandard and yet she attempted to sidestep **any** supervisory responsibility at all for initiating the CAP. I explained to Kelly what had taken place and that it was a decision that was made in conjunction with Ms. Fisher's report of her performance.

When Ms. Fisher learned of my conversation with Ms. Kelly she was furious with me. This led to a meeting between Fisher, me and Sandy Rader during which it was very obvious she barely contained her contempt for me. She was angry that I had dared to interfere in her affairs on her unit with her ANM. I was disappointed that she had refused to take any actions for over a year. I also felt that if she had taken proper supervisory actions it would not have been necessary for me to become involved. She told me that she felt that I used things from her conversation with me and her staff as a weapon against her and that I had violated the confidence we had between us. From that point forward our relationship changed and she was evasive with her answers, a loner and no longer a part of the team I had been trying to build among the cluster nurse managers.

Eventually Fisher, Kelly, Rader and I met to discuss the CAP for Kelly. I had taken the liberty to review Kelly's past performance evaluations and learned that the same patterns had emerged. Those included a lack of leadership ability, lack of time management, lack of organizational skills, etc. This had been in her evaluations since she was promoted to the ANM position several years prior. This further supported the pattern that I had perceived and Fisher had also independently acknowledged.

During the course of the meeting I was very clear that I expected that Ms. Kelly to participate in the creation of the CAP and if she was not comfortable with any part or any expectations she was to say so. The final CAP needed to be fair and meet with her approval if at all possible. When Ms. Wright assumed the leadership of the unit I asked her if the CAP had been kept up to date (reviewed regularly) by Ms. Fisher and she said it had not. I asked that she (Wright) continue with the CAP. She asked me if she could alter it based upon her needs and the duties she assigned to the ANM position. I agreed with the caveat that again Ms. Kelly was expected to participate in any alteration and she had to feel it was a reasonable expectation. This took place

**Fisher-200707**

and Ms. Kelly never did completely fulfill the CAP. Please contact Ms. Wright in regard to this and many other things she learned after taking over for Ms. Fisher.

I was later told anecdotally that the staff thought that Kelly should have transferred with Ms. Fisher so she would continue to be "protected". It seems at least some of the nursing staff perceived a special relationship or sorts existed between Ms. Kelly and Ms. Fisher. I believe that Beth Pipkin, ANM of the FE might be able to confirm this.

This leads me to relate to you another idea of how Ms. Fisher had a warped sense of right and wrong. She told Beth Pipkin that she _had_ to give her a CAP because I had made her give Ms. Kelly one. She didn't give her one because of her performance, but because of Ms. Kelly. Now I ask you does that make any sense at all? Is that the kind of manager you want to work for or would respect? (see attached image files from a document written by Pipkin)

*Why was the decision made to move the Nurse Managers around?*

This was a joint decision made principally between Denise Box and I however we also discussed it with Dr. Vincent and Dr. Adams and Ms. Gotcher. We all agreed it might be beneficial. I felt that all of them needed a change of scenery. I had made such a move when I was the DON of the southern region in Sugarland. I moved two CNM there and it seemed to have been a good change. In the case of Ms. Fisher specifically I thought it might also give her a bit of a break as she was putting in many hours between the three units she had at that time.  I felt it would also serve to demonstrate if the complaints I had received would follow or were they merely circumstantial.

*What would you say regarding Adams' performance apart from what I have generated from looking at her evaluations?*

I have no idea what you generated from looking into her evaluations.  I feel her performance was adequate, but I also feel as if she was burned out.  She was not happy to be moved at first as she felt it was because she did something wrong and was being punished. She later told me she was so happy I had moved her as she didn't realize how stressed she was until she had assumed her new duties.

*I was told that Aguilar had a similar incident to that of Kelly's, i.e., he did not assess a patient and the patient eventually ended up in Galveston and died.  Is there truth to this, if so why wasn't Aguilar disciplined?  If so, how was it that he was able to get a promotion a few months later?*

Needless to say I can not address his promotion as I had no part of that process. My recollection of this is vague, but I seem to recall it revolved around a patient who was both physically ill as well as having some psychiatric symptoms. Ms. Fisher was worked up that the patient was not placed in a psych holding cell. Well we are an inpatient facility at the RMF and that psych obs policy is essentially made for an outpatient setting.  This patient's room was right across the hall form the nurse's station.  We have no psych holding cell per se.  I don't think his condition would have allowed for him to have been placed out in front of the nurse's station.  The man

10

Fisher-200708

eventually died from some sort of medical complication as I recall. It had nothing to do with his mental state. And if I recall correctly he *was* assessed by the nursing staff, though perhaps not as well as he could have been. The charting done is by expectation and it leaves a lot of room for interpretation as to what went wrong and where, by whom. Essentially if nothing bad is charted and the last entry was not abnormal, then to some degree it is assumed all is well, when in reality it may not be. But there may be no way to prove that from the charting.

The patients transfer was delayed due to lack of transportation if I recall which there was nothing the medical staff could do about it. The irony is that Ms. Fisher was upset that he was not placed in some sort of psych obs situation, she didn't seemed particularly upset that he died from a medical condition and as such the focus should have been on his physical assessments. It is my feeling that she was so focused on trying to find something on Mr. Aguilar that she overlooked the forest for the trees.

And seeing as how you brought up Kelly, her performance was also one of a pattern. Some months before the incident you cited with Ms. Kelly, Ms. Fisher failed to send out a suicidal patient form the Ferguson unit in spite of a psychiatrist order to do so. This patient later committed suicide. That caused some professional issues for her with TDCJ and other sources. I might add that I defended her in this as well, even going so far as writing a formal letter on her behalf to a state agency to defend her. I performed several in-services about what to do in such a case so we didn't have this sort of thing happen again. Ms. Kelly fully well knew of this. Some months after the fact she failed to take proper actions regarding a patient who declared to her he **was** suicidal **and planned to hurt himself** and he had an extensive psych history which as I recall included acts of self injury. She left the patient in the hands of lay persons rather than bringing him back to the medical department where he could be watched and/or guarded. As a result of her leaving him without medical supervision/oversight, he was transferred off site and she had no idea where he went, or what care he was receiving or even if he was alive or dead. They had to track him down in the system and thankfully he had not harmed himself.

After that she failed to assess a patient who had a suspected dislocated shoulder and who (if she had bothered to check) also had a history of dislocating this shoulder and finally she failed to check on a diabetic patient who complained of having a low blood sugar. This last incident was pending her return and happened in March and was reported to me by Lt. McWhorter of the Huntsville Unit security. Ms. Write can elaborate on this last incident. And last but not least, Ms. Kelly's performance was more than lack luster regarding her CID duties at the Goree unit all of which was discovered *after* she went out on extended medical leave. Again, see Ms. Wright who discovered all of the problems left behind. These last two incidents are supported with attached files

*What is your recollection regarding orienting agency nurses to the various units? I have not been able to find anything definitive in writing regarding this, do you know of something in writing and where I might get it? Did you instruct the Nurse Managers, the Assistant Nurse Managers, the nurses on call as to how you wanted this to occur, if so, where can I find this document?*

**Fisher-200709**

11

I can not recall any specific documents. As I no longer have the resources to research I can not assist you in this. However it is just common sense to provide orientation to a nurse when assigning him/her to a new unit. The best nurse in the world will only be as effective as their ability to know something about the system. It is a professional liability to the nurse assigned and the one making the assignment as well as a risk to the patients and UTMB as a whole not to do so. This is understood by all managers to the best of my knowledge.

*What is your recollection regarding the salary change that was requested by Kelly?*

It is that she requested a salary equity review. I seem to recall she was not being paid equitably. We had been reviewing several of these equity issues about this point in time. Sandy determined that she was not paid equitably when compared with other ANMs with a similar number of years of service. There could be several reasons for this inequity so I should not speculate as to why that was the case.

*What interaction did you have with Kelly before the salary issue was raised?  Can you document any interaction that occurred before the salary issue?*

See above. Usually I refer salary equity issues to HR. I do seem to recall it was an equity and **NOT** a performance issue. I think Sandy and I may have had some discussion regarding this and were concerned that giving her a raise would send the message that it was performance related not equity related. But please check with Sandy Rader.

*Do you believe Kelly was treated like any other assistant nurse manager based on the incidents that have been associated with her?  Can you give me names of persons who were treated similarly?  Can you provide me with the incidents and where I might be able to obtain documentation?*

No I don't think Ms. Kelly was treated like any other ANM, I think she was treated better. Her ability to adequately provide patient care was also becoming questionable. Her manager protected her and "worked with her" for many months and apparently thereafter as well if you can believe the rumors. Furthermore, Leigh Gossett was given a CAP by Ms. Adams. Ms. Fisher had the opportunity to pick it up and continue it when she arrived. She asked if she could change it and I agreed to let her with the same caveats given to Ms. Kelly.  Mr. Brophy was on his way to getting a CAP as well, but he was demoted to staff nurse. Other ANM have been moved out from under their current nurse managers and/or given a CAP to change their performance (Helen Tarbuutton/Elisabeth Ford). Ms. Kelly was allowed to remain where she was and given every opportunity to succeed and she failed to do so. Marty Harris CNM for dialysis was given a CAP and resigned instead of attempting to fulfill it.

*What was your involvement if any in the Freeman incident?*

Fisher-200710

My involvement in the Freeman incident is exactly the same as in every other incident with one exception. In every disciplinary action the Nurse Managers are directed to bring it to my attention before taking any written formal actions. I am ultimately responsible for the nursing performed under my purview so I want to know about each incident. I will ask the NM to investigate the incident and give me the findings. If I feel they have omitted something either for or against the nurse I will asked them to correct that. It is then presented to HR. If and when we all agree to the next step we go forward. In the incident I feel you are referring to I did involve Dr. Adams to see if she felt as I did that the risk to the patient with the dislocated shoulder was as serious as I suspected. She agreed it was.

The one thing different about this incident was that when Ms. Gotcher and I were on the unit she ran into the Assistant Warden Wakefield. They were old acquaintances. We were invited into his office and he shared more information regarding Ms. Freeman that we did not previously have privy to. Such as the fact that he had submitted other complaints against her to the NM (Fisher) and the Practice Manager, (McMaster) in the past and from his perspective nothing was ever done about it. He personally found her (Freeman) back in the inmate kitchen cooking food and fraternizing with the offenders and he banned her from returning. He related that she (Freeman) was frequently rude to his officers and inmates alike and frequently refused to see offenders for reported medical problems. I asked him if he could find the older documentation to support this and he was unable to do so. Still I feel an Assistant Warden has certain credibility due to his position. In this instance he also told us of more details that had been documented by his security staff that we were unaware of. With this in hand I spoke to the involved security staff and obtained statements since I was on the scene and it was pretty obvious to me the warden expected some sort of action taken.

In order to be certain this was completely unbiased and balanced I spoke with Ms. Wright and asked her of she was OK with this disciplinary action. I needed to know she was in agreement and was not pursuing it for my sake. She said she was and in fact was slightly annoyed with me for asking her. She told me that she would never pursue such a thing unless she was satisfied it was appropriate. Ms. Wright also related that when she presented all of the facts in the case to Ms. Freeman, that Ms. Freeman had to admit that she had done as was described on paper.

When I made a spot visit to the unit one day it was Ms. Freeman, not I, who brought up the incident. She justified her lack of response to the offenders medical complaint as : (1) She had to work a long shift the next day and was tired. And (2) she knew UTMB was watching overtime and asked me if I would support the overtime to see the patient. I explained that overtime should never be an excuse not to see a patient with a medical complaint, particularly one with such potential for a bad outcome i.e. loss of limb.

I think it should also be noted that Ms. Freeman wanted to transfer to the Estelle unit. Both Denise Box and I were reluctant to grant the transfer because it was common knowledge that Ms. Freeman was a trouble maker in general. This was her reputation on the RMF even before I ever came to Huntsville. In specific it had been reported to me by numerous staff members that when Ms. Fisher was not around that Ms. Freeman would drop her name (Fisher's) and insist to the staff that they were personal friends and as such she was untouchable. Ms. Fisher denied this or that she and Freeman had any relationship outside of work. I later learned that Ms. Freeman had

13

Fisher-200711

babysat Ms. Fisher's children on many occasions and they conversed frequently by phone on a daily basis. I also explained that my reluctance to transfer Ms. Freeman to Estelle had more to do with hurting Fisher's career if the rumors were true and I didn't want to have it undermine her ability to effectively lead or have the rest of the staff to feel there was a bias there.  I explained this to Ms. Fisher in the presence of Denise Box who also agreed with me. Per her usual pattern she denied it was an issue.

I finally agreed to the transfer of Freeman to the Estelle unit after consulting with both Dr Vincent and Ms. Box with the proviso that she would be at the High Security building where she would have limited exposure to adversely influence the bulk of the nursing staff. Ms. Wright and Ms. Fisher had already arranged it.  Ms. Freeman just had to provide a legitimate reason for the transfer. I had made it a process that all transfers within the district had to be approved by me. When Ms. Freeman came to me and I asked her for the reason to transfer to the unit she had none. I asked her three different times and all three times she had no reason except that she just wanted to.  I didn't feel I could start a precedent for that lack of reason so I felt compelled to deny the transfer.  I was dumfounded by this.  When I email her my decision she responded with a disrespectful and insubordinate reply. (I have this documented)

I suspect that when you spoke with Ms. Freeman she presented you with a nice, sweet lady who was just a victim of circumstances.  Ms. Freeman is a bully and when someone stands up to her she backs down.  When I did it she suddenly played the role of the poor victim.  Read the tone of her emails toward me and I ask you if that sounds like a poor sweet lady?  You will note my emails were professional but the ones from Ms. Freeman were pretty coarse.

*Can you provide me with any incidents that might be similar involving others?*

If you mean disciplinary actions I have been involved in yes….I hardly know where to begin….

Jan Cooper, RN (Wynne Unit) (W)
Ron Evens (ANM, Wynne Unit) (W)
Sallie Brown (CNM, FBOP) (W)
Jennie McClain, (CNM, Texas City) (W)
Lois Harris PCA (Estelle Building) (B)
Kathy Miller (CNM, Scott/Retrieve units) (W)
Deborah Maddox-Turner, LVN (Wayne Scott Unit) (B)
Sheree Newland (Estelle Building) (W)
Carol Nichols, LVN (FBOP) (W)
Leila Jeffero, (ANM, Mark Stiles Facility) (B)
Marianne Anderson, RN (Estelle RMF) (W)
Janet Henley, LVN (Ferguson) (W)
Marty Harris, CNM (Dialysis/Estelle) (W)
To name just a few……

I think it is also noteworthy that it was *I* who requested the EEOC investigation in March of 2006, well before any complaints were made.  I have known John Pemberton, Dorita Reed,

**Fisher-200712**

Sandy Rader and Georgia Melton for years. I have no doubt they will report to you that I have always been above board in any dealings I have had with any employee regardless of race. I personally and professionally resent the implications that I have made any decision out of retaliation or based upon a racial bias.

When I get an occasional complaint against someone I take it with a grain of salt. Everyone gets the occasional complaint from a disgruntled employee. I look for patterns of behavior. People are creatures of habit. If they are doing something wrong chances are very good they will continue to do so if they are getting away with it. Feel free to look at the case of Jenny McClain in Texas City. John Pemberton is very familiar with this case. On the surface she seemed to be the quintessential Nurse Manger. She was poised, she knew politically powerful people within UTMB, she had a Master's degree and was active in professional organizations etc. But when the complaints burst forth it was just amazing all of what was going on beneath the surface. I later learned this behavior had been in place for years. And also in that case virtually everyone was fearful of giving written statements for fear of retaliation. If you look at my investigation I have a large amount of interview reports, but very few if any written statements. But I still felt taking action was the right thing and I did. I have seen this pattern before in this system.

So I looked at the pattern with Ms. Fisher. The same complaints keep arising about her talking down to staff and the fear of retaliation, having favorites who can do no wrong, providing unequal treatment to the nurses. I heard it from employees at Ferguson, Huntsville and Goree. Then I heard it from employees at Estelle RMF. An entire management team comes forward and requests her removal. This may well be a first. I don't know if this has ever occurred before. Still I backed her. When I refused to remove her at that time I suspect it sent a pretty strong message to people who had complained that she was somehow protected. It was not the intent, but may have happened nonetheless. Then she moves to Estelle and I have all four of the ER RNs (a majority of the RN staff) and all three Assistant Nurse Managers at some point along with assorted line staff paint the same picture of her. Then I spoke with the agency administrators at Supplemental Health Care who supplied contract nurses. They also told me that their nurses felt they were abused by Ms. Fisher and as a result did not wish to return the RMF.

By way of yet another example of her openly vindictive behavior:

We instituted a provider assisted sick call process at the Huntsville unit that involved Julia Lawson, PA. The idea was that the provider would see a majority of the sick call thus freeing up nurses to do other things as we were in a chronic nursing shortage. Ms. Fisher made no bones about the fact that she wasn't keen on the idea and that she felt like her control over the nurses was being challenged by Ms. Lawson. The process was not working well and it seemed no matter what was tried it didn't fair well. One day I decided to go see for myself. When I arrived the waiting room was full of patients. The nurses (2-3 including Ms Kelly) were in the nursing station piddling around with no patients. Ms. Lawson was almost in tears and very obviously overwhelmed. I intervened and asked Ms. Lawson what needed to be done. She simply needed some coordination between herself and the nurses. I pulled the staff together and had nurses start seeing patients in conjunction with the PA and soon all of the patients were seen. The stress level was palpable at first. I returned the following day and repeated the same steps. Slowly everyone began to relax and even began smiling and joking with each other. The third day I

**Fisher-200713**

returned to make sure things remained on track and they were well on the way to becoming a good operation. I then mandated that no one was allowed to alter this process without my express permission. To the best of my knowledge that resolved the largest part of the problem. Ms. Fisher later made a comment, in front of witnesses (the other nurse managers) that she wished I had let the dysfunction go on another few days as Ms. Lawson was on the verge of breaking. I think this well demonstrates her desire to manipulate things to meet her own personal agenda even if it damages the system and staff and does not meet the mission of the organization.

On her issues with not having control:

Just before Ms. Fisher was to go out on medical leave with her son I asked her how many nurses (agency nurses) she needed in her absence to cover the RMF. She said no less than three. She then added that she was not having much luck finding any. I inquired about several agencies we use and she said she had no luck. As an afterthought recalling the reports of complaints from the agency nurses, I called Supplemental and spoke with Brian Allison. I asked him if we had a problem and he told me we did and it was Ms. Fisher and the way she treated his nurses and for that reason the RMF in general and Ms. Fisher in particular had a reputation and they did not wish to return.

I asked him if I selected another contact person besides Ms. Fisher would that help and he said yes he thought it would. I told him I would re-contact him and let him know. When Ms Fisher came to my office later that day I told her I had been in contact with this agency and asked her to select another liaison for them. She refused without a reason.. She said she would do without them. Not two hours previously (in front of witnesses) she told me she needed no less than three nurses to run the complex and now, when faced with a challenge to her authority she needed none? This indicated to me that she was willing to sacrifice the mission of the RMF for her own ends. She indicated that she didn't believe me and asked that I get Brian back on the phone so she could hear it herself. This is professionally precarious, but I did so and Brian repeated to her that his nurses felt she was the problem and didn't want to come because of her. She attempted to argue with him as is her pattern and I stopped the conversation. I gave her a time limit to either find other nurses or provide me with another contact person. It was just before her departure, after I had to ask her twice in emails, that she provided me the name of Ms. MacCartney. I asked MacCartney later if she knew she was the selected contact person and said Ms. Fisher never bothered to tell her. I later spoke with Supplemental and she never told them either. I documented this with an incidental note and an email to Ms. Gotcher and Ms. Melton. I am pretty sure I can produce my incidental note and Ms. Gotcher and Melton will recall the email.

An example of her inconsistencies of disciplinary nature:

She disciplined several staff nurses at the Huntsville unit for leaving a sharp instrument out laying in the clinic and the sharps count being off. When she maintained that she sharps count was off at the Estelle unit she wanted to do the same thing. Initially I agreed to allow this. I later heard I wasn't getting the whole story so I asked to see the disciplinary and related documents. Upon reading the statements it seemed pretty apparent that it could have been a mathematical error as opposed to reckless negligence as it was at the HV unit where the instrument remained

16

Fisher-200714

out in the open for at least 1-2 days. It just so happens one of the persons to be disciplined was Mr. Aguilar who had already informed me he thought she was out to get him. When I questioned Ms. Fisher in detail she maintained it was the same situation. I pointed out that an instrument was in fact missing at the HV unit and this seemed to have been a mathematical error at the RMF. Furthermore she was not sure of exactly who was responsible but was willing to punish all who may have been involved (or not). At first she maintained it was a missing instrument then later admitted that yes, perhaps it could have been a math error. I asked her what she told security and she told them it could have been a math error. Yet she was willing to insist to me that it was a missing instrument. They are not the same thing. She later accused me of allowing her to administer discipline to black staff at HV but not the white staff at Estelle. In truth I had no idea who she administered the discipline to at HV. Yes I reviewed the papers, but I didn't relate all of the names to faces. I have over 200 employees in the district and I had no idea who was who or what their race was. At that point I trusted her judgment in such matters. By the time this had arisen at Estelle I was not quite as trusting and gave her actions additional scrutiny. It is interesting to note that I was later informed that Ms. Fisher was also apparently involved in the counting of instruments during this same time period and it seems she may have also overlooked the missing instrument at the HV unit, yet she didn't discipline herself. (refer to Ms. Wright for details)

An example of how Ms. Fisher does not wish to empower her staff:

In 2005 I conducted training regarding process change on the unit. I directed each CNM to go back to their respective units and try the process I had trained them to use. At a managers meeting on 3-24-06 I asked them to share with the group how the experience had gone. Most all of the CNM had good experience. Ms. Fisher was a notable exception.

Ms. Fisher described that she had good success with it on two pods but that the ER nurses had a fit when *SHE* made changes in the ER. Upon closer scrutiny Ms. Fisher didn't utilize the process as taught. Rather she reportedly told the nurses in staff meetings that the PAR levels needed to be rectified on the units. She gave them what she considered an adequate amount of time (never told them the time) to make the changes and when they failed to do so she made them herself. This didn't bring the focus back on the employees to resolve the problems. By taking unilateral actions without further discussion, direction or warning she alienated the staff.

Most everyone present at the meeting agreed she failed to follow the process as taught and thus lost the principles of empowerment with the staff. She stated that she felt she made her expectation known to the staff and asked why she should involve them if they didn't take the time to rectify the problem. I pointed out that it was about bringing them together to resolve their own problems and in so doing you removed many opportunities for them to complain about their own resolution. She was to act as a guide for the process and a coach and not just do it herself. Her performing the task did nothing to empower her employees and force them to take ownership and responsibility for the process changed. Instead she became the target of their ire.

She was encouraged to try the process as taught on the remaining pod for correction. When she voiced potential obstacles many of the CNMs, particularly Ms. Adams and Ms. Mason made good suggestions to resolve the obstacle and use the process. She didn't seem particularly

17

Fisher-200715

enthusiastic about the possibilities and never committed to even trying. She later related that empowerment of the staff was wasted if they didn't use it. I couldn't disagree more. Empowering a person is never a waste of time or effort. But I think this very well demonstrates her mind set regarding power. She seems to work from a zero based power theory. Any power she gives to others she loses herself and thus thinks she is diminished. Philosophically I disagree and feel this is a root of many of her problems.

I suggest that you contact and interview the following individuals for additional perspectives:

Kim Roddey, Former CNM, Melrose, CO  Email:
Glenda Adams, Northern Division Medical Director                kimroddey@hotmail.com
Julia Lawson, PA, Huntsville Unit
Lavina Wright, CNM
Victor Aguilar, CNM
Anne Darby, RN (Estelle RMF)

I think that Ms. Fisher has positive attributes. She is intelligent, knowledgeable, and hard working. I suspect that if she considers you a friend she will stick with you through thick and thin. If you agree with her and she feels you are no direct challenge to her or her authority she will probably get along very well with you. On the other hand if you cross her or she feels threatened by you, things will not bode well. Ms. Fisher does not have the ability to include other perspectives if they don't match her own views. Once she makes up her mind about a situation she is not going to change that view. She does not listen well and only listens long enough to THINK she knows where the conversation is going and then jumps ahead with her view and there ends the discussion. If she is made to follow a plan she does not support she will most likely be passive aggressive and allow the plan to fail and falter through neglect or subtle sabotage (is with the HV provider sick call process and lack of follow thru on Ms. Kelly's CAP). Up till very recently I didn't think she would actually be untruthful but I am no longer so sure.

I would also ask that you take note of one more thing. In case you were unaware of it. I am the same person who _hired_ Ms. Fisher in the first place. I was new to this area and didn't know reputations or the people etc. About all I had to go on was her interview and application. On the surface Ms. Fisher appeared to by a bright, dynamic, well rounded individual. She seemed to have every quality that would make her as a standout in the organization. I felt she was a success story waiting for a chance to happen. I thought all she needed was a little time and seasoning and experience to do well. I held high hopes for her. It may well have been that mind set that blinded me in some respect and kept me from seeing the real Ms. Fisher before I did.

If all of this were truly based upon race and racism or was in the least way racially motivated, why on earth would I do such a thing? I also defended her from more attacks and criticism that I can now look back and count. So why, all things being equal, would I take any untoward steps against her without truly feeling I had GOOD reason and certainly why would I do it based upon race?

Fisher-200716

18

While looking through old records to find documentation to support this long involved story I found quite a few. Many were old enough that I had completely forgotten about them. I had to scan them in for email Once I realized the size of the scanned documents it was obvious that emailing them was not practical so I printed them out. Unfortunately due to the fact that they were scanned by hand with a flatbed scanner some of the prints are vertical and some horizontal and some combines. Sorry for the printed mess. They are still quite readable though.

I hope once you get a chance to review these files in conjunction with this response you will see that I tried to be fair, honest and supportive. The Roddey MEMO was addressed to Carol Warren, DNM who was responsible for taking Ms. Fisher into her chain of command after she was demoted. I have also included an email from Georgia Melton which I think supports my claims regarding ANM versus NC-III. As I pointed out previously, I verbally requested an EEO inquiry back in I think it was March of this year to Ms. Melton. I finally made it formal with an email to Ms. Gotcher some time later. As I have maintained, I have nothing to hide Mr. Williams. If I erred in any way it was only by honest fault and not by design.

There are copies of emails from a Harriett Clark that vaguely reference Ms. Freeman. I was unable to find them all, but there was one (missing) that was reasonably serious and it involved Freeman backing Clark (physically) into a corner and implying a physical threat. I asked Ms. Rader to contact Ms. Clark and investigate this further but she never did. Ms. Clark resigned out of fear of Ms. Freeman. One email of hers references going to the Huntsville unit. The nurse Manager (Ms. Wright) offered to let Ms. Clark transfer to avoid having to work with Ms. Freeman and she writes that she was not interested as Ms. Freeman had already made it know she would get her if she went to the Huntsville unit. I seriously doubt that, but it made for an effective tool of intimidation.

There are several references to an "obs bed" project. This is a sort of regional observation project they also refer to as a "hub" project and it is intended to send medically stable patients from nearby units to the RMF for close medical care for say 6 to 12 hours or so rather than straight to the free world ER. It is a big deal because it involved extra training for the nurses. Buying and deploying bedside lab equipment, buying new EKG monitors, creating and maintaining logs etc. On 3-10-06 during a meeting between Ms. Fisher and the two ANMs I specifically instructed her to begin making perpetrations for this new project. As you can see she never bothered to even mention it to the ER nurses. Ms. Fisher maintained tight control over everything including information flow. In order to get the ER nurses on board one would seem to think it would involve opening discussions with them and having some dialog about what was coming, what it would involve, getting input and suggestions etc. That simply was not her way. Her way was to give orders and if the people who got those orders knew what was good for them they better do as they were told without comment.

I specifically directed her to meet with her ANMs at LEAST once per week or more so if THEY (not just her) thought it was needed. The main thrust of this meeting was to improve communication between the three who made up the entire nursing management of that unit. She failed to meet even once following that meeting with me on the 10th. Both MacCartney and Aguilar complained that she was telling them nothing and making changes on the fly they were

19

Fisher-200717

later responsible for dealing with, but were given no foreknowledge. Does that sound as if maybe they were being set up to fail? It did me.

Aguilar later told me verbally when MacCartney got up to go to the bathroom that Ms. Fisher told him I had related every conversation I had ever had with him to her (sold him out) That was just a plain, unvarnished lie. In fact it was just the opposite. I tried very carefully to cover his concerns or at least not let her know where they came from as he stated to me repeatedly that he feared she would retaliate against him if she ever knew he spoke with me. I don't recall even one time that Victor ever came to me to complain about her. It was when I would ask an open ended question about how things were going and he would look down at the floor and then open up to me. So you can sort of appreciate that she was willing to stoop to bold face lying to drive a wedge and damage a relationship to gain her ends. After that poor Aguilar didn't know who to trust and left as fast as he could. I don't blame him either. I literally saw Aguilar come into the RMF with a spring in his step and a fast walk and always a quick smile for everyone. When he left he dragged his feet, seldom smiled and walked with his head down wherever he went. It was so obvious he was physically broken down by the experience. This is the Jackie Fisher you don't see but I was finally beginning to see.

If you have any question please contact me. I can usually be reached at home between the hours of 6-9 PM ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ be best to let me know ahead of time to expect the ▓▓▓▓▓ may plan accordingly.

I pray that you give my view due diligence. I also ask that you please speak with the personnel I listed in this document. This is a deeply personal matter to me. As you can see from my lengthy response I have invested a great deal of time and thought into this situation. Since I am no longer employed by UTMB I could have just as easily "blown it off" and let the chips fall where they may. But I don't feel that way. I **FEEL** grievously offended by what has transpired and I sincerely wish nothing more than vindication by a fair and impartial investigation.

Sincerely and Respectfully,


David Watson


PS


There was a late breaking development I thought you should know about. I just started this job on 11-27-06. My boss came down from corporate Thursday 12-7-06 and wanted to meet privately with me. He said he had received news from the local HR office that some unflattering rumors were circulating about me (specifically this investigation and others from UTMB). Care to guess where they seem to have come from? Well if you guessed Ms. Freeman you would be correct. Ms. Freeman works at the hospital part time. I haven't bothered to tell the world what I think about her, (and I won't) but I don't seem to be receiving the same courtesy in return. I think this speaks volumes about the character of the people in question.

Fisher-200718

When Ms. Fisher assumed control of the Huntsville, Ferguson and Goree units I began receiving complaints of her inability to speak tactfully with the existing staff. Since she was a new Nurse Managers I felt I needed to allow her time to work on her communications skills. I have mentioned in multiple Nurse Manger meetings that a little tact and hearing the employees complaints demonstrated to them that they were valued and appreciated. While these comments were not for Ms. Fisher alone they were certainly intended for her as well. As time passed I continued to get complaints and I finally called her into my office and spoke with her about her communication style. She pointedly asked me what she was doing wrong. Acting only on the complaints I had received I told her that I had heard that she spoke in loud tones and failed to listen to what others said before interrupting them and pushing her own agenda for the conversation. I explained that if a conversation was escalating to calm it down and take it into a private place such as an office.

As we spoke in my office Ms. Fisher continued to insist that she was communicating well and that I was just not there and I was accepting only the employee's words for her behavior. I explained that while this was in fact true that I had heard it from many different employees on more than one unit and it was now an established pattern to the degree that the overwhelming evidence was that I had to give it merit. I explained that I was not unhappy or upset, but that she could certainly be more mindful of how she communicates with others and work toward being better. As our conversation continued Ms. Fisher would repeatedly interrupt me and try to talk over me. I finally stopped her after the third occurrence and pointed out that if she would speak to me in such a manner, and this was one of the exact same things her employees were complaining of how could this not be happening with a subordinate?

I could tell that she now understood what I was trying to say. I went on to explain that the staff needed to see their manager as someone who was at least approachable so they could vent their problems. If not, problems would continue to exist till they became major events and the staff would have no confidence in the leadership which would ultimately lead to failure.

This issue was of enough concern that she made it a goal of her semiannual to work toward increasing her communications skills and listening effectively. I felt like I saw Ms. Fisher make some progress toward this goal, but never felt she was proficient at easy, effective and non-confrontational communication.

I also feel she has difficulty accepting other people's views that conflict with her own. I can recall times in meetings when both I and the other Nurse Managers would repeatedly attempt to explain a situation to Ms. Fisher but she could never seem to make the connection. She seems to have difficulty assimilating certain things or once she has made up her mind about a topic it is difficult if not impossible to get her to re-examine her position. This inflexibility and inability to see things from another's perspective is a weakness in her ability to lead effectively. I felt his problem was resurfacing at the RMF so I mentioned it to her in conversations and I again listed it as a goal for her in her 2005

*Watson*

EXHIBIT NO. 2

Fisher-200204

semiannual evaluation.  In her written response back she denied this was a problem even though she had accepted it previously as worthy of a goal to improve.

When Ms. Fisher assumed the manager position following her promotion I told her of concerns I had regarding her ANM that was then posted at the Ferguson unit.  I listed concerns I had as being disorganized and lacking the ability to lead or even effectively direct subordinates.  I asked Ms Fisher to follow this and let me know if she observed the same things.  In every single conversation following this she reaffirmed that she felt similarly and told me on more than one occasion that she just didn't feel the ANM had the raw skills to perform the job effectively no matter how much she worked with her.  I advised her to continue to monitor this situation and keep me informed.  After several months I suggested that she may want to create a Corrective Action Plan (CAP) for the ANM and begin documenting her efforts formally.  I expressed that I didn't believe in leaving someone in a position, especially a management position if they could not perform effectively.  I felt it was not good business and that it block any possibility of other staff to promote who could do a better job.

In late 2004 (date??) I had a lengthy conversation with Ms. Fisher regarding the lack of progress of the ANM. Again she advised me there was no progress and that she didn't know if the ANM could ever come to the level expected of a ANM.  At that time I told her she would need to make some sort of decision soon, that I was growing concerned by her lack of inaction. She offered no other explanation other than she would continue to attempt to work with the ANM to improver her skills.

After a few more months passed I held a nurse managers meeting.  It was my custom to go around the room and have each manager provide me a verbal report of their units problems and strengths.  During Ms. Fishers report I asked her how the ANM was coming and she replied as per usual, there was no significant improvement noted.  I became exasperated at this point and formally directed her to create a CAP and begin documenting this situation and attempt a formal resolution as informal resolution had obviously not been effective. I advised her that I had reviewed the ANMs previous evaluations and virtually all of them revealed the same pattern of problems that were then being exhibited by the employee.  I invited her to review them as well. I expressed that I felt UTMB as an organization had to step up to the plate and attempt to improve the employees performance.  I also voiced that, sadly some employees can not meet the expectations and in that event a demotion may be the only alternative left.

I then waited a few days and asked her how the efforts were going with the ANM.  She related that she had introduced her to the concept by telling her that her performance had come under scrutiny at a recent meeting and that she would need to take some formal actions with the ANM. I was speechless upon hearing this.  It sounded to me that Ms. Fisher was about to wash her hands of any responsibility for her own accountability by telling the employee this was the result of a meeting and not her own experiences with the employee.

Fisher-2O0205

Later that day I went to the employee and asked her myself how this had been introduced to her. She said Ms. Fisher related to her that there was a meeting and that "someone" had apparently voiced concerns about her ability to effectively perform her job. I explained in great detail that while that explanation was technically correct it grossly lacked important details. I described how the whole situation had come to light beginning with my observations when Ms. Fisher had been hired and how they had continued through to the present. The ANM seemed stunned and at a loss for words. I felt using the meeting as a premise to create a CAP for an employee who had months of deficient performance supported by her own supervisor's reports was bordering on unethical and strongly indicative of the manager's displacing accountability and responsibility.

Following this Ms. Fisher and I had a spirited debate over the questionable approach of this tactic. It was held in the presence of both Ms. Box and Ms. Rader, District HR administrator. Ms. Fisher accused me of using personal information to undermine her relationship wit her staff. My view was that Ms. Fisher had ample opportunity to take action knowing full well what my expectations were in this matter and only did so when I insisted. She then tried to evade direct responsibility for this by such as tangential presentation, i.e. a meeting.

Ms. Fisher did eventually create a CAP in conjunction with the employee. I was adamant that the CAP be created as a joint effort and that the ANM be an active participant and encouraged both Ms. Fisher and the ANM to work collaboratively to design a fair plan they could both agree to. This CAP, in conjunction with other deficits, eventually led to the demotion of the ANM in question. However it was only after another nurse Manager assumed supervision of the employee.

Ms. Fisher struggled to work as a team player in her initial assignment as a Nurse Manager. I instructed her before she ever stepped foot on a unit to assess the situation before making changes. As a new member to an older established team it was important to be accepted as much as possible. Shortly after she began working at the Goree unit she decided the supply room should be cleaned out. She proceeded to do so without checking with her colleague the practice Manager. As it turns out the Practice Manager was furious that she would make such changes without at least consulting with him. When asked about this she stated simply that she saw changes that needed to be made and she made them. She went on to cite multiple reasons that supported her actions. I asked her why she didn't at least consider speaking with her team and she replied that she just didn't think it was necessary.

Within a year after Ms Fisher was hired Dr. Adams, Dr. Julye, Jean McMasters and Julie Lawson, PA, approached the Management Team, specifically Ms. Box and I and requested that Ms. Fisher be removed from their team. Their general consensus was that Ms. Fisher was not a team player and didn't treat people well. As a result they were concerned with the departure of multiple, valued, nursing staff members. At that time Ms. Box and I both felt that there were multiple strong personalities involved and there was an adjustment period wherein the new staff members would need to be encouraged to get

Fisher-200206

along and work together.  A new plan was established wherein the nurses would work with the midlevel provider at the Huntsville unit to expedite the sick call process.  This process never seemed to work well in the beginning.  I kept hearing reports of turf wars and who was going to control what.  At one point I gave up on the nursing leadership (i.e. Ms. Fisher and her ANM) working effectively with the providers and I went to the Huntsville unit myself and literally took control of the process.  When I went there that day the provider was in her office near tears and the nurses were in the nurses station doing apparently very little and there were numerous patients waiting to be seen.  In short I got the staff together and asked the provider what she needed to get the job done and when I learned what it was we, as a team of nurses and the provider, proceeded to tackle the problem.  Within an hour or so sick call was finished and people were beginning to speak with one another.  I returned the second day and continued the process.  There was still some hesitancy and coolness between the providers and the nursing staff but in got better and better with time.  I found it amazingly simple to provide such a small amount of leadership to resolve a problem.  From that point on, to the best of my knowledge, the process functioned better and no major obstacles were encountered.  I do not know why Ms. Fisher could not have accomplished the same thing in the previous weeks that she had a leadership role on that facility.  At that time I had concerns about Ms. Fisher's ability to lead effectively.

While I feel it is not my job to go to a facility and take charge like that it was readily apparent to me that things were out of hand and the system at that unit was about to fail.  Ms. Fisher later told me that she was not happy that I intervened in the situation because she felt if it had continued for a little longer the process would have failed completely thus supporting her position that it was a bad idea.  I seem to recall that this statement was made in front of some of the other nurse managers.  I was deeply disturbed by this point of view.  It indicated to me that she may have very well deliberately sabotaged the process by dividing the nursing staff from the provider staff (which was abundantly apparent).  Prior to this she had asked me who was going to run nursing, her or the provider.  I explained that she was responsible for nursing, but I could see no reason why some collaboration and cooperation could not be forthcoming.  I also volunteered that if she could not facilitate this that I was more than willing to assist her and all she had to do was ask.  It is my perception and belief that she loathes any interventions in her affairs and will suffer consequences of failure rather than ask me for assistance.  In this case she was willing to see an entire process fail which would have adversely affected care for many patients who had no other means of treatment, in order for her to pursue her own personal agenda.  She chose to do this rather than work with the other team member to give the process a fair chance of succeeding.  This indicated to me that she was willing to go to any length to attain what she wanted at the expense of others and the failure of the mission.  However given the backdrop at that time of the ongoing political struggles between the Practice Manager, Provider and some of the physician staff I decided to take a wait and see attitude.

In August of 2005, after lengthy consultation with Ms. Box and other members of the District Management team, I decided to move three Nurse Managers.  They were moved for a variety of reasons.  As it relates specifically to Ms Fisher I chose to relocate her to

Fisher-200207

the Estelle Regional Medical Facility (RMF). I decided to move her there for several reasons. One was that I knew she had worked hard to cover a cluster of three units that were divided geographically and I had hopes this one single unit might give her a little respite from so much turmoil and confusion. I had hoped it would give her a fresh start and if there were truly any lingering problems from her previous team this would be demonstrated with the move. I also chose her due to her familiarity with the RMF as she had worked here before as an Assistant Nurse Manager (ANM) under the direction of Ms. Adams. And in addition to this it was felt that she and the medical director had a good working relationship.

Shortly after the move numerous staff from all of the units immediately wanted to move to follow their respective nurse managers. I halted all transfers at that point and instituted a process that required all transfers be personally approved by me. This was done to expose the staff to new management styles and allow managers to work with some new fresh faces in the hope that growth would be healthy for all involved. One of the very first requests for transfer was a staff nurse who I will refer to as "Ms. M" who worked for Ms. Fisher at another unit. Ms. M had a reputation among the staff of being personal friends with Ms. Fisher. This was a reputation Ms. M apparently reinforced on the unit with some frequency. She also had a reputation of sometimes being difficult to work with. I was reluctant to grant this transfer as I was concerned that Ms. Fisher's relationship with the staff at the RMF might well be undermined. I shared these concerns with Ms. Fisher but she seemed unconcerned. There was considerable discussion between myself, Ms. Box, Ms. Fisher and even the medical director. I finally and reluctantly consented to the transfer with the understanding that Ms. M would work at the High Security Unit which is on the grounds of the RMF.

When Ms. Fisher was directly supervising Ms. M I had received reports that she would do things like bypass the chain of command and go directly to Ms. Fisher when she wanted something. This undermined the RN staff and the ANM of the unit. When I called this concern to Ms. Fisher's attention she seemed to believe I had only one source for such complaints and therefore it was a single source who didn't like Ms. M and a such had no credibility. In actuality I had multiple sources for this information and told Fisher as much, but she still denied any substance to the perception. Ms. Fisher repeatedly denied that she and Ms. M were friends outside work and that she didn't grant M any freedoms she didn't grant others. The fact was that Ms. M could and did, call Ms. Fisher at home any time. She reportedly made it known on the unit to co-workers that they were friends. I had multiple people come to me and express this concern and the perception that Ms. M was untouchable and thus any untoward behavior was not reported due to this perception among the staff. In February of 2006 this was given additional support from Warden Wakefield who told both me and Ms. Gotcher that there had been numerous complaints given to the previous practice manager and Ms. Fisher by security regarding the behavior of Ms. M and as far as he could tell no action was taken. He went on to say that from his perspective Ms. M's undesirable behaviors such as rudeness and lack of enthusiasm toward patient care continued to the present day.

I spoke to Ms. Fisher about my concerns on more than one occasion, but Ms. Fisher repeatedly assured me the concerns were groundless and that I was just hearing from one unhappy staff member. I asked her how she could know this as the behaviors and insinuation toward the alleged friendship were not portrayed when she was on the unit. I asked her if Ms. M did in fact call her at home on personal time and she agreed this happened, nevertheless she insisted that she just didn't think Ms. M would do this.

I made arrangements between Ms. Fisher and the other involved nurse manager for the transfer of Ms. M to the RMF. It was agreed that M only needed to come to me and provide me with a reasonable reason to request the transfer. An appointment was made and she came to my office. When I asked her why she wanted to transfer she seemed unprepared for the question and after some time finally admitted she had no real reason to transfer. I asked her if she had a good working relationship with the current nurse manager and staff and so forth. Every question was met with no real complaint. In short order I was at a loss to find a justification for the transfer. Since it was the whole reason for the interview process to prevent needless and rampant transfer I felt I had no choice but to deny the transfer as there were no grounds whatever presented to me to support it. As soon as she left I went to both Ms. Fisher and the other Nurse Manger and reported that I was completely dumfounded that she would request a transfer and then fail to provide even the most meager grounds for it. I was not able to grant it. We were all stunned and surprised by this turn of events.

I later emailed Ms. M and explained I could not grant the transfer for a lack of grounds. She wrote back a curt and sarcastic email accusing me of intimidating her due to my professionalism and extremely courteous behavior and that I had failed to even inquire into her medical reasons for transfer. Again I was stunned as I had never been accused of intimidating anyone by being professional and courteous. I couldn't imagine how I was supposed to know there was any medical reason to inquire about.

This seemed to be a stumbling block between myself and Ms. Fisher that she felt I had an axe to grind toward Ms. M. I called Ms. Fisher into my office and asked her if she thought I acted or displayed any prejudice (racial or otherwise) in my management style. She said she didn't think I was acting in a prejudiced manger but that at times my actions could perhaps be perceived as such. I asked her for an example. She related to me that I had accepted the view of other staff member toward some of Ms. M's behaviors but that I had never actually spoken to Ms. M and gotten her side of things. I agreed that this was true but that I had not actually taken any actions on what I had heard I had only relayed my concerns to her (Fisher) Nevertheless I was moved by the argument and I asked Ms. Fisher if she would consent to helping me be more objective if she ever felt I was not doing so. In short I asked that she act as a compass, as it were, if she ever felt I was off track. She agreed that she would do so and I thanked her.

One of the positions I have taken as the District Nurse Manager was not to rehire personnel who had previously worked for us that had a demonstrable reputation for being unreliable or difficult to work with. Once such incident came up during an impromptu Nurse Mangers meeting on an interview day. It was regarding a previous employee that I

had initially granted for rehire.  Ms. Fisher was adamant that this was a mistake.  Upon further reflection I agreed to reconsider this decision.  I later concluded that Ms. Fisher was correct in this instance and I would have been remiss to allow the rehire. Subsequently I did prohibit the rehire of the employee in question. However, during this discussion she related that I would not allow Ms. M. to transfer because I felt she exhibited the same characteristics as the applicant in question. I explained that while that was true that was not what prohibited her transfer. It was her failure to give any reason for said transfer and that this was not the same thing. None of the other Nurse Managers could fathom her rationale as I explained repeatedly that I fully intended to grant the transfer pending M.s interview. Ms. Fisher refused to accept my word.  I later learned that the nurse managers present for that meeting felt as if Ms. Fisher had all but accused me of lying about the incident.  It was later relayed to me by one of the Nurse Managers that Ms. M had in fact admitted to a co-worker that she didn't offer any reason to me for the transfer.

A few days later this again came up in conversation with Ms. Fisher in Ms. Box's office. I even produced the emails from Ms. M and shared them with Ms. Fisher.  It was as if everyone with an unbiased view could plainly appreciate the situation but Ms. Fisher.  At this point I felt I was beginning to see an established pattern of her inability to objectively view things that held an emotional link to her.

I was profoundly disturbed by this but I was at a complete loss to know how to impact it in a positive manner.  I didn't know how to convince someone to alter their decision making process and increase their objectivity when they never saw themselves at fault, not even in the slightest way. I have pointed this out in Ms. Fisher's most recent evaluation, but she refuses to believe or accept this. Once again, how do you convince someone that can't be convinced?  She doesn't appear to take any responsibility for her actions.

I saw a flow of employees away form the RMF upon Ms. Fisher's arrival.  I had expected some of those and was not initially overly concerned.  The RMF has traditionally been difficult to staff and in conjunction with the above mentioned discontent with manager relocation I felt with was to be somewhat expected.  I felt this essentially represented line staff. I mentioned in passing on Ms. Fisher's semi-annual evaluation this was occurring and that it might only be an artifact, but that it would bear watching.  Ms. Fishers response was that everyone that left did so with other rationales and she was not at fault.

She specifically cited the departure of an ANM who was under a Corrective Action Plan (CAP) and who had underlying discontent as a result of the plan. This is not accurate. That ANM was already under a CAP when the announcement was made that the transfer of managers would take place. She was working toward improving her performance and had made no mention, to my knowledge, of a desire to leave. She came to my office and was extremely agitated to learn that Ms. Fisher was returning the RMF in a supervisory capacity.  She cited numerous examples of previous inappropriate behavior by Ms. Fisher during her previous posting there.  Some examples included rude and extremely vulgar language in public places and toward coworkers including the medical director.  I

admonished the ANM to give Ms. Fisher a chance. I explained that time had passed and perhaps she had grown and that it was only fair to give someone a chance. It was several months following this that the ANM departed. I don't know what explanation she gave to Ms. Fisher but she took a large cut in pay to leave and she made it abundantly clear to me it was because of Ms. Fisher. While many employees may have left due to Ms. Fisher many won't make that public to her for fear of "burning bridges".

Late in the month of October 2005 I was visiting with another ANM. He advised me he was not happy with Ms. Fisher's direction. He explained that since she had arrived she had yet to even meet with the staff and share her expectations and her goals and listen to their concerns or problems. He went on to say that she essentially provided no direction to him or the other ANMs. He said that Ms. Fisher allowed certain staff to bypass the chain of command and go directly to her which undermined the authority of the ANMs in general. Again, this seems to be a pattern of behavior for her. She would make changes in processes without consulting or advising the ANMs. When they were asked about some changes by disgruntled staff they had no knowledge and therefore felt they had no choice but to refer staff back to her. His perception was that Ms. Fisher became angry when this happened and she expressed that she felt it was alack of support for her management by the ANMs. It is my preference that such problems be resolved at the lowest level. I asked him if he had discussed this with her and he replied that he had attempted to early on but that it was now met with any understanding. He went on to say it was not worth what might happen if you ever questioned her decisions or disagreed with her. He requested to be allowed to transfer back under his previous manager as he felt he could learn form her but didn't feel he could learn under Ms. Fisher. As with the previous ANM I admonished him to continue to try and that it sometimes took a settling in period. I asked him if it would be helpful for me to act as a facilitator and he replied that no he preferred to continue to work toward a resolution on his own. His allegations about a lack of useful communication were later confirmed by the only other remaining ANM.

Shortly after I spoke the ANM above I went to Ms. Fisher and in casual conversation I asked how her staff meetings had been going and how the staff were responding to her new leadership? She informed me she had not held any staff meetings to date. I reminded her that I was constantly expressing the managers how important it was to share their expectations to the staff and get them oriented to things. I also pointed out that as a manager new to the post it was extremely important to meet with the staff early on and get to know them and see what was on their minds. I reminded her that that was one of the very first orders of business I undertook when I came to this post and I felt it was extremely important. She then agreed to hold a staff meeting soon. I think it was eventually in November this took place. I later asked how it went and the ANM said it was long overdue and it was well received for the most part. This was also mentioned, in passing in Ms. Fisher's semi-annual evaluation. She cited that she had worked the floors and visited with the staff and had anecdotally shared her vision and goals with the staff piecemeal. I found this to be lacking in both logic and leadership. Once again, I felt Ms. Fisher was determined to take no responsibility for her performance.

In February of 2006 I was working late one evening and I observed a nurse com into the RMF I didn't recognize. I later learned she was one of the RN we had recently hired, who had come with excellent references. I walked back to the ER to speak with her, welcome her aboard and get to know her. During our conversation I asked her how her orientation was going and did she need anything to better support her efforts to assimilate to the new environment. She stated she would like a few more hours of orientation with a specific nurse. I asked her to please email Ms. Fisher and let her know of her needs. She immediately looked disturbed at this suggestion. I asked her if she had any concerns about doing so and she admitted that she was concerned that Ms. Fisher night not take such a request well. I was completely taken aback by this response for such a new employee. She had been with the organization for less than two months and already expressed concerns about approaching her manager for the most meager and reasonable of requests.

I assured her that I was certain such a request would be most reasonable and would be accepted well and asked her to please bind copy me on the email. She later did so. I have seen her a few times since then and have asked her if she ever received the additional orientation she had requested. She replied she had not. On one occasion I mentioned to Ms. Fisher that I had visited with her in passing and she had requested some additional orientation and asked that this be addressed. Ms Fisher advised me she would look into it. I emphasized that our ability to recruit and retain good personnel was not the best and I felt it was very important we deal rapidly and constructively with such requests. On 3-30-06 I again saw this nurse, more than a month following the initial conversation. I asked her if she had ever received any additional orientation and she replied that it had not been supplied.

I was contacted by the four RN, ER nurses and they requested a group meeting with me concerning Ms. Fisher. These four RNs represent he majority of the RN leadership of this facility besides the ANMs and Ms. Fisher. I agreed to meet with them and did so at 6PM on January 10, 2006. Three of the four were present. They complained about many and things including staff turnover since Ms. Fisher's arrival. I felt that some of their complaints were simply not justified and I told them so. Some were conclusions made out of ignorance of certain processes and I explained those processes and those were cleared up. Some, however represented what they felt was unprofessional and retaliatory behavior. For some of the allegations I had no answers. I conceded there may be merit to at least some of their complaints. One was that one of the RN had made a safe harbor claim. Shortly thereafter her long standing vacation request, which was subsequently approved, was suddenly revoked by Ms. Fisher. That looked retaliatory. I explained that the Safe Harbor filing concerning inadequate staffing could have justified the revocation. What I didn't say to them was that on the other hand, if the Safe Harbor filing was in fact not supported, then why revoke the vacation of the very nurse who made the claim just days before?

One complaint was that Ms. Fisher had worked on night in the ER and decreased APR levels of certain stocks that they felt they needed. She had removed some items because she didn't know what they were. Those had to be returned. They were upset that they

**Fisher-200212**

employee three hours off for a medical appointment on a day shift as opposed to losing an entire day or having someone else work the entire time. It didn't seem to be a reasonable decision. It just so happens this is the same employee who filed the grievance against Ms. Fisher for abusive behavior. This appeared to be a retaliatory move especially in light of the fact the ANM had already agreed to approve it. I advised MacCartney I was re-approving it and to grant the three hours leave. She then said that another employee (also a day shift) had asked for a similar leave and it was also disapproved by Ms. Fisher on the same grounds, but that employee had now called in for two or three days and therefore no intervention on my part would make any difference.

Upon reviewing the schedule it seems we needed a few holes filled in the schedule and I could find no justification for three, full time, agency nurses as I had been advised by Ms. Fisher earlier.

Another issue cropped up this same day that was troublesome. Early on in the use of agency staff nurses, when invoices were coming through from the agency I saw the delay was not conducive to accurately following our financial situation. I instructed Ms. Fisher to institute a program wherein a spreadsheet would be created and agency time tracked as it was used so we could predict how our budgeted funds were going and we would not outpace the spending due to the lag time in the arrival of the invoices. Apparently this was not well followed as I learned we had overspent the allotted funds by some 6-8 thousand dollars.

In summary, while I have seen some things in Ms. Fisher's behaviors that disturbed me I was more than willing to give her every benefit of the doubt. I have defended her behaviors on numerous occasions in the hope that what I saw was the result of a multifaceted problem and that she was doing her part. I have counseled with her repeatedly on the need for effective communication. When she was relocated to the RMF these same patterns of behavior have continued. She has now demonstrated to me that she is willing to allow others to suffer to meet her own ends. This was most manifest regarding her unwillingness to work with and delegated to her ANMs. Her willingness to suffer or have the staff/patients suffer rather than relinquish absolute control over the agency nurses. And finally, her failure to accept any responsibility whatever for her performance as exhibited in her rebuttal statement for her semi-annual evaluation.

I feel that I am in a situation where I can not ail to act. It is my belief that I will be unable to convince her that her behaviors need to change and she will continue on a path that will be destructive to the RMF and it's staff. I feel I have no other choice but to remove her from her position as a Cluster Nurse Manager over the RMF.

Fisher-200213

I rang Bryan back on the phone and advised him we would be in touch and thanked him for his time. I told Ms. Fisher to check with Elite (the other agency) and let me know if they had viable candidates and if not let me know we would act accordingly.

As previously mentioned Ms. Fisher was to go out on LOA on 3-28.  By 3-24 I had received no updates regarding staffing. I was growing uncomfortable. I called Elite myself.  They reported to me that Ms. Fisher had called them but they had only two RNs and no LVN that could work the RMF.  She stated that Ms. Fisher had not requested the LVN begin security clearance process. Essentially we were now completely dependant upon Supplemental to meet our needs.

I emailed Ms. Fisher on 3-24, a Friday, and requested an update on the situation.  I asked her specifically if Elite could provide the nurses and if not who was to be her point of contact with Supplemental. Her response to this email was to be evasive and talk about budget concerns and avoided answering my question about a contact person. She eventually provided me with a point of contact person (Ms. MacCartney) late on 3-27 her last day to work before the LOA started.

On Wednesday, 3-29-06 I received a message to call Bryan at Supplemental.  When I contacted him at about 3PM he stated he was growing concerned as he had received no word about supplying any nurse t the RMF and he needed to make scheduling arrangements as he had other obligations to meet for other clients.  I advised him someone would be in touch by Friday. I asked him if he had been given a contact at the RMF besides Ms. Fisher. He listed Ms. MacCartney if Ms. Fisher was not available.  I asked him if that was what Ms. Fisher had stated specifically, if she was not available? He confirmed this.  I amended that to three contact staff, myself, Ms. MacCartney or Mr. Aguilar.

By now it was readily apparent that Ms. Fisher was pursuing her own agenda as she had previously and had totally disregarded my directions.  There is no way there was any misunderstanding as she and I had a very detailed conversation in my office regarding this. It was also very apparent she felt distaste at being removed from the loop, even if it was for the apparent benefit of the operations.

On 3-29-06 I met with Ms MacCartney and informed her of what I had advised Supplemental regarding contact persons now being myself, Mr. Aguilar and her. I asked her how the schedule was looking for the month of April.  She said there were various holes in it toward the middle of the month. She also pointed out there was no relief factor in the schedule whatever.  I asked her to contact Supplemental and determine what they might have to offer.

During our conversation she mentioned to me that a staff nurse had requested three hours off for a dental appointment and that she had approved it.  However Ms. Fisher had disapproved it citing a lack of staffing. This was a day shift position and the staff is already working over and stretched very thin.  I felt it was very doable to provide an

She initially stated that she was not the problem but rather the problem was their nurses wanting to work no weekends and no holidays etc. She said it wasn't fair to our staff to hire agency nurses and give them the preferred shifts over our own personnel. I agreed, but pointed out that was not what I was told by Bryan. She said if she had to do that she would just not use the agency's nurses. Once again, as with the Huntsville provider situation, she was willing to risk a potentially catastrophic failure than accept responsibility and direction from another source. I told her that was not an option. She was about to go out on two weeks leave, I was not sure what ANM Aguilar might do and we were short staffed as it was. I advised her that the RMF failing was just not an option. This is not the first time I advised her that failure of the RMF was not an option.

She asked me if we could call Bryan back and speak with him on my speaker phone. I said no problem and called him immediately.

When Bryan came on the phone she stated that she was aware of his concerns and told him that the reasons he gave her for not getting nurses was they didn't want to work the schedules she had. He told her that was originally *partly* true but that since they had last spoken he had located other possible nurses. She went on to tell him that the two disgruntled nurses were Ms. Tune and Ms. Rogers and that she didn't want them back. He agreed that might be a part of the problem but that his nurses talked to one another and the word was out that she was not a nice person and now other potential nurses didn't wish to come based upon the reports from their co-workers.

She asked him what was said. He said that Ms. Fisher was "Very, very rude and forceful" and that she was "hard to work under". I asked him specifically if it was that and not the schedule issues and he confirmed to me this was the problem (Ms. Fisher's behavior).

Ms. Fisher asked for names of the nurses that were making the allegations. Bryan was uncomfortable with this request and I told him it was not necessary and not to worry about it. The concerns were what they were and that was that. In my view this was not the time to get into finger pointing it was a time to focus on the mission of the RMF which was patient care. The perception had already been created and determining the specifics of who and what and attempting to justify her actions was not in anyone's best interest or the interests of the ongoing problem, i.e. staffing.

I placed Bryan on hold while I spoke with Ms. Fisher. She said she didn't want to appoint another contact person. I asked her why not? If the problem was truly the nurses and they had problems with our other staff she could be vindicated by that. She didn't want to do this but never provided a specific reason. She asked me if we designated someone else to deal with the agency nurses would she retain control the schedule? I stated that she would control the schedule but they would just deal with someone else in person and on the phone like Mr. Aguilar and/or Ms. MacCartney. She asked if she would have no dealing with those agency nurses at all. I said not unless there was an emergency and then I would expect her to intervene as appropriate. She stated she would rather call the other agency (Elite).

Fisher-200215

I recently received a grievance from a staff nurse complaining of being demeaned and embarrassed publicly by how she was treated by Ms. Fisher. Following my investigation I spoke with three witnesses to the events described in the grievance. Their responses to me fully supported the complaints in the grievance. Two of the three witnesses don't even work for UTMB. A forth witness (also not a UTMB employee) related how she had seen Ms. Fisher display a complete lack of tact when dealing with staff and furthermore allowed her personal dislike of some employees to publicly exhibited in her interactions with them. This seems to lend even more support the pattern of poor interpersonal skills.

On Wednesday March 22, 2006, the Nurse Managers were assembled for interviews. Ms. Fisher was to leave for an LOA for approximately 10 days effective the 28th. She reported to me that due to more recent departures of staff that she would require additional agency nurses to maintain the operation of the RMF. A total of three agency nurses would be needed, for 40 hours per week each, according to her. That represents a rough cost of approximately $15,840 per month. She went on to say that if she didn't get the staff she wasn't sure how she was going to be able to meet staffing needs. She also added that she had called Supplemental Staffing and they had no nurses available.

I was disturbed to say the least. I had heard previously that there was friction between her and the agency nurses from Supplemental. When I called supplemental back on January 9, 2006, I spoke with Geneva, Senior Staffing Manager. I asked her if her agency had any recorded problems from their employees working at the RMF. She informed me that there were problems with Ms. Fisher. According to her nurses Ms. Fisher was rude to them and assigned a patient load that was too high.

I called Supplemental at 12:07 PM and spoke with Bryan Allison who is the Recruiting Manager. I identified myself and asked him if they were having problems finding nurses for the RMF he stated that yes they were. I asked him if he could tell me why. He stated that he was glad that I called. He was aware of a problem here and had made several attempts to speak with Ms. Fisher. He had complaints from 2-3 of his nurses who did not wish to return to the RMF due to their treatment from Ms. Fisher. He said the RMF in general had a poor reputation in his agency and Ms. Fisher in particular as being "hard to work for".

I asked him if I assigned another point of contact person for his agency would that help matters. He readily agreed that might improve his ability to recruit and retain agency nurses who could work here.

On this same date at approximately 3 PM I spoke with Ms. Fisher in my office. I informed her that I had a problem. I advised her that subsequent to speaking with her and being told that Supplemental was unable to provide additional nurses I contacted them and talked to Bryan to see what the situation was. I related to her that he told me of concerns by his staff nurses and we agreed another point of contact was preferred. I asked her who she wanted to designate.

**Fisher-200216**

knowledge then it seems to be more of a power and control issue and not leadership ability. This is the trend I think I perceive in these circumstances

During a nurse managers meeting in November I held a long discussion on process change and how to deal with and implement it. They were all to attempt one process change with the guidance I had given them. At the following nurse managers meeting I went around the room and asked the managers to share at least one of the efforts they had attempted. Most of the managers related one situation that came out with success. Ms. Fisher related telling her staff that PAR levels were not being kept and they were to address this. When such time passed that it wasn't addressed to her satisfaction she made the changes herself. She went on to say that she made the ER nurses angry with her changes. It was painfully obvious that she made no attempt to work with the staff or empower them. She simply made assignments and stepped back and watched till her patience were exceeded, then acted on her own, just as she had done with the supply room at Goree. It is a small wonder the staff in the ER was upset. Even the other nurse managers tried to explain the difference, but she crossed her arms and legs and looked off in the distance and certainly appeared to me that her attentiveness to other opinions and points of view was not what she makes it out to be in her rebuttal statement.

During this meeting I had asked another Cluster Nurse Manager to share with the rest her approach to management. I had seen this in the past and it struck me as particularly personable and empowering. She seems to have pretty good responses from her employees. When she began relating how she works with her staff Ms. Fisher comments were that her staff was just "different" from hers in Huntsville. As she talked Ms. Fisher just kept shaking her head and repeating that her staff was different. I asked Ms. Fisher if that was so could it be because of the management or in spite of it? Which came first, the behaviors of the managers or the staff? Yet again it was obvious to the average observer that Ms. Fisher had made up her mind and was not the least interested in even considering other possibilities.

Her response also stated that her ANMs are essentially useless and show no willingness to take initiative to correct problems. I do not agree with this and even if I did it is painfully obvious from my conversation with both ANMs that they are reluctant to take any actions without her express consent or face the consequences. As I mentioned above which led to the other? She points out that one of the ANMs is new and doesn't understand the needs of the pods. There is no mention whatever of what she has done to help him improve on this or how she has supported him or empowered him. She is critical of others but fails to demonstrate how she has attempted to offset these deficiencies to help them improve their performance. For example simply meeting with them on a regular basis. That had to be mandated by me and even then apparently it was not followed. Ms. Fisher seems to pursue directions when it suits her.

She talks about how most staff does not have a problem with her people skills. Is that a fact or merely her perception? It has already been demonstrated that many of the staff take her abuse and are afraid to speak up otherwise. How accurate is her feedback from the staff?

Fisher-200217

this. She has said many times, in my presence as well as that of others, that if someone doesn't want to work there then they needed to just leave. While that attitude is sometimes understandable, it is not appropriate when the staffing is critical and one loses focus on our ability to meet our mission.

She goes on to say that I have shown a lack of support for her and a lack of empowerment. Between January and the end of February, I noted that Ms. Fisher was very stressed. I told her that I wanted to assist her and that it was my desire that we meet and talk at least 1-2 times per week. I invited her into my office any time she was in that area of the building and we could just chat about the problems she was facing and I would try to help with suggestions or just listen to her vent or whatever she needed. Since that time she has yet to come by for one discussion. I have made it well know to all of my staff I have an open door policy.

She states that it is undesirable for me to circumvent her authority. I have no idea what she refers to. She states that it is undesirable for me to solicit information from both her assistants and other employees and that what is gained is not used constructively. That is an interesting observation. One such solicitation was that she had been on the property for over 2 months and still had held no staff meetings. She points out that she came in mid August and that the hurricane and other things hampered her ability to hold meetings. It is difficult to use the information fro the staff with a clear conscience when they tell me they are afraid for me to do so out of fear of retaliation from Ms. Fisher. She points out that she has repeatedly told me that she is responsible for the unit, which is true. However, she seems to overlook the fact that I am ultimately responsible for this and all of the other units in my division above and beyond her local responsibility. How am I to gauge how things are going on any unit without interaction with the staff, including her ANMs. Am I not to speak to the staff without her permission? Are the ANM's off limits? I make it a habit of asking staff how things are going. If I have a reason to believe there is a specific problem I would be remiss not to ask about it and just ignore it. Ms. Fisher's performance is my direct responsibility but it seems she would have no means to determine that absent her own reports. I find that totally and completely unacceptable. I utilize the same process to gauge operations and employee sentiments on all of the facilities, not just hers. I walk the units and chat with the staff. I have been told many times that the staff enjoy and appreciate this contact. I have even been chastised for a lack of doing so from time to time.

She also states that, "unless taken advantage of empowerment is useless." I could not disagree more. Empowerment is never useless. I suspect that Ms. Fisher doesn't even know what empowerment is. It is not simply telling the employees to do something, it is showing them they are valued as individuals and encouraging them to do things and solve their own problems. If they don't have problem solving skills they need to be led to those skills and allowed/encouraged to succeed. Not all employees are going to be outstanding performers just because they are "empowered". Micromanaging and acting on the behalf of the employees will never succeed in doing anything but ensuring that they remain dependent upon you. If a manager makes all of the decisions and fails to share

change of assignment and the ANM had denied it. The PCA went to Ms. Fisher and she approved it without speaking to the ANM. She also stated that several schedules had been altered after the fact and the RN staff was not consulted. I have not been able to verify this at this point but will be looking into it further. It seems that Ms. Fisher's treatment of staff has not changed appreciably as supported by the investigation of the grievance cited elsewhere in t his document.

It seems that the same general concerns I have expressed throughout this document were essentially independently supported by the investigation of Ms. Melton and Ms. Gotcher.

On March 26, 2006, I received an email from Mr. Aguilar who announced that he was accepting a promotion to Cluster Nurse Manager in a southern division district. I later spoke with him on the phone and discussed his reasons for transfer. Among other things he cited that he felt Ms. Fisher was trying to run him off. On March 10, 2006 I had met with him and Ms. MacCartney and Ms. Fisher. Ms. Box was also present for the meeting. One of the underlying and consistent themes that had revealed itself with this groups dynamic was that there was insufficient communication between the ANMs and Ms. Fisher. Among other topics I discussed was better communications. I directed that Ms. Fisher meet with the ANMs at least once per week if not more. The meetings didn't have to be either long or elaborate, but they needed to discuss views and what was happening in the facility and maintain good communications and a focused direction. I made several assignments and made known a change of bed allocation based upon acuity was coming to the RMF and we would be taking on observation beds soon. I felt that should give them more than enough to discuss and work toward as a team. I felt it gave Ms. Fisher a fresh opportunity to step up as a leader with a small intimate group she could at least attempt to mold into a cogent team. As of March 30th I spoke with both ANMs and they both agreed there had been on meetings.

During this same meeting I advised them to acquire two EKG monitors for the obs beds and to form a Corrective Action Team (CAT) for the unit. As of 3-24-06 no monitors had been sought and no CAT team members had been selected. Neither of these assignments would have taken long to either accomplish or delegate. I had to revisit this with Ms. Fisher and amazingly enough when I did both were accomplished in less than 24 hours.

On 3-13-06 I met with Ms. Fisher and was also joined by Ms. Box regarding Ms. Fisher's semi-annual evaluation. I gave it to her to read. In short order she became unhappy with the evaluation and began questioning it. I didn't feel it was overly critical or accusing but her reaction seemed to indicate that she felt it was. At that time, after lengthy discussion I suggested that she take the evaluation with her and look it over and make suggestions for amendments if she felt something was not agreeable to her. She elected to do so. As of 3-23 the evaluation was still not returned. I emailed her to please return it by 3-24. She eventually returned it by 3-27.

In the evaluation I made mention of the fact that turnover at the RMF had been steady, but that it *could be attributable to many reasons and it bore watching*. In her response she felt the need to list why each employee left. I felt she was overly defensive about

Since that meeting Ms. Fisher has approached me with disciplinary actions for several staff nurses, among which was Mr. Aguilar. She wanted to give him a written warning for a sharps count that was off. I asked her why a written as opposed to a coaching or an oral reminder. She stated that she felt the needed to be consistent and that she had done the same thing at the Huntsville unit and people had missed merit raises as a result and that she had "faded heat" for her decision to do that. Upon further reflection I recalled that those were done in light of a missing instrument. A missing instrument is a big deal and could result in the lockdown of an entire facility. When I called this to her attention she stated that there were also instruments missing at the RMF as well. As we discussed it further she finally admitted that she was not sure if anything was actually missing or if it was just a mathematical error and had said as much to security.

So in my analysis this was not actually a confirmed case of a missing instrument. Yst despite this she was prepared to hand out written disciplinary action to several staff, knowing already that the morale is suffering here over an issue that is not even certain. She wants to be "consistent" when it suits her. She seems to have overlooked that there was a lesser step in the PREP process for an oral reminder. When I reviewed Mr. Aguliar's statement regarding the count being off I could plainly see that I could well have been written up over the same thing for performing the same actions as he did. In the count process the other nurse counted the actual sharps and he merely verified that number with the log. How can he have been at fault for certain? If her count matched what was in the book how can you pinpoint where the error even occurred?

Ms. Fsiher wanted to refer several staff, again including Mr. Aguilar, for a written disciplinary for failing to move a suicidal patient to direct observation pending transfer to crisis management. The patient was an in-patient whose room was directly across from the nurses station. He was either bed bound or wheelchair bound. It ultimately took about 24 hours to get him to crisis management. When he arrived he was physically so ill that Crisis management failed to accept him. He later died from his illness. Ms. Fisher wanted to discipline approximately four nurses for failing to place the patient in direct observation. She later admitted to me she wasn't even sure how one of the nurses was even accountable for the process, but yet she was willing to discipline her anyway. She didn't seem to be overly concerned that the patient died from clinical, not mental health issues and this was not caught by the staff during assessments. She stated that she was motivated to take actions because she was sent to peer review for a similar situation and her former ANM was disciplined for failing to monitor another suicidal patient. There were considerable differences in these cases.

I contacted MHS services for a second opinion and they were familiar with these case. They agreed that while this was a technical violation of the MHS portion of the policy that it was making a mountain out of a mole hill in light of the eventual outcome and that more focus needed to be on clinical processes.

During my investigation of the grievance by the staff nurse one of the things she reported to me was that subordinate staff still bypass the RNs and ANMs and get special consideration from Ms. Fisher. One such thing she cited was that a PCA had requested a

**Fisher-200220**

were not consulted about the changes.  Ms. Fisher's position was that she had warned them previously that the PAR levels needed to be addressed and when she felt sufficient time had passed and the opportunity arose she made the adjustments herself.  She didn't give them a specific time span to make the changes.  She didn't consult with them to ascertain if the PAR levels themselves might not be need to be adjusted upwards as opposed to adjusting the stock downwards.  She gave them no reason to believe she would make the changes if they failed to do so.  She happened to be working one night that was slow and made said changes.  When the nurses that work there on a regular basis retuned they were at a loss as to what had happened and where to find certain supplies.  This was one of the change processes Ms. Fisher refers to as a success at empowering people.  I could not disagree more.  One theme I have literally harped on since my coming to this area is to make your expectations known to the staff.  I cannot recall how many times I have said this to all of the nurse managers and how important I feel it is.

Prior to his meeting with the ER nurses I had already concluded there were problems at the RMF which I didn't feel totally adequate to assess.  I was concerned that my close proximity to the issues might be a case of not seeing the forest for the trees.  I contacted my supervisor, Northern Region DON Mary Gotcher and shared with her my concerns.  She asked if it would be helpful for her to come tot eh RMF and talk with the staff and see if she could make a more objective assessment.  I readily agreed this might be productive.

Ms. Gotcher and Ms. Melton came to the RMF on the 17th and 18th of January and met with the staff.  I was ware there were some staff who had an axe to grind, either real or imagined, with Ms. Fisher.  I made it a point to contact certain members of the staff and request that supporters as well as opponents had an opportunity to speak.  I wanted a balanced story told whatever that might be.  I was approached by some staff who said that they wanted to talk to the DON but were afraid that if they did so they might be retaliated against by Ms. Fisher.  I assured them that would not be allowed and furthermore if they truly felt the need to be heard this was a good opportunity and if they chose not to take advantage of it and not to be passive aggressive and complain without taking actions of their own. If they truly felt there were problems this was their chance to do something. In addition, it was decided by mutual agreement that I would not be present for any of the interviews.  Neither I nor Ms. Gotcher wanted there to be any question regarding influence of opinions or reports by staff.

Following these meetings Ms. Gotcher and Ms. Melton met with Ms. Fisher and covered all of the areas of concern.  I was not present for this meeting.

Within a few weeks Ms. Gotcher returned to the RMF and shared her expectations with the staff.  Among her expectations for Ms. Fisher were that all of Ms. Fisher's communications with staff be professional. That she would seek advice from the Estelle staff before making any significant changes. That Ms. Fisher treatment of all employees and staff is fair and equal.  She further stipulated that the chain of command not be bypassed.



**UTMB**
The University of Texas Medical Branch

David Watson, RN, BSN
Senior Cluster Nurse Manager
Huntsville Cluster
UTMB Correctional Managed Care
Estelle Regional Medical Facility
264 FM-3478
Huntsville, Texas 77320-3322

September 17, 2004

**TO:**        Jackie Fisher, RN, Cluster Nurse Manager

**FROM:**   David Watson, Huntsville Cluster Nurse Manager

**RE:**        Letter of expectation

Recently there was a situation at the Ferguson Unit that resulted in some misunderstandings and miscommunications. This is a letter of expectation that is intended to clarify some of those issues for future reference. This is not a written warning.

You are expected to be familiar with the following guidelines:

- If a provider's order is received with regard to the transfer of a patient who is or has exhibited any signs or symptoms or self harm or harm to others, that patient is to be transferred off the unit in accordance with those orders. In the event a situation should arise such that the patient refuses the transfer, that is an issue that should be resolved between the patient in question and security personnel.

- If you feel a provider does not fully appreciate the concern for a situation wherein a patient is threatening harm to self or others and the provider neglects to order a transfer to a higher level of psychiatric care, you are to act as a patient advocate and call the backup provider for a second consultation. In the event both providers neglect to order a transport you will attempt to contact the medical director for Mental Health Services for additional input. You will carefully document that a provider did not grant the transfer. You will be expected to share the results of the consultation with security staff.

- After hours call documents are intended to protect all parties involved and document care provided. It is in the patient's best interest and that of UTMB to see that these documents are carefully completed and incorporated into the patient's chart as soon as practical, i.e. the next business day. You are expected to know and comply with Nursing Service Policy E-37.2 that addresses this situation. In addition you may elect to create a chart clinic note to further document pertinent concerns or issues.

- You should be aware that a patient may not sign, nor should they be offered, a Refusal of Treatment form for crisis management transfers.

*Watson*

**EXHIBIT NO.** 4

**FISHER-101190**

- In the event the orders you receive from a provider conflict with the patient's desire for treatment, you are to re-contact the provider and advise him/her of the status of the patient so that he/she may give consideration to other alternatives if they so choose. Whatever is decided should be clearly reflected in the documentation.

- You will conduct an in-service(s) with all nursing staff to ensure these guidelines are universally understood and followed. I suggest that management personnel of the unit and/or cluster be invited as well. This should be completed no later than October 15, 2004.

- You are to conduct an in-service(s) with security personnel to make sure they know what to expect under the circumstances outlined above. This should be completed no later than October 15, 2004. They should also be made aware that if they are not comfortable with the decisions made they have the option to appeal to a higher level, i.e. the Huntsville Senior Cluster Nurse Manager or Senior Practice Manager.

_Jackie Fisher, RN, CNM_                              _9-22-04_
Jackie Fisher, RN, CNM                                Date


CC:    Tom Wooldridge, DON
       File

FISHER-101191



**UTMB**
The University of Texas Medical Branch

David Watson, RN, BSN
Senior Cluster Nurse Manager
Huntsville Cluster
UTMB Correctional Managed Care
Estelle Regional Medical Facility
264 FM-3478
Huntsville, TX 77320

May 30, 2003

**TO:**     Jacklyn Fisher, RN, Assistant Nurse Manager, Wynne Facility

**FROM:**   David Watson, RN, BSN, Senior Cluster Nurse Manager

**RE:**     GEM Card

Ms. Fisher I just wanted to take a moment to tell you how much I appreciate the job you do for our cluster and UTMB. Recently when I toured the facility it was very obvious that many improvements have been made since you came. It was also very obvious the staff enjoy working with and for you. It appears that you motivate and support the staff to work hard and still create a light and friendly atmosphere. My compliments to you on your work. Please accept this GEM card as a small token of my appreciation for the great job you do. I look forward to many fruitful years working with you.

If I may be of any assistance to you or your staff do not hesitate to call. Thanks you again.

Sincerely

David Watson

David Watson

To JACKLYN Fisher

From DAVID WATSON                   Ext.

Reason FOR MOTIVATING AND SUPPORTING

her STAFF THROUGH A DIFFICULT TIME

Date Given 5/30/03

Entered into Drawing by _____ (Validation line)

Initials of supervisor or other authorized agent required for drawing entry

Item #65114    For more details go to www2.utmb.edu/gem or call 772-7900

Watson

EXHIBIT NO. 2

**GEM**

**GOING THE EXTRA MILE**

1 GEM POINT

**FISHER-100090**

 **UTMB**
The University of Texas Medical Branch

David Watson, RN
Senior Cluster Nurse Manager

Huntsville District
UTMB Correctional Managed Care

April 11, 2006

Jacklyn L. Fisher, RN
Cluster Nurse Manager
Estelle Regional Medical Facility
University of Texas Medical Branch at Galveston
UTMB Correctional Managed Care

Dear Ms. Fisher:

This letter is to notify you that I intend to request your demotion to Nurse Clinician III effective April 13, 2006, due to your continued failure to meet minimum performance expectations. A pattern of performance has been identified that represents significant areas of deficiencies in your performance. Those areas are:

1. Ineffective communications with subordinate staff
2. Insubordinate attitude toward your supervisor
3. Failure to follow your supervisor instructions
4. Ineffective management/leadership

The factual basis that supports my intent is as follows:

**Ineffective communication with staff:**

- During your first year as a Cluster Nurse Manager for the Huntsville, Goree and Ferguson Facilities numerous complaints were received by the Senior Cluster Nurse Manager's office regarding your communications with staff. The complaints included that you spoke in loud, stern tones, failed to listen adequately and continued to interrupt them when they spoke. While you denied these allegations, you were counseled regarding your communication in 2005. During the counseling session you displayed this same behavior towards your supervisor. At that time you agreed to set a goal for the following year to improve your communication skills.
- Although some improvement in your communications skills was noticed over the next few months, you again exhibited an argumentative behavior during several nurse manager meetings. At times it became necessary for your supervisor to instruct you to stop your discussion/arguments in order to proceed with the meeting.
- When you transferred to the Estelle Regional Medical Facility (ERMF) in August 2005, the same type of complaints regarding your communication/interaction with staff were reported to your supervisor's office. Once again you denied that it was a concern. At that time, it was suggested that you set another goal to improve this area of your management style.



Watson

EXHIBIT NO. 25

Fisher-200068

Jackie Fisher, RN
April 11, 2006
Page 2

- In January 2006, Mary Gotcher, the Northern Region Director of Nurses and Georgia Melton, the Northern Region Human Resources Administrator, received similar reports of your poor communication from multiple staff members during their investigation of complaints of staff dissatisfaction.
- On March 9, 2006, a grievance was filed by one of your employees alleging that you spoke to her in a demeaning and demoralizing way in front of both patients and correctional staff. The investigation of the allegation revealed evidence to sustain this grievance.

## Insubordinate attitude toward your supervisor and Failure to follow your supervisors instructions:

- On 3-22-06, you informed your supervisor that staffing at the ERMF was so critical that you would require a minimum of three, full time agency nurses to meet mission goals. I advised you that due to complaints about you from the contracted nursing agency, Supplemental Health Care, who supplied nurses, the representative reported that they are having problems recruiting nurses to work at the ERMF. The reason given was due to your unprofessional behavior towards the temporary nurses during their assignment(s) at the ERMF.
- At that time, you were instructed to provide an alternate contact at the ERMF for that agency's staff, however, you refused to do so. You were unable to provide an appropriate explanation for your refusal to follow this instruction and you stated that you just would not use the agency in question. Your refusal to cooperate indicated to your supervisor that you were willing to allow a potential disaster to befall the operations of the unit because you didn't wish to follow my instructions.
- You were then directed to contact another nursing agency to secure temporary nursing staff. In the event that the second agency was unable to supply nurses, you were directed to appoint a contact person (other than yourself) at the ERMF to work with the representative from Supplemental. This instruction from your supervisor was very explicit that this point of contact was to be the liaison for all situations except an emergency on site.
- The name of your contact person was requested by your supervisor at least twice via email before you finally provided this information. Upon speaking with the agency a few days later, your supervisor was informed that you instructed them (nursing agency) to contact the alternate person *only if you were not available*. This is in direct violation of your supervisor's instructions.
- On March 10, 2006, during a meeting with your Assistant Nurse Managers (ANM) we discussed the need for you to improve communications with both of them. Both of your ANM's had expressed to your supervisor that you were not keeping them informed of your actions and decisions. They frequently learned about changes you made from the staff after the fact. They felt left out and ill prepared to deal effectively with the staff as a result. During this meeting, you were explicitly advised that you were to meet at a minimum of once per week or more if needed. As of 3-27-06 both ANMs informed your supervisor that you have not met even once with them. Again, this is a direct violation of my instructions.

Fisher-200069

Jackie Fisher
April 11, 2006
Page 3

- In February 2006, your supervisor requested that you meet with him informally 2-3 times per week in order that he may keep abreast of problems/issues and provide assistance to you. As of this date, you have failed to adhere to your supervisor's request.
- On March 13, 2006, when your supervisor presented your semi-annual evaluation you objected to some parts of the evaluation. This document was given to you with instructions to closely review and offer alternate wording or constructive comments so that we could negotiate what you felt was fair. Ten days later you still had not returned the evaluation and your supervisor had to request it's return.
- In the last paragraph of your response to the evaluation, you accused your supervisor of circumventing your authority, soliciting information from your assistants and other employees without constructive use of information. This accusatory tone in your response displays an insubordinate attitude towards your supervisor.

## Ineffective management/leadership

- You assumed the Cluster Nurse Manager position of the Goree, Huntsville, Ferguson cluster, in August 2003. Your supervisor expressed concerns regarding the performance of your Assistant Nurse Manager, Ms. Kelly, who was assigned to the Ferguson Facility at that time. Some of the concerns were that she seemed to have a lack of time management, organization and leadership ability.
- Over the course of the next several months, this person's performance showed no improvement, however, you failed to prepare a Corrective Action Plan to address her deficiencies.
- Your supervisor allowed your ample opportunity to address the ANM's performance issues, however, after approximately another three months it was necessary for your supervisor to direct you to make such a plan. You refused to accept any accountability for your lack of action for the better part of the preceding 18 months.
- Attempts were made to implement the provider assisted sick call process at the Huntsville Facility during your assignment at the facility. You resisted the process change so intensely that your team members (The Practice Manager, Mid-Level Practitioner, a Physician and the Cluster Medical Director) requested that you be removed from the team. This issue was finally resolved when your supervisor intervened. Your resistance to this process change had a significant impact on the patient care flow and on the clinic operations. You later commented in the presence of witnesses that you were disappointed that your supervisor had intervened because you thought if the problems had lingered a little longer the entire program would have failed miserably thus supporting your original belief that provider assisted sick call was a bad idea.
- In late 2004, during the onset of the cold and flu season, the Huntsville Unit was besieged by an abnormally high number of sick call requests (70) from patients suffering from what appeared to be flu or other acute respiratory infection. Due to the absence of the Mid-Level, the Medical

Fisher-200070

Jackie Fisher
April 11, 2006
Page 4

    Director agreed to see patients. Without consultation with a Medical Director, you ordered the patients dismissed from the clinic due to only two nurses being available. It was necessary for the Medical Director to intervene in order to proceed with patient care. Again, you attempted to interfere with the patient care and interrupt the workflow of the clinic.

- By your own admission, you did not conduct staff meeting between August 2005 and November 2005 at the ERMF. Your supervisor has expressed his expectations to all of his Nurse Managers regarding the need for regular staff meetings to ensure communication throughout the department

Before I ask for your demotion, you have the opportunity to tell me, whether in writing or in person, if any of my facts are incorrect or if there are any reasons why you should not be demoted. If you wish to take advantage of this opportunity, a hearing has been scheduled at 10:00 a.m. on April 12, 2006, in Room 181 of the Health Services Building in Huntsville, Texas. If you choose not to attend this meeting you may submit your information in writing at that time. If I do not hear from you, I will assume you do not wish to respond and your demotion will be effective on April 12, 2005 at 5:00 PM.

Sincerely,

David Watson
Senior Cluster Nurse Manager

I am in receipt of a copy of this letter.

*I disagree with the content.*

Jackie Fisher, RN      4-11-06
                                                  Date



David Watson, RN
Huntsville District Nurse Manager

UTMB Correctional Managed Care

May 2, 2006

Jacklyn Fisher, RN
Estelle Facility
University of Texas Medical Branch at Galveston
UTMB Correctional Managed Care

Dear Ms. Fisher:

I have carefully reviewed your response regarding my intent to demote. I found nothing compelling in your response to alter the decision to demote you.

However, I have made the decision that you will be demoted to the position of Assistant Nurse Manager rather than Nurse Clinician III as originally intended. You will be assigned to the Wynne Unit and answer directly to Cluster Nurse Manager Kim Roddey. In addition, you will be reassigned to District Nurse Manager Carol Warren. Your salary will be $65,352.00, annualized. This action will be effective on May 6, 2006.

You have the right to appeal my decision under the UTMB Human Resources Appeal Policy 3.10.2. If you wish to do so, you must contact Sandy Rader, Human Resources Administrator within five (5) working days.

Sincerely,

David Watson, RN
District Nurse Manager

Watson
EXHIBIT NO. 26

FISHER-100212