UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JACKIE FISHER,                      *
     Plaintiff                    *
                         *
                         *    CIVIL ACTION NO.
     v.                           *    4:08-CV-01273
                         *
UNIVERSITY OF TEXAS                 *
MEDICAL BRANCH and DAVID            *
WATSON,                             *
     Defendants                   *

**********************************************************

ORAL DEPOSITION OF
JACKIE FISHER
AUGUST 26, 2009

**********************************************************

    THE ORAL DEPOSITION OF JACKIE FISHER, produced as

a witness at the instance of the Defendants, and duly

sworn, was taken in the above-styled and numbered

cause on August 26, 2009, from 9:59 A.M. to 2:41 P.M.,

before Angelica Rodriguez, Notary Public in and for

the State of Texas, reported by electronic reporting

and transcription, at the offices of Jo Miller, 505 N.

Main, Carriage House, Conroe, Texas 77301 pursuant to

the Federal Rules of Civil Procedure and the

provisions stated in the record or attached hereto.

2

1                              APPEARANCES

2    FOR THE PLAINTIFF:

3              Law Office of Jo Miller
               By: Ms. Jo Miller
4              505 N. Main
               Carriage House
5              Conroe, Texas 77031
               Phone: (936) 539-4400
6
     FOR THE DEFENDANTS:
7
               Office of the Attorney General
8              General Litigation Division
               By: Sam Lively
9              300 West 15th,  11th Floor
               Austin, Texas 78701
10             Phone: (512) 463-2120

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                              INDEX

2                                                      Pag

3   Stipulations      . . . . . . . . . . . . . . . . .

4   Appearances       . . . . . . . . . . . . . . . . .

5   Examination By Mr.

6   Examination By Ms. Miller     . . . . . . . . . . .

7   Signature and Changes     . . . . . . . . . . . . .

8   Reporter's Certification      . . . . . . . . . . .

9

10                            EXHIBITS

11  No.   Description

12   1    Plaintiff, Jackie Fisher's Original Complaint and

13        Jury Demand    . . . . . . . . . . . . . . . . 50

14   2    Emails between Jacklyn Fisher and Becky Faiello

15        dated May 6, 2009    . . . . . . . . . . . . . 129

16   3    Reply to Grievance from Judy Upshaw to Jackie

17        Fisher . . . . . . . . . . . . . . . . . . . . 139

18   4    Email from Jackie Fisher to Judy Upshaw dated

19        January 16, 2009    . . . . . . . . . . . . . . 140

20   5    Grievance filed by Jackie Fisher dated March 16,

21        2009 . . . . . . . . . . . . . . . . . . . . . 141

22   6    Letter from Judy Upshaw addressed to Jackie Fisher

23        dated March 10, 2009    . . . . . . . . . . . . 142

24

25

4

1                          JACKIE FISHER,

2     having been duly sworn, testified as follows:

3                          EXAMINATION

4     BY MR. SAM LIVELY:

5          Q.     Would you go ahead and please state your whole

6     name for the record, ma'am?

7          A.     Jacquelyn Lynette Fisher.

8          Q.     How do you spell Lynette, L-Y?

9          A.     Lynette, L-Y-N-E-T-T-E.

10         Q.     Okay.  Ms. Fisher, have you ever had your

11    deposition taken before?

12         A.     Not that I can recall.

13         Q.     I'm sure Ms. Miller has kind of gone over it,

14    but I'm going to go over some of the ground rules for

15    us.  Most of the ground rules are for the benefit of

16    the court reporter and a clear record.  After we get

17    through here today, the court reporter will prepare a

18    booklet, a transcript, and it'll be please state your

19    name, Jacquelyn Lynette Fisher, Line One, Two and

20    Three.  In other words, it's a cold-printed record.

21    And we don't have the benefit of a lot of nonverbal

22    communication that we have sitting face to face.  You

23    nod your head, you point at things, and it's all

24    perfectly clear to us here because we're sitting here.

25    But, you look at the record six weeks from now or six

1  work for me at the Estelle Facility.

2      Q.   Okay.  And I am getting -- it's my

3  understanding, and please correct me if I'm wrong,

4  employees can request transfers from various units

5  within the Huntsville area.  I guess you can go

6  anywhere in the -- in the prison system.  But, it's not

7  unusual for an employee to go I'd like to transfer from

8  this unit to that unit, is it?

9      A.   That is correct.

10     Q.   I mean, there's a process involved in that.

11  You may get it, you may not, correct?

12     A.   That is correct.

13     Q.   How do you go about making that app -- or do

14  you file an application?  Do you ask orally or how --

15  how is that typically handled?

16     A.   Typically it's supposed to be that they file

17  an application for a vacant position that posted.  You

18  interview them and select the best applicant.

19     Q.   Okay.  Is that -- usually has done?

20     A.   For the most part.

21     Q.   Okay.  In other words, for the most part, I

22  mean, a person working at one unit may say, okay

23  there's a job posting, and I feel like I'm qualified

24  for, and I'd like to be closer to home, and so I'm

25  going to apply there.  And you go through the usual

1     Q.    Oh, PCA.  Okay.  Anything else?

2     A.    That's it.

3     Q.    Okay.  See, I told you that's how the memory

4  worked.  And did I understand you correctly that this

5  investigation occurred over two consecutive days?

6     A.    From my understanding.  As stated earlier, I

7  was out on pretty much bereavement leave during the

8  whole onsite investigation.

9     Q.    Oh, okay.  Okay.  Did -- were you ever given

10 an opportunity to tell your side of the story, so to

11 speak?

12    A.    Yes.  If I can finish just explaining the

13 onsite investigation.

14    Q.    Sure.

15    A.    At the time I supervised like 42 people.

16    Q.    Right.

17    A.    Okay?  And as far as explaining my side of it

18 I can't remember, maybe a week or later, I e-mailed

19 Ms. Gotcher and/or Ms. Melton.  I think maybe

20 Ms. Melton and copied Ms. Gotcher or vice versa and

21 requested that -- that I meet with them to basically

22 find out what was said or what the decisions was or --

23 to basically figure out what had went on and what the

24 conclusions were.

25    Q.    I presume you did that after you had returned

76

1  **from Tyler?**

2      A.    After I had come back to work from bereavement

3  leave I did.

4      **Q.    Okay.  And so you asked an opportunity, I**

5  **guess, in essence to visit with people in your chain of**

6  **command what's this all about?**

7      A.    Correct.

8      **Q.    Did you get an opportunity to visit with chain**

9  **of command when you returned?**

10     A.    Correct.  I visited with Ms. Gotcher and

11  Ms. Melton.

12     **Q.    Okay.  Was that a personal visit like we're**

13  **having today?  I mean, you got down --**

14     A.    Well, they came out -- they came to the

15  facility, and we met in a private area, in a conference

16  room, to discuss what -- what had taken place, and

17  what -- what was said.  So, I guess, pretty much.

18     **Q.    How long did this meeting last?  Do you**

19  **remember?**

20     A.    I want to say maybe an hour.

21     **Q.    Okay.**

22     A.    If not longer, a little longer.

23     **Q.    Did you have an opportunity then to learn of**

24  **what prompted the investigation?**

25     A.    At that time I did ask because that was my

1    Q.    Were there any employees from the other nurse

2  manager?  I can't remember her name.

3    A.    No.  And I wanted to -- I wanted to back up,

4  and -- and I didn't know where to stop to back up.

5    Q.    Okay.

6    A.    But, no.  And -- and just because you -- we

7  landed there, I'm going to go ahead and make the

8  statement.  Even though the e-mail included the other

9  nurse manager's employees, when they came out and did

10 the onsite investigation they never went to the other

11 nurse manager's building, which was probably less than

12 300 feet.  And at the time her vacancy rate was much

13 higher than mine, her staffing levels much critical

14 than mine.  They never set foot in her building, none

15 of her employees were interviewed, and she was not

16 subjected to demoralizing treatment.

17   Q.    And you told me this woman's name, but I --

18   A.    Joyce Bahns.

19   Q.    So, the -- so, your co-nurse manager at the

20 Estelle Unit was Joyce Bahns?

21   A.    Correct.

22   Q.    And -- and I gathered from your answer that

23 you were each given, kind of, two separate buildings

24 to -- to run?

25   A.    She had -- on the complex is four buildings.

1  offensive because I did not -- I felt like they took

2  employees' allegations and did not research any of them

3  to find out if there was any validity to them.  But,

4  yet, and still I was expected to switch a behavior

5  because of what an employee had said.

6      **Q.   Were you given an opportunity in your meeting**

7  **be -- to -- when you were told about the gist of the**

8  **onsite investigation's conclusions or what the**

9  **employees have told them, were you given an opportunity**

10 **to address those employee complaints?**

11     A.   Pretty much I was.  Yes.  I -- I, pretty much,

12 told my side of the story.

13     **Q.   Okay.  And then, the list of expectations came**

14 **to your attention?**

15     A.   Not that day.  Not that day.  In a complete

16 different meeting.

17     **Q.   A few days later or a week?**

18     A.   I don't know if it was a few days later or a

19 week.  I can't remember.  It wasn't that long.  It was

20 shortly after.

21     **Q.   That's -- okay.  The sequence was, you had a**

22 **meeting, got to tell your side of the story, and then,**

23 **some time later you had, what I'm calling, the group**

24 **meeting?**

25     A.   Correct.

1    Q.    And do you remember what areas you were given

2  a poor evaluation in?

3    A.    The whole evaluation was poor.

4    Q.    Did you have an opportunity to sit down with

5  Mr. Watson and go over that evaluation form?

6    A.    I had asked for a meeting with Mr. Watson, and

7  the meeting was scheduled or at least the meeting was

8  said that we would meet with you when you come back

9  because I had -- at that point I was getting ready to

10  go off for a week -- a week.  My -- my little boy had

11  surgery, so --

12    Q.    Okay.

13    A.    -- I had taken a week off.  So, pretty much,

14  the -- when I got the evaluation I did a rebuttal to

15  the evaluation and I --

16    Q.    A written?

17    A.    A written rebuttal, and I asked that -- if I

18  could meet with him when I got back.  And it was pretty

19  much, kind of, passed on to "yeah, yeah, whatever, when

20  you come back, and I'll sit down and talk to you about

21  it."

22    Q.    Did you eventually talk with Mr. Watson about

23  it?

24    A.    The day I came back off of that week leave, I

25  received my demotion letter.

93

1   you demoted to?  Do you remember?

2        A.   Rephrase that question, please.

3        Q.   Yeah.  'Cause I thought, correct me if I'm

4   wrong.  I thought you were demoted when it all shook

5   out only to assistant nurse manager?

6        A.   That is correct.  When it all shook out.

7        Q.   Okay.  Well, let's talk about how it got

8   shaken out.  You get a letter giving you a demotion?

9        A.   Uh-huh.

10       Q.   And somehow the demotion changed from nurse

11  clinician III to assistant manager?

12       A.   Correct.

13       Q.   Nurse -- assistant nurse manager?

14       A.   Correct.

15       Q.   Did you do anything to get it changed from

16  nurse clinician to assistant nurse manager?

17       A.   Well, I got the demotion letter, I filed an

18  appeal.

19       Q.   Okay.  And to -- to whom -- is that to HR?

20       A.   To HR.

21       Q.   Okay.  And was the appeal then handled or what

22  happened?  You filed an appeal what happened?

23       A.   The first level appeal it was -- finally came

24  maybe weeks later 'cause you have -- you know when you

25  file an appeal and grievances is all time line.  So,

94

1  the first appeal that I file -- filed it -- it

2  eventually way at the deadline I was sent a letter.

3      Q.    Saying what?

4      A.    At that time, I think it said that I would be

5  demoted to an assistant nurse manager and report to the

6  Wynne Unit.

7      Q.    Okay.  So, they reduced the terms of your

8  demotion?

9      A.    Correct.

10     Q.    And so, when the appeal worked its way through

11 the process you got another letter saying you're going

12 to win and you're being demoted to assistant nurse

13 manager.  Did I understand you correctly?

14     A.    Correct.

15     Q.    Okay.  And how long did that -- that take?

16 And again, I don't need the exact -- was it --

17     A.    Let's see.

18     Q.    -- days or weeks?

19     A.    Probably weeks.

20     Q.    Okay.  Did you take -- what happened then?

21     A.    What do you mean what happened then?

22     Q.    You're -- you've gotten a second letter saying

23 okay, go to Wynne, and it's not to nurse clinician.

24 It's to -- to assistant nurse manager.

25     A.    Okay.  Let me --

1     Q.    **Then what happened?**

2     A.    Okay.  Let me -- let me back up.  When I got

3 the first demotion letter and I did the first appeal,

4 at that time I went out to take care of my son on

5 family medical leave.  So, I got this letter while I

6 was out --

7     Q.    **The second letter?**

8     A.    Correct.

9     Q.    **Okay.**

10     A.    And then, when I returned I went to Wynne as

11 the assistant nurse manager.

12     Q.    **Okay.  And how long did you work then at Wynne**

13 **as the assistant nurse manager?**

14     A.    From like June '07 till I was reinstated as

15 the nurse manager, which I'm still at Wynne.  Wynne is

16 still one of my units.

17     Q.    **Okay.**

18     A.    So, I worked there as assistant nurse manager

19 from June -- around June '07.

20     Q.    **Till -- then you -- it's my understanding, at**

21 **some point, you were -- that demotion was reversed as**

22 **well and you were put back to being a nurse manager?**

23     A.    Well, that is correct.  Ultimately, at the

24 end.  But, in between -- in between being put back as a

25 nurse manager, I got another letter to demote me from

 1  assistant nurse to a staff nurse again.

 2       Q.    **Would that be nurse clinician?  Is that the**

 3  **same thing?**

 4       A.    Uh-huh.

 5       Q.    **Yes?**

 6       A.    Correct.

 7       Q.    **Okay.  And what happened?  That would be your**

 8  **third letter.**

 9       A.    Correct.

10       Q.    **Okay.  And after your third letter, did -- did**

11  **you appeal either the second or third letter?**

12       A.    I appealed each of them.

13       Q.    **Okay.  Did any of the demotions that you got**

14  **have anything to with the B -- Board of Nursing**

15  **Examiner findings?**

16       A.    The last demotion that they said -- they were

17  demoting me from the assistant nurse manager to the

18  R.N., it eluded because -- that it was because of the

19  BON order.  The Board of Nurse --

20       Q.    **The Board of Nursing Examiners?**

21       A.    Right.  Because of the order.

22       Q.    **Okay.**

23       A.    Then I appealed it which says that there was

24  no stipulations put on my license.  I've been

25  functioning as a managers position since '05, two years

97

1  ago, and when it was convenient for me to do it, it was

2  okay.  But, now that I keep the appeals and grievances,

3  then all of a sudden, it's a problem.  You can't

4  function as a manager anymore.  Whereas, in the appeal

5  I did make it known that there had been other Caucasian

6  people that had Board stipulations that functioned in

7  manager positions.

8      **Q.   And who would those be?**

9      A.   I know for a fact one of -- well, I can't say

10  I know for a fact, but I have a very good -- Lavana

11  Wright was one of them that had had past Board

12  stipulations.  And I want to say, and I'm not really

13  sure, but I have all the information at home, I think,

14  it was Dr. Cherian which was -- had been a facility

15  medical director with Board stipulations all under

16  UTMB.

17      **Q.   Doctor what?**

18      A.   I think it was Cherian.

19      **Q.   Like the fruit, cherry man, as far --**

20      A.   C-H-E-R-I-A-N.

21      **Q.   All right.  Oh, Cherian.  Okay.  Was he a**

22  **medical doctor?**

23      A.   Medical, yes.  He was the medical director

24  for --

25      **Q.   Have you reviewed the records for Ms. Wright**

1  or Dr. Cherian?

2       A.   Ms. Wright, I do not have and actually, I

3  don't know why I did not go ahead and submit those

4  to -- to the Opens Records Act.  But, I did get

5  Dr. Cherian's through Open Records Act.  And I'm not

6  quite sure why I did not get Ms. Wright's.  Why I

7  didn't pursue it, should I say.

8       Q.   At -- so, you got -- you got a third letter,

9  if I understand correct, saying you're a nurse

10 clinician, correct?

11      A.   Correct.

12      Q.   And you appealed that through the UTMB system?

13      A.   Uh-huh.

14      Q.   Correct?

15      A.   Uh-huh.

16      Q.   Yes (whispering).

17      A.   Yes, sir.

18      Q.   There you go.  And what happened on that

19 appeal?  This would be the -- on the third letter?

20      A.   None of my appeals were -- except the first

21 appeal was answered.  The second and the third appeal

22 was never -- I never received a written response.

23 After the third appeal, then shortly after that I

24 received a letter stating, "Here's some back pay," but

25 it did not have a title or position change, which we

1  rejected it.  In the end, I received another letter

2  stating that your client is being reinstated in whole

3  to a nurse manager with all back pay.

4      **Q.    Okay.  And this came from HR?  Do you**

5  **remember?**

6      A.    It came from -- I can't ask any questions -- I

7  can't --

8      **Q.    You can ask me questions.  I mean, I may not**

9  **know the answer.**

10      A.    I'm sure it -- it may have come from the legal

11  office in Galveston.  I don't think it came from

12  Ms. Raeder's office.  I think it came from the legal

13  office in Galveston.

14      **Q.    But, at some point, and correct me if I'm**

15  **wrong, you got a letter with a check in it with back**

16  **pay?  And then, you got another letter saying you're**

17  **back to nurse manager?  Did I understand you correctly?**

18      A.    Correct.

19      **Q.    So, you got two -- two sets of correspondence?**

20      A.    Correct.  Final -- final sets, after many

21  appeals and grievances.  The final correspondence was,

22  "This is your back pay as a settlement," and then, we

23  rejected that and then, the final correspondence was,

24  "Here's your letter, we're reinstating you to nurse

25  manager."

1       A.   Yes.  But, I did not do any detailed

2   calculations as -- in comparison as what raise -- what

3   the amount would have been if I would have got the

4   raise.

5       **Q.   Was this a merit raise or a standard kind of,**

6   **for lack of better term, cost of living adjust --**

7       A.   It was a merit -- if I'm not mistaken, it was

8   a merit raise because you didn't -- if you was in

9   disciplinary you didn't get merit increases, you

10  forfeited.

11      **Q.   And I want to be clear too, although I think**

12  **you've answered it.  You've got a check, but you sent**

13  **it back, you didn't cash it?**

14      A.   No.  We didn't send it back.  I held the

15  check --

16      **Q.   Okay.**

17      A.   -- until -- and was I was reinstated

18  everything was reinstated, then I cashed the check or

19  deposited the check.

20      **Q.   Okay.  So, once you got the second set of**

21  **correspondence that says, Okay.  You're back to nurse**

22  **manager, then you cashed the check you'd gotten in the**

23  **first set of correspondence, if -- is that correct?**

24      A.   I think that is correct.  I don't remember the

25  exact date.

1  cannot file a grievance or an appeal?

2       A.    Cannot file a grievance.  I'm not -- I don't

3  understand what -- rephrase it, please.

4       Q.    You have -- during this whole process you've

5  had an opportunity to file grievances or appeals of

6  your demotion, for instance, have you not?

7       A.    For my demotion I filed basically appeals.

8  For incidents I filed grievances.

9       Q.    Right.  And in some cases those grievances

10 were -- were they done in writing?

11      A.    They were.

12      Q.    And did anybody at UTMB, the Human Resources

13 or Mr. Watson ever direct you or order you not to file

14 an appeal or a written grievance about any of these

15 problems?

16      A.    Not that I can recall.

17      Q.    When you have -- in filing these written --

18 these grievances and appeals you did so I guess in

19 accordance, to your understanding, of proper procedure

20 and policy for the UTMB Managed Care, correct?

21      A.    Correct.

22      Q.    And nobody ever denied you the right to file

23 an appeal or a grievance, did they?

24      A.    No one ever denied me the right to turn them

25 in, but no one really answered either grievance that I

117

1  demoted you?  Wherever you went, was it Mr. Watson that

2  demoted you?  Was he the motive force behind there?

3       A.   I can't honestly say that he was the force . I

4  think it was a combination, everybody included.

5  Because there's a lot -- as a manager you have to get

6  the approval of HR.  So it had to go all the way up to

7  come back down.

8       Q.   Okay.

9       A.   He -- I think he was the -- the one who

10  actually set it all in motion but I think it was a

11  combination of approvals from Mr. Watson, Ms. Gotcher,

12  and Ms. Melton's level.

13       Q.   Okay.  And during this, and we'll just call it

14  the demotion period, wherever you went and -- and my

15  question is did you have the same job benefits, not

16  wage but benefits during that time?  You know, health

17  insurance, that sort of thing.

18       A.   My benefits never changed.

19       Q.   Okay.

20       A.   Because those were pay options that I opted,

21  so my bene -- I never changed my benefits.

22       Q.   Your wage changed.

23       A.   Right.

24       Q.   Now, part of your complaint is that you were

25  retaliated against because of your right to free

1      A.    I've read 87, 88 and 89.

2      Q.    **What free speech are you claiming you were**

3  **retaliated against by the defendants?**

4              MS. MILLER:  Objection, calls for a legal

5  conclusion.

6              THE WITNESS:  Free speech is when I file

7  grievances, when I made verbal complaint.  That's what

8  I mean free speech.

9  **BY MR. LIVELY:**

10     Q.    **Okay.  Are you claiming you were discriminated**

11 **against because of your conversations with Mr. Watson**

12 **about Ms. Freeman's failure to get a transfer?**

13     A.    That's not -- no.  That may be inclusive but

14 that's not what I'm referencing.

15     Q.    **Okay.  You're referencing your complaints**

16 **about your problems with him, correct?**

17     A.    Correct . I'm referencing a discrimination,

18 how I was treated differently, received different

19 treatment, partial treatment than my peers which were

20 white nurse managers.

21     Q.    **Okay.  And there was a -- you talked about a**

22 **statement by Ms. Kim Roddy about her breasts.  What**

23 **race was Ms. Roddy?**

24     A.    She's white.

25     Q.    **Let's talk a little bit, I'm going to kind of**