

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JACKIE FISHER,            )
                          )
      Plaintiff,          )
                          )
VS.                       ) C.A. NO. 4:08-cv-01273
                          )
UNIVERSITY OF TEXAS MEDICAL)
BRANCH and DAVID WATSON,  )
                          )
      Defendants.         )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF
MARY GOTCHER
AUGUST 27, 2009

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF MARY GOTCHER, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered
cause on August 27, 2009, from 10:21 a.m. to 3:46
p.m., before Lorri Lucas, CSR in and for the State
of Texas, reported by machine shorthand, at the
offices of TDCJ Conference Center, Huntsville,
Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.



1135 East 11th Street • Houston, TX 77009
Phone: (713) 861-8589 •Toll Free: (888) 577-5048 • Fax: (713) 861-1729 • Email: bcrdepo@sbcglobal.net

```
 1                    A P P E A R A N C E S
 2
 3    FOR THE PLAINTIFF:
          Ms. Jo Miller
 4        Law Office of Jo Miller, PLLC
          505 North Main
 5        Carriage House
          Conroe, Texas   77301
 6        (936) 539-4400
 7
 8
 9    FOR THE DEFENDANTS:
          Mr. Sam Lively
10        Assistant Attorney General
          General Litigation Division
11        P.O. Box 12548
          Austin, Texas   78711-2548
12        (512) 463-2120
13        Ms. Cari G. Bernstein
          Department of Legal Affairs
14        Rebecca Sealy Hospital, Room 4.254
          301 University Boulevard
15        Galveston, Texas   77555-0171
          (409) 747-8735
16
17
18
      ALSO PRESENT:
19        Ms. Jackie Fisher
20
21
22
23
24
25
```

INDEX

|   |   | PAGE |
|---|---|---|
| Appearances | | 2 |
| MARY GOTCHER: | | |
| Examination by Ms. Miller | | 4 |
| Signature and Changes | | 137 |
| Reporter's Certificate | | 139 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Document titled "Mary Gotcher Director of Nurses, Northern Division" Fisher-200690-200692 | 62 |
| 2 | UTMB Employee General Information dated 6/25/04 Fisher-10077-10082 | 80 |
| 3 | E-mail dated 1/12/06 Fisher-200263, 200265, 200267, 200269, 200271, 200273, 200275, 200277 | 92 |
| 4 | Memo dated 1/27/06 Fisher-200249-200251 | 94 |
| 5 | Memo dated 3/1/06 Fisher-100526 | 100 |
| 6 | E-mail dated 3/25/06 UTMB-1369-1370 | 107 |
| 7 | Memo dated 4/7/06 UTMB-1351 | 107 |
| 8 | Letter dated 4/11/06 Fisher-200068-200071 | 116 |
| 9 | Letter dated 4/12/06 Fisher-200072 | 117 |
| 10 | Letter dated 5/2/06 Fisher-100212 | 120 |
| 11 | UTMB-CMC Employee Task Force Report of Recommendations August 2006 Executive Summary Fisher-100435-100442 | 131 |

```
                                                            Page   4
 1                   MARY GOTCHER,
 2   having been first duly sworn, testified as follows:
 3                   EXAMINATION
 4   BY MS. MILLER:
 5        Q    Mary Gotcher.  Right?
 6        A    "GO-cher."
 7        Q    "GO-cher."
 8        A    Um-hmm.
 9        Q    Would you spell your name for the record,
10   please?
11        A    G-O-T-C-H-E-R.
12        Q    M-A-R-Y?
13        A    Yeah.
14        Q    And, Ms. Gotcher, have you had your
15   deposition taken before?
16        A    Yes.
17        Q    Okay.  So you're familiar with the ground
18   rules or other people's ground rules and you sat
19   there yesterday during the deposition of Ms. Fisher.
20        A    Yes.
21        Q    And you heard Mr. Cummings describe his
22   ground rules for the deposition.
23        A    Yes.
24        Q    And mine are no different.  If you have a
25   question you don't understand what I'm asking you,
```

Page 19

1  here.  You're making me work.
2          THE WITNESS:  Close.  Close.
3     Q    (BY MS. MILLER)  Is that 2003?
4     A    Yes.
5     Q    All right.
6     A    That's close.
7     Q    Okay.  And were you the director of
8  nursing for the northern division at the time that
9  Ms. Fisher was made -- or was first promoted to be a
10 nurse manager?
11    A    Yes.
12    Q    So --
13    A    I think so, yes.
14    Q    That was under your tenure --
15    A    Yes.
16    Q    -- that she was promoted.
17    A    Yes.
18    Q    Did you have any involvement in that
19 promotion?
20    A    No.
21    Q    You don't approve promotions at that
22 level?
23    A    I'm usually notified that -- of who
24 they're going to put in the facility nurse manager
25 position, but I don't make the decision.  The

1  remember the time?
2  A  No. I don't. I remember her concern.
3  Probably after the on-site visit is when I knew that
4  she was concerned.
5  Q  Okay. And that would be the on-site visit
6  in January of 2006?
7  A  Yes.
8  Q  Let's talk about that specifically and
9  that. What precipitated that particular visit that
10 you -- and I just know from other discussions --
11 that you made and you were accompanied, I believe,
12 by Ms. Melton?
13 A  Yes.
14 Q  Okay. What precipitated that visit?
15 A  Multiple things precipitated that visit.
16 I had been having discussions with Mr. Watson about
17 the performance of Estelle facility. I had received
18 several e-mails from some employees at the Estelle
19 facility that were unhappy. The turnover was
20 increasing at that facility and Mr. Watson felt that
21 he had made all the assessment and done all the
22 changes that he could do, and he and I agreed that I
23 would facilitate continued improvement at Estelle by
24 doing an on-site investigation to see what I could
25 find different.

Deposition of Mary Gotcher

Page 29

1  Q   And that was a discussion you had directly
2  with Mr. Watson?
3  A   Yes.
4  Q   Was Ms. Melton involved in that
5  discussion?
6  A   No.
7  Q   How was it that she became a part of the
8  visit?
9  A   After I decided to make a visit -- I don't
10 usually make those type of visits without HR with
11 me.
12 Q   Okay. And so at this point, the
13 discussion is between and you Mr. Watson and you've
14 invited Ms. Melton. How did you determine when to
15 go and do this?
16 A   The next time I had available, I went to
17 Estelle, and the next time Georgia had -- Ms. Melton
18 had available time, we planned the trip.
19 Q   And that turned out to be in January, mid
20 January?
21 A   I don't remember.
22 Q   17th and 18th?
23 A   I don't remember.
24        MS. MILLER:  Or January 9th, you're
25 telling -- okay.

Bayou City Reporting, Inc.

Deposition of Mary Gotcher

Page 37

1  Ms. Fisher and another nurse manager?
2  A    Yes.
3  Q    Okay. And so Ms. Fisher was a nurse
4  manager over some of the employees, and who was the
5  other nurse --
6  A    Most of the employees.
7  Q    Most of the employees. And do you recall
8  how many nurse -- how many employees reported to
9  Ms. Fisher?
10 A    No.
11 Q    Do you recall who the other nurse manager
12 was?
13 A    Joyce Bonds.
14 Q    Joyce Bonds?
15 A    And she was over the geriatric center.
16 Q    Do you recall how many employees reported
17 to her?
18 A    Very few. The geriatric center was only
19 staffed 12 hours a day, it was not staffed at night,
20 and it was a very small -- it's a very small
21 facility.
22 Q    Okay. So there was some conversation
23 yesterday that Ms. Fisher had 42 employees that
24 reported to her?
25 A    (Moving head side to side)

Page 40

1  had these people. People came and talked to you.
2  What else did you do while you were there?
3      A   I have no idea. Don't remember doing
4  anything else. It felt like we were in that
5  conference room a long time.
6      Q   Did you, at any time, try to interview
7  Ms. Fisher and get her side of the story?
8      A   She was not there. She was out on
9  bereavement and we knew we would have to get her
10 when she got back, we would have to discuss with her
11 when she got back.
12     Q   So you went there knowing she wasn't going
13 to be available.
14     A   Yes. We went there the soonest time we
15 had available and did not know she was going to be
16 out at that time.
17     Q   When did you get with Ms. Fisher to
18 discuss her side of the story and her concerns?
19     A   It was sometime shortly after that.
20     Q   And how did you approach that?
21     A   I don't remember. I don't remember if she
22 called us or we called her, but we did set up a time
23 to meet with her and did meet with her to hear her
24 side of the story.
25     Q   And do you recall where you met with

1  trying to understand the sequence here.  You did an
2  investigation, you came to a conclusion, gave her
3  some expectations, you gave her 90 days to improve,
4  and then you went back behind that 90-day
5  improvement expectations and said, "Oh, no.  We're
6  going to do it worse."  Right?  "We're essentially
7  not going to give her a chance to improve.  We're
8  going to demote her."  Is that what happened?
9  Strike that.  Let me ask another.
10          What other facts that you learned
11 that you didn't know when the expectations were
12 given?
13     A    I just told you, the urgency.  Estelle was
14 failing.
15     Q    Okay.
16     A    Estelle was not --
17     Q    That's a concept but those aren't facts.
18 What facts showed you the urgency that Estelle was
19 failing?
20     A    The number of complaints continued.  The
21 number of people that planned to leave, the number
22 of staffing vacancies that were remaining uncovered,
23 making it dangerous for the patients, caused the
24 urgency.
25     Q    Okay.  So the number of complaints.  These

Page 58

1  were new complaints that you received --
2     A    That continued, yes.
3     Q    -- after -- okay.  So -- but they were --
4  you received new ones after you gave her the 90-day
5  expectation.
6     A    Nothing seemed to settle.
7     Q    Well, that wasn't my question.
8     A    Yes.
9     Q    Okay.  You received complaints that you
10 hadn't acted on previously.
11    A    There were continued complaints, yes.
12    Q    Okay.  And people were planning to leave.
13 What?  Are people calling you up, saying, "I'm going
14 to -- I'm going to quit if you don't fire her"?
15    A    That was what the -- they were saying.
16    Q    And these are subordinate employees
17 that -- and you're listening to them threaten to
18 leave.  Is that correct?
19    A    They didn't say -- they did not say that
20 they were going to leave if I didn't fire her.  They
21 said they had plans to leave.
22    Q    Okay.  Who said that?
23    A    There were several.  I don't remember who
24 all they were.
25    Q    Can you think of any --

1    A    No.

2    Q    -- of the several?

3    A    No.

4    Q    Okay. And did they tell you that in
5  person or --

6    A    It wasn't always just to me. Some of it
7  was to human resources, to Ms. Melton.

8    Q    Okay. And the continued complaints, who
9  did those come from?

10   A    Various employees, and they were, again,
11 to Ms. Melton, as well as myself.

12   Q    Okay. But you -- do you recall any of the
13 names?

14   A    No.

15   Q    And then the vacancy rates, that's a
16 matter of historical data. Right?

17   A    It's -- okay.

18   Q    Well, I'm asking you.

19   A    It's an ever-changing number.

20   Q    Okay.

21   A    Okay.

22   Q    But historically you can look at the
23 vacancy rates and see if the Estelle Unit indeed was
24 worse than the other units.

25   A    Yes.

Page 60

1  Q  Okay. And it's your testimony that the
2  vacancy rates at Estelle continued to be worse than
3  the other units?
4  A  No.
5  Q  Okay.
6  A  That they continued to -- the vacancy rate
7  continued to increase and the turnover continued. I
8  never said it was worse than anywhere else.
9  Q  All right. Did any other nurse managers
10 get reprimanded or demoted for vacancy rates or
11 turnovers that were high?
12 A  No. Not in -- to my knowledge. Not in my
13 division.
14 Q  Okay. After she received this 90-day
15 improvement plan of expectations and you continued
16 to have some concerns, did you review any of those
17 with her?
18 A  No. She was out.
19 Q  Okay. So she was out on medical leave?
20 A  Yes.
21 Q  This is when her son had surgery?
22 A  Yes.
23 Q  All right. How can you improve if you're
24 not even there to do it?
25 A  I don't know what you want me to say.

Page 71

1   but normally they hear everything that's referred to
2   them.
3       Q   Okay.  So your answer is, yes, it is
4   discretionary?
5       A   Yes.
6       Q   Okay.  You said it could come from the
7   morbidity committee?  Tell me --
8       A   Yeah.
9       Q   -- what that is.
10      A   It's a joint mortality and morbidity
11  committee that is a committee that is required
12  through TDCJ.  It has members that are from TDCJ,
13  Texas Tech, and UTMB on the committee.  We review
14  all deaths on all the -- in all the entities, Texas
15  Tech and UTMB, and we specifically look for -- I am
16  part of that committee.  We specifically look for
17  things we could have done better, improved, care
18  could have been improved upon, something that didn't
19  happen to the standard that we had hoped that it
20  would.  And they then refer -- they then just accept
21  cases or can refer them to many places.  They refer
22  them to nursing peer review, medical peer review.
23  Psychiatric has a whole another way they do theirs
24  but with committee review.  And they could even
25  refer it to security for -- if it's a security

Page 72

1 issue, or a systems problem.

2 Q Okay. When you say they -- are they a
3 referral committee? Is that what happens?

4 A Yes. Yes. They don't -- they don't --

5 Q And must they refer something?

6 A No.

7 Q Okay. So they're a review committee with
8 referral potential?

9 A Yes.

10 Q But their main mission is not to refer.

11 A Their main mission is to look at the case.

12 Q Is to evaluate. Is that correct?

13 A Yes.

14 Q All right. Now, you know that Ms. Fisher
15 had a referral to peer review during the time that
16 some of the other issues were happening. You're
17 aware of that.

18 A Yes.

19 Q Can you tell me the circumstances under
20 which that was referred to peer review?

21 MR. LIVELY: I think I'm going to
22 object to this. It's getting into privileged matter
23 and instruct the witness not to answer.

24 MS. MILLER: The referral.

25 MR. LIVELY: If you want --

Page 73

1           MS. MILLER: The only thing that's
2  objectionable is the actual -- the report.
3           MR. LIVELY: Can you go --
4           MS. MILLER: Can we go off the record
5  just a minute?
6           MR. LIVELY: Yeah.
7           (Discussion off the record
8            from 12:54 to 12:55)
9       Q   (BY MS. MILLER) Now, you're aware that
10 Ms. Fisher was referred -- or her actions were
11 referred to a peer review committee.
12      A   Yes.
13      Q   And what procedure happened or how did the
14 procedure stages follow that the actual referral was
15 made to the peer review committee? I'm not asking
16 you what was referred.
17      A   At that time in the organization when she
18 was -- when that referral was made from mortality/
19 morbidity, all nursing referrals from mortality and
20 morbidity committee were heard -- that were referred
21 to the nursing peer review committee were heard by
22 nursing peer review.
23      Q   Okay. That wasn't my question. Going to
24 the mortality committee, that's standard practice
25 when an inmate passes away or an individual passes

Deposition of Mary Gotcher

Page 74

1 away under the care of UTMB. Is that correct?
2  A  Or Texas Tech?
3  Q  Or Texas Tech. Correct?
4  A  Yes.
5  Q  All right. So is it -- in Ms. Fisher's
6 case, was her case referred by the mortality
7 committee to the peer review?
8  A  Yes.
9  Q  And was then the option of whether or not
10 to review it became a peer review option, to accept
11 it or not?
12  A  Yes.
13  Q  Okay. And in the peer review process, who
14 is permitted to be in the peer review meetings?
15  A  There's no rules and regulations about who
16 can be in the room. There are rules and regulations
17 about who serves on the committee as a -- as a
18 committee member and who's -- who can vote in the
19 decision. The peer review committee often has
20 people in the room that can provide knowledge to the
21 peer review committee, members that need additional
22 knowledge. Ad hoc members are allowed in the peer
23 review committee for -- as an example, a utilization
24 review nurse was referred to the peer review
25 committee and the nurses in -- on the committee were

1  nonresponsive.
2     Q    (BY MS. MILLER)  Who made the decision to
3  promote her -- or to demote her?  You said there are
4  two times.  Who made the decision the first time?
5     A    I did.
6     Q    Okay.  And what -- when was the second
7  time she was demoted?
8     A    There was an intent to demote her when she
9  had Board of Nursing regulations -- stipulations and
10 regulations restrictions to her licensure.
11    Q    And when was that?
12    A    I don't remember the date.
13    Q    Okay.  And who made that decision?
14    A    I did.
15    Q    Okay.
16    A    That is also common practice throughout
17 all of UTMB that nursing does not allow managers to
18 have stipulations or restrictions on their
19 licensures.
20    Q    And that's understandable.  Sure.  And so
21 you made that decision at that point.
22    A    The minute I found out she had -- I was
23 notified through the mail that she had restrictions
24 on her licensure, I went to human resources and
25 recommended her demotion.

1  Q   Okay.  And what happened with that?
2  A   She wrote and told me -- or e-mailed or
3  called or in some way I found out that she had
4  already met the agreed-upon stipulations from the
5  Board of Nursing and that she had already completed
6  those and that they had already -- she thought they
7  had already cleared her of all requirements.
8  Q   Um-hmm.  Um-hmm.
9  A   So I stopped what I was doing.  I went and
10 looked on the BON web site on our licensure to see
11 if the restrictions remained.  They did not remain.
12 She was correct.  They had all been approved by the
13 board and accepted and they had been taken off her
14 license, and I removed my intent to demote her when
15 I found that out.
16 Q   So did you jump the gun on that decision
17 to demote her?
18 A   No.
19 Q   All right.  So, what?  Did she ever have
20 restrictions?
21 A   Yes.
22 Q   And how were you notified?
23 A   I was notified through the BON through the
24 mail that there were restrictions on her licensure.
25 Q   And so that certainly would be a document