**Plaintiff**
**Jackie Fisher's**

**Response in Opposition**
**to Defendants'**

# Motion for
# Summary
# Judgment

# EXHIBIT
# 2

Jackie Fisher                    RE: Jackie Fisher v. UTMB

Page 1

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JACKIE FISHER,                    *
        Plaintiff                 *
                                  *    CIVIL ACTION NO.
        v.                        *    4:08-CV-01273
                                  *
UNIVERSITY OF TEXAS               *
MEDICAL BRANCH and DAVID          *
WATSON,                           *
        Defendants                *

*********************************************************

ORAL DEPOSITION OF
JACKIE FISHER
AUGUST 26, 2009

*********************************************************

        THE ORAL DEPOSITION OF JACKIE FISHER, produced as

a witness at the instance of the Defendants, and duly

sworn, was taken in the above-styled and numbered

cause on August 26, 2009, from 9:59 A.M. to 2:41 P.M.,

before Angelica Rodriguez, Notary Public in and for

the State of Texas, reported by electronic reporting

and transcription, at the offices of Jo Miller, 505 N.

Main, Carriage House, Conroe, Texas 77301 pursuant to

the Federal Rules of Civil Procedure and the

provisions stated in the record or attached hereto.

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                         RE: Jackie Fisher v. UTMB

---

**Page 2**

```
1              APPEARANCES
2  FOR THE PLAINTIFF:
3      Law Office of Jo Miller
       By: Ms. Jo Miller
4      505 N. Main
       Carriage House
5      Conroe, Texas 77031
       Phone: (936) 539-4400
6
   FOR THE DEFENDANTS:
7
       Office of the Attorney General
8      General Litigation Division
       By: Sam Lively
9      300 West 15th, 11th Floor
       Austin, Texas 78701
10     Phone: (512) 463-2120
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
1              INDEX
2                              Page
3  Stipulations  . . . . . . . . . . . . . . . . . . . . . 1
4  Appearances  . . . . . . . . . . . . . . . . . . . . . 2
5  Examination By Mr. Lively  . . . . . . . . . . . . 4
6  Examination By Ms. Miller  . . . . . . . . . . . 144
7  Signature and Changes  . . . . . . . . . . . . . 145
8  Reporter's Certification  . . . . . . . . . . . . . 147
9
10             EXHIBITS
11 No. Description                      Page
12  1  Plaintiff, Jackie Fisher's Original Complaint and
13     Jury Demand  . . . . . . . . . . . . . . . . . 50
14  2  Emails between Jacklyn Fisher and Becky Faiello
15     dated May 6, 2009  . . . . . . . . . . . . . . 129
16  3  Reply to Grievance from Judy Upshaw to Jackie
17     Fisher . . . . . . . . . . . . . . . . . . . . 139
18  4  Email from Jackie Fisher to Judy Upshaw dated
19     January 16, 2009  . . . . . . . . . . . . . . 140
20  5  Grievance filed by Jackie Fisher dated March 16,
21     2009 . . . . . . . . . . . . . . . . . . . . . 141
22  6  Letter from Judy Upshaw addressed to Jackie Fisher
23     dated March 10, 2009  . . . . . . . . . . . . 142
24
25
```

---

**Page 4**

```
1              JACKIE FISHER,
2  having been duly sworn, testified as follows:
3              EXAMINATION
4  BY MR. SAM LIVELY:
5      Q.  Would you go ahead and please state your whole
6  name for the record, ma'am?
7      A.  Jacquelyn Lynette Fisher.
8      Q.  How do you spell Lynette, L-Y?
9      A.  Lynette, L-Y-N-E-T-T-E.
10     Q.  Okay.  Ms. Fisher, have you ever had your
11 deposition taken before?
12     A.  Not that I can recall.
13     Q.  I'm sure Ms. Miller has kind of gone over it,
14 but I'm going to go over some of the ground rules for
15 us.  Most of the ground rules are for the benefit of
16 the court reporter and a clear record.  After we get
17 through here today, the court reporter will prepare a
18 booklet, a transcript, and it'll be please state your
19 name, Jacquelyn Lynette Fisher, Line One, Two and
20 Three.  In other words, it's a cold-printed record.
21 And we don't have the benefit of a lot of nonverbal
22 communication that we have sitting face to face.  You
23 nod your head, you point at things, and it's all
24 perfectly clear to us here because we're sitting here.
25 But, you look at the record six weeks from now or six
```

---

**Page 5**

```
1  months from now a lot of that doesn't show up as
2  clearly.  So, I've been doing this long enough now that
3  I may follow up with the question is that a yes or no
4  or you're pointing at your left shoulder or -- and it's
5  not that I don't understand you and it's not meant as
6  criticism of your answers that you're not doing a good
7  job it's just, again, so that when we look at the
8  record after everybody's memory of this has kind of
9  gone away, we can say, oh that -- she was talking about
10 this.  Okay?
11     A.  Yes, sir.
12     Q.  Also, in day-to-day conversation the mind is
13 generally quicker than the mouth.  And what that means
14 is you will understand a lot of times where my question
15 is going before I finish my question, and we do it in
16 day-to-day conversation, we override each other.
17 You'll answer the question yes or no and -- 'cause
18 you'll understand where I was going, and there'll be
19 times when my -- I'm already on another question before
20 you finish your answer, and we'll try not to lack
21 agreement with you to try not to go over each other in
22 this case.  We do it in day-to-day conversation.  If
23 you'll watch people, they all the time talk over each
24 other, but we do a fine job, but it makes her job
25 harder 'cause she can't take two people down at the
```

2 (Pages 2 to 5)

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

Page 6

1  same time. Okay?
2      A.  Yes, sir.
3      Q.  Also, you're a little soft spoken. I'm going
4  to ask you to kind of speak up a little bit for the
5  benefit -- 'cause I think she's got an audio -- you've
6  got a microphone, but it helps her get an accurate
7  transcript. She does it two ways, by her stenographic
8  machine, as well as an audio recording so that we get
9  an accurate transcript. Okay?
10     A.  Yes, sir.
11     Q.  There you go. Also, we do a lot of
12 communication with nods of heads or uh-huhs and huh-
13 uhs, and I may follow up was that a yes or a no. And
14 it wasn't that I didn't understand your question, but
15 sometimes those can be confusing later on. Okay?
16     A.  Yes, sir.
17     Q.  Also, if at any time you don't understand one
18 of my questions, you feel free to tell me, and I'll be
19 happy to rephrase it. Okay?
20     A.  Yes, sir.
21     Q.  Otherwise, we're going to assume you
22 understood the question. Okay?
23     A.  Yes, sir.
24     Q.  Also, this is not an endurance contest. We do
25 have control over our fate here. If we were in the

Page 7

1  courtroom and you were sitting in the witness box, you
2  don't get to leave the witness box until the judge says
3  so. We don't get to take breaks until the judge says
4  so. But, here, if at any time you want to take a break
5  just tell us.
6      A.  Yes, sir.
7      Q.  Okay. Go to the bathroom, talk to your
8  lawyer, whatever it is, if there's a question pending,
9  we may finish that question, but then we'll go ahead
10 and take a little break because, again, we do have some
11 control in that nature. All right?
12     A.  Yes, sir.
13     Q.  Okay. You will also have an opportunity to
14 review the deposition once it's been prepared and sent
15 to you. And don't -- if there's a correction to be
16 made, at the back of the deposition it's called a
17 Correction Sheet or an Errata Sheet. That's where you
18 make corrections. If on Page 25, Line 16, you said
19 Main Street and it was really Smith Street --
20         MS. JO MILLER: I'll help her with that.
21 BY MR. LIVELY:
22     Q.  Okay. Do it there. Don't write on the
23 transcript, but you'll get directions on that because I
24 have seen some people when they come in with us --
25         MS. JO MILLER: On the original? No, we

Page 8

1  won't do that, promise.
2  BY MR. LIVELY:
3      Q.  Yes. But, she'll help you with that, all
4  right?
5      A.  Okay.
6      Q.  Okay. What is your mailing address?
7      A.  1150 FM 2296 Road, Huntsville, Texas, 77340.
8      Q.  And how long have you lived there at -- on the
9  Farm-to-Market Road?
10     A.  Probably about five or six years.
11     Q.  Do others live with you there?
12     A.  Yes. I have a spouse and two siblings.
13     Q.  And what is your spouse's name?
14     A.  Craig Fisher.
15     Q.  And what does Mr. Fisher do for a living?
16     A.  He is a major at the Eastham Unit.
17     Q.  Okay. So, he works for the --
18     A.  TDCJ.
19     Q.  And did you say siblings or kids?
20     A.  I'm sorry. I'm sorry. I have two kids.
21     Q.  Okay.
22     A.  I have siblings, but not living with me.
23     Q.  Okay. And the two kids, what are their names?
24     A.  Cameron --
25     Q.  Cameron.

Page 9

1      A.  -- and Corey.
2      Q.  Corey. And what are their ages?
3      A.  They're 12.
4      Q.  They're twins?
5      A.  That's correct.
6      Q.  Let's talk a little bit about your education.
7  Where did you graduate high school?
8      A.  Alto High School. Alto, A-L-T-O.
9      Q.  Okay.
10         MS. JO MILLER: There you go. That's
11 better.
12 BY MR. LIVELY:
13     Q.  Yes. And is that in Huntsville?
14     A.  It's Alto, Texas.
15     Q.  And post high school education?
16     A.  I have an Associate degree in respiratory
17 therapy and then an Associate degree in nursing.
18     Q.  Would the Associate's degree in nursing give
19 you an R.N. or an L.V.N.?
20     A.  An R.N.
21     Q.  Okay. And from what institution did you
22 receive the Associate's degrees?
23     A.  The respiratory degree in Tyler --
24     Q.  In Tyler, did you say?
25     A.  Yes, sir. And the R.N. degree in Houston.

3 (Pages 6 to 9)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

Page 10

1    Q.  And what was the name of the school in Tyler?
2    A.  Tyler was Tyler Junior College --
3    Q.  Okay.
4    A.  -- and North Harris.  At the time it was North
5  Harris Community College.
6    Q.  And when did you get your respiratory degree?
7    A.  19 -- no, not 19.  I want to say round about
8  1987.
9    Q.  Okay.  Most of the time is -- well, I didn't
10  go over that.  If I ask you for a date, particularly in
11  questions like this, I don't need an exact date.  I'm
12  just trying to get a general chronology on things.  If
13  I need an exact date I'll probably try to press you a
14  little bit on it or show you a document and go, hey,
15  did this happen?  Is there any reason for you to
16  disagree?  Something like that.  But, I'll let you know
17  on that.
18    A.  Yes, sir.
19    Q.  And the Houston North Harris Community
20  College?
21    A.  1993, around in there.
22    Q.  Okay.  Have you ever been married before?
23    A.  No, sir.
24    Q.  How long now have you worked for UTMB Managed
25  Care?

Page 11

1    A.  Since October 2000.
2    Q.  Okay.  And I am presuming since that time,
3  since 2000, you've worked in a full-time capacity of
4  one sort or another?  Roughly 40 or plus more hours a
5  week?
6    A.  Yes, sir.
7    Q.  Where did you work before you went to work for
8  UTMB Managed Care.
9    A.  Conroe Regional Medical Center.
10    Q.  Conroe Regional?
11    A.  Yes, sir.
12    Q.  Is that a hospital here?
13    A.  Yes, sir.
14    Q.  And how long did you work for Conroe?
15    A.  14 years.
16    Q.  Sounds like then you maybe started -- my
17  math's not that good, but did you start then -- I guess
18  you started right out of respiratory therapy?
19    A.  Yes, sir.
20    Q.  Okay.  Did you work as a respiratory therapist
21  then at Conroe?
22    A.  Yes, sir.
23    Q.  For the hospital?  And again, was that a full
24  time position?
25    A.  Yes, sir.

Page 12

1    Q.  And then, I guess you went to school while you
2  working at some point?
3    A.  Yes, sir.
4    Q.  And that's when you got your R.N. --
5    A.  Yes, sir.
6    Q.  -- your Associate's degree?
7    A.  Yes, sir.
8    Q.  And then, I guess, did you take a board, a
9  test -- lawyers have to take a bar test.  Once they
10  finish law school they have to take a bar exam to get
11  licensed.  Did you have to do an equivalent to get your
12  R.N.?
13    A.  Yes, sir.
14    Q.  Okay.  And when did -- do you remember when
15  you got your R.N. license?
16    A.  Around 1993.
17    Q.  Did you work for Conroe Regional Medical
18  Center as an R.N.?
19    A.  Yes, sir.
20    Q.  And how long did -- was that during the 14
21  years?
22    A.  Yes, sir.
23    Q.  Okay.  Did you -- did you go directly from
24  Conroe Regional Medical Center to UTMB Managed Care?
25    A.  Yes, sir.

Page 13

1    Q.  Okay.  And why did you leave to go from one
2  place to the other?
3    A.  The UTMB job was closer to my home, and the
4  hours more -- were more accommodating.
5    Q.  Okay.  And were you living there at the Farm-
6  to-Market when you left Conroe?
7    A.  No, sir.
8    Q.  Where were you living?
9    A.  We were living in Huntsville.  I can't
10  remember the exact address, but it was on 11th Street.
11    Q.  Okay.  And how long had you lived there in
12  Huntsville on 11th Street?
13    A.  How long did I live there?
14    Q.  Uh-huh.
15    A.  I want to say probably roughly two to three
16  years.
17    Q.  Okay.  And did you have another residence
18  there in Huntsville before the 11th Street address?
19    A.  No, sir.
20    Q.  Okay.  Where were you living before you were
21  living in Huntsville?
22    A.  Conroe.
23    Q.  Okay.  Your husband is a major in the Texas
24  Department of Criminal Justice, so that gives me some
25  idea that he's been working for them for a while.

4 (Pages 10 to 13)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

Page 14

1    A.  Roughly 28 years.
2    Q.  Okay.  Did you meet him then when you went to
3  work at UTMB?
4    A.  No.  I met him prior to my employment with
5  UTMB.
6    Q.  Okay.
7    A.  Well, actually, I met him prior to UTMB and it
8  was -- when it was all TDCJ.
9    Q.  Oh, okay.  You have any military service?
10   A.  No, sir.
11   Q.  Does your husband still work or is he retired
12  or --
13   A.  He still works.  He has a couple more years
14  before full retirement.
15   Q.  Okay.  And I guess he works there at one of
16  the units?
17   A.  He -- he works at Eastham Unit now.
18   Q.  Eastham?
19   A.  Uh-huh.
20   Q.  I'm going to kind of go over your -- where did
21  you first start at the UTMB or T -- Texas Department of
22  Criminal Justice?  Did you work before they reorganized
23  or -- when you went to work for the prison system in a
24  health care capacity, what was it called?
25   A.  I initially -- we worked for TDCJ.  We were

Page 15

1  hired by TDCJ.
2    Q.  Okay.  And --
3    A.  And my initial employment was respiratory
4  therapy there.
5    Q.  Okay.  Do you remember when that was?  Would
6  that have been around 2000?
7    A.  No -- close -- close enough.  I don't know,
8  no.  Probably in the late '80s, roughly.
9    Q.  Would you had been there -- did you have a
10  break in service with them?
11   A.  I did.
12   Q.  Okay.  So, what -- you went to work for the
13  prison, what is called the prison system in the health
14  capacity as a respiratory therapy (sic) --
15   A.  Uh-huh.
16   Q.  -- some time after you got your license to do
17  so and finished your course work, correct?
18   A.  Correct.
19   Q.  And how long then did you work for the prison
20  system in that initial --
21   A.  I want to probably say, roughly about a year,
22  year and a half.
23   Q.  And then, you went to work at Conroe Hospital?
24   A.  After I left TDC I moved back home, and then I
25  moved back and went to work for Conroe.

Page 16

1    Q.  Okay.  You moved back in with your parents?
2    A.  No.
3    Q.  What -- 'cause when you say you went back
4  home?
5    A.  After I initially worked for TDCJ in a
6  respiratory capacity, I went back to live at home, but
7  I worked and lived on my own.
8    Q.  Oh.
9    A.  And then, I moved back, went to work at Conroe
10  as a respiratory therapy (sic), went to school during
11  that time and became an R.N., worked for them as an
12  R.N., then I went to UTMB as an R.N.
13   Q.  Okay.  Do you remember what unit you worked
14  with when you were working as a respiratory therapy
15  (sic) in your initial --
16   A.  The Huntsville Unit.
17   Q.  And you worked for how long at the Huntsville
18  Unit?
19   A.  About a year, year and a half, roughly.
20   Q.  And I'm presuming this was, again, a full-
21  time, 40 plus hours a week job?
22   A.  Yes, sir.
23   Q.  Okay.  Do you remember who your supervisors
24  were?
25   A.  Bill Givens, William, I think, but Bill

Page 17

1  Givens.
2         MS. JO MILLER:  What was the last name?
3         THE WITNESS:  Givens, G-I-V-E-N-S.
4  BY MR. LIVELY:
5    Q.  Bill or William.  Did you have any problems
6  while you were working at the -- any employment
7  problems, out of the ordinary, while you were in your
8  initial service in the prison system as a respiratory
9  therapist?
10   A.  No.
11   Q.  Did you ever file any grievances or lawsuits
12  or anything while you were in this initial period of
13  service?
14   A.  No.  There was no reason to.
15   Q.  Then your second tour, so to speak, started in
16  2000?
17   A.  Correct.
18   Q.  And by this time there had been some
19  reorganization, and you worked for UTMB Managed Care --
20  excuse me?
21   A.  Correct.
22   Q.  And when you came back did you have to
23  reapply, go through the whole interview process?
24   A.  Yes, sir.
25   Q.  They didn't recruit you in the sense that they

5 (Pages 14 to 17)

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

---

Page 18

1  didn't come to you and go Ms. Fisher, we'd like you to
2  come to work, you responded to a job posting, I
3  presume?
4      A.  No, sir.  An employee that worked for UTMB
5  actually pretty much, I guess, recruited me.
6      Q.  Oh, okay.  So, somebody who was already
7  working there said there's a -- in essence there's a
8  job opening, why don't you apply?
9      A.  Yes, sir.
10     Q.  Okay.  And who was that?
11     A.  The practice manager, Chanta Crawford.
12     Q.  Chanta, C-H-A --
13     A.  A-R-H, Chanta Crawford.
14     Q.  Crawford, okay.  Does Ms. Crawford still work
15 there?
16     A.  Yes, sir.
17     Q.  And where does she work?
18     A.  She's still a practice manager at the Ellis
19 and Eastham Facility.
20     Q.  Ellis what?
21     A.  Ellis and Eastham Facility.
22     Q.  Oh, and.  Okay.  Eastham is just, it's one
23 word, but it's East like the direction and Ham like
24 Easter Ham?
25     A.  Correct.

---

Page 19

1      Q.  Okay.  Who -- who in essence hired you then on
2  your second -- I mean, I -- correct me if I'm wrong.
3  You sent a job application in, correct?
4      A.  Correct.
5      Q.  I guess, along with your license and
6  transcripts and letters of reference and that sort of
7  thing?
8      A.  Correct.
9      Q.  And that at some point, did you interview?
10     A.  Yes, sir.
11     Q.  Okay.  And at some point, I guess, you were
12 offered employment?
13     A.  Yes, sir.
14     Q.  Do you know who made the -- the decision to
15 hire you?
16     A.  Mary Adams.
17     Q.  Okay.  And who does Ms. Adams -- where does
18 she work and for whom?
19     A.  She has retired from UTMB, and I'm not quite
20 sure where she's employed at now.  She doesn't even
21 live in this state.
22     Q.  At the time when she hired you?
23     A.  Oh, she worked for Delanne Zellar.
24     Q.  Who?
25     A.  She worked for UTMB --

---

Page 20

1      Q.  Okay.
2      A.  -- but, her supervisor was Delanne Zellar.
3      Q.  Was she a human resources or nursing or
4  do you know what division did she work in?
5      A.  Who are you referring to?
6      Q.  Ms. Adams.
7      A.  She was the nurse manager.
8      Q.  Okay.  She would have been, I guess, would she
9  have been Chanta Crawford's immediate supervisor?
10     A.  No.  Ms. Crawford did not report to Ms. Adams.
11     Q.  At all?
12     A.  Ms. Adams was part of the management team on
13 the facility, but Ms. Crawford did not report to her in
14 her direct chain of command.
15     Q.  Okay.  And by facility, we're talking about
16 the Ellis Eastham Unit?
17     A.  Ellis is one unit, Eastham is another unit.
18     Q.  Okay.
19     A.  So -- but, at the time Ms. Crawford worked at
20 the Estelle Facility.
21     Q.  Okay.  And you were hired -- when you were
22 initially hired back in 2000, for what position?
23     A.  Assistant nurse manager.
24     Q.  In which unit?
25     A.  Estelle Unit.

---

Page 21

1      Q.  And again, this was a full-time job?
2      A.  Yes, sir.
3      Q.  Okay.  And what were the duties of an
4  assistant nurse manager?
5      A.  Actually it was to assist in overseeing the
6  operations of the nursing department, act as a liaison
7  for the nurse manager.
8      Q.  And who was the nurse manager?
9      A.  Mary Adams.
10     Q.  Mary Adams.  And how long were you -- and,
11 again, this is not one of those I need the exact date,
12 but just roughly, how long then were you an assistant
13 nurse manager?
14     A.  For about three years.
15     Q.  Okay.  And during that period of time, did you
16 report to Mary Adams?
17     A.  Yes, sir.
18     Q.  Okay.  Was she in your immediate chain of
19 command?
20     A.  She was my direct supervisor.
21     Q.  Supervisor, there you go.  And who was
22 Ms. Adam's direct supervisor?
23     A.  Delanne Zellar.
24     Q.  Ooh, you may have to spell that, if you can.
25     A.  Delanne is D-E-L-A-N-N-E.

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                          RE: Jackie Fisher v. UTMB

Page 22

1    Q.  Thank you.
2    A.  Zellar, Z-E-L-L-A-R.
3    Q.  Does she still work there or is she retired?
4    A.  She's retired.
5    Q.  Then what happened at the end of three years?
6  That would've put us around 2003, 2004, something in
7  that neighborhood, correct?
8    A.  Uh-huh.
9    Q.  Yes?
10   A.  Yes, sir.
11   Q.  There you go 'cause you were doing the nodding
12 your head and uh-huh.  At some point what happened
13 then?  Were you promoted?  Did you change units?
14   A.  I was promoted --
15   Q.  Okay.
16   A.  -- and I changed units.
17   Q.  Okay.  And what were you promoted to?
18   A.  Nurse manager.
19   Q.  Okay.  To what unit were you transferred to?
20 Where'd you go to be a nurse manager?
21   A.  Let me -- let me back up.
22   Q.  Sure.
23   A.  Between 2000 and 2003, I had transferred from
24 Estelle to the Wynne Unit as an assistant nurse
25 manager.

Page 23

1    Q.  Okay.
2    A.  I went from an inpatient facility to an
3  outpatient facility.
4    Q.  Okay.
5    A.  Okay.  And then in 2003, I was promoted to
6  nurse manager at Ferguson, Goree and Huntsville
7  Cluster.
8    Q.  Just to make sure I've got the basics of this,
9  before your promotion, you were transferred to the
10 Wynne Unit?
11   A.  I put in an application to do a lateral
12 transfer, and this is assistant nurse manager to the
13 Wynne Unit.
14   Q.  Okay.
15   A.  'Cause I was going from an inpatient to an
16 outpatient facility.
17   Q.  Okay.  So, this was done at your -- you
18 requested a transfer from your old unit to the Wynne
19 Unit to deal, I guess, a little bit different medicine?
20   A.  Actually, to -- for different learning
21 opportunity --
22   Q.  Okay.
23   A.  -- because most of the facilities are
24 outpatient in the area.
25   Q.  And just so we're clear, outpatient is not

Page 24

1  overnight stays, in essence.  The prisoner will come in
2  to be evaluated.  You know, I broke my hand, and I need
3  a cast or something like that and then sent back to
4  his --
5    A.  Cell.
6    Q.  -- cell or unit?
7    A.  Yes, sir.
8    Q.  And the place where you had been before on
9  inpatient, I guess, was a little more involved medical
10 care, 'cause you said it was inpatient?
11   A.  Correct.
12   Q.  And how was it -- were the medical conditions
13 more serious there?
14   A.  Pretty much.  They were -- some were long
15 term, they required more extensive care than in an
16 outpatient facility.
17   Q.  Okay.  So, you put in for a transfer and were
18 given it -- was given it, correct?
19   A.  Correct.
20   Q.  Okay.  And that went to Wynne?
21   A.  Correct.
22   Q.  Then, you received your promotion --
23   A.  Correct.
24   Q.  -- to nurse manager and at the same time or
25 did they -- to this new Ferguson, Goree, Huntsville --

Page 25

1  was that done at the same time or sequentially?  How --
2  how did that happen?
3    A.  Sequentially.  It wasn't done at the same
4  time, and I can't remember how long I was at the Wynne
5  Unit before I was promoted to nurse manager.
6    Q.  But, before -- when you were promoted to nurse
7  manager, did you consider it -- that part of your new
8  job as a nurse manager was to take over extra duties at
9  the Ferguson, Goree, Huntsville?
10   A.  That was the duties when I applied for the job
11 to manage those three units.
12   Q.  Okay.  That's kind of -- it wasn't -- when you
13 applied or sought the new job opening as a nurse
14 manager, you knew it was for these -- this Ferguson,
15 Goree, Huntsville Unit.  And that if you were hired or
16 promoted then that's where you would be going?
17   A.  Yes, sir.
18   Q.  Okay.  And who was it that promoted you?
19   A.  Dave Watson or David Watson.
20   Q.  Is that the same David Watson you've sued in
21 this lawsuit?
22   A.  Yes, sir.
23   Q.  Okay.  Did you -- were you in Mr. Watson's
24 chain of command before you were promoted to nurse
25 manager?

7 (Pages 22 to 25)

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                           RE: Jackie Fisher v. UTMB

Page 26

1     A.  I cannot really recall if Mr. Watson was in
2   his new job before I was promoted to nurse manager.  I
3   really can't recall.  So --
4     Q.  Okay.
5     A.  -- to answer the question, I'm -- I can't
6   recall that.
7     Q.  Okay.  He might have been, he might not have
8   been.
9     A.  Correct.
10     Q.  But, when you -- just so we're clear, when you
11   applied for the nurse manager position, it was
12   Mr. Watson, David Watson, that promoted you?
13     A.  Correct.
14     Q.  And I guess, did you go through the same sort
15   of things, you applied, went through interviews,
16   etcetera?
17     A.  Correct.
18     Q.  Okay.  Did you interview with Mr. Watson and
19   some others, I presume?
20     A.  I interviewed with Mr. Watson in that -- and
21   his management team.
22     Q.  Okay.  And who was on that management team?
23   You -- if you remember.
24     A.  Let me see if I can remember all of them.  I
25   know I remember some of them.  Denise Bocks, Jerry Tool

Page 27

1   --
2     Q.  Tool, is it T-O-O --
3     A.  No, wait.  It was Denise Bocks, Dr. Seal, and
4   Glenda Adams and Beverly Slong; if I can remember
5   correctly.
6     Q.  Were there others who applied for this same
7   nurse manager?
8     A.  Yes, sir.
9     Q.  Okay.  So, you were selected out of a pool of
10   applicants?
11     A.  Yes, sir.
12     Q.  Okay.  And do you remember when it was then
13   that you went -- did you ever operate as a nurse
14   manager at the Wynne Unit or do you remember?
15     A.  As assistant nurse manager.
16     Q.  So, your first actual work as a nurse manager
17   was when you went to the Ferguson, Goree, Huntsville
18   Unit?
19     A.  Correct.
20     Q.  And what would be the difference in lay terms
21   between the work you would do as an assistant nurse
22   manager and your job duties as a nurse manager?
23     A.  They're actually very similar, but as a nurse
24   manager you're ultimately responsible for the total
25   operations.  As an assistant nurse manager, you kind of

Page 28

1   serve as a liaison.
2     Q.  Okay.  Do you -- would you have more paperwork
3   as a nurse manager than an assistant nurse manager?
4     A.  I would say yes.  You're ultimately
5   responsible for all of the paperwork.
6     Q.  What about in dealing with employees?  Would
7   you have more responsibility in dealing with employees
8   as a nurse manager than as an assistant nurse manager?
9     A.  You'd probably spend roughly the same amount
10   of time dealing with the employees.
11     Q.  Okay.  And, again, the Ferguson, Goree, and
12   Huntsville Units were three separate units, but you
13   called it -- I think you used the term cluster?
14     A.  Correct.
15     Q.  And so, these are three separate physical
16   facilities for housing prisoners?
17     A.  Correct.
18     Q.  And so that would indicate to me, and please
19   correct me if I'm wrong, that there was some traveling
20   involved, not perhaps a great distance, but you would
21   have to go from one facility to another as a nurse
22   manager?
23     A.  Correct.
24     Q.  And did you have to -- did you have an
25   assistant nurse manager at each of the facilities?

Page 29

1     A.  No, sir.
2     Q.  Okay.  So, you would have -- you had one, to
3   the best of your -- if you were not at the Ferguson
4   Unit, who would be in essence your next in command?
5     A.  Nobody.  I had one assistant nurse manager,
6   and she was housed at the Huntsville Unit.  That was
7   her primary unit.
8     Q.  Okay.  So, then you would just have nurses
9   and, I guess, nursing assistants at each of the
10   Ferguson, Goree, and Huntsville Units that you would
11   have to keep track of, so to speak, correct?
12     A.  Correct.
13     Q.  And you only had one assistant nurse manager
14   for all three units?
15     A.  Correct.
16     Q.  And she would spend most of her time at
17   Huntsville?
18     A.  Correct.
19     Q.  So, if you went to the Goree or Ferguson Unit,
20   then you would deal with the actual nurses or nursing
21   assistants?
22     A.  Correct.  I didn't have nursing assistants,
23   but the nursing personnel.
24     Q.  Just the nursing personnel.  Okay.  And as a
25   nurse manager, would you be involved in disciplining

8  (Pages 26 to 29)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

Page 30

1  the employees in your chain of command?
2      A.  We do some discipline, but most discipline
3  was, you know, it -- it would depend on what level of
4  discipline you're -- you're -- you're at.  The rest has
5  to be referred to HR for approval before you're
6  actually able to submit it to the employee.
7      Q.  As a nurse manager, what sort of discipline
8  could you deal with without kicking it up the chain of
9  command?
10      A.  Pretty much just coaching, verbal reminders,
11  redirecting --
12      Q.  Could you administer oral reprimands?
13      A.  Yes.
14      Q.  What about written reprimands?
15      A.  No.  That had to be approved.
16      Q.  So, if -- if you were going to reprimand a
17  nurse for not being on time on a regular basis, you
18  would have to send that up to, I guess, who -- was
19  Mr. Watson your direct supervisor?
20      A.  Mr. Watson was my direct supervisor, but we
21  sent it to the Human Resource Office.
22      Q.  Okay.  So, if you had somebody, when you were
23  nurse manager, and there was an employee in your chain
24  of command, one of the nurses that was, just to pick an
25  example, not showing up for her shift on time on a

Page 31

1  regular basis, to the point you've tried oral
2  counseling, you've given her an oral reprimand, and you
3  decide okay we're going to boost the discipline, you
4  would go to HR?
5      A.  At the written stage.
6      Q.  Okay.  Would you keep Mr. Watson informed of
7  this?
8      A.  Mr. Watson would be informed.
9      Q.  In other words, here's the action I want to
10  take with this employee, did you need to get his
11  approval to do that?
12      A.  We -- we actually did not -- we -- we have an
13  attendance standard or we have policies that govern how
14  we discipline people.  And, basically, once they've met
15  the level that -- that required a written, we
16  formulated the disciplinary, and we sent it to HR.
17      Q.  Okay.  We being you and your boss?
18      A.  The nurse managers or whoever.  We, I, may --
19  maybe I should say I.
20      Q.  If you wanted to just continue along with this
21  example, if -- if a person in the employ had not been
22  showing up at work on time, and you wanted to get a
23  written reprimand, would you run it past Mr. Watson
24  before you contacted HR?
25      A.  No.  Pretty much you type it up, send it to HR

Page 32

1  and notify Mr. Watson.
2      Q.  By carbon copy or here's --
3      A.  Or verbal or --
4      Q.  Or e-mail?
5      A.  Right.
6      Q.  Okay.  And then, as a practice matter, he
7  would either -- did you ever have any -- did you ever
8  have any time when Mr. Watson -- let's see, stopped you
9  from disciplining anybody that you wanted to?
10      A.  Yes, sir.
11      Q.  Okay.  And who was that, the employee?
12      A.  It's very -- it is several employees that I
13  had written disciplinarys on for the same thing that he
14  had, and encouraged me to write up people for in the
15  past.  And when I submitted them to him and HR, they
16  rejected them.
17      Q.  Okay.  Your pronouns have confused me --
18      A.  Okay.
19      Q.  -- a little bit here.  They being?
20      A.  Mr. Watson and HR.
21      Q.  Okay.
22      A.  Which was Sandy Raeder who I submitted them
23  to.
24      Q.  Okay.  So, I get the impression, and correct
25  me if I'm wrong, that if you wanted to -- to do a

Page 33

1  written reprimand, for instance, and you sent it to HR
2  and Mr. Watson vetoed that, then HR would obey him over
3  you?
4          MS. JO MILLER:  Objection, mis-states her
5  prior testimony.
6  BY MR. LIVELY:
7      Q.  Okay.  I'm just trying to figure out, as a
8  practice matter, I -- I'm presuming that Mr. -- if
9  Mr. Watson vetoed or -- one of your proposed actions
10  with HR, it wouldn't go through?
11      A.  I'm not quite sure if he was -- how they made
12  that determination.
13      Q.  Okay.
14      A.  I can just tell you that it did not happen.
15      Q.  Okay.
16      A.  And --
17      Q.  And who were these and by employees that were,
18  and I'm presuming were under your chain in command --
19      A.  Uh-huh.
20      Q.  Correct?
21      A.  Correct.
22          MS. JO MILLER:  Can I object unless you
23  put a time frame on this.  When did this happen?
24          MR. LIVELY:  Yes.  I'm back in -- sure.
25  BY MR. LIVELY:

9  (Pages 30 to 33)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                           RE: Jackie Fisher v. UTMB

Page 34

1    Q.  I'm back in when you were in a nurse
2  manager -- I'm at that stage.  Where you're the nurse
3  manager for the Ferguson, Goree, Huntsville Units
4  'cause that's when Mr. Watson -- is that when you first
5  started having the problems with Mr. Watson overriding
6  your desire to -- to give a written reprimand to
7  employees?
8    A.  Basically, the desire to reprimand an employee
9  and he override it -- rode it, is when I were at --
10  pretty much started -- that point of it started when I
11  went to Estelle Unit.
12    Q.  Okay.  Now -- okay.  So, not -- while you were
13  nurse manager at the Ferguson, Goree, Huntsville Units,
14  did you have any problems with Mr. Watson?
15    A.  Be specific.
16    Q.  Any out of the ordinary problems?
17    A.  While I was at Ferguson, Goree, and
18  Huntsville, I did make a complaint on Mr. Watson about
19  some discriminatory practices.
20    Q.  Okay.  And when you say you made a complaint,
21  did you file a grievance?
22    A.  No, sir.  I did it informal.
23    Q.  And to whom -- I guess, an oral report --
24    A.  Correct.
25    Q.  -- it's what we're talking about?  And to whom

Page 35

1  did you make an oral report?
2    A.  Actually, in that loop of discussion was Sandy
3  Raeder and Denise Bocks and Mr. Watson.
4    Q.  And Ms. Bocks worked for whom?  Where was she
5  in -- in this?
6    A.  She's a practice manager.  She was part of his
7  management team.
8    Q.  Okay.  And so I'm -- did you have a meeting
9  with all four of you or did you do it --
10    A.  Yes.  We -- we had a meeting.
11    Q.  And this is while you were still as a nurse
12  manager at the Ferguson, Goree -- excuse me, Huntsville
13  Unit?
14    A.  Correct.
15    Q.  And what was the gist of the complaint?
16    A.  That he, basically, had instructed me and
17  another nurse manager, which was a white nurse manager,
18  to, basically, give both of our assistant nurse
19  managers a letter of expectations.
20    Q.  A what?
21    A.  Letter of expectations.
22    Q.  Okay.
23    A.  Okay.  Pretty much I received an e-mail asking
24  for a deadline.  I did what he requested, but in the
25  meantime, Mr. Watson went to my assistant nurse

Page 36

1  manager, which was a black assistant nurse manager, had
2  a conversation pretty much, basically, saying that I
3  had, you know, complained about her, and this is why
4  I -- he had instructed me to give her the letter of
5  expectation.  Which, by the same token, the same -- the
6  white nurse manager, that had a white assistant
7  manager, he never approached that particular white
8  assistant nurse manager to, basically, say that her
9  nurse manager had complained about her.  And that he
10  had instructed the lady to give her a letter of
11  expectation.
12    Q.  Okay.  Again, it's normal in conversation, but
13  I kind of got lost on the pronouns again with the hes
14  and shes, so I'm going to follow up some questions
15  here.
16    A.  Okay.
17    Q.  There was a meeting with you, Ms. Raeder,
18  Ms. Bocks, and Mr. Watson.  And your complaint to them
19  was that Mr. Watson had instructed you and a white
20  nurse manager, under his chain of command, do you --
21    A.  Correct.
22    Q.  -- do you remember her name?
23    A.  Mary Adams.
24    Q.  Mary Adams, to give to your assistant nurse
25  managers a letter of -- now, I forget.

Page 37

1    A.  Expectation.
2    Q.  Expectations.  That is, here's what we want
3  you to do.
4    A.  Correct.
5    Q.  And then, at some point -- well, did you --
6  did you give a letter of expectations to your assistant
7  nurse manager?
8    A.  Yes, I did.
9    Q.  And what was her name?
10    A.  Rosalyn Kelley.
11    Q.  Do you remember the name of the assistant
12  nurse manager for Mary Adams?
13    A.  Lee Gossett.  Lee Gossett.
14    Q.  Can you spell that last name?
15    A.  G-O-S-S-E-T-T.
16    Q.  Do you know whether or not Ms. Adams gave this
17  document to her assistant nurse manager?
18    A.  I can't verify that.
19    Q.  Then, at some point, your complaint was that
20  Mr. Watson went to see, in person, your assistant nurse
21  manager, Ms. Kelley?
22    A.  Correct.
23    Q.  Okay.  And had a conversation then with
24  Ms. Kelley?
25    A.  Correct.

10 (Pages 34 to 37)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                           RE: Jackie Fisher v. UTMB

---

Page 38

1    Q.  And were you there at that conversation?
2    A.  No sir, didn't have a clue that it was going
3  on until Ms. Kelley called me in tears.
4    Q.  Okay.  Had you ever been making any complaints
5  to anybody in your chain of command about Ms. Kelley
6  before this?
7    A.  It really wasn't a complaint.  We had a
8  discussion one day in the nurse managers' meeting.  We
9  were all just general conversation, just like if you
10  were sitting around talking about your employees.  And
11  I made the statement that Ms. Kelley, I don't even
12  remember how actually the part came up, but I did make
13  the statement that Ms. Kelley really hadn't had all the
14  training that I felt that an assistant nurse manager
15  should have had.  But, I also pointed out the fact that
16  it wasn't Ms. Kelley's fault because Ms. Kelley was not
17  allowed to certain things.  She had never been
18  trained to do certain things.  And I made that point
19  when Mr. Watson demanded that I gave her the letter of
20  expectation.
21    Q.  Had Mr. Watson ever -- how many times did
22  Mr. Watson ask you to give a written letter, of what
23  you're terming letter of expectations, to Ms. Kelley?
24    A.  I think he told us in the meeting, both of
25  us and --

---

Page 39

1    Q.  You and Ms. Adams?
2    A.  Me and Ms. Adams, and then, he sent me an e-
3  mail wanting to know had I drafted up and where was I
4  at on it?  And -- and he pretty much gave me a deadline
5  to get it to her.  So, I emailed him back, told him I
6  had it, forwarded it to him for him to review and make
7  the changes as needed.  And I basically asked him at
8  that point.  So, am I -- so as Ms. Adams' pretty much
9  on the same time line.  I mean, did she -- I just
10  basically wanted to know, was I being expected to do
11  the same thing that she was expected to do?
12    Q.  She being?
13    A.  Ms. Adams.
14    Q.  When did you first get asked by Mr. Watson to
15  provide what you're calling a letter of expectations to
16  give to Rosalyn Kelley?  Do you remember?
17    A.  I can't recall exactly.
18    Q.  How long was it between the time that you were
19  first instructed to give the letter of expectations to
20  Ms. Kelley and that you actually did it?
21    A.  I can't recall exactly, but I'm thinking maybe
22  weeks because he went and talked to Ms. Kelley a few
23  days later.  So, I'm thinking, maybe within a couple
24  weeks.
25    Q.  Could it be quite a bit longer?

---

Page 40

1    A.  I can't recall the exact date.
2    Q.  At this point, how long then had Ms. Kelley
3  been assistant nurse manager?
4    A.  I really can't recall.  I'm thinking a couple
5  years, maybe.  But, Ms. Kelley had not been assistant
6  nurse manager under my leadership.  And there are
7  assistant nurse managers today that's been assistant
8  nurse managers for a year or so and still struggling
9  with their duties.  So, I'm not -- I was not -- and I
10  made it a point of saying, "I don't want to hold
11  Ms. Kelley responsible for anything prior to my
12  comment.  I want to work with Ms. Kelley and try to
13  bring Ms. Kelley up to speed.  I've identified her
14  deficiencies, and I want to work with her to bring her
15  up to speed."  But, that wasn't good enough for him.
16    Q.  Him being Mr. Watson?
17    A.  Mr. Watson.
18    Q.  And from your answer, I gather that Ms. Kelley
19  was an assistant nurse manager at the Ferguson,
20  Huntsville, Goree Units before you came onboard?
21    A.  When I got promoted she was an assistant nurse
22  manager, and as far as I know only at the Huntsville
23  Unit.
24    Q.  Okay.  Did she come over to your units there,
25  the -- the Ferguson, Goree, Huntsville Unit while

---

Page 41

1  you -- after you got there?
2    A.  I replaced the -- the nurse manager that
3  Ms. Kelley had, so she did, at that time, follow on
4  the -- the clusters that I assumed.
5    Q.  She was already as an assist -- that's what
6  I'm trying to clear up.  As an assistant nurse manager,
7  she was already there when you came onboard as a nurse
8  manager?
9    A.  Correct.  But, I can tell you that she
10  actually was -- was assigned to the Ferguson, Goree
11  Unit.
12    Q.  Okay.  I'm with you.  Okay.  Did you know
13  whether or not Mr. Watson ever met with Lee Gossett?
14    A.  No.  He never did.
15    Q.  Okay.  Do you know whether or not Ms. Adams
16  was ever complaining about Lee Gossett?
17    A.  We were both in the same meeting and pretty
18  much made the same statements.
19    Q.  Okay.  Outside of the -- bless you.  Outside
20  of -- of this meeting with Ms. Adams, you and
21  Mr. Watson where you were talking about your assistant
22  nurse managers, were you at any other meetings with
23  Ms. Adams and Mr. Watson about assistant nurse
24  managers?
25    A.  No.  It came up in the conversation, at a

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

---

Page 42

1  meeting, and only one meeting that I can recall.
2      Q.  Okay.  Then you had a meeting with Mr. Raeder
3  (sic), Ms. Bocks, and Mr. Watson, to address these
4  concerns you had about Ms. Kelley?
5      A.  No, sir.  It was to address the concern --
6  well, to address the -- the approach that Mr. Watson
7  took to address that because that -- that -- that
8  really created -- could have created an atmosphere --
9  adversarial working relationship between me and
10  Ms. Kelley, whereas he -- I mean, he didn't subject
11  Ms. Adams and Ms. Gossett to the same possibility.
12     Q.  When you had this meeting with Ms. Raeder,
13  Ms. Bocks, and Mr. Watson to address these concerns,
14  when was that?  Do you remember?
15     A.  Probably days, and I can't re -- recall
16  exactly.  But, probably, a couple of days or so after
17  he met with Ms. Kelley.
18     Q.  Do you remember what year this would have
19  been?
20     A.  Probably 2005.
21     Q.  What exactly -- how long did this meeting last
22  with Raeder, Bocks, Watson, and you?
23     A.  I would roughly say 30 minutes to an hour.
24     Q.  Okay.  And what exactly -- who asked for
25  meeting you?

Page 43

1      A.  I did.
2      Q.  And what happened at that meeting?  I mean,
3  what did you -- as best as you can remember, tell me
4  what you told them your concerns were.
5          MS. JO MILLER:  Objection.  Asked and
6  answered.  You can go ahead.
7          THE WITNESS:  That he, basically, could
8  have set up an adversarial relationship.
9  BY MR. LIVELY:
10     Q.  Between?
11     A.  Me and Ms. Kelley, in that Ms. Gossett and
12  Ms. Adams had not been subjected to the same treatment
13  that we had.
14     Q.  How did Mr. Watson respond?
15     A.  He --
16     Q.  And -- and I'm talking about this meeting?
17     A.  What meeting?
18     Q.  The meet -- the meeting we're talking about
19  now.
20     A.  Basically, said that he was sorry, that the
21  reason why he did it, and I can't even remember what
22  did he say, pretty much.  But, kind of tried to
23  pacify the situation with a reasoning and -- but, he
24  did ultimately say that he should have handled it
25  differently.

Page 44

1      Q.  Did -- at this same meeting we're talking
2  about, did Ms. Raeder or Mrs. Bocks say anything?
3      A.  They both spoke, but I can't recall exactly
4  what they said.
5      Q.  Do you remember any of the gist of what they
6  said?
7          MS. JO MILLER:  Objection.  Asked and
8  answered.
9  BY MR. LIVELY:
10     Q.  You can go ahead.
11     A.  Go ahead?
12         MS. JO MILLER:  Go ahead.  If you can
13  recall.  You just said you couldn't so --
14         THE WITNESS:  I -- I can't recall.
15  BY MR. LIVELY:
16     Q.  Okay.  Okay.  You know, we didn't go over
17  that.  Sometimes lawyers will make an objection.  It's
18  something that we do for the record, and again, it's
19  not a criticism of you or anything.  And I know
20  sometimes witnesses will go, "Oh, I did something
21  wrong."  You didn't do anything wrong, so --
22         MS. JO MILLER:  He did.
23  BY MR. LIVELY:
24     Q.  Okay.  Let's go back then to the -- after
25  Mr. Watson met with Ms. Kelley, I think you said that

Page 45

1  she called you or came to see you in person?  Do you
2  remember that?
3      A.  She called me on the phone in tears.
4      Q.  Where were you at work?  Was she at work?
5      A.  At work.  We were both at work.
6      Q.  Okay.  And I'm presuming then you were in
7  different units?
8      A.  Different units.
9      Q.  Okay.  And what did Ms. Kelley have to say to
10  you?
11     A.  She basically said, "I had an unexpected
12  visit.  I just wanted you to be aware of it.  I was
13  told some things that was very distraught.  I thought
14  we had a -- very honest working relationship.
15  Mr. Watson has just told me that you have made several
16  accusations and complaints about me, and that I will be
17  receiving a letter of expectation."  Which, I think, in
18  my opinion, was totally inaccurate.
19     Q.  Did you tell Ms. Kelley, at any point, that
20  Mr. Watson was making you give her this letter or take
21  any disciplinary action against her?
22     A.  When I -- when I actually went to the unit to
23  talk to Ms. Kelley --
24     Q.  After the phone call?
25     A.  After the phone call, I set her down, and I

12  (Pages 42 to 45)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

Page 46

1   said, "Ms. Kelley, this is actually, basically, what
2   happened. We were in a meeting, these are the things
3   that I said. Mr. Watson has instructed me to give you
4   the letter of expectation." And I said, "If he would
5   have told -- told -- told the story accurate, he would
6   have told you." But, he made her believe that it was
7   all my idea to give her the letter of expectation. I
8   said, "If he would have told the story accurate, he has
9   instructed me to give you a letter of expectation, and
10  that's what I will be doing."
11      Q.  Okay. Did this conversation face to face with
12  Ms. Kelley occur within a short time frame after the
13  telephone conversation?
14      A.  I think, if I can recall, correctly, I think I
15  went to her -- the unit where she was at that day
16  because she called me, and she was, basically, crying.
17  And, I mean -- so, I felt like I needed to go and
18  pretty much just kind of resolve the issue before --
19      Q.  Did you then subsequently give her this
20  document you've termed letter of expectation?
21      A.  I did.
22      Q.  Okay. Does Ms. Kelley still work there?
23      A.  No, sir.
24      Q.  When did Ms. Kelley leave?
25      A.  I can't recall that.

Page 47

1       Q.  Was she terminated? Did she leave on her own
2   volition? Do you know why she left?
3       A.  I'm not quite sure if Ms. Kelley left, if she
4   resigned in lieu of termination, I -- I cannot recall
5   that. I have no honest answer.
6       Q.  Was she working for you when she left
7   employment?
8       A.  No, sir.
9       Q.  Where was she? What unit?
10          MS. JO MILLER: If you know.
11          THE WITNESS: She, from the best of my
12  recollection, she was at the Huntsville Unit.
13  BY MR. LIVELY:
14      Q.  Okay. Did -- again, did you have any then
15  more problems that you're complaining about in this
16  lawsuit while you were there as nurse manager at the
17  Ferguson, Goree, Huntsville Unit that we haven't talked
18  about?
19      A.  Well, if you go back and read the initial
20  complaint, there were several things that happened at
21  the Huntsville Unit that I did mention.
22      Q.  Okay. We'll kind of go through them. If you
23  need to see this, I'll be happy to --
24      A.  No.
25      Q.  -- show it to you. You mentioned the original

Page 48

1   complaint, and now I'm looking at the Plaintiff's
2   original complaint. It looks like Paragraph 12 --
3           MS. JO MILLER: Let's get her a copy of
4   it.
5           MR. LIVELY: This is the only copy --
6           MS. JO MILLER: I can get you one.
7           MR. LIVELY: Why don't we take a little
8   break and -- why don't we take a little bathroom break?
9           THE WITNESS: And what I'm saying in
10  comparison, when I got to Estelle, in comparison, there
11  were things that I was -- that happened at the
12  Ferguson, Huntsville and Goree Facility that I was not
13  allowed to do the same thing to the employees that are
14  supervised at the Estelle Facility. So, Mr. Watson
15  made a difference in the way that I was allowed to
16  treat the employees at the Huntsville, Ferguson, and
17  Goree Cluster, as opposed to what the treatment that
18  the employees at the Estelle Facility got.
19  BY MR. LIVELY:
20      Q.  Okay.
21      A.  So, in comparison, in all of my appeals,
22  grievances, and in complaint, those were made -- those
23  were brought out.
24      Q.  Okay.
25          MR. LIVELY: Why don't we take a little

Page 49

1   break.
2           MS. JO MILLER: Great. Okay. How many
3   copies do you want?
4           MR. LIVELY: And we'll come -- just one
5   for -- have a copy. Why don't we --
6           MS. JO MILLER: I don't know -- anything
7   else you need, let us know. We're -- we're kind of
8   disorganized.
9           (Break.)
10          MR. LIVELY: You ready?
11          COURT REPORTER: Yes, sir.
12  BY MR. LIVELY:
13      Q.  Ms. Fisher, we had talked a little bit about
14  any other episodes while you were nurse manager at
15  the -- all right, that's my memory -- the Goree,
16  Ferguson, Huntsville Unit, you remember that?
17      A.  Yes, sir.
18      Q.  And you directed us to -- to the pleadings,
19  and what you have before you, I think, is a copy of
20  Plaintiff, Jackie Fisher's, original complaint, do you
21  not?
22      A.  Yes, sir.
23      Q.  And I asked -- directed your attention then to
24  Paragraph 12 of that on Page 4 of 15. Do you see that?
25  You -- you're right.

13 (Pages 46 to 49)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                    RE: Jackie Fisher v. UTMB

Page 50

1       A.  Paragraph 12, yes sir.
2           MS. JO MILLER:  I am going to ask that
3   you make it an exhibit, though, if you're going to
4   ask --
5           MR. LIVELY:  Sure, sure.  We can -- sure.
6   If you'll stick that on the front page there, someplace
7   where it doesn't cover anything up.
8           COURT REPORTER:  Perfect.
9           (Deposition Exhibit No. 1 marked.)
10  BY MR. LIVELY:
11      Q.  Okay.  We've marked the original complaint as
12  Exhibit 1, have we not?
13      A.  Yes, sir.
14      Q.  Okay.  And if you'll look at Paragraph 12, do
15  you see where it says on or about August of 2005?  Do
16  you that?
17      A.  Yes, sir.
18      Q.  It's -- were -- in August of 2005, were you
19  the nurse manager of the Ferguson, Goree, Huntsville
20  Unit?
21      A.  I think in this particular incident, Page 4 of
22  15, Number 12, I think at that particular time, I had
23  been transferred.  We were all moved, and I was
24  transferred to the Estelle Facility.
25      Q.  As a nurse manager?

Page 51

1       A.  As a nurse manager.
2       Q.  Okay.  And it says here on Paragraph 12 on
3   August of 2005, "A black subordinate, Ms. Freeman,
4   wanted to transfer within the Huntsville Cluster to
5   work under Fisher's supervision."  Do you see that?
6       A.  Yes, sir.
7       Q.  By the Huntsville Cluster is that what we've
8   been calling the -- the Ferguson, Goree, Huntsville
9   Unit?  What -- what is the Huntsville Cluster, I guess
10  is --
11      A.  It's the whole -- I think it's like 12 or 14
12  units in the Huntsville area.  The geographic location
13  of the Huntsville area.  That's what we're calling the
14  Huntsville Cluster.
15      Q.  Okay.  Okay.  And Ms. Freeman was she in your
16  chain of command back then?
17      A.  I think Paragraph 12, if I'm not mistaken, at
18  this time I was already reassigned to the Estelle
19  Facility.
20      Q.  Was -- so, your understanding then is that
21  Ms. Freeman worked in another unit and wanted to come
22  work with you?
23      A.  Ms. Freeman I think, if I can call -- recall
24  correctly, in regards to this Number 12, Ms. Freeman
25  worked at the Goree Facility and wanted to transfer to

Page 52

1   work for me at the Estelle Facility.
2       Q.  Okay.  And I am getting -- it's my
3   understanding, and please correct me if I'm wrong,
4   employees can request transfers from various units
5   within the Huntsville area.  I guess you can go
6   anywhere in the -- in the prison system.  But, it's not
7   unusual for an employee to go I'd like to transfer from
8   this unit to that unit, is it?
9       A.  That is correct.
10      Q.  I mean, there's a process involved in that.
11  You may get it, you may not, correct?
12      A.  That is correct.
13      Q.  How do you go about making this app -- or do
14  you file an application?  Do you ask orally or how --
15  how is that typically handled?
16      A.  Typically it's supposed to be that they file
17  an application for a vacant position that posted.  You
18  interview them and select the best applicant.
19      Q.  Okay.  Is that -- usually has done?
20      A.  For the most part.
21      Q.  Okay.  In other words, for the most part, I
22  mean, a person working at one unit may say, okay
23  there's a job posting, and I feel like I'm qualified
24  for, and I'd like to be closer to home, and so I'm
25  going to apply there.  And you go through the usual

Page 53

1   process 'cause you're basically being rehired.  Am --
2   am I correct?
3       A.  For that unit, yes sir.
4       Q.  Okay.  And so, do you know whether or not
5   Ms. Freeman filed to transfer any sort of any
6   application or did she just orally ask?  Do you know
7   how Ms. Freeman handled this?
8       A.  If I'm not mistaken and can recall correctly,
9   at the time anybody that put in for a transfer,
10  Mr. Watson had made it a rule that they had to
11  interview with him, and he had to approve the transfer.
12      Q.  Okay.
13      A.  And so, I don't know if she actually put in an
14  application, but I know she had an appointment, and she
15  met with him.
16      Q.  Okay.  Were you there at the meeting with --
17  between Mr. Watson and Ms. Freeman?
18      A.  No, sir.
19      Q.  Okay.  Do you -- Mr. Watson denied Ms. Freeman
20  the transfer, correct?
21      A.  Initially, correct.
22      Q.  Okay.  And do you know why?
23      A.  If I can recall --
24          MS. JO MILLER:  Objection, calls for
25  speculation.

14 (Pages 50 to 53)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                          RE: Jackie Fisher v. UTMB

Page 54

BY MR. LIVELY:
1
2    Q.   What is your understanding then of why
3  Mr. Watson denied Ms. Freeman the initial request to
4  work for you -- transfer to work for you?
5    A.   According to Mr. Watson, he didn't feel like
6  her -- her reasoning was valid.
7    Q.   Do you know whether or not Ms. Freeman even
8  gave him a reason why she wanted to transfer?
9    A.   I wasn't at the meeting.
10   Q.   And I gather the impression at some point
11 Ms. Freeman was allowed to transfer?
12   A.   After I made a complaint about Mr. Watson's
13 discriminatory practices of hiring and transfer, she
14 was granted the transfer.
15   Q.   Okay.  And this would be a separate complaint
16 from the one we talked about where you had a meeting
17 with Ms. Bocks?
18   A.   This was a -- this was a separate issue, so it
19 was a separate complaint.
20   Q.   A separate --
21   A.   It was a separate occurrence, so it was a
22 separate complaint.
23   Q.   Okay.  And do you know whether Ms. Freeman
24 filed any sort of grievance or complaint about this
25 particular request for transfer?

Page 55

1    A.   I can't recall.  I know that there were
2  several e-mails that went back and forth between her
3  and Mr. Watson because I was copied on one or two of
4  them.  But, I can't recall if Ms. Freeman made a formal
5  complaint to anybody --
6    Q.   Okay.
7    A.   -- outside of Mr. Watson.
8    Q.   Okay.  Did she ask you to file a complaint?
9  Ms. Freeman, did she come to you and complain about
10 being denied -- let me rephrase the question.  Did
11 Ms. Freeman come to you after the denial of the
12 transfer and complain to you about Mr. Watson?
13   A.   No.  She told me that her transfer had been
14 denied.
15   Q.   Anything else that she told you?
16   A.   But, the correspondence was between her and
17 Mr. Watson, and I was copied on some of the e-mails.
18   Q.   Okay.  Did -- who did you then go -- did --
19 who did you then go complain to about Ms. Freeman's
20 denied transfer?
21   A.   At that time, nobody.  Mr. Watson was the
22 supervisor, he made a decision, so I respected that
23 decision.  When I complained about Mr. Watson was, if
24 I'm mistaken, it was around January '06, like five, six
25 months later.

Page 56

1    Q.   Okay.  And when you made this complaint in,
2  let's call it, even though we're not sure, we'll call
3  it the January '06 complaint, who was that -- to whom
4  did you complain?
5    A.   I complained to Mr. Watson, who in turn
6  complained to Ms. Raeder and Ms. Gotcher.
7    Q.   What was the wording -- what did you tell --
8  was it an oral complaint to Mr. Watson or was it a
9  written?
10   A.   We were all in interviews, and there was a
11 white nurse manager who wanted to rehire a white
12 employee.  Prior to Ms. Freeman, well not prior, in
13 between Ms. Freeman wanted to transfer Mr. Watson made
14 it known to us that he was not pretty much letting
15 anybody transfer that had bad attitudes.  We were not
16 being allowed to rehire anybody with bad attitudes.
17 That was his, pretty much that was just his
18 description, not his exact words, but his -- problem
19 employees.  So, at the time, in a January interview
20 session, a white employee, a nurse manager wanted to
21 hire a white employee which everybody knew when the
22 employee left that she had caused a lot of problems,
23 pretty much was what they considered as a problem
24 employee.  Mr. Watson had gave approval in that
25 interview session for her to hire the white employee

Page 57

1  back.
2    Q.   Okay.  Let's -- okay.  I just -- we need --
3  who was the -- who was the name of the white nurse
4  manager?
5    A.   Lavana Wright.
6    Q.   Lavana W-R-I-G --
7    A.   H-T.
8    Q.   And who was the white rehire?
9    A.   I cannot recall her name right now.  I can see
10 her face, but I can't recall her name.
11   Q.   I should have gone over this instruction.
12 Sometimes too because the human memory if you're trying
13 to think of something, you know, it's on the tip of my
14 tongue and you can't think of it and then you'll change
15 the subject, and then, all of a sudden that name or
16 whatever will pop up, feel free to tell us, now I think
17 of it in the middle of an answer.  Oh, that just dawned on me who
18 that was, and then we --
19   A.   Okay.
20   Q.   -- and that also applies to any answer.  For
21 instance, if you answered a question earlier in the
22 deposition, and then we've gone onto some other
23 subject, then you realize, wait a minute, I didn't
24 really -- 'cause that's the way human memories work, at
25 least mine.

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                           RE: Jackie Fisher v. UTMB

Page 58

1    A.  Okay.
2    Q.  Feel free to go, you know that answer where I
3  said I had a red light at that Smith and Jones
4  intersection, it really wasn't.  It was at some
5  other -- you know, 'cause that's the way human -- and
6  so, if you need to do that -- in short, if this
7  rehired, white, ex-employee's name pops into your head,
8  tell us, all right?
9    A.  Okay.  Correct.
10   Q.  Okay.  Do you know whether this rehired,
11  white, ex-employee was in fact rehired?
12   A.  No.  Because at that interview session, after
13  he said that she was able to rehire, I said to --
14  pretty much, not in these same words, "Mr. Watson, if I
15  understand you correctly, the reason why Ms. Freeman
16  was denied transfer, pretty much, is that we were not
17  allowing rehires or transfers of problem employees."  I
18  said, "Do you remember why this employee left?"  And we
19  went over the holding thing -- whole thing, and he
20  pretty much said, "Yes, I can remember that."  And
21  during that conversation he pretty much -- I was able
22  to -- he re -- rethought it, and he was able to
23  remember the details.  The next day --
24   Q.  After the meeting?
25   A.  -- he said -- the very next day after the

Page 59

1  interview process, he sent an e-mail to the white nurse
2  manager, which was Lavana Wright and Sandy Raeder and
3  myself, and said he's -- he's rethought it, I was
4  correct and that he was not going to approve her
5  rehire.
6    Q.  Okay.  So, if I -- if I understand you
7  correctly, you're recollection is Lavana wanted to
8  rehire the ex, problem employee --
9    A.  Uh-huh.
10   Q.  -- and at this meeting there was no objection
11  made to Mr. Watson, initially, and you reminded him of
12  what you understood to be this ex-employee --
13        MS. JO MILLER:  Objection, asked and
14  answered, and this states facts not in evidence.
15        MR. LIVELY:  Sure.
16  BY MR. LIVELY:
17   Q.  I'm just -- did you -- at this initial
18  interview, is that when the ex-employee, the white,
19  problem, ex-employee was interviewed?
20   A.  Correct.
21   Q.  And was it at this same interview process or
22  meeting after the interviews that you reminded
23  Mr. Watson of some of the problems that had occurred
24  with this white, ex-employee?
25   A.  Usually what happens at the end of an

Page 60

1  interview process, we discuss what applicants we're
2  going to actually select for our unit.
3    Q.  Okay.
4    A.  So, during the selection process is when I
5  raised the issue that I didn't think that it was fair
6  that you are allowing Lavana to rehire, whatever, I
7  can't remember her name, after you've denied
8  Ms. Freeman's transfer because you were not allowing or
9  rehiring problem employees per se.
10   Q.  Okay.  And so, he obvious -- I mean, it's my
11  understanding then, that he thought about what you had
12  said, and then gave directions to Lavana, in effect,
13  saying you can't rehire this ex-employee?
14        MS. JO MILLER:  Objection, calls for
15  speculation about what he thought.
16        THE WITNESS:  The e-mail that I received
17  from Mr. Watson to Lavana, and copy to me, said that,
18  you cannot rehire, we thought about it, and I --
19  BY MR. LIVELY:
20   Q.  I veto it?
21   A.  Ms. Fisher is correct.
22   Q.  Okay.  Paragraph 15 of your pleadings talks
23  about -- of your Plaintiff's Exhibit 1, your original
24  complaint.  You see Paragraph 15 there?
25   A.  Yes, sir.

Page 61

1    Q.  It talks about during the same period he --
2  he, being Mr. Watson, granted several white employees
3  their requests for transfer within that cluster.  Do
4  you see that?
5    A.  Yes, sir.
6    Q.  Who were these white employees that you are
7  stating that were allowed to transfer?
8    A.  I can't recall their names off the top of my
9  head.  There were several transfers from August '05 to
10  the beginning of the year.  Several transfers among
11  white employees.  And Ms. Freeman was the only employee
12  and black that was not granted a transfer.
13   Q.  Paragraph 16, you see Paragraph 16 on
14  February 11, 2005?  "Fisher complained about -- to her
15  supervisor, Defendant Watson, because he treated her
16  and another black employee who she supervised,
17  Ms. Kelley, differently and more harshly than he
18  treated" -- you see that?  We -- we've already gone
19  over that, have we not?
20   A.  Yes, sir.
21   Q.  That's the episode that we spent some time
22  talking about earlier in your deposition?
23   A.  Yes, sir.
24   Q.  Okay.  Now, there was an episode --
25  Paragraph 19 of your complaint talks about an inmate

16 (Pages 58 to 61)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

Page 62

1  that had committed suicide eight -- eight or so days
2  after you had spoke to him.  Do you see that?
3      A.  Yes, sir.
4      Q.  And do you know who it was that referred that
5  matter to the Board of Nursing Examiners?
6      A.  Actually, I don't know who actually referred
7  it to the Board of -- well, the Peer Review, from my
8  understanding, referred it to the Board of Nursing.
9      Q.  Do you know who instituted the peer review?
10      A.  From my knowledge of peer review it's reviewed
11  in the Mortality/Morbidity Committee.  It's only a
12  recommendation for peer review, and the decision is
13  made at Mr. Watson's and Ms. Gotcher's level.
14      Q.  Okay.  Do you know whether or not the peer
15  review in this case was instituted by the Department
16  of -- the Texas Department of Criminal Justice?
17      A.  From my understanding, peer review -- the
18  Texas Department of Criminal Justice, they make the
19  recommendations.  And the final decision, from my
20  understanding, is made at the district and division,
21  which is Mrs. Watson -- Mr. Watson and Ms. Gotcher's
22  level.
23      Q.  Okay.  It is -- at some point, your actions
24  were sent to the Texas Board of Nursing Examiners over
25  this inmate suicide, was it not?

Page 63

1      A.  That is correct.
2      Q.  And did Mr. Watson write a letter on your
3  behalf to the Texas Board of Nursing Examiners over the
4  matter?
5      A.  Later in the case, as far as I can remember.
6      Q.  Did you ask him to -- to write you a letter to
7  the Board of Nursing Examiners over this episode?
8      A.  No.  And Mr. Watson did it after I made
9  multiple complaints that he actually sat in on Peer
10  View Committee against policy, five out of seven
11  employees that were voting, committee members, were
12  under his direct influence.  And I felt, under his
13  direct chain of command, and I felt like he had
14  influence over the decision.  I made several complaints
15  to him about that, and then, he wrote a letter, and it
16  was probably months, a year -- almost a year later, to
17  the Texas Board of Nurse Examiners.
18      Q.  Have you ever seen that letter he wrote on
19  your behalf?
20      A.  I -- if I can recall correctly, I have,
21  because I got the -- a complete file -- I -- I
22  requested in paper the complete file that was sent in
23  by UTMB to the Board of Nurses.  If I can remember
24  correctly, I think the letter was included.
25      Q.  And the letter by Mr. Watson was defending

Page 64

1  you, wasn't it?
2      A.  I don't remember the exact wording of the
3  letter.  But, I know after I made multiple complaints
4  to Mr. Watson about his participation in the process,
5  he eventually did write a letter.
6      Q.  Did you object to Mr. Watson being at the peer
7  review at the time it was happening?
8      A.  Nobody asked me did I object to him being at
9  the peer review.  It is stated in policy that he -- he
10  as a chairperson should not have participated.  I
11  shouldn't have not have to had objected.  At any time
12  he should not have been there.
13      Q.  So, at the peer review were you allowed to
14  tell your side of the story?
15      A.  Yes, sir.
16      Q.  At that point did you -- was Mr. Watson there?
17      A.  Yes, sir.
18      Q.  At that point did you object in oral or
19  writing to his being there?
20      A.  No, sir.  But, as a chairperson I don't feel
21  like I should've objected.  It was part of the policy,
22  and he -- he did not follow the policy.
23      Q.  And at some point, the Board of Nursing
24  Examiners took some action, I think, requiring you to
25  get more education?

Page 65

1      A.  To take a class, not go per se get more
2  education.  But, I guess, you could call it that.  But,
3  not any schooling, I just had to take an independent
4  class, like an in-service or --
5      Q.  Online or a seminar or --
6      A.  Actually, I went in person.
7      Q.  Did it last a week, a day, kind of like
8  defensive driving?  How long --
9      A.  Yes.  Kind of like defensive driving.  I think
10  it may have been a six to eight-hour class.
11      Q.  Do you remember what the subject matter was?
12      A.  If I'm not mistaken, called correctly it was
13  Prudence -- I really don't -- Prudence and -- I don't
14  remember.
15      Q.  Okay.  And did the Board of Nursing Examiners
16  place any restrictions on your license?
17      A.  No, sir.
18      Q.  Their requirement was simply take this class?
19  Did they give you a menu of classes or did you have to
20  seek approval for the class from them or how did
21  that --
22      A.  They told you the classes to take.
23      Q.  Okay.  Did they give you a menu of classes or
24  did they just say you need to take this class from this
25  teacher --

17 (Pages 62 to 65)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                              RE: Jackie Fisher v. UTMB

Page 66

1    A.  You just --
2    Q.  -- or --
3    A.  They -- they basically just said, "Here's the
4  order you need to take," this, this, and this.
5    Q.  Okay.
6    A.  And you have one year to do it.
7    Q.  Okay.  Now, you're --
8    A.  Can I make an interjection on the peer review?
9    Q.  Sure.
10   A.  The peer review case was at the decision level
11 of Ms. Gotcher and Mr. Watson, really could have been
12 stopped before it was referred to Peer Review.
13 According to our Board of Nursing standard, that
14 particular incident could have been considered as a
15 minor incident, with no further actions.
16   Q.  Are we talking about the inmate suicide?
17   A.  Correct.
18   Q.  If you'll go to Paragraph 26 of your original
19 complaint, Exhibit 1, you see that?
20   A.  Correct.
21   Q.  It says, "About January 4, 2006, Fisher
22 opposed to what she perceived to be discrimination and
23 confronted Mr. Watson about his different standards for
24 white and black employees and told him it was not
25 fair," you see that?

Page 67

1    A.  Yes, sir.
2    Q.  Have we talked about this conversation?
3    A.  Yes, sir.
4    Q.  Already?
5    A.  That's the hiring and the transferring.
6    Q.  Okay.  That's where you talked about -- that's
7  the conversation you had with Mr. Watson about this
8  white, non-rehire?
9    A.  Correct.
10   Q.  Now, then, it looks like Paragraph -- if
11 you'll take a look at the following Paragraphs 27,
12 roughly 28, 29, 30 on so forth, it talks about an
13 onsite investigation?
14   A.  Uh-huh.
15   Q.  I want you to tell what you remember about
16 this -- what -- what led up to this?
17   A.  Okay.  I -- I honestly cannot tell you what
18 led up to it.  I just know it that Paragraph 26, on the
19 January the 4th, after I complained about Mr. Watson's
20 discrimination for the third time, five days later,
21 Ms. Gotcher and Ms. Melton started an onsite
22 investigation.  And I was told it was at Mr. Watson's
23 request.
24   Q.  And onsite investigation, which unit would
25 this be?

Page 68

1    A.  The Estelle Facility.
2    Q.  And who told you that this was at Mr. Watson's
3  request?
4    A.  Ms. Gotcher or Ms. -- Ms. Melton.
5    Q.  Okay.  And what happened?  Did they -- when
6  you talk about onsite, did -- who showed up?
7    A.  Okay.  If I can remember correctly, there was
8  an e-mail sent out from Mr. Watson to the entire
9  Estelle Complex.  And just so you can kind of get an
10 understanding, the Estelle Complex, at that time, had
11 two nurse managers, myself and another white nurse
12 manager.
13   Q.  Do you remember her name?
14   A.  Joyce Bahns.
15   Q.  Okay.  Go ahead.
16   A.  Okay.  There was an e-mail sent out from
17 Mr. Watson to the entire complex, to my employees and
18 to Ms. Bahns' employees, that Ms. Gotcher and
19 Ms. Melton would be coming to the unit and pretty much
20 they would be there for good, bad, neutral, and that it
21 was pretty much open invitation.  And that's what I
22 could remember from the e-mail.  During the scheduled
23 time that they actually came onsite, I was off on
24 bereavement leave.  My grandmother was passing away.
25 So, I wasn't on the facility during the time that they

Page 69

1  were actually there --
2    Q.  Okay.
3    A.  -- doing the interviews.
4    Q.  Okay.
5    A.  I received several phone calls from employees,
6  basically stating that it was witch hunt.  There were
7  employees who felt that they were encouraging the staff
8  to be disloyal, employees that said that they felt
9  attacked when they tried to support me.  The employees
10 that were actually interviewed pretty much were
11 solicited, certain employees.
12   Q.  Was what?
13   A.  Solicited.  Like I want you to go.  Solicited
14 employees.
15   Q.  Okay.  So, that -- I guess, was a room set
16 aside as far as you know?
17   A.  As far as I remember, they were in a
18 conference room.
19   Q.  Okay.
20   A.  Okay?
21   Q.  And so, when you say solicited, they said,
22 "Send me Mr. Smith."
23   A.  They didn't say, "Send Mr. Smith."  Mr. Watson
24 had certain people that he was telling the assistant
25 nurse manager to send down to talk to them.

18  (Pages 66 to 69)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                    RE: Jackie Fisher v. UTMB

Page 70

1    Q.  Okay.  And who was this assistant nurse
2  manager?
3    A.  Victor Aguilar.
4    Q.  Okay.  Go ahead.  I'm sorry.
5    A.  And there were certain employees that
6  basically requested to be relieved and go --
7    Q.  To be what?
8    A.  To be relieved to go sit down at the
9  meeting --
10    Q.  At the meeting?  Okay.  Okay.
11    A.  -- with them.  Right.  That, from what I
12  understand, pretty much had to find their own relief.
13  These people were not put as a priority, if they're
14  not -- was not the ones that Mr. Watson wanted to go
15  down and talk to.  They interviewed, I guess for two
16  days, day and night people.
17    Q.  Okay.
18    A.  And out of the people that was interviewed at
19  the time I supervised about 42 people.
20    Q.  Okay.
21    A.  And I don't really know how many they talked
22  to -- ultimately, that they talked to.
23    Q.  Okay.  Who was it that called you, I presume
24  at home -- were you at home?
25    A.  Uh-huh.  I was -- I was at the hospital.

Page 71

1    Q.  With -- with your mother?
2    A.  Grandmother.
3    Q.  Grandmother?  Okay.  On your cell phone, I
4  presume?
5    A.  Uh-huh.  Yes, sir.
6    Q.  There you go.  Who called you?
7    A.  I can't remember.  There were several
8  employees.
9    Q.  You just don't remember their names?
10    A.  I can't recall their names because they had
11  been calling all along to check on me, you know, in my
12  situation.  And during the -- during the process of all
13  the interviews, as they went and -- and made their --
14  had their discussion with them, they were pretty much
15  just calling and letting me know what was said.  What
16  they told and what their responses were.  And that's
17  pretty much what they said.  It was basically a witch
18  hunt, and the people who had good things to say was
19  pretty much redirected.
20    Q.  Do you remember the exact wording of any of
21  these employees?
22    A.  The only thing that I really remember that was
23  common that stuck out was it was a witch -- witch hunt.
24    Q.  And did I understand you also correctly, that
25  these people who called you during the onsite

Page 72

1  investigation were people that were, I mean, they were
2  also calling you to see how -- how you doing --
3    A.  Uh-huh.
4    Q.  -- personally, in relation to your
5  grandmother's hospitalization?
6    A.  Uh-huh.
7    Q.  Is that correct?
8    A.  Correct.
9    Q.  Okay.
10    A.  And even the guy, Victor Aguilar, came -- he
11  drove to Tyler to visit me.
12    Q.  While you were with your grandmother?
13    A.  Yes, sir.
14    Q.  Did he -- did he come there -- he didn't come
15  there to talk to you about the onsite investigation?
16  He just came to -- as a --
17    A.  He never mentioned it.
18    Q.  -- as an act of friendship?
19    A.  He never mentioned it.
20    Q.  Okay.  He just came there.  Did you take it as
21  an act of friendship and support from Victor, the
22  visit, in Tyler?
23    A.  I -- I wouldn't say that's how I took it.
24  But --
25    Q.  How did you take it?

Page 73

1    A.  Out of obligation.
2    Q.  Okay.
3       MS. JO MILLER:  It's not my deposition,
4  but it's --
5       MR. LIVELY:  Oh, let's quit.  Okay.  No.
6  I missed it.  No.  Thank you.  Let's take a break.
7       (Lunch Break 11:45 A.M. through 12:45
8  P.M.)
9  BY MR. LIVELY:
10    Q.  Ms. Fisher, we're back on the record after a
11  lunch break.  And my memory, poor though it is, says
12  that we were talking about he onsite investigation.  Do
13  you remember us talking about that right before we
14  broke?
15    A.  Yes, sir.
16    Q.  Okay.  And --
17    A.  May I interject --
18    Q.  Oh, sure.
19    A.  -- to go back.  And I want to prefacate that
20  the name of the employees that --
21    Q.  Called you?
22    A.  -- called me, but, I kind of prefacate that
23  these -- that I -- my desires, but not the -- these
24  employees not to be retaliated against.
25    Q.  Sure.

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                RE: Jackie Fisher v. UTMB

Page 74

1    A.  Was Rocio Sevilla.  I think her first name is
2  Rocio Sevilla.
3    Q.  Rocio?  Could you --
4    A.  R-O-C-I-O, Sevilla.
5    Q.  Okay.
6    A.  S-E-V-I-L-L-A.
7    Q.  Okay.
8    A.  Teresa Morning.
9    Q.  Teresa Morning, like good morning?
10   A.  Uh-huh.  Ruby Proctor.
11   Q.  Ruby Proctor.  Okay.  Anybody else, that you
12  can --
13   A.  And I can't remember her first name.  It's --
14  her -- it's Ms. Pope.  I want to say -- I can't recall
15  the first name, now.  But, Pope, P-O-P-E.
16   Q.  Oh, okay.  Like the Pope.  Okay.
17   A.  Those were the ones that -- the ones I could
18  remember.
19   Q.  Were these -- I'm presuming four women under
20  your chain of command?
21   A.  Correct.
22   Q.  Okay.  Were they all nurses?
23   A.  PCAs, nurse aides, I think that's correct.
24   Q.  And PTA would physical therapy assistant?
25   A.  PCA is patient care assistants.

Page 75

1    Q.  Oh, PCA.  Okay.  Anything else?
2    A.  That's it.
3    Q.  Okay.  See, I told you that's how the memory
4  worked.  And did I understand you correctly that this
5  investigation occurred over two consecutive days?
6    A.  From my understanding.  As stated earlier, I
7  was out on pretty much bereavement leave during the
8  whole onsite investigation.
9    Q.  Oh, okay.  Okay.  Did -- were you ever given
10  an opportunity to tell your side of the story, so to
11  speak?
12   A.  Yes.  If I can finish just explaining the
13  onsite investigation.
14   Q.  Sure.
15   A.  At the time I supervised like 42 people.
16   Q.  Right.
17   A.  Okay?  And as far as explaining my side of it
18  I can't remember, maybe a week or later, I e-mailed
19  Ms. Gotcher and/or Ms. Melton.  I think maybe
20  Ms. Melton and copied Ms. Gotcher or vice versa and
21  requested that -- that I meet with them to basically
22  find out what was said or what the decisions was or --
23  to basically figure out what had went on and what the
24  conclusions were.
25   Q.  I presume you did that after you had returned

Page 76

1  from Tyler?
2    A.  After I had come back to work from bereavement
3  leave I did.
4    Q.  Okay.  And so you asked an opportunity, I
5  guess, in essence to visit with people in your chain of
6  command what's this all about?
7    A.  Correct.
8    Q.  Did you get an opportunity to visit with chain
9  of command when you returned?
10   A.  Correct.  I visited with Ms. Gotcher and
11  Ms. Melton.
12   Q.  Okay.  Was that a personal visit like we're
13  having today?  I mean, you got down --
14   A.  Well, they came out -- they came to the
15  facility, and we met in a private area, in a conference
16  room, to discuss what -- what had taken place, and
17  what -- what was said.  So, I guess, pretty much.
18   Q.  How long did this meeting last?  Do you
19  remember?
20   A.  I want to say maybe an hour.
21   Q.  Okay.
22   A.  If not longer, a little longer.
23   Q.  Did you have an opportunity then to learn of
24  what prompted the investigation?
25   A.  At that time I did ask because that was my

Page 77

1  first available opportunity to ask.  And I can't
2  remember if it was Ms. Gotcher or Ms. Melton said that
3  at Mr. Watson's request because there were a high
4  turnover in vacancy rates.
5    Q.  Vacancy?
6    A.  Vacancy rates and high turnover.
7    Q.  Okay.  Now, turnover, would this be in dealing
8  with employees?
9    A.  Correct.
10   Q.  And vacancy rate would be, we have a position
11  here and there's nobody in it?
12   A.  Turnover is employees leaving.  Vacancy rate
13  is -- was authorized and assigned what percentage is
14  vacant.
15   Q.  In other words, if you had say those 42
16  positions and there was really -- you were authorized
17  for -- to pick a number, 50, then your vacancy rate
18  would be eight, for instance?
19   A.  The difference.
20   Q.  If I'm understanding you?
21   A.  Correct.  Correct.
22   Q.  Okay.  Okay.  And then your turnover rate
23  would be you might have all 50 positions filled, but --
24  but people are continually leaving?
25   A.  Correct.

20  (Pages 74 to 77)

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

Jackie Fisher                              RE: Jackie Fisher v. UTMB

Page 78

1    Q.  Okay.  I just wanted to make sure I understood
2  what we were talking about there.  So, okay.  Back to
3  the meeting then with Ms. Gotcher and -- and who else?
4  You told me, and I already forgot.
5    A.  Ms. Melton.  Georgia Melton.
6    Q.  Melton.  Okay.  And so, they told you that the
7  onsite investigation was started at Mr. Watson's
8  request?
9    A.  Uh-huh.
10    Q.  Is that correct?
11    A.  Uh-huh.  Correct.
12    Q.  And did they say what prompted him to ask for
13  an investigation?
14    A.  Not in so many words, but it was just that at
15  his request because of the turnover --
16    Q.  Oh, okay.  You just told me.
17    A.  -- and the high vacancy rate.
18    Q.  Okay.  And did you What else did you all talk
19  about at that meeting?
20    A.  What some of the employees had said, some of
21  their alleged complaints, what their -- what their
22  outcome was.  I mean, what -- what the -- when I say
23  outcome, is that they were going to come back and meet
24  with me and the staff.  So, pretty much the decision of
25  how to handle the situation.

Page 79

1    Q.  Okay.  And what were some of the complaints?
2    A.  Okay.  Let me see.  That it -- it was kind
3  of -- they were really general.  One of them said that
4  I let one of the black employees leave, come and leave
5  when she get ready, that during Hurricane Ike I had fed
6  some black employees that come from the South to help
7  out --
8    Q.  That you had what?
9    A.  I had fed, given them some food.
10    Q.  Oh.  Okay.  Go ahead, I'm sorry.
11    A.  Let me see, give them some food.  That I had
12  went in the emergency room, changed some things around
13  in the employees' work set.  Some of the employees felt
14  like I wasn't approachable.
15    Q.  Approachable, did you say?
16    A.  Approachable.  Their determination was that it
17  was a polarized racial issue.  That's just what I can
18  remember right off the top of my head.
19    Q.  Okay.  And that was the general gist of what
20  you were told some of the employees had said?
21    A.  Well, I think the polarized racial issue was
22  their determination --
23    Q.  Okay.
24    A.  -- or conclusion.
25    Q.  Okay.  And then did they also tell you what

Page 80

1  steps that they were going to take then to try to
2  remedy the situation?
3    A.  They were going to come back out and meet with
4  me and the employees --
5    Q.  Who was they?
6    A.  Ms. Gotcher and Ms. Melton.
7    Q.  Okay.
8    A.  Well, let me back up.
9    Q.  Sure.
10    A.  Ms. Gotcher came back out and met with me and
11  the employees.
12    Q.  Was this a meeting in a con -- big conference
13  room or was it --
14    A.  We had the same -- it was a private conference
15  room.  I mean, that's where they have meetings.
16    Q.  I guess, it was a poor question on my part.
17  Did they sit -- did Ms. Gotcher sit down with you and
18  an employee one on one, so to speak or did they --
19  excuse me --
20    A.  No.
21    Q.  -- address people in a group?
22    A.  Okay.  It was -- it was me, Mr. Watson,
23  Ms. Gotcher and a group of people.
24    Q.  Okay.  Of your employees?
25    A.  My employees.

Page 81

1    Q.  Were there any employees from the other nurse
2  manager?  I can't remember her name.
3    A.  No.  And I wanted to -- I wanted to back up,
4  and -- and I didn't know where to stop to back up.
5    Q.  Okay.
6    A.  But, no.  And -- and just because you -- we
7  landed there, I'm going to go ahead and make the
8  statement.  Even though the e-mail included the other
9  nurse manager's employees, when they came out and did
10  the onsite investigation they never went to the other
11  nurse manager's building, which was probably less than
12  300 feet.  And at the time her vacancy rate was much
13  higher than mine, her staffing levels much critical
14  than mine.  They never set foot in her building, none
15  of her employees were interviewed, and she was not
16  subjected to demoralizing treatment.
17    Q.  And you told me this woman's name, but I --
18    A.  Joyce Bahns.
19    Q.  So, the -- so, your co-nurse manager at the
20  Estelle Unit was Joyce Bahns?
21    A.  Correct.
22    Q.  And -- and I gathered from your answer that
23  you were each given, kind of, two separate buildings
24  to -- to run?
25    A.  She had -- on the complex is four buildings.

21  (Pages 78 to 81)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                          RE: Jackie Fisher v. UTMB

Page 82

1    Q.  Okay.
2    A.  There's four buildings.  She was the manager
3  of one of the buildings.
4    Q.  Okay.
5    A.  And I was the manager of the other three
6  buildings.
7    Q.  Okay.  Did you have roughly the same number of
8  employees?
9    A.  No, sir.
10   Q.  Okay.  How many employees do you --
11   A.  I cannot recall.  She probably had probably
12  half, and that's just a ballpark figure.  Probably half
13  of the amount of employees that I had.
14   Q.  As you were a nurse manager there, I guess, if
15  you had three buildings, did you have three types of
16  care to give in each building or --
17   A.  The -- the RMF was the inpatient, and the
18  other two --
19   Q.  What does that mean?
20   A.  The Regional Medical Facility.
21   Q.  Okay.  Thank you.
22   A.  It was the inpatient building.  The other
23  three stand alone -- well, the other two were
24  outpatient.  So, there were different care in each
25  building.

Page 83

1    Q.  Okay.  And you were the nurse manager for
2  the -- the inpatient and then, the two outpatient
3  buildings?
4    A.  Correct.
5    Q.  Okay.  And then, Ms. Bahns was the nurse
6  manager for the four building which dealt with what?
7    A.  Outpatient.
8    Q.  Okay.
9    A.  Which is less than probably 300 feet.
10   Q.  The actual facility?
11   A.  Right.  It has a connecting sidewalk.
12   Q.  Do you know what the turnover rate was for
13  Ms. Bahns or the vacancy rate at this time?
14   A.  No.  I have documentation that shows the
15  vacancy rates for the whole cluster, but I can't recall
16  it, and I don't -- I don't have it here with me.
17   Q.  Okay.  And by cluster, what -- what's that?
18   A.  The Huntsville Cluster.  Those --
19   Q.  All of them?
20   A.  Yes.
21   Q.  Okay.  Do you have documents that show what
22  the vacancy rate or turnover rate was for the facility
23  under the direction of Ms. Bahns?
24   A.  I have a facility -- a vacancy facility rate
25  during that time.

Page 84

1    Q.  And then, at some point, then, if I understood
2  you correctly, Ms. Gotcher came out with -- and you and
3  Ms. Gotcher met with a group of your employees in --
4  privately --
5    A.  Uh-huh.
6    Q.  -- in a little conference room or big
7  conference room?
8    A.  In a conference room.
9    Q.  And how long did that meeting take?
10   A.  Maybe an hour, a little over.
11   Q.  What was said at that meeting?
12   A.  Pretty much Ms. Gotcher summarized the meeting
13  for all of the staff, and she, basically, said, "Some
14  of you would like Ms. Fisher gone, and Ms. Fisher would
15  like to see some of you gone.  But, pretty much, these
16  are my expectations."  She gave me expectations.
17  "These are my expectations for Ms. Fisher," which I
18  think was like five or six.  "This is my expectation
19  for the staff," which was like five or six.  "And I'll
20  be back out to reevaluate in 90 days."
21   Q.  Okay.  On the list of expectations that were
22  given to you by Ms. Gotcher, was there anything out of
23  the ordinary or offensive about that list of
24  expectations that she gave you?
25   A.  The list, to me, the whole entire list was

Page 85

1  offensive because I did not -- I felt like they took
2  employees' allegations and did not research any of them
3  to find out if there was any validity to them.  But,
4  yet, and still I was expected to switch a behavior
5  because of what an employee had said.
6    Q.  Were you given an opportunity in your meeting
7  be -- to -- when you were told about the gist of the
8  onsite investigation's conclusions or what the
9  employees have told them, were you given an opportunity
10  to address those employee complaints?
11   A.  Pretty much I was.  Yes.  I -- I, pretty much,
12  told my side of the story.
13   Q.  Okay.  And then, the list of expectations came
14  to your attention?
15   A.  Not that day.  Not that day.  In a complete
16  different meeting.
17   Q.  A few days later or a week?
18   A.  I don't know if it was a few days later or a
19  week.  I can't remember.  It wasn't that long.  It was
20  shortly after.
21   Q.  That's -- okay.  The sequence was, you had a
22  meeting, got to tell your side of the story, and then,
23  some time later you had, what I'm calling, the group
24  meeting?
25   A.  Correct.

22  (Pages 82 to 85)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                          RE: Jackie Fisher v. UTMB

Page 86

1    Q.   Okay.  Did you look at the list of
2  expectations that were given to the -- your employees?
3    A.   Did I look at them?  I wrote them down.
4    Q.   Oh, okay.  So, the list -- Ms. Gotcher gave
5  you your list of expectations, and you gave the
6  employees a list of expectations?  How --
7    A.   No.  She -- she -- in a meeting, just in a
8  discussion, she basically was summarizing it all, and
9  she said, "I'm going to give -- this is Ms. Fisher's
10 expectations," and I wrote them down.  "This is the
11 employees' expectations," and I wrote them down.  "And
12 I'll be back out in 90 days."
13   Q.   When you say, "I wrote them down,"
14 you --
15   A.   I wrote them down.
16   Q.   Okay.  You -- you were taking notes in
17 essence?
18   A.   Yes, sir.
19   Q.   Okay.  And then, did -- so, the list of
20 expectations for you and the group of employees came
21 from Ms. Gotcher?
22   A.   Correct.
23   Q.   At that meeting?
24   A.   Correct.
25   Q.   Okay.  And did -- did you have any sort of

Page 87

1  problems with list of expectations given to the
2  employees?
3    A.   Off of what she felt I wasn't in the meeting,
4  I don't know really what the employees complained of.
5  But, what she expected the employees to do was pretty
6  much what I was trying to do anyway, flow, be
7  versatile, follow the chain of command, and I can't
8  remember all of them.  But, no.  No, sir.  I didn't.
9    Q.   What were -- do you remember what was on your
10 list of expectations?
11   A.   My list was to be in, so many words, be -- be
12 approachable, treat everybody the same, don't move
13 anything without asking some, you know, getting, I
14 guess, in other words, the approval or the buy-in of
15 the staff --
16   Q.   Approval by what?
17   A.   Like, they complained that I went into the ER
18 and moved things around.  And so, I guess, it was -- it
19 was in so many words that if you're going to move
20 something or change something, you need to let the
21 staff know, pretty much get their opinion, is the way I
22 took it.
23   Q.   Okay.  Anything else?  Be approachable, treat
24 everyone the same, don't move stuff without letting the
25 staff know, anything else that you can --

Page 88

1    A.   I can't -- not -- not that I really remember.
2    Q.   Okay.  Well, again, if something pops like it
3  did with names of the people, tell me if it pops into
4  your mind, just interject.  Okay?
5    A.   Okay.
6    Q.   At that point, did you file a written
7  grievance?
8    A.   No, sir.
9    Q.   'Cause -- that -- that was poorly worded.
10 Look -- look at Paragraph 33 of your Plaintiff's
11 Exhibit 1 or your complaint.  It says, "Fisher
12 exercised her protected right by filing a grievance
13 which pointed out that the other white managers had
14 higher turnover vacancy rates, etcetera."  Does that
15 refresh your recollection?  Did you file a written --
16   A.   I don't think I filed a grievance at that
17 point.
18   Q.   Oh, okay.
19   A.   I -- I don't think I filed a grievance at that
20 point.  I would have to actually look at the grievance
21 itself to recall actually when I filed it.  But, I
22 don't think it was right after the meeting.
23   Q.   After it.  Okay.  Go to Paragraph 36.  At some
24 point after this, it says that you were given a poor
25 performance evaluation.  Do you see that?

Page 89

1    A.   Yes, sir.
2    Q.   Now, I think, customarily did UTMB give you an
3  annual performance evaluation?
4    A.   We have semi-annual and annual evaluations.
5    Q.   Oh, okay.  This performance evaluation you're
6  talking here in Paragraph 36, is that a semi-annual or
7  an annual or do you remember?
8    A.   If I can remember correctly, that was a semi-
9  annual evaluation that was actually due in December
10 that he did not present to me for two or three months
11 after.
12   Q.   So, it would have been due in December and it
13 didn't get around to you till some time in the
14 spring --
15   A.   In March.
16   Q.   -- or so.
17   A.   If I can remember correctly.
18   Q.   Okay.
19   A.   It should have been given to me in December,
20 but it was not.  It wasn't presented to me till
21 somewhere around March.
22   Q.   And it looks like -- are we around the year
23 2007 now?
24   A.   Six.
25   Q.   Six?

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                          RE: Jackie Fisher v. UTMB

---

Page 90

1      A.  I think.
2      Q.  Six.  No, you're right.  Six.  Okay.  I'm
3  looking at March 7th.  Okay.  So anyway, What did you
4  consider -- what areas did you consider to be incorrect
5  in evaluating you as an employee?
6      A.  The whole evaluation.
7      Q.  Was this on a form?
8      A.  Yes, sir.
9      Q.  'Cause the forms I have seen have various
10 areas, you know --
11     A.  Uh-huh.
12     Q.  -- how you work with others, skill and
13 knowledge of the --
14     A.  Uh-huh.
15     Q.  -- subject area, yatta, yatta (sic).  You've
16 seen -- they have 16, 12, whoever knows how many.  Is
17 that kind of performance evaluation we're talking
18 about?
19     A.  If I can remember correctly, yes.  'Cause we
20 do have a semi-annual evaluation form, and we have an
21 annual evaluation.  But, I think it was -- the semi-
22 annual was put on an annual evaluation, which is the
23 one you're talking about.
24     Q.  It's a form?
25     A.  Yes.

---

Page 91

1      Q.  And do you remember what areas you were given
2  a poor evaluation in?
3      A.  The whole evaluation was poor.
4      Q.  Did you have an opportunity to sit down with
5  Mr. Watson and go over that evaluation form?
6      A.  I had asked for a meeting with Mr. Watson, and
7  the meeting was scheduled or at least the meeting was
8  said that we would meet with you when you come back
9  because I had -- at that point I was getting ready to
10 go off for a week -- a week.  My -- my little boy had
11 surgery, so --
12     Q.  Okay.
13     A.  -- I had taken a week off.  So, pretty much,
14 the -- when I got the evaluation I did a rebuttal to
15 the evaluation and I --
16     Q.  A written?
17     A.  A written rebuttal, and I asked that -- if I
18 could meet with him when I got back.  And it was pretty
19 much, kind of, passed on to "yeah, yeah, whatever, when
20 you come back, and I'll sit down and talk to you about
21 it."
22     Q.  Did you eventually talk with Mr. Watson about
23 it?
24     A.  The day I came back off of that week leave, I
25 received my demotion letter.

---

Page 92

1      Q.  Okay.  And this demotion was from what
2  position to what position?
3      A.  Well, that's kind of interesting.  Because the
4  demotion letter actually itself stated that I was being
5  demoted from a nurse manager to a nurse clinician.
6      Q.  And where in the pecking order would nurse
7  clinician be?
8      A.  Two levels down.  You have your R.N., your
9  assistant nurse manager, and your nurse manager.
10     Q.  Okay.  I -- I'm a little confused.  Let's
11 start at the top.  Nurse manager, assistant nurse
12 manager, and then, would that --
13     A.  Nurse clinician III, nurse clinician II, nurse
14 clinician I.
15     Q.  And that would be from top down?
16     A.  Uh-huh.
17     Q.  Okay.  So, you were dropped from nurse manager
18 down to nurse clinician III --
19     A.  If I can remember --
20     Q.  -- in the letter?
21     A.  -- if I can remember, it was a nurse clinician
22 III.  I'm sure it was nurse clinician on the initial
23 demotion, if I recall correctly.  But, I'm -- I'm
24 pretty sure it was a Level III.
25     Q.  Okay.  And as a practical matter, where were

---

Page 93

1  you demoted to?  Do you remember?
2      A.  Rephrase that question, please.
3      Q.  Yeah.  'Cause I thought, correct me if I'm
4  wrong.  I thought you were demoted when it all shook
5  out only to assistant nurse manager?
6      A.  That is correct.  When it all shook out.
7      Q.  Okay.  Well, let's talk about how it got
8  shaken out.  You get a letter giving you a demotion?
9      A.  Uh-huh.
10     Q.  And somehow the demotion changed from nurse
11 clinician III to assistant manager?
12     A.  Correct.
13     Q.  Nurse -- assistant nurse manager?
14     A.  Correct.
15     Q.  Did you do anything to get it changed from
16 nurse clinician to assistant nurse manager?
17     A.  Well, I got the demotion letter, I filed an
18 appeal.
19     Q.  Okay.  And to -- to whom -- is that to HR?
20     A.  To HR.
21     Q.  Okay.  And was the appeal then handled or what
22 happened?  You filed an appeal what happened?
23     A.  The first level appeal it was -- finally came
24 maybe weeks later 'cause you have -- you know when you
25 file an appeal and grievances is all time line.  So,

24  (Pages 90 to 93)

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

Jackie Fisher                           RE: Jackie Fisher v. UTMB

Page 94

1  the first appeal that I file -- filed it -- it
2  eventually way at the deadline I was sent a letter.
3      Q.  Saying what?
4      A.  At that time, I think it said that I would be
5  demoted to an assistant nurse manager and report to the
6  Wynne Unit.
7      Q.  Okay.  So, they reduced the terms of your
8  demotion?
9      A.  Correct.
10     Q.  And so, when the appeal worked its way through
11 the process you got another letter saying you're going
12 to win and you're being demoted to assistant nurse
13 manager.  Did I understand you correctly?
14     A.  Correct.
15     Q.  Okay.  And how long did that -- that take?
16 And again, I don't need the exact -- was it --
17     A.  Let's see.
18     Q.  -- days or weeks?
19     A.  Probably weeks.
20     Q.  Okay.  Did you take -- what happened then?
21     A.  What do you mean what happened then?
22     Q.  You're -- you've gotten a second letter saying
23 okay, go to Wynne, and it's not to nurse clinician.
24 It's to -- to assistant nurse manager.
25     A.  Okay.  Let me --

Page 95

1      Q.  Then what happened?
2      A.  Okay.  Let me -- let me back up.  When I got
3  the first demotion letter and I did the first appeal,
4  at that time I went out to take care of my son on
5  family medical leave.  So, I got this letter while I
6  was out --
7      Q.  The second letter?
8      A.  Correct.
9      Q.  Okay.
10     A.  And then, when I returned I went to Wynne as
11 the assistant nurse manager.
12     Q.  Okay.  And how long did you work then at Wynne
13 as the assistant nurse manager?
14     A.  From like June '07 till I was reinstated as
15 the nurse manager, which I'm still at Wynne.  Wynne is
16 still one of my units.
17     Q.  Okay.
18     A.  So, I worked there as assistant nurse manager
19 from June -- around June '07.
20     Q.  Till -- then you -- it's my understanding, at
21 some point, you were -- that demotion was reversed as
22 well and you were put back to being a nurse manager?
23     A.  Well, that is correct.  Ultimately, at the
24 end.  But, in between -- in between being put back as a
25 nurse manager, I got another letter to demote me from

Page 96

1  assistant nurse to a staff nurse again.
2      Q.  Would that be nurse clinician?  Is that the
3  same thing?
4      A.  Uh-huh.
5      Q.  Yes?
6      A.  Correct.
7      Q.  Okay.  And what happened?  That would be your
8  third letter?
9      A.  Correct.
10     Q.  Okay.  And after your third letter, did -- did
11 you appeal either the second or third letter?
12     A.  I appealed each of them.
13     Q.  Okay.  Did any of the demotions that you got
14 have anything to with the B -- Board of Nursing
15 Examiner findings?
16     A.  The last demotion that they said -- they were
17 demoting me from the assistant nurse manager to the
18 R.N., it eluded because -- that it was because of the
19 BON order.  The Board of Nurse --
20     Q.  The Board of Nursing Examiners?
21     A.  Right.  Because of the order.
22     Q.  Okay.
23     A.  Then I appealed it which says that there was
24 no stipulations put on my license.  I've been
25 functioning as a managers position since '05, two years

Page 97

1  ago, and when it was convenient for me to do it, it was
2  okay.  But, now that I keep the appeals and grievances,
3  then all of a sudden, it's a problem.  You can't
4  function as a manager anymore.  Whereas, in the appeal
5  I did make it known that there had been other Caucasian
6  people that had Board stipulations that functioned in
7  manager positions.
8      Q.  And who would those be?
9      A.  I know for a fact one of -- well, I can't say
10 I know for a fact, but I have a very good -- Lavana
11 Wright was one of them that had had past Board
12 stipulations.  And I want to say, and I'm not really
13 sure, but I have all the information at home, I think,
14 it was Dr. Cherian which was -- had been a facility
15 medical director with Board stipulations all under
16 UTMB.
17     Q.  Doctor what?
18     A.  I think it was Cherian.
19     Q.  Like the fruit, cherry man, as far --
20     A.  C-H-E-R-I-A-N.
21     Q.  All right.  Oh, Cherian.  Okay.  Was he a
22 medical doctor?
23     A.  Medical, yes.  He was the medical director
24 for --
25     Q.  Have you reviewed the records for Ms. Wright

25  (Pages 94 to 97)

Jackie Fisher                              RE: Jackie Fisher v. UTMB

---

Page 98

1  or Dr. Cherian?
2      A.  Ms. Wright, I do not have and actually, I
3  don't know why I did not go ahead and submit those
4  to -- to the Opens Records Act.  But, I did get
5  Dr. Cherian's through Open Records Act.  And I'm not
6  quite sure why I did not get Ms. Wright's.  Why I
7  didn't pursue it, should I say.
8      Q.  At -- so, you got -- you got a third letter,
9  if I understand correct, saying you're a nurse
10  clinician, correct?
11     A.  Correct.
12     Q.  And you appealed that through the UTMB system?
13     A.  Uh-huh.
14     Q.  Correct?
15     A.  Uh-huh.
16     Q.  Yes (whispering).
17     A.  Yes, sir.
18     Q.  There you go.  And what happened on that
19  appeal?  This would be the -- on the third letter?
20     A.  None of my appeals were -- except the first
21  appeal was answered.  The second and the third appeal
22  was never -- I never received a written response.
23  After the third appeal, then shortly after that I
24  received a letter stating, "Here's some back pay," but
25  it did not have a title or position change, which we

Page 99

1  rejected it.  In the end, I received another letter
2  stating that your client is being reinstated in whole
3  to a nurse manager with all back pay.
4      Q.  Okay.  And this came from HR?  Do you
5  remember?
6      A.  It came from -- I can't ask any questions -- I
7  can't --
8      Q.  You can ask me questions.  I mean, I may not
9  know the answer.
10     A.  I'm sure it -- it may have come from the legal
11  office in Galveston.  I don't think it came from
12  Ms. Raeder's office.  I think it came from the legal
13  office in Galveston.
14     Q.  But, at some point, and correct me if I'm
15  wrong, you got a letter with a check in it with back
16  pay?  And then, you got another letter saying you're
17  back to nurse manager?  Did I understand you correctly?
18     A.  Correct.
19     Q.  So, you got two -- two sets of correspondence?
20     A.  Correct.  Final -- final sets, after many
21  appeals and grievances.  The final correspondence was,
22  "This is your back pay as a settlement," and then, we
23  rejected that and then, the final correspondence was,
24  "Here's your letter, we're reinstating you to nurse
25  manager."

Page 100

1      Q.  Okay.  And so, do you remember, was -- was
2  there check included with the first set of
3  correspondence?
4      A.  I think there was a check, if I can recall
5  correctly.
6      Q.  Did you -- do you remember the amount of the
7  check?
8      A.  No, not -- not right offhand.
9      Q.  Do you know -- do you know whether or not the
10  check that was sent to you was in the correct sum for
11  your back pay?
12     A.  I don't -- I don't -- in my opinion, no sir.
13  It was -- I didn't, you know, it's an undetermined
14  amount of what -- how much it should have been, but I
15  know that it did not include one raise that they got
16  that I was denied because they said I was in
17  disciplinary status.
18     Q.  And so, I think you answered my question.  I
19  want to be clear.  You didn't take the amount of the
20  check and do any independent calculations and said,
21  "Yeah, this sum equals by back pay or no this sum is
22  less than my back pay by X dollars," correct?
23     A.  I roughly did calculations on the salary -- on
24  my previous salary of nurse manager, previous, but --
25     Q.  Okay.  Thank you.

Page 101

1      A.  Yes.  But, I did not do any detailed
2  calculations as -- in comparison as what raise -- what
3  the amount would have been if I would have got the
4  raise.
5      Q.  Was this a merit raise or a standard kind of,
6  for lack of better term, cost of living adjust --
7      A.  It was a merit -- if I'm not mistaken, it was
8  a merit raise because you didn't -- if you was in
9  disciplinary you didn't get merit increases, you
10  forfeited.
11     Q.  And I want to be clear too, although I think
12  you've answered it.  You've got a check, but you sent
13  it back, you didn't cash it?
14     A.  No.  We didn't send it back.  I held the
15  check --
16     Q.  Okay.
17     A.  -- until -- and was I was reinstated
18  everything was reinstated, then I cashed the check or
19  deposited the check.
20     Q.  Okay.  So, once you got the second set of
21  correspondence that says, Okay.  You're back to nurse
22  manager, then you cashed the check you'd gotten in the
23  first set of correspondence, if -- is that correct?
24     A.  I think that is correct.  I don't remember the
25  exact date.

26 (Pages 98 to 101)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                          RE: Jackie Fisher v. UTMB

Page 102

1      MS. JO MILLER:  Objection, assumes facts
2  not in evidence.  She's not -- not clear on the
3  sequence of events.
4      THE WITNESS:  Yeah.  When I cashed the
5  check, but --
6  BY MR. LIVELY:
7     Q.  Eventually, you did cash the check?
8     A.  Eventually.
9     Q.  And -- and you did get the demotion reversed
10  and put back as a nurse manager.
11      MS. JO MILLER:  Objection, assumes
12  facts -- in -- not evidence as to demotion reversed.
13      THE WITNESS:  Yes.
14  BY MR. LIVELY:
15     Q.  Okay.  And since -- do you remember when it
16  was that you got the letter putting you back as a nurse
17  manager?
18     A.  I don't really remember the exact date, but I
19  guess it would be somewhere around April, May of '07.
20     Q.  And since then you have been a nurse manager
21  at the Wynne Unit?  Am I -- am I --
22     A.  Wynne and Goree Units was the initial
23  reinstatement.
24     Q.  Okay.
25     A.  And then, I was re -- re, I guess, kind of

Page 103

1  reassigned to Wynne and Ellis.  And that's where I am
2  currently.
3     Q.  Where you working at now?  That was I guess --
4     A.  Wynne and Ellis Facilities.
5     Q.  Are those two normally linked together?
6     A.  No.  What had happened was when I was
7  reinstated, it kind of broke up what we call the normal
8  cluster arrangements because, I guess, I was an extra
9  person now.  So, they -- it kind of divided the units
10  in a different shape.
11     Q.  Okay.  Are the Wynne and Ellis Units separate
12  physically?
13     A.  Yes.
14     Q.  And then, I guess, how many -- do you have the
15  same number of people, less people to -- to handle?
16     A.  In comparison to what, what units?
17     Q.  When you were talking about when you had 42,
18  some odd, remember that?
19     A.  Yes.  This is less people.
20     Q.  Less people.  Do you have an assistant nurse
21  manager?
22     A.  Yes.
23     Q.  Okay.  And that's where you've been -- you've
24  been in that position then since -- what do you -- I
25  want to use your term, you were reinstated as nurse

Page 104

1  manager?
2     A.  Correct.
3     Q.  Okay.  And have you received any raises,
4  merit, cost of living or otherwise since you were
5  reinstated?
6     A.  Yes, sir.
7     Q.  I didn't hear you?
8     A.  Yes, sir.
9     Q.  Okay.  And I think when you got the check and
10  the reinstatement, that happened through the policies
11  or the internal procedures of the dealing with UTMB and
12  human resources?
13      MS. JO MILLER:  Objection, calls for
14  speculation.  If you know.
15      THE WITNESS:  Actually, I had filed an
16  outside EEOC complaint.  And the reinstatement and the
17  back pay came after the EEOC made their final ruling.
18  BY MR. LIVELY:
19     Q.  Okay.  Okay.  I'd like you to go -- I've got
20  to find it here, there was an allegation in your
21  original complaint --
22      MS. JO MILLER:  Exhibit Number 1?
23  BY MR. LIVELY:
24     Q.  Yes, yes.  Exhibit Number 1 about sexual
25  harassment or something along those lines, and I'm

Page 105

1  trying to find it here.  Here we go.  Paragraph 38 of
2  Exhibit 1 of the original complaint.  Do you have that?
3     A.  Yes, sir.
4     Q.  It says here that you had complained Defendant
5  Watson's unwelcome and inappropriate sexually comments.
6  Do you see that?
7     A.  Yes, sir.
8     Q.  Okay.  Could you tell me about that, please?
9     A.  In a meeting that I had with Ms. Gotcher and
10  Ms. Melton, I had noted the fact that we were all in
11  a -- one of the interview sessions.  And I was drinking
12  a bottle of water, and I drunk the water and, you know,
13  how the sides kind of pop or kind of collapse in and
14  Mr. Watson made the statement that, in so many terms
15  that, he was impressed that we -- he bet that we could
16  have a good time.
17     Q.  To -- to the best of your recollection, what
18  were the exact words that Mr. Watson used?
19     A.  Something to my about suction in eluding oral
20  sex.
21     Q.  So, is -- is the only word that you actually
22  remember him saying, and please correct me if I'm
23  wrong, is something about suction?  'Cause I'm trying
24  to get --
25     A.  I -- I can't really recall.  I have it written

27  (Pages 102 to 105)

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

Jackie Fisher                          RE: Jackie Fisher v. UTMB

Page 106

1   down.  I can't recall, at this time, the exact comment
2   he made.  But, it was eluding that when I drunk and the
3   bottles collapse, the comment he made was about oral
4   sex.  It was related in nature to oral sex.
5       Q.  Okay.  And do you remember -- Paragraph 38
6   says that on March 7th you complained UTMB of this
7   episode.  You see that?
8       A.  Yes, sir.
9       Q.  So, it must have happened before March 7th of
10  2006?
11      A.  That's what my original complaint states so, I
12  have no reason to believe that it didn't.
13      Q.  Who did you complain to about this?
14      A.  Ms. Gotcher and Ms. Melton.
15      Q.  Were they at the meeting?
16      A.  No.  When I met with them -- I had met with
17  Ms. Gotcher and Ms. Melton at least one or two other
18  times about complaints about Mr. Watson.  And -- and it
19  was told during one of the meetings --
20      Q.  You told them about that during one of the --
21      A.  Correct.
22      Q.  Okay.  Are there any other episodes of
23  unwelcome or inappropriate sexual comments that we
24  haven't talked about other --
25      A.  Well, I mean, he -- he would make them, I

Page 107

1   mean, here and there.  We had one nurse manager, Kim
2   Roddy, and you know, he'd make comments about her
3   breasts.  And those are the only two that I can really
4   remember.
5       Q.  What did he say about Kim Roddy's breasts?
6       A.  I don't remember the exact words.  But, the
7   content was, pretty much, she had nice, round breasts.
8       Q.  How many times did he make a statement about
9   Ms. Roddy's breasts?  He being Mr. Watson.
10      A.  I only heard him say it once.
11      Q.  Did you file any sort of written complaint
12  about these unwelcome and inappropriate sexual
13  comments?
14      A.  No.  I did not.  I made -- I filed a verbal
15  complaint with the District and Divisional Director of
16  Nurses and the Human Resource Department.
17      Q.  Okay.  Who did you -- okay.  Was that
18  Ms. Raeder?
19      A.  Ms. Melton.
20      Q.  Ms. Melton.  Do you remember ever dressing up
21  in an elf costume with shorts?
22      A.  Elf costume?  I don't even have an elf
23  costume.  No, sir.  That never, ever happened.
24      Q.  Did you ever shake your behind in a short-
25  shorts at a meeting or your -- at work?

Page 108

1       A.  In short pants?  I have never wore short pants
2   to work.  That is not even part of the dress code, and
3   you can't even get in our units with short pants on.
4       Q.  Did you ever -- did you do it a Christmas
5   party?
6       A.  Christmas party.  I think we -- I've taken a
7   picture at a Christmas party, but I don't remember what
8   I had on.
9       Q.  Why don't we take a little break.  I don't
10  think I've got a lot more, maybe half hour or so.  But,
11  I'm going to take -- I need to take a little break.
12          (Off the record.)
13          MR. LIVELY:  We're back on the record?
14          COURT REPORTER:  Yes, sir.
15  BY MR. LIVELY:
16      Q.  Okay, we're back on the record, Ms. Fisher.
17      A.  Okay.
18      Q.  And I'm going to try to kind of cut down some
19  of the questions.  And we've been talking at some
20  length about the allegations in your original complaint
21  today, have we not?
22      A.  Correct.
23      Q.  Does your original complaint set forth all the
24  acts or omissions that you claim to have been racially
25  based?

Page 109

1          MS. MILLER:  Objection.  Calls for a
2   legal conclusion.
3          THE WITNESS:  To say that's accurate I
4   believe I'll have to defer to my attorney, but as far
5   as I'm concerned I would like to also include the
6   grievances and appeals.
7          MS. MILLER:  I mean it's noticed
8   pleading, Sam.
9          MR. LIVELY:  Huh?
10          MS. MILLER:  It's noticed pleading.  She
11  doesn't have to put all the facts in.
12          MR. LIVELY:  No, I'm just trying to
13  shortcut.  No, I understand.  I'm not --
14          (Other matters discussed.)
15          MR. LIVELY:  Okay.  Are we good to go?
16          COURT REPORTER:  Yes, sir, we are.
17          MR. LIVELY:  Okay.
18  BY MR. LIVELY:
19      Q.  You mentioned that the grievances, and I
20  forget what else you said, the --
21      A.  My appeals.
22      Q.  Okay, appeals.  Those were somehow racially
23  discriminatory against you?
24      A.  I said as far as -- if you would rephrase --
25  ask me the question again so I'm clear.

28  (Pages 106 to 109)

e968154c-1317-46b6-86f1-b3c8d56fa713

Page 110

1    Q.   We've spent a few hours here talking about
2  various things that are in your pleadings, correct?
3    A.   Correct.
4    Q.   And what I'm trying to do is have we covered
5  all the areas in your deposition today that you claim
6  were racially discriminatory against you?
7         MS. MILLER:  Objection, calls for a legal
8  conclusion.  She's not required to do noticed
9  pleadings.  Are you asking her --
10        MR. LIVELY:  Yeah, let me rephrase.
11        MS. MILLER:  Okay.
12        MR. LIVELY:  Let me try to rephrase it.
13 BY MR. LIVELY:
14   Q.   Are there any other actions or omissions of
15 the defendants in this case that you claim were
16 racially discriminatory against you that we have not
17 talked about in your deposition today?
18   A.   We have not talked in detail about my appeals
19 or grievances, which are all stated as part of my
20 initial discrimination charge.
21   Q.   Okay.  And let's kind of break those down.
22 When was the first -- I'm going to chronology working
23 from back to the present, okay?  When is the first
24 grievance or appeal that you took -- that you feel was
25 racially discriminatory?

Page 111

1    A.   I would have to review the document.
2    Q.   What documents --
3    A.   Because I can't -- the grievances to answer
4  that question.  I can't even start answering that
5  without reviewing the records.
6    Q.   Okay.  I guess I'm a little confused.  Are you
7  saying that it was racially discriminatory against you
8  because you had to file a grievance or an appeal?
9    A.   No, that's not what I'm saying . I'm saying I
10 filed the grievances because of the racial
11 discrimination, retaliation, and harassment.
12   Q.   Okay, okay.  Okay.  That's kind of what I was
13 trying to clear up.  The fact that you had to undertake
14 the process at UTMB, that's not discriminatory.  What
15 you're talking about is the facts that led up to you
16 filing the grievance or the appeal.
17        MS. MILLER:  Objection, calls for --
18        MR. LIVELY:  Is that correct?
19        MS. MILLER:  -- a legal conclusion.
20 BY MR. LIVELY:
21   Q.   Is that correct?
22   A.   Correct.
23   Q.   Okay.  And so we could take a look at where
24 it's in writing at least on the grievance or the
25 appeals, and those writings would set forth what you

Page 112

1  felt were the racially discriminatory actions or
2  omissions of the defendants.  Correct?
3    A.   I would have to defer really to my attorney to
4  make sure I understand the question, but from my
5  understanding, yes.
6    Q.   Yes.  I mean when you filed a grievance or an
7  appeal in writing, whenever it was, you put forth facts
8  in there that you felt like were the basis of your
9  grievance or an appeal, correct?
10   A.   Correct.
11   Q.   And you did so I guess a lot closer to the
12 events than we are sitting here at your deposition
13 sometime later.
14   A.   Correct.  Each grievance or appeal followed an
15 incident.
16   Q.   Fairly shortly thereafter.
17   A.   Correct.
18   Q.   Did anybody working at UTMB in your chain of
19 command, including Mr. Watson, people at Human
20 Resources, ever make any sort of comments to you that
21 you took to be racially offensive against you as an
22 African-American?
23   A.   I really can't recall.
24   Q.   You seemed a little --
25        MS. MILLER:  You mean specific racial

Page 113

1  terms.
2         MR. LIVELY:  Yeah, let me --
3         MS. MILLER:  You're not --
4         THE WITNESS:  Yeah.
5         MS. MILLER:  -- (indiscernible) racial
6  comments but you're asking specific --
7         MR. LIVELY:  Yeah, let me --
8         MS. MILLER:  -- (indiscernible).
9         MR. LIVELY:  Let me rephrase in a
10 different context.
11 BY MR. LIVELY:
12   Q.   Say this was a AIDS discrimination lawsuit and
13 somebody said -- and you were working for Target, and
14 one of your bosses said -- and you're 70 years old.
15 And the boss says we need to get rid of all these old
16 people.  See, that would be kind of a remark that kind
17 of indicates that somebody's after you -- could be
18 construed as -- you see what I'm saying?
19   A.   Uh-huh.
20   Q.   So with that explanation, were there any sort
21 of comments specifically made by people along those
22 kind of lines that you took to be racially offensive
23 because you're an African-American?
24   A.   Not that I can recall.
25   Q.   Did UTMB or Mr. Watson ever tell you that you

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

Page 114

1  cannot file a grievance or an appeal?
2      A.  Cannot file a grievance.  I'm not -- I don't
3  understand what -- rephrase it, please.
4      Q.  You have -- during this whole process you've
5  had an opportunity to file grievances or appeals of
6  your demotion, for instance, have you not?
7      A.  For my demotion I filed basically appeals.
8  For incidents I filed grievances.
9      Q.  Right.  And in some cases those grievances
10  were -- were they done in writing?
11      A.  They were.
12      Q.  And did anybody at UTMB, the Human Resources
13  or Mr. Watson ever direct you or order you not to file
14  an appeal or a written grievance about any of these
15  problems?
16      A.  Not that I can recall.
17      Q.  When you have -- in filing these written --
18  these grievances and appeals you did so I guess in
19  accordance, to your understanding, of proper procedure
20  and policy for the UTMB Managed Care, correct?
21      A.  Correct.
22      Q.  And nobody ever denied you the right to file
23  an appeal or a grievance, did they?
24      A.  No one ever denied me the right to turn them
25  in, but no one really answered either grievance that I

Page 115

1  filed or either of my last two formal appeals.  So an
2  act of omission to me is basically an act of
3  negligence.
4      Q.  So the -- and we're talking there about
5  appeals of your demotion that never got answered,
6  correct?
7      A.  If I can remember correctly, the only formal
8  response that I got back from an appeal that I filed
9  was the very first one.
10      Q.  Okay.
11      A.  And they never responded to either of the
12  other appeals nor did I get a response back from either
13  grievance that I filed.
14      Q.  And were you ever denied the opportunity to
15  tell your side of the story when somebody made a
16  complaint against you?
17          MS. MILLER:  Objection, asked and
18  answered.
19          THE WITNESS:  I basically -- to tell my
20  side of the story I had to request a meeting with
21  whomever took the complaint.
22  BY MR. LIVELY:
23      Q.  And did you get those meetings to tell your
24  side of the story?
25      A.  Pretty much --

Page 116

1          MS. MILLER:  Objection, asked and
2  answered.
3  BY MR. LIVELY:
4      Q.  You can go ahead and answer.
5      A.  Pretty much to just see what the complaints
6  were and, yes, to defend my own self.
7      Q.  Okay.  Did you -- we already asked that, never
8  mind.  Strike that.  When you were -- when you went
9  from nurse manager to assistant nurse manager down to
10  nurse clinician, during that process did your benefits
11  stay the same?
12      A.  I never went to a nurse clinician.  The first
13  demotion letter stated that you are being demoted to
14  nurse clinician.  Then I received one from the appeal
15  saying you are being demoted to the assistant nurse
16  manager.  Then after I served as assistant nurse
17  manager for a year and a half, somewhere around in
18  thereabout, then I got another letter saying you are
19  being demoted to nurse clinician 3, and then I got a
20  letter saying you're being reinstated to a nurse
21  manager.  So I only went from a nurse manager to an
22  assistant nurse manager even though I received two
23  letters stating that the intent was to demote me to a
24  nurse clinician.
25      Q.  Do you know if Mr. Watson was the one that

Page 117

1  demoted you?  Wherever you went, was it Mr. Watson that
2  demoted you?  Was he the motive force behind there?
3      A.  I can't honestly say that he was the force . I
4  think it was a combination, everybody included.
5  Because there's a lot -- as a manager you have to get
6  the approval of HR.  So it had to go all the way up to
7  come back down.
8      Q.  Okay.
9      A.  He -- I think he was the -- the one who
10  actually set it all in motion but I think it was a
11  combination of approvals from Mr. Watson, Ms. Gotcher,
12  and Ms. Melton's level.
13      Q.  Okay.  And during this, and we'll just call it
14  the demotion period, wherever you went and -- and my
15  question is did you have the same job benefits, not
16  wage but benefits during that time?  You know, health
17  insurance, that sort of thing.
18      A.  My benefits never changed.
19      Q.  Okay.
20      A.  Because those were pay options that I opted,
21  so my bene -- I never changed my benefits.
22      Q.  Your wage changed.
23      A.  Right.
24      Q.  Now, part of your complaint is that you were
25  retaliated against because of your right to free

30 (Pages 114 to 117)

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

Page 118

1  speech.  If you'll take a look at 89, paragraph 89?
2  Well, just take a look at paragraph 87 through 93.
3          MS. MILLER:  Of Exhibit No. 1?
4          MR. LIVELY:  Huh?
5          MS. MILLER:  Of Exhibit No. 1?
6          MR. LIVELY:  Of Exhibit No. 1, correct.
7          MS. MILLER:  It just makes it easier when
8  you're --
9          MR. LIVELY:  No, I understand.
10          MS. MILLER:  -- (indiscernible) record.
11          MR. LIVELY:  Right, right.  No, you're
12  right.  That's that sort of stuff we understand right
13  now but you look at it in six weeks, it's like what in
14  the hell was he talking about.
15          MS. MILLER:  What exhibit.
16          THE WITNESS:  Will you --
17  BY MR. LIVELY:
18      Q.  Yeah, just take a look at it, those paragraphs
19  on free speech, and let me know when you're through.
20      A.  What paragraphs was it?
21      Q.  Oh, I'm sorry.
22      A.  86, did you say 86 through?
23      Q.  Right here, that page.
24      A.  87?
25          (Pause.)

Page 119

1      A.  I've read 87, 88 and 89.
2      Q.  What free speech are you claiming you were
3  retaliated against by the defendants?
4          MS. MILLER:  Objection, calls for a legal
5  conclusion.
6          THE WITNESS:  Free speech is when I file
7  grievances, when I made verbal complaint.  That's what
8  I mean free speech.
9  BY MR. LIVELY:
10      Q.  Okay.  Are you claiming you were discriminated
11  against because of your conversations with Mr. Watson
12  about Ms. Freeman's failure to get a transfer?
13      A.  That's not -- no.  That may be inclusive but
14  that's not what I'm referencing.
15      Q.  Okay.  You're referencing your complaints
16  about your problems with him, correct?
17      A.  Correct .  I'm referencing a discrimination,
18  how I was treated differently, received different
19  treatment, partial treatment than my peers which were
20  white nurse managers.
21      Q.  Okay.  And there was a -- you talked about a
22  statement by Ms. Kim Roddy about her breasts.  What
23  race was Ms. Roddy?
24      A.  She's white.
25      Q.  Let's talk a little bit, I'm going to kind of

Page 120

1  change the subject to your claimed damages.  Do you
2  have any idea about how much you're going to claim in
3  lost wages as a result of this alleged discrimination?
4      A.  Undetermined amount.
5          MS. MILLER:  You can explain it if you
6  can.  You don't have a dollar amount, you still need to
7  explain how it will be figured if you can.
8          THE WITNESS:  Oh, I thought he meant --
9          Can you rephrase the question?
10  BY MR. LIVELY:
11      Q.  Sure.  Do you have a way of figuring -- do you
12  -- strike that.  How do you intend to show that you
13  lost any wages as a result of these alleged
14  discriminatory practices?
15      A.  Wages.  I had a reduction in wage, which is an
16  undetermined amount.
17      Q.  From the demotion?
18      A.  Right.  Mental anguish in the past, mental --
19      Q.  No, no, I'm sticking just to lost wages.
20          MS. MILLER:  (Indiscernible) wages.
21          THE WITNESS:  Okay.  So wages.  And can I
22  add the merit increase that I was forfeited because of
23  the demotion?
24  BY MR. LIVELY:
25      Q.  Who would have approved you for a merit

Page 121

1  increase?  During this period of time.
2      A.  Merit increases, I don't know, is based on the
3  valuations and performance and disciplinaries.
4      Q.  But who would make the decision on whether or
5  not you actually got one back at this time?
6      A.  At that time I was actually reporting to Carol
7  Warren.
8      Q.  Warren is?
9      A.  W-A-R-R.
10      Q.  Oh, Warr, okay.
11      A.  E-N.
12      Q.  Oh, Warren, okay.  Do you know whether or not
13  you would have received this merit increase during this
14  period?
15      A.  If I had not got the demotion, I would have
16  received a merit increase.
17      Q.  And what leads you to believe that?
18      A.  Because disciplinary, if you're under
19  disciplinary pro -- if you're in disciplinary, if you
20  had a disciplinary, you -- it forfeits you the
21  opportunity to receive the merit increase.  I didn't
22  get it because I was in a demotion status.
23      Q.  Did Ms. Warren ever tell you that you would
24  have gotten a merit increase but for the disciplinary
25  process?

31 (Pages 118 to 121)

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

Page 122

1    A.  Ms. Warren didn't tell me, she gave me a
2  letter, which is standard that everybody gets sent, and
3  you are not -- you will not receive a merit increase
4  because, and it's checked demotion status.
5    Q.  Okay.  You started to mention about mental
6  anguish, which is -- how has this affected you from a
7  point of mental anguish?
8    A.  It has -- emotional pain, it's caused a lot of
9  inconveniences, pretty much more worried than usual,
10  depression, unable to sleep, embarrassment.
11  Reputation, slander.
12    Q.  Have you applied for any jobs outside UTMB?
13    A.  In what timeframe?
14    Q.  Since -- well, that's a good question.  Since
15  2004.
16    A.  Till when?
17    Q.  Today.
18    A.  I had one job interview.
19    Q.  And where was that?
20    A.  With Huntsville Independent School District.
21    Q.  As a school nurse?
22    A.  It was some -- I can't exactly remember the
23  title now.
24    Q.  When did you apply for that job?
25    A.  Just within the last -- it was, what, `09,

Page 123

1  within `09, if I'm not mistaken.
2    Q.  How far along in the process did you get, did
3  you --
4    A.  The process for me, we were complete . The
5  process as far as the demotion was finished.
6    Q.  During the period of your demotion you made an
7  application?
8    A.  No.
9    Q.  Okay.  I'm confused.
10        MS. MILLER:  Would you rephrase the
11  question?  She thinks you're talking process of, her
12  process at UTMB.  You're asking about the process of
13  the application --
14        MR. LIVELY:  Yes.
15        MS. MILLER:  -- (indiscernible), correct?
16        MR. LIVELY:  Yeah.
17        MS. MILLER:  Okay.
18  BY MR. LIVELY:
19    Q.  When -- well, let me phrase it.  Just so I'm
20  clear, you applied for a job at Huntsville Independent
21  School District, correct?
22    A.  Correct.
23    Q.  And what job did you apply for?
24    A.  It was actually not a school nurse per se but
25  it was a health science teacher.  I can't remember the

Page 124

1  exact title of the job but that's --
2    Q.  Okay.  And why did you apply with the
3  Huntsville ISD?
4    A.  Basically because even though the demotion
5  part, that part is over, there are still time to time
6  that I still feel like I'm subjected to some
7  retaliation and harassment.
8    Q.  And where at in the Huntsville ISD job process
9  are you?  Have you been --
10    A.  I was offered the job and declined it because
11  of salary.
12    Q.  Okay.  I presume it paid less than what you're
13  making.
14    A.  Way less.
15    Q.  Okay.
16    A.  Not (indiscernible).
17    Q.  Have you applied anywhere else?
18    A.  No, sir.  It was almost half of the salary
19  that I make now, so I really couldn't afford to take
20  it.
21    Q.  My wife's a school teacher, so
22  (indiscernible).  Have you sought any medical treatment
23  or health care treatment from a psychologist, a pastor,
24  priest, counselor of any sort for any of the mental
25  anguish you're claiming in this lawsuit?

Page 125

1    A.  What timeframe?
2    Q.  Well, since 2004.
3    A.  I have records that I went to the doctor again
4  back in `06-`07 for health reasons and depression.
5    Q.  For health reasons other than the mental
6  anguish?
7    A.  Yes.
8        (Pause.)
9        MS. MILLER:  That's --
10        MR. LIVELY:  Huh?
11        MS. MILLER:  That's the construction.
12        MR. LIVELY:  Okay.
13        MS. MILLER:  We've lived this for a year
14  now, and it's almost over, thank God.
15        Please don't put that on the record.
16  BY MR. LIVELY:
17    Q.  There are some documents that were provided to
18  us today by your attorney dealing with a Charlene
19  Jordan.
20    A.  Yes, sir.
21    Q.  What -- did you have a problem with Ms.
22  Jordan?
23    A.  Actually what surrounded that about Ms.
24  Jordan, Ms. Jordan was a fairly new employee that had
25  only been working for me for a short period of time.

32 (Pages 122 to 125)

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                           RE: Jackie Fisher v. UTMB

Page 126

1  We had received an -- well, I had received an email
2  from my boss stating that, you know, we really needed
3  to watch the overtime, utilize the staff, you know, if
4  they were requesting vacations, and you really couldn't
5  let them off because of staffing or budget-wise, that,
6  you know, we should encourage people to take different
7  -- take -- to request time off at a different time.
8  Ms. Jordan, which was a fairly new employee, had put in
9  a leave request to be off, and I can't even remember
10 what days. But I scheduled -- the way it's set up, we
11 are required to a schedule to my supervisor by the 15th
12 of every month. So by the 10th of every month I
13 request all employees to have their leave request
14 submitted to me for that month. Ms. Jordan submitted a
15 leave request on the 17th, which was after the schedule
16 was posted, to go back to Oklahoma to have some work
17 done on her house. So I spoke to my supervisor prior
18 to denying the request and said she put it in after,
19 it's nothing urgent. And actually when talking to Ms.
20 Jordan, the damage to her house occurred during
21 Hurricane Ike, which was prior in months before she
22 even started work there. So I told her that she really
23 needed to pick, you know, pick different days, I
24 couldn't let her off, that, you know, the leave request
25 was due. So she pretty much told me that she was

Page 127

1  calling my supervisor, which --
2     Q.  Who was that?
3     A.  Ms. Jordan, which is now Ms. Upshaw.
4     Q.  Okay, that's --
5     A.  Which that's why if they ever -- they allow
6  disloyalty, they encourage, it's encouraged the
7  employees to be disloyal and vice-versa, to
8  supervisors. So she called her, and Ms. Upshaw decided
9  that if I wouldn't give her the days off, that she
10 would move into another unit. And so she was moved to
11 another unit.
12    Q.  What unit was she moved to?
13    A.  The Huntsville Unit.
14    Q.  Are you involved in the Huntsville Unit?
15    A.  No, sir. That's another nurse manager.
16    Q.  So does Ms. Jordan work for you at all now?
17    A.  No. Ms. Jordan works for Ms. Pipkin now.
18    Q.  What race is Ms. Upshaw?
19    A.  She's white.
20    Q.  And Ms. Jordan?
21    A.  She's white.
22        (Pause.)
23    Q.  There's also included her an email -- I'll be
24 happy to show it to you but --
25    A.  Okay.

Page 128

1     Q.  -- dated May 6, 2009, to a Peggy L. McCleskey,
2  M-C-C-L-E-S-K-E-Y. You want to take a look at that?
3        MS. MILLER: Why don't we make it part of
4  the record and I'll get you a whole different set.
5        MR. LIVELY: Okay. Okay.
6        MS. MILLER: Is that all right?
7        MR. LIVELY: Sure, sure.
8        MS. MILLER: Since it's --
9        MR. LIVELY: You want to just mark it?
10       MS. MILLER: -- (indiscernible) before
11 today.
12       MR. LIVELY: Why don't you stick that on
13 -- do you want to just do that letter or?
14       THE WITNESS: Ms. Miller.
15       MS. MILLER: Oh. That's fine.
16       MR. LIVELY: Just that letter or the
17 whole thing?
18       MS. MILLER: Yes, I'll let the whole
19 thing.
20       MR. LIVELY: Okay, just stick that on
21 that.
22       MS. MILLER: You can separate it, pull it
23 out.
24       MR. LIVELY: Let's pull this out.
25       MS. MILLER: And I'll get -- well, just

Page 129

1  tell me the bates numbers you need to be replaced.
2        MR. LIVELY: Okay. It's bates stamped
3  I'm just going to say 55, 56. 55 and 56.
4        MS. MILLER: 55 and 56. Anything else?
5  That's it?
6        MR. LIVELY: No, that will be it.
7        (Deposition Exhibit No. 2 marked.)
8  BY MR. LIVELY:
9     Q.  Okay, what happened there?
10    A.  This appears that a email that I sent out
11 to --
12    Q.  McCleskey?
13    A.  -- Wynne and Ellis staff. If you back up, I
14 sent it out to both -- both Wynne and Ellis employees.
15 And the subject is staff improvement, and it's from me
16 to them allowing them an opportunity to rate how
17 they feel about me as a supervisor.
18       I said, "I would like for input for staff
19 improvement. I would like for you to be honest. (I
20 won't hold it against you.) How am I doing as your
21 supervisor? What would you do different if you were in
22 my position? What can I do to improve as a manager?
23 Please take some time this week to help. I won't give
24 you a due date, and you don't have to respond if you do
25 not choose to but it would help me to help you.

33 (Pages 126 to 129)

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

Page 130

1  Thanks."
2      Q.  Okay.
3      A.  And she --
4      Q.  Replied.
5      A.  In positive ways.
6      Q.  Okay.  Did -- in case of employee nursing
7  shortages, UTMB will bring in contract labor from
8  staffing agencies.
9      A.  Uh-huh.
10     Q.  Isn't that right?
11     A.  Correct.
12     Q.  And these are outside private employers that
13  UTMB can call and say, look, we're short three nurses
14  because of the flu and we need you to to send somebody
15  out.  Is --
16     A.  Correct.
17     Q.  Did you ever have any problems yourself with
18  staffing agencies?
19     A.  Myself with staffing agencies, no.  But with
20  them being able to provide as many nurses that we need
21  to staff the place, yes.
22     Q.  Did you ever become aware that there were
23  complaints from staffing agencies about you that they
24  heard from the staffing agency employees?
25     A.  According to Mr. Watson, but none were able to

Page 131

1  be validated.
2      Q.  Did you ever attend -- did you ever talk with
3  a staffing agency person with Mr. Watson there?
4      A.  Over the phone we talked to a guy named
5  Allison, I think Brian Allison.
6      Q.  What was the result of that conversation?
7  What do you remember about that conversation?
8      A.  Pretty much Mr. Watson kind of steered the
9  conversation in the way that he wanted to go to pretty
10  much say that -- was questioning the guy to say why is
11  it that we can't -- Mr. Watson was alluding during the
12  whole conversation that we were not able to staff
13  Estelle, which is where I was at the time, because of
14  myself.  That's pretty much the way he was steering the
15  conversation.  And he actually told the guy that if
16  they had any -- any -- you know, if they needed to
17  contact anybody at the Estelle Unit, for him to contact
18  the assistant nurse managers instead of myself.  And
19  just to give you some history on that, the same agency,
20  which was supplemental, we still use them now, they
21  still have a problem staffing our unit, they still have
22  a problem staffing Estelle's unit.  So even though the
23  allusions were made, the same problem still presents
24  throughout the Huntsville cluster.
25     Q.  I don't remember if I asked you.  Since you've

Page 132

1  -- back at the Wynne Unit as a nurse manager, have you
2  received any raises?
3      A.  Yes, I have.
4      Q.  Have you been denied any raises?
5      A.  No, I haven't.
6      Q.  And you are claiming loss of enjoyment of life
7  in this lawsuit.  How has the matters you've alleged in
8  your lawsuit caused you to suffer loss of enjoyment of
9  life?
10     A.  Depression, fatigue, more worrying than
11  normal, stress.
12     Q.  Are you taking any sort of prescription
13  medication for any of these problems?
14     A.  I'm currently not.
15     Q.  Have you ever?
16     A.  I was given a prescription back during the
17  initial demotion.
18     Q.  Okay.  And who gave you the prescription?
19     A.  Dr. Hulme, H-U-L-M-E I think that's how --
20     Q.  H-U?
21     A.  U-L-M-E.
22     Q.  Is he a medical doctor?
23     A.  Actually he's an Ob/Gyn doctor.
24     Q.  Okay.  What did he prescribe?
25     A.  I want to say -- if I can look at those

Page 133

1  documents, I can tell you.  I think it's Lexapro.  If
2  it's in here.
3      Q.  Did you fill the prescription of whatever it
4  was?
5      A.  He gave me lots and lots of samples.
6      Q.  Okay.
7      A.  So I took -- I want to say Lexapro.  (Pause.)
8  I think it's -- I think.  I'm not quite sure, I can't
9  honestly say that was the name of it.
10     Q.  I guess my question was did you ever go out
11  and fill a prescription or did you just rely on
12  samples?
13     A.  I think I got one prescription filled, if I
14  can recall correctly.  Because I had a whole bag of
15  samples.  I mean --
16     Q.  Did you finish taking the samples and the
17  prescription?
18     A.  I took the samples.  If I recall correctly, I
19  finished all of what I had.
20     Q.  I had being the prescription as well?
21     A.  Correct.
22     Q.  And how many times did you -- I guess -- I'm
23  about to strike that.  Have you seen any other health
24  care provider about loss of enjoyment of life for
25  mental anguish other than Dr. Hulme?

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                              RE: Jackie Fisher v. UTMB

Page 134

1    A.  No, sir.
2    Q.  Okay.  Did I say his name right?
3    A.  Wrong.
4    Q.  Hokeybanphonics (phonetic), it worked for me.
5  Have you applied for any positions with UTMB that
6  you've been denied?
7    A.  No, sir.
8    Q.  Have you lost any promotions, not merit
9  increases but promotions at UTMB?
10   A.  I haven't applied for any promotions.
11   Q.  Okay.  Have you applied for any transfers that
12 have been denied?
13   A.  I haven't applied for any transfers.
14   Q.  Are you currently satisfied with your job at
15 the Wynne Unit?
16   A.  That's a big question.  I have mixed -- that's
17 a two-fold.  I'd have to say yes and no.
18   Q.  Okay.  In what way is your current position at
19 Wynne unsatisfactory?
20   A.  Actually I really do not feel that there's any
21 loyalty as far as people supporting me in doing my job.
22 I always feel like there's an undercurrent looking for
23 pitfalls in my performance.  I definitely feel the
24 constant sabotage of my reputation and relationship
25 with my employees.  And dishonesty and just distrust

Page 135

1  the relationships.
2    Q.  With whom?
3    A.  With pretty much my supervisors.
4    Q.  Which would be?
5    A.  My immediate supervisor is Judy Upshaw and
6  Mary Gotcher is pretty much up the chain of command.
7        MR. LIVELY:  Why don't we take a little
8  break because I'm about --
9        MS. MILLER:  Okay.
10       MR. LIVELY:  -- about through.
11       (Off the record.)
12       (On the record.)
13 BY MR. LIVELY:
14   Q.  Ms. Fisher, one -- do you -- have you -- do
15 you have any bills or sums for any medical expenses
16 that you are claiming to have incurred as a result of
17 the actions or omissions of the defendants in this
18 lawsuit?
19   A.  The only thing is the co-pays in the doctor
20 visits.
21   Q.  Do you know how many doctor visits you may
22 have had related to things related to your lawsuit?
23   A.  One, maybe two.
24   Q.  Visits with Dr. Hulme?
25   A.  Uh-huh.

Page 136

1    Q.  Okay.  And then one prescription?
2    A.  Yes, sir.
3    Q.  Do you know where you filled that
4  prescription?
5    A.  It would have either been Walgreen's or
6  Eckert's in Huntsville.  Those are just where I live.
7    Q.  Okay.  The next thing is are there any other
8  episodes of racial discrimination or retaliation that
9  you plan to tell the jury about that we haven't
10 discussed today?
11       MS. MILLER:  That's a nefarious question.
12 You're asking her to -- objection, nefarious question.
13 If you can recall.  Everything -- what he said.
14 Whatever you can recall.  If you can't recall or
15 there's something that you've forgotten --
16       THE WITNESS:  Is there any --
17       MS. MILLER:  -- or you remember later.
18       THE WITNESS:  Rephrase it for me.
19 BY MR. LIVELY:
20   Q.  Are there any episodes of racial
21 discrimination or retaliation by the defendants in this
22 lawsuit that you plan to tell the jury but that we
23 haven't discussed already today in your deposition?
24   A.  Now --
25       MS. MILLER:  Objection as to episodes.

Page 137

1        THE WITNESS:  Now, we didn't discuss each
2  one of my grievances in details, but I'm sure -- that
3  should be included because that was all during my
4  initial demotions.
5  BY MR. LIVELY:
6    Q.  Right.
7    A.  I have filed a grievance, I think one since
8  the demotion but that would be up to my attorney to
9  decide if we're going to use that or not.
10   Q.  Is that grievance -- do you think the actions
11 that led to that grievance were racially motivated?
12   A.  I think it's a more retaliatory and just
13 harassment.
14   Q.  And who undertook the actions that led to the
15 grievance?
16   A.  It was a combination of what led up to the
17 grievance.
18   Q.  No, who.  Who did the actions that led to the
19 grievance?
20   A.  Well --
21   Q.  Ms. Upshaw?
22   A.  It was -- it was actually all involved was Ms.
23 Upshaw and HR.
24   Q.  And I think that may have been part and parcel
25 of what you supplied us today?

                              35 (Pages 134 to 137)

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

Jackie Fisher                              RE: Jackie Fisher v. UTMB

Page 138

1     A.  I think so, that's --
2     Q.  Because I'm trying to --
3     A.  -- why I said it.  No, this letter -- yes,
4  this letter is not the grievance, this letter is that
5  one of my employees called Ms. Upshaw and complained
6  about me.  Instead of her calling me to find out what
7  my side of the story --
8     Q.  Ms. Upshaw.
9     A.  Right.  She basically just assumed that I had
10 did what the employee said I did, and then after I
11 talked to her --
12    Q.  Her?
13    A.  Ms. Upshaw.  -- she realized that that was far
14 by the truth.  So this is -- she came to the unit and
15 apologized to me, so this is just with Ms. Upshaw.  So
16 this is just my email to her thanking her for coming
17 over apologizing to me, and hoping that we could have,
18 you know, open up our lines of communication.
19    Q.  Okay.
20    A.  So that's not the grievance.
21    Q.  Let me show you -- there you go.
22    A.  That is the grievance.
23    Q.  Okay.  And what we're looking at, bates
24 stamped -- I apolo --
25        MS. MILLER:  We'll get you another.  What

Page 139

1  pages are they (inaudible).  Right now you need to
2  (indiscernible).
3        MR. LIVELY:  This would be 58, 59.
4        MS. MILLER:  58 and 59?
5        MR. LIVELY:  Yeah.
6        MS. MILLER:  Okay.
7        MR. LIVELY:  There's -- we'll mark that
8  as whatever, 3?
9        COURT REPORTER:  (Inaudible.)
10       (Deposition Exhibit No. 3 marked.)
11       THE WITNESS:  Mr. Lively, could I see
12 that packet again, please?  Let me ask you a question.
13       (Attorneys confer.)
14       THE WITNESS:  May I see that packet
15 again?
16       MR. LIVELY:  Oh, sure.
17       MS. MILLER:  We talked about the one but
18 we didn't put it in.  It's in here.
19       MR. LIVELY:  You lost me.
20       MS. MILLER:  There was another email you
21 talked about.
22       MR. LIVELY:  Yeah.  It's right here.
23       MS. MILLER:  McCleskey or something.
24       MR. LIVELY:  Yeah, that's --
25       THE WITNESS:  Can we put that one in

Page 140

1  there?
2        MS. MILLER:  Didn't he ask you about this
3  one?
4        THE WITNESS:  That's the one I just got
5  through explaining.
6        MS. MILLER:  Okay.
7        THE WITNESS:  Can we make that one?
8        MR. LIVELY:  Yeah, we'll make -- why
9  don't you mark that one 4 real quick.
10       (Deposition Exhibit No. 4 marked.)
11       MS. MILLER:  What number is that?
12       MR. LIVELY:  That's 52.  So 52, 55, 56,
13 58 and 59.
14       MS. MILLER:  Let me call and stop them
15 right now because if they're reading my email they're
16 going to (indiscernible) two pages.
17       MR. LIVELY:  Okay.
18       MS. MILLER:  Then we'll have to do it
19 again.
20       THE WITNESS:  Now, this is the response
21 to the grievance.  This is -- this is actually the
22 grievance, that's the response.
23       MR. LIVELY:  Okay.  Well, I'm not -- I'm
24 trying to --
25       MS. MILLER:  Unless he asks you about

Page 141

1  (indiscernible).
2        (All speak at once.)
3        MS. MILLER:  -- emails.  (Speaks on
4  phone.)
5        MR. LIVELY:  And 37 through 40.
6        MS. MILLER:  (Speaks on phone.)
7        THE WITNESS:  41.
8        MR. LIVELY:  Through 41.  I'm sorry, 41.
9        MS. MILLER:  (Speaks on phone.)
10       Anything else?
11       MR. LIVELY:  No, I think that's it.  And
12 I'm going to be real --
13       MS. MILLER:  (Speaks on phone.)
14       MR. LIVELY:  Now, that's service.  Okay.
15 BY MR. LIVELY:
16    Q.  Exhibit 4 was talking about the episode where
17 you and Ms. Shaw (sic) worked it out.  Ms. Upshaw I
18 mean, correct?
19    A.  Yes, sir.
20       (Deposition Exhibit No. 5 marked.)
21    Q.  Exhibit 5 is a grievance you filed, correct?
22    A.  Correct.
23    Q.  And then back of page -- well, page bates
24 stamp 41, last page of Exhibit 5, was an addendum to
25 the grievance?  Because there wasn't enough room, I

Integrity Legal Support Solutions
512-320-8690 or www.integrity-texas.com

e968154c-1317-46b6-86f1-b3c8d56fa713

Jackie Fisher                          RE: Jackie Fisher v. UTMB

Page 142

1 guess, or.  Let me ask you this.  Let me strike the
2 question.  Is Exhibit 5 the grievance you filed?
3     A.  It's the cover sheet to the grievance I filed,
4 correct.
5     Q.  Okay.  And what about -- what is page?
6     A.  Okay.  This is how it goes.
7     Q.  Okay.
8         MS. MILLER:  Refer to the page number,
9 so --
10        THE WITNESS:  Okay.  Page No. 38 was a
11 letter that I received from Ms. Upshaw stating "this
12 letter serves," and then this is the grievance.
13        MR. LIVELY:  Okay, we'll mark it then.
14        (Deposition Exhibit No. 6 marked.)
15 BY MR. LIVELY:
16    Q.  Exhibit 6 is a letter you received from your
17 supervisor, Ms. Upshaw, correct?
18    A.  Right.
19    Q.  Exhibit 5 is the grievance that you filed in
20 response to Exhibit 6, the letter.
21    A.  Correct.
22    Q.  And Exhibit 5 is bates stamps 37, 39, 40 and
23 41, correct?
24    A.  Correct.
25    Q.  Okay.  And then Exhibit 3, what is that?

Page 143

1     A.  That's the response to this, the grievance.
2     Q.  Okay.  Here's the letter that -- Exhibit 6 is
3 the letter that --
4         MS. MILLER:  That letter's backwards.
5 BY MR. LIVELY:
6     Q.  Exhibit 6 is --
7         MS. MILLER:  (Indiscernible) backward.
8 BY MR. LIVELY:
9     Q.  -- is the letter that triggered the grievance.
10    A.  Correct.
11    Q.  Exhibit 5 is the grievance.
12    A.  Correct.
13    Q.  Then Exhibit 3 is the UTMB or Ms. Upshaw's
14 response to your grievance, correct?
15    A.  Correct.
16    Q.  Okay.  That's all we need.  Attorney fees.
17 Have you actually paid any money in attorney fees or is
18 this a contingency fee arrangement?
19    A.  It's a contingency arrangement.
20    Q.  Have I been courteous to you today?
21    A.  Yes, sir.
22    Q.  Okay.  I haven't made you cry, have I?
23    A.  I don't cry that easy.
24        MR. LIVELY:  I'm done.
25        MS. MILLER:  Okay, I just have a couple

Page 144

1 follow-up questions.
2              EXAMINATION
3 BY MS. MILLER:
4     Q.  Merit increases, there was -- since your
5 tenure began at UTMB how many years have you not
6 received a merit increase?
7     A.  Oh.  The one during the demotion phase and
8 there were some years that they didn't award merit
9 increases, and I'm not sure exactly how many.
10    Q.  In the years that other employees received
11 merit increases were there -- other than the year of
12 the demotion were you ever excluded from a merit
13 increase?
14    A.  No.
15        MS. MILLER:  Okay.  I'll reserve the rest
16 of mine for trial.  Off.
17        MR. LIVELY:  Yes.
18        (Whereupon the deposition was concluded)

Page 145

1              CHANGES AND SIGNATURE
2 PAGE/LINE  CHANGE          REASON

37 (Pages 142 to 145)

Jackie Fisher                                    RE: Jackie Fisher v. UTMB

## Page 146

1       I hereby certify that I have read the foregoing deposition, and that this deposition,
2  together with my corrections, is a true and correct record of my testimony given at this deposition.
3
4    _____
        Jackie Fisher
5  THE STATE OF _____)
    COUNTY OF _____)
6
       Before me, _____, on the day
7  personally appeared JACKIE FISHER, known to me (or proved to me under oath or through _____)
8  to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they
9  executed the same for the purposes and consideration therein expressed.
10
       Given under my hand and seal of office this
11  _____ day of _____, A.D. 2009.
12
13
14
15  _____
    Notary Public
16  In and for the State of _____
    My Commission Expires _____
17
18
19
20
21
22
23
24
25

## Page 147

1       UNITED STATES DISTRICT COURT
2     FOR THE SOUTHERN DISTRICT OF TEXAS
3        HOUSTON DIVISION
  JACKIE FISHER,    *
4    Plaintiff     *
          *  CIVIL ACTION NO.
5    v.     *  4:08-CV-01273
          *
6  UNIVERSITY OF TEXAS  *
  MEDICAL BRANCH and DAVID  *
7  WATSON,     *
    Defendants    *
8       REPORTER'S CERTIFICATE
      DEPOSITION OF JACKIE FISHER
9      TAKEN ON AUGUST 26,2009
10    I, Angelica Rodriguez, Notary Public in and for the State of Texas, hereby certify to the
11  following:
12    That the witness, JACKIE FISHER, was duly sworn by the officer and that the transcript of the
13  oral deposition is a true record of the testimony given by the witness;
14    That the deposition transcript was submitted on _____ to the witness or to the attorney for
15  examination, signature, and return to Integrity Legal Support Solutions by _____;
16    That the amount of time used by each party at the deposition is as follows:
17    Mr. Sam Lively - 3 hours, 4 minutes
    Ms. Jo Miller - 1 minute
18    That $_____ is the deposition officer's charges for preparing the original deposition
19  transcript and any copies of exhibits, charged to Defendants.
20    That, pursuant to information given to the deposition officer at the time said testimony was
21  taken, the following includes all parties of record;
22    Ms. Jo Miller, Attorney for Plaintiff;
    Mr. Sam Lively, Attorney for Defendant
23
       I further certify that I am neither counsel
24  for, related to, nor employed by any of the parties in the action in which this proceeding was taken, and
25  further that I am not financially or otherwise

## Page 148

1  interested in the outcome of the action.
2      Sworn to by me this _____ day of
    _____, 2009.
3
4
    _____
5    Angelica Rodriguez
    Notary Public, #12613809-0
6    My Commission Expires 06-07-2011
    Integrity Legal Support Solutions
7    114 West 7th  Street, Suite 240
    Austin, Texas 787801
8    (512) 320-8690
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

38 (Pages 146 to 148)

e968154c-1317-46b6-86f1-b3c8d56fa713