**Plaintiff**
**Jackie Fisher's**

**Response in Opposition**
**to Defendants'**

# Motion for Summary Judgment

# EXHIBIT 3

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

JACKIE FISHER,                    )
                                  )
          Plaintiff,              )
                                  )
VS.                               ) C.A. NO. 4:08-cv-01273
                                  )
UNIVERSITY OF TEXAS MEDICAL       )
BRANCH and DAVID WATSON,          )
                                  )
          Defendants.             )

********************************************

ORAL DEPOSITION OF
DAVID W. WATSON
AUGUST 28, 2009

********************************************

ORAL DEPOSITION OF DAVID W. WATSON, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered
cause on August 28, 2009, from 10:43 a.m. to 4:13
p.m., before Lorri Lucas, CSR in and for the State
of Texas, reported by machine shorthand, at the
offices of TDCJ Conference Center, Huntsville,
Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.

## 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
   Ms. Jo Miller
   Law Office of Jo Miller, PLLC
   505 North Main
   Carriage House
   Conroe, Texas  77301
   (936) 539-4400

FOR THE DEFENDANTS:
   Mr. Sam Lively
   Assistant Attorney General
   General Litigation Division
   P.O. Box 12548
   Austin, Texas  78711-2548
   (512) 463-2120
   Ms. Cari G. Bernstein,
   Department of Legal Affairs
   Rebecca Sealy Hospital, Room 4.254
   301 University Boulevard
   Galveston, Texas  77555-0171
   (409) 747-8735

ALSO PRESENT:
   Ms. Jackie Fisher

## 3

INDEX
                                          PAGE
Appearances..................................  2
Stipulations................................ 170
DAVID W. WATSON:
   Examination by Ms. Miller................  5
Signature and Changes....................... 173
Reporter's Certificate...................... 175

EXHIBITS
NO.  DESCRIPTION                          PAGE
1    Document numbered Fisher 200699-200718   100
2    Document numbered 200204-200221      103
3    Memo dated 12/10/04 Fisher-100087-100088  112
4    Memo dated 9/17/04, Fisher-101190-101191  114
5    Memo dated 12/1/03 Fisher 100089     115
6    Memo with attachment Fisher-100843-100844  117
7    Memo dated 5/30/03 Fisher-100090     118
8    Candidate Evaluation Form dated 8/19/03   119
     Fisher-100850-100855

9    (Withdrawn)                          120

10   Document titled "Mary Gotcher Director  121
     of Nurses, Northern Division"
     Fisher-200690-200692

11   UTMB Employee General Information    121
     dated 6/25/04 Fisher-10077-10082
12   Memo dated 8/31/05 Fisher-100487     123
13   Memo dated 9/18/05 Fisher-200257-200259  124

## 4

14   Memo dated 10/22/05 Fisher-200261    125
15   Death Summary dated 12/15/05         125
     Fisher-101245-101246

16   Memo dated 1/9/06 Fisher-200320      128

17   E-mail dated 1/12/06 Fisher-200263,  130
     200265, 200267, 200269, 200271, 200273,
     200275, 200277

18   Memo dated 1/27/06 Fisher 200249-200251  132

19   Memo dated 2/8/06 Fisher-100522      133

20   Memo dated 3/1/06 Fisher-100526      133

21   Memo/Quarterly Evaluation dated 3/7/06  135
     Fisher-100068-100070
22   E-mail dated 3/25/06 UTMB-1369-1370  137
23   Memo dated 4/7/06 UTMB-1351          138
24   E-mail dated 4/3/06 Fisher-200202-200203  148
25   Letter dated 4/11/06 Fisher-200068-200071  150
26   Letter dated 5/2/06 Fisher-100212    156
27   E-mail dated 8/17/06 Fisher-100562   161
28   UTMB-CMC Employee Task Force Report of  164
     Recommendations August 2006 Executive
     Summary Fisher-100435-100442

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

---

**5**

1            DAVID W. WATSON,
2  having been first duly sworn, testified as follows:
3           EXAMINATION
4  BY MS. MILLER:
5     Q   Mr. Watson, my name's Jo Miller and I
6  represent Jackie Fisher, as you know. We just met
7  for the first time this morning. Correct?
8     A   Yes, ma'am.
9     Q   And I appreciate you nodding your head, as
10  well as answering out loud, because the --
11     A   I'll try to be --
12     Q   -- court reporter is here --
13     A   Sure.
14     Q   -- and she's going to need you to do that.
15     A   Sure.
16     Q   But if you don't and I remind you --
17     A   Please.
18     Q   -- it's so that we can have a complete
19  record.
20     A   Of course.
21     Q   Have you had your deposition taken before?
22     A   No.
23     Q   And I'm sure you had a chance to review
24  some of the ground rules with Mr. Lively, but if you
25  don't understand my question, ask me to repeat it or

---

**6**

1  rephrase it. I'm looking for correct answers,
2  correct meaning your thoughts and your answers to my
3  questions. So if I'm getting an answer that's
4  different to the question that I ask, that's not
5  what I'm here for --
6     A   I understand.
7     Q   -- either. So slow me down -- I can talk
8  pretty fast -- and ask me to repeat it.
9     A   I will do.
10     Q   Is there any reason that you can't give
11  accurate and true answers to the deposition
12  questions today?
13     A   No. I will give you my best answer.
14     Q   Okay. I appreciate that. If you need a
15  break, let me know.
16     A   Okay.
17     Q   And we'll take a break. And you
18  understand that this deposition is under oath, so it
19  can be used in trial, can be used as regular
20  testimony just as if you were there before the Judge
21  and the jury.
22     A   I understand.
23     Q   Okay. Do you have any questions before we
24  begin?
25     A   I don't think so.

---

**7**

1     Q   All right. I guess you better state your
2  full name so we have it for the record.
3     A   My name is David W. Watson.
4     Q   And we won't have the court reporter put
5  this down in the record, but I would like to have a
6  reference of your complete home address or residence
7  where you can be reached.
8     A   (Redacted)
9     Q   And your home, land-based telephone
10  number?
11     A   (Redacted)
12     Q   Okay. And what's your Social Security
13  number?
14     A   (Redacted)
15     Q   And your Texas driver's license?
16     A   Well, let me think about that one.
17  (Redacted)
18     Q   Need to check it?
19     A   Don't have it.
20     Q   Okay.
21     A   I think it's in the truck.
22     Q   What's the highest level of education
23  you've achieved, Mr. Watson?
24     A   I have two bachelor's degrees.
25     Q   And take them one at a -- one at a time.

---

**8**

1  A bachelor of?
2     A   I have a Bachelor's of Science in law
3  enforcement and police science and I have a
4  bachelor's degree in nursing.
5     Q   Okay. Let's take the first one, the law
6  enforcement and police science. Where did you
7  receive that? In what year?
8     A   Sam Houston State University here in
9  Huntsville in 1982, I believe it was.
10     Q   Okay. And what -- did you have any
11  specialty in that degree or is it just a general
12  degree in law enforcement and police science?
13     A   It's just a general degree in law
14  enforcement.
15     Q   And a Bachelor of Science in nursing?
16     A   Yes, ma'am.
17     Q   And where was that?
18     A   The University of Texas at Tyler.
19     Q   And what year did you achieve that?
20     A   1994.
21     Q   And that's also a Bachelor of Science?
22     A   Yes, ma'am.
23     Q   Any specific area of education or
24  specialization in your nursing degree?
25     A   My early years were spent in critical

---

Bayou City Reporting, Inc.

Deposition of David W. Watson

9

1  care, mostly in the emergency department.
2     Q   And that's in your education or in your
3  experience?
4     A   Oh, that's experience.
5     Q   Okay.  Any specialty in your nursing
6  degree?
7     A   No, ma'am.
8     Q   And prior to your studies at Sam Houston
9  and University of Texas at Tyler, did you attend any
10  other post-high school?
11     A   I had an associate's degree, also, in law
12  enforcement from Grayson County College prior to
13  coming to Sam Houston State.
14     Q   Grayson?
15     A   Yes, ma'am.  G-R-A-Y-S-O-N.
16     Q   And where is that?
17     A   It's North Central Texas.  It's about, I'd
18  say, 60 miles or so north of Dallas.
19     Q   Okay.  And you're a Texan?
20     A   Yes, ma'am.
21     Q   Okay.
22     A   Can't tell, huh?
23     Q   I see the burnt orange shirt, so --
24     A   Strictly coincidental, ma'am.  It just
25  happened to be clean and toward the front of the

10

1  closet.
2          (Discussion off the record
3          from 10:48 to 10:49)
4     Q   (BY MS. MILLER)  And prior to your
5  associate's degree at Grayson County College, where
6  did you go to high school?
7     A   Denison High School in Denison, Texas,
8  which is also located in Grayson County.
9     Q   Okay.  And let's talk about your work
10  history as it relates to nursing.  You've had some
11  work history, and just from a little casual
12  conversation before and I've seen your resume and I
13  do know just from speaking with you that you ran a
14  K-9 unit in police and law enforcement.  So I guess
15  briefly go through your law enforcement background
16  for me and then we'll go more in-depth in your
17  nursing background.
18     A   Okay.  Started out here in Huntsville at
19  the University Police Department in 1981, I believe
20  it was, and then in 1985 I moved to the Huntsville
21  Police Department.  While there, I worked as a
22  uniformed patrol officer, I worked as a detective, I
23  worked as a K-9 officer, and I ended my career as a
24  K-9 officer in 1992 in the police department.
25     Q   And that's when you went back to school?

11

1     A   Yes, ma'am.
2     Q   For nursing.  Okay.  And since -- did you
3  work while you were working -- while you were
4  pursuing your nursing degree?
5     A   Yes.
6     Q   And where did you work?
7     A   Oh, let me think about that.  I worked at
8  Longview Medical Center -- I'm sorry.  Wait a
9  minute.  It's Good Shepherd, I guess.  I think it's
10  Good Shepherd Medical Center in Longview, and I also
11  spent some time working as a nurse tech at the East
12  Texas Medical Center in Tyler.
13     Q   And then after you graduated in 1994,
14  where did you work?
15     A   I worked at the trauma unit in the East
16  Texas Medical Center, ER, if you will.
17     Q   And what position was that?
18     A   Staff nurse.
19     Q   Did you have anybody that reported to you
20  at that point?
21     A   No.  I don't think so.
22     Q   Okay.  And that was East Texas?
23     A   Yes, ma'am.
24     Q   And how long were you at the East Texas
25  trauma center as a staff nurse?

12

1     A   I don't recall precisely.  Due to a family
2  situation, we moved in, I think was '95, back to
3  Caldwell, Texas.  It was in that time period.  I
4  believe it was in about --
5     Q   And because you moved, that's the reason
6  you left the East Texas?
7     A   Yes, ma'am.
8     Q   What did you do in Caldwell?
9     A   Well, originally I began working at The
10  Med -- they call it The Med now, I think The Med
11  Center in College Station.  I worked in the ER there
12  for a while.  And then -- oh, I don't know how long
13  I stayed there.  And then I took a position as a
14  field nurse in the home health department at the
15  small hospital in Caldwell, field super -- RN field
16  supervisor, I think, is what it was referred to as.
17     Q   RN supervisor?
18     A   Yes, ma'am.
19     Q   Okay.  So in The Med Center, when you were
20  in the ER, did you have any direct reports at that
21  point?
22     A   I don't think so.
23     Q   And as a field nurse in the home health,
24  did you have direct reports?
25     A   Yes.  I had at least one, maybe two LVNs

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

13

1  and some nurses' aides.
2      Q   And do you recall approximately how many
3  nurses' aides?
4      A   Two, I think.  It was very small.
5      Q   And how long were you at the -- as a
6  field -- did you work as a field nurse?
7      A   Just a few months.
8      Q   And when did you leave that?
9      A   Well, I left the position after a few
10  months but then the director of the unit resigned
11  and I was asked to become the director of that
12  agency and I took that on, like I say, within a few
13  months and did that for approximately a year.
14      Q   And that was a director of the home health
15  agency for the hospital?
16      A   Yes, ma'am.
17      Q   And as the director, how many people
18  reported to you?
19      A   Two or three R -- it varied, but probably
20  no more than three RNs, two to three LVNs, and two
21  to three nurses' aides and a secretary, I believe.
22      Q   And you did that for about a year?
23      A   Yes, ma'am.  Approximately.
24      Q   And when did you leave that position?
25      A   I believe it was in 1996.

14

1      Q   And where did you go?
2      A   My father was diagnosed with terminal
3  cancer, so I moved back to Denison to take care of
4  him and help take care of my elderly mother till he
5  passed?
6      Q   I'm sorry to hear that.  How long was that
7  that you were -- you were essentially unemployed in
8  the work force but -- although you were working
9  full-time, I'm sure.
10      A   Yeah.  Yeah.  It was, I want to say, maybe
11  a month or two and then I took another job as a
12  field office supervisor, I guess you would call it,
13  for another home health agency, and I do not
14  remember the name of that agency.
15      Q   And that was in Denison?
16      A   I was living in Denison.  The agency was
17  located in Sherman, Texas.
18      Q   And how many people reported to you at
19  that point?
20      A   Gosh, that's reaching back.  This is an
21  estimation.
22      Q   Sure.  That's fine.
23      A   Probably two or three RNs and two or three
24  LVNs and maybe a half a dozen aides, secretary, and
25  an assistant director of the office.

15

1      Q   Okay.  And how long were you there at
2  the -- as the field officer for -- in the Sherman
3  facility?
4      A   Less than six months.
5      Q   Okay.  What time period are we up to now?
6      A   Late -- late '96, maybe early '97.
7      Q   Okay.  And then where did you go?
8      A   Huntsville Memorial Hospital, ER here in
9  Huntsville, staff nurse.
10      Q   How long were you in that position?
11      A   Approximately one year.
12      Q   And as a staff nurse, you wouldn't have
13  had any direct reports.  Is that correct?
14      A   No.  No direct reports unless you were
15  occasionally a charge nurse on that shift.  I think
16  I did that a whole total of once.
17      Q   And after the Huntsville hospital?
18      A   Texas Department of Criminal Justice
19  Medical Health Services?
20          MS. FISHER:  Health Services.
21          THE WITNESS:  Health Services.  Thank
22  you.
23      A   Health Services Division as a -- gosh, I
24  can't remember.  QA nurse or contract monitor.  I
25  think our titles changed in there sometime.

16

1          MS. MILLER:  You have to stop this.
2          THE WITNESS:  Helping me?
3          MS. MILLER:  Yes.  Jackie is.
4          THE WITNESS:  I'm sorry.  I
5  appreciate it, though, for what it's worth.  You may
6  have not noticed, but I'm fat, old, and gray.  My
7  memory's not what it used to be.
8          MS. MILLER:  You're not special at
9  this table.
10          MR. LIVELY:  That's what we talked
11  about yesterday.  Right?
12      Q   (BY MS. MILLER)  Okay.  So you're
13  either -- let's go back to the TDC position and you
14  think what was -- as best as you can recall, your
15  job title was what?
16      A   I'm sorry.  I just -- I can't remember.  I
17  know we did something with quality assurance program
18  and I know we were -- it was a combination of
19  things.  We were that and contract monitors but I
20  don't -- I'm sorry.  I don't remember the job title.
21      Q   And contract monitors?
22      A   Yes, ma'am.
23      Q   And what kind of contracts would you
24  monitor?
25      A   The contract that the Texas Prison System

b63bb072-dd57-43e8-9c38-b0f02f40da32

17

1  had with UTMB.
2      Q   And in that relationship, who did you work
3  with at UTMB?
4      A   Cavan Brophy, Ms. Watkin -- Helen Watkins
5  was my supervisor.  Dorothy Gilbert, Marjorie
6  Archie, Susan Townsend.  That's all I can remember.
7      Q   Okay.  And did you have any direct reports
8  in that position?
9      A   I did not.
10     Q   How long were you in that position?
11     A   About three years, I guess, or four.
12     Q   And from that position, where did you go?
13     A   I was promoted to Ms. Watkins' position
14  when she retired and I don't remember the title of
15  that one, either.  I'm sorry.
16     Q   And that was still at TDCJ?
17     A   Yes, ma'am.
18     Q   And do you remember when that was?
19     A   I do not.
20     Q   And what did the position entail when you
21  took over Ms. Watkins' position?
22     A   Supervising the other contract monitor
23  nurses.  I think there was maybe five or six.
24     Q   And how long did you hold that position?
25     A   Till I came to UTMB, which I think was

18

1  October of 2001.
2      Q   And do you recall what position you
3  started in with UTMB?
4      A   Southern regional director of nurses.
5      Q   And as southern regional director of
6  nurses, what areas did you have?  Was it a
7  geographic division, I'm assuming?
8      A   Yes.  It about a 1500-square-mile area,
9  triangle, with the tip being -- the lower tip being
10  in Galveston, and then one of the angles would be in
11  Sugar Land and the other one would be in Beaumont.
12  So it extended from -- the west side was Sugar Land
13  area all the way to Beaumont, through Houston, and I
14  don't think I actually -- I had some south or in the
15  area -- in the general area of Galveston down near
16  the coast.
17     Q   Okay.  And to whom did you report in that
18  position?
19     A   Elaine Milewesci.
20     Q   Could you spell that for me?
21     A   No.
22     Q   You couldn't.  Okay.
23         MS. MILLER:  Can you?
24     A   She wanted us to call her -- she wanted us
25  to call her Elaine --

19

1      Q   (BY MS. MILLER)  Elaine?
2      A   -- and we liked that.
3      Q   Would you just pronounce it again for me
4  and I'll just do the best I can.
5      A   Milewesci.
6      Q   Milewesci.
7         MS. FISHER:  M-I-L-E-W-E-S-C-I.
8      A   That's impressive.  Closer than I could
9  have.
10     Q   (BY MS. MILLER)  Okay.  That's fine.
11  Close enough.  And how long were you in that
12  position with UTMB?
13     A   Year, maybe 18 months.
14     Q   And essentially what did you do in that
15  position?
16     A   I supervised 24 facilities, the nursing
17  aspects of 24 facilities throughout that region,
18  nursing process.
19     Q   And compared to your job that you had at
20  TDC, that was a significant amount of
21  responsibility, increase in responsibility; wasn't
22  it?
23     A   Yes, ma'am.
24     Q   Do you recall what you were making in
25  salary when you worked for TDCJ?

20

1      A   42,000 to 46, somewhere in that
2  neighborhood.
3      Q   And when you started at UTMB, what level
4  did you start at, do you recall?
5      A   Just under 80,000.  I believe it was 78-
6  or 79,000.
7      Q   And in these 24 facilities that you
8  supervised all the nursing processes -- is that
9  correct -- as well as the nursing staff?
10     A   Yes.
11     Q   Does that encompass it?
12     A   I think that's a fair statement.
13     Q   All right.  And I'm not a nurse and I'm
14  not a medical professional, so if I misstate
15  something because of ignorance, you will help me out
16  on that; won't you?
17     A   I'll help you if you'll help me.
18     Q   Okay.  I'm not sure I can.  And so you
19  worked for Elaine --
20     A   Yes.
21     Q   -- for about a year and then what did you
22  do?
23     A   UTMB underwent an organization -- excuse
24  me, a reorganization, and they decided that we had
25  four regions, north, south, east, and west, and they

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

21

1  decided that that was too much for one person to
2  supervise and so they created, I want to say, like
3  11, maybe, smaller little subdivisions, districts or
4  clusters.  I forget what we -- I think it was
5  clusters, which I strenuously objected to that name,
6  but didn't matter.  And so I had to reinterview for
7  the job, in fact, right here in this very building
8  in the room right over there, and I was hired as a
9  senior cluster nurse manager.  We were, in effect,
10  RIF'd.
11     Q   Okay.  So you were -- and everybody had to
12  reapply.  Well --
13     A   Yes.
14     Q   -- there were only four of you,
15  essentially.  Right?
16     A   Well, there were four of us but other
17  people that were in positions also applied for those
18  jobs, so you weren't competing just with those four
19  other people, plus they had to have like 11 or
20  however many to fill.  So four -- they had --
21  assuming you hired those four back, Estelle had
22  seven or so, eight.
23     Q   And as a senior cluster nurse manager,
24  what cluster were you put in charge of or were you
25  hired for?

22

1     A   The Huntsville cluster here.
2     Q   The Huntsville cluster.  And you remained
3  at the Huntsville cluster until you left the agency.
4  Correct?
5     A   That's correct.
6     Q   So where you had 24 facilities the prior
7  year, after you -- after the reorganization and you
8  were the cluster nurse manager for the Huntsville
9  area, how many facilities did you supervise?
10     A   It varied between 11, and I think it was
11  14 because they redefined boundaries of some of the
12  clusters and we picked up units.  There was also a
13  private contract with the Walker County Jail that I
14  was given.  And then the next year wasn't renewed,
15  so it fluctuated between 11 and 14.
16     Q   And as the senior cluster nurse manager,
17  to whom did you report?
18     A   I think it started out with Elaine but --
19  yes, I know it did, because she interviewed me for
20  the job, and then somewhere in the process, she left
21  and Mary Gotcher became the director of nurses.  So
22  I reported to Mary Gotcher after that.
23     Q   And did you know Mary from before?
24     A   Yes.  In fact, I was on her interview
25  board when they hired her.

23

1     Q   Okay.  And essentially by the -- at the
2  time you left UTMB, you were also Estelle -- you
3  were -- remained a senior cluster nurse manager.  Is
4  that correct?
5     A   (Moving head up and down).
6     Q   So you had that title.  When did you
7  leave?
8     A   I believe it was October of '06.
9     Q   So you essentially worked for UTMB about
10  five years?
11     A   About five years.
12     Q   Okay.  How did you get to know Jackie
13  Fisher?
14     A   Ms. Fisher applied for a cluster nurse
15  manager position that was open and I interviewed
16  her.
17     Q   Ms. Fisher applied for a cluster nurse
18  manager position, and do you recall for what
19  facility?
20     A   Ferguson, Goree, and the Huntsville
21  Wallace Unit, I believe.
22     Q   Are there more than one -- is there more
23  than one Huntsville unit?
24     A   No.  It's the one right across the street.
25     Q   It's just the Wallace Unit, is the only

24

1  one in Huntsville.
2     A   And it goes by both names.
3     Q   Okay.
4     A   I don't even know, honestly, what the
5  official name is.  I think it's the Huntsville Unit
6  but I've heard it called the Wallace Unit as well.
7     Q   Okay.  And did she get the job?
8     A   She did.
9     Q   Do you recall when that was?
10     A   No.  I'm sorry.
11     Q   Do you recall other people that you
12  interviewed that did not get the job?
13     A   I do not.
14     Q   So you began working with Ms. Fisher in
15  the capacity of the cluster nurse manager position?
16     A   Yes.
17     Q   Was it a cluster nurse manager or was she
18  hired as an assistant first?
19     A   She may have been an assistant at the
20  time, but when I came across and interviewed her, it
21  was for the cluster nurse manager position.
22     Q   Okay.  So you really didn't have
23  contact -- if she had been an assistant before,
24  which I'm going to represent to you that she was,
25  you would not have had contact with her.

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

25

1      A   We may have met informally when I first
2   came here but I don't have any recollection of
3   anything specific.
4      Q   And in your position, you wouldn't have
5   the opportunity or wouldn't have a necessity,
6   really, to get to know all the assistant cluster
7   nurse managers.
8      A   Well, ultimately, yeah, I would want to
9   know all the cluster nurses and cluster nurse
10  managers.  I would speculate if she stayed in that
11  position, I would have gotten to know her, anyway.
12     Q   Okay.  And about -- do you recall how many
13  assistant cluster nurse managers you had in -- over
14  your supervisory role?
15     A   Maybe nine.  There might have been a few
16  more.  I'm not sure.
17     Q   And of those nine, was she the first one
18  that you hired as a cluster nurse manager or had you
19  hired cluster nurse managers prior to hiring
20  Ms. Fisher?
21     A   She was the first, I believe.
22     Q   So essentially the -- at the time you
23  hired her, you had inherited the rest of the staff.
24     A   Correct.
25     Q   Okay.  And how about the -- were you

26

1   responsible for hiring the assistant nurse managers?
2      A   No.
3      Q   Okay.  And that would have been the
4   responsibility of the nurse managers.  Correct?
5      A   Yes.  I like them to review their
6   selection with me.  If I had any input or
7   suggestion, I would like to talk to them about it,
8   but it was ultimately their responsibility.
9      Q   And after working with Ms. Fisher for a
10  while as the assistant cluster nurse manager, did
11  you form an opinion as to her performance abilities
12  and her professionalism?
13     A   Yes.  My early impressions was that she --
14  well, in fact, stemming from the interview, that she
15  was intelligent, dynamic, personable, knew the
16  system, hard-working.  She was very impressive.
17     Q   Okay.  Intelligent, dynamic, personable,
18  hard-working, knew the system.  Anything else?
19     A   No.
20     Q   Professional.  Did you say professional?
21     A   I may have.
22         MS. MILLER:  Can you see if he did?
23  I'm not trying to give you adjectives.
24         THE WITNESS:  No, that's fine.
25         THE REPORTER:  No.

27

1      Q   (BY MS. MILLER)  No.  Okay.  So
2   intelligent, dynamic, personable, hard-working and
3   knew the system.  And you said that was your early
4   impression of Ms. Fisher.  And after working -- and
5   when you say "early impression," when was that
6   impression formed?  Over what period of time?
7      A   Well, it started when I interviewed her
8   and it continued for, I would say, the first six to
9   nine months or so.
10     Q   And apparently there was a time when your
11  impression started to change.
12     A   Gradually.
13     Q   Okay.  And did your impression of her
14  intelligence change?
15     A   No.  She's very intelligent.
16     Q   And your impression of her dynamic?
17     A   No.
18     Q   Did the dynamic change?
19     A   I think she's still pretty dynamic.
20     Q   How about your impression of her being
21  personable?
22     A   A little.  It changed a little.
23     Q   And her -- your impression of her being
24  hard-working?
25     A   She's hard-working.  Never changed.

28

1      Q   No -- that's not a question.
2      A   Not in my mind.
3      Q   And how about knowing the system?  Did
4   that -- did --
5      A   No.  Didn't change.
6      Q   That didn't change.  Okay.  Now, there was
7   a time in October of 2005, I believe, that you had
8   the opportunity to discuss a transfer with another
9   nurse, with a nurse that worked -- I'm not sure what
10  she was working.  Strike that.  Ms. Patricia
11  Freeman.  Do you recall that discussion?
12     A   I'm sorry.  What was the time period?
13     Q   October of 2005.
14     A   Yes, I recall that.
15     Q   All right.  Tell me, in your own words,
16  about that situation.  What happened and why is that
17  a memorable situation to you?
18     A   Well, I had moved several managers around.
19  Ms. Fisher is one of those managers.  And it became
20  fairly apparent pretty quick that the dynamic or the
21  immediate response to some of the staff was to run
22  and scurry and follow their managers, which, in my
23  mind, would somewhat defeat the purpose of the
24  transfer in the first place.  And so when that
25  happened, I essentially said that if anybody were

Bayou City Reporting, Inc.

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

29

1    going to transfer inside the -- inside my cluster
2    that it would have to be approved by me first and
3    they would have to give me a rationale for transfer.
4        Q   Okay.  And that was a general stated
5    policy, maybe not a written policy, but that was
6    just something --
7        A   (Moving head up and down).
8        Q   It wasn't developed specifically for this
9    situation.  Is that correct?
10       A   Actually, it was developed, I believe,
11   specifically for this situation.
12       Q   Okay.  All right.
13       A   Formulated, if you will.
14       Q   Okay.  And so why did it become an issue?
15       A   I was concerned -- well, let me step back
16   for a moment.  When I came to the cluster, as you
17   said, I inherited the staffing.  And when
18   Ms. Freeman's -- when Ms. Freeman was brought to my
19   attention, I was told thirdhand -- I didn't know
20   what her personal experiences were -- that she was
21   problematic, she was rude, not an -- not an ideal
22   employee.  And so --
23       Q   And let me just interrupt you for a second
24   and let you continue.  Who told you that when you
25   were told thirdhand?

30

1        A   I don't -- well, Ms. -- I do remember,
2    too.  There was probably more, but Ms. Box, Denise
3    Box, told me that, as well as did Mary Adams.
4        Q   Okay.
5        A   And so I was a little concerned that if
6    Ms. Freeman transferred under Ms. Fisher's command,
7    if you will, command structure, that it could cause
8    Ms. Fisher problems, and I didn't want that to
9    happen.  Furthermore, when I talked to Ms. Freeman,
10   she was unable to give me a reason or a rationale
11   for the transfer other than just because.  The
12   people I had spoken with previously -- I only
13   remember one that sticks in my mind, and as I recall
14   the situation, she had -- I think she had moved her
15   residence and now she was closer to one unit than
16   she was to another, so she wouldn't have a long way
17   to drive, so it was an economic impact, and I said
18   that's a reasonable explanation.  I granted it.  But
19   Ms. Freeman couldn't give me an explanation at all.
20       Q   And so was Ms. Freeman permitted the
21   opportunity to interview for that position?
22       A   To transfer?
23       Q   Um-hmm.
24       A   Yes.  She met with me personally in my
25   office.

31

1        Q   Okay.  And is that the formal interview
2    process?
3        A   It could have been in person or it could
4    have been on the phone.  I think I dealt with one
5    telephonically but, yes.
6        Q   Okay.  And was there another employee who
7    also desired to transfer too?  I believe it was
8    Ms. Ford?
9        A   No.
10       Q   Do you recall that situation in January?
11   Oh.  That was a rehire.  Strike that.
12           It became a problem with
13   Ms. Freeman's denial; didn't it?
14       A   I think it's safe to say Ms. Fisher had
15   concerns about it, yes.
16       Q   Okay.  And those concerns were voiced to
17   you, I believe, in a meeting on January 4th of 2006.
18   Do you recall that meeting?
19       A   No.  We had several discussions about
20   Ms. Freeman.  I don't recall any specific.
21       Q   Do you remember the discussion of rehiring
22   Ms. Ford?
23       A   Oh, yes.
24       Q   Okay.
25       A   I remember that one.

32

1        Q   You remember that discussion.
2        A   I do.
3        Q   Okay.  If I represent to you that the
4    information shows that was January 4th of 2006 --
5        A   I wouldn't object to it.
6        Q   You wouldn't object to it.  Okay.  Tell me
7    what happened in that meeting.
8           MR. LIVELY:  Which meeting are you
9    talking about?
10          MS. MILLER:  January 4th, 2006.  That
11   was the discussion of rehiring --
12          MR. LIVELY:  Okay.
13          MS. MILLER:  -- Ms. Ford for Lavina
14   Wright.
15          MR. LIVELY:  We're off Ms. Freeman?
16          MS. MILLER:  Well, kind of.
17          MR. LIVELY:  That's -- I'm just -- I
18   was confused.
19          MS. MILLER:  Okay.
20          MR. LIVELY:  Go ahead.  I'm sorry.
21          THE WITNESS:  Could you repeat?  I'm
22   lost.
23       Q   (BY MS. MILLER)  All right.  I think there
24   was a question pending but I'll formulate another
25   one --

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

33

1     A   Okay.
2     Q   -- so you have one.  You indicated, oh,
3  yes, you recalled that instance.
4     A   Yes.  I do.
5     Q   Can you tell me what happened during that
6  meeting?  We think the date is January 4th and we'll
7  go with that for the time being.
8     A   In order to explain, may I step back in
9  time just a little?
10    Q   Surely.
11    A   Ms. Ford had left UTMB and she had done
12 whatever she did and she wanted to come back and
13 come back to work.  Ms. Wright approached me about
14 that and explained that -- because Ms. Ford was
15 problematic, quite frankly.  She was rude.  She was
16 brusk.  She was, in my opinion, a know-it-all, and
17 somewhat abrasive.  So Ms. Wright explained that,
18 "Oh, she's changed.  You know, her lifestyle, things
19 have changed.  She's a better person," blah blah
20 blah.  Okay.  Fine.
21        So we were in the -- in the meeting.
22 It was the -- it was the nurse managers in the
23 cluster.  And I don't remember exactly how the topic
24 came up, but it came up, and I had originally been
25 persuaded to allow Ms. Wright to rehire Ms. Ford.

34

1  And Ms. Fisher pointed out quite correctly some
2  things I had forgotten, i.e., Ms. Ford was, in fact,
3  abrasive and she was problematic, and once she
4  reminded me of that, I realized she was right and I
5  stopped the hiring process.
6     Q   Okay.  And did Ms. Ford have an
7  opportunity to interview again for -- during the
8  rehire process?
9     A   I'm not sure.
10    Q   Okay.  And when you said you'd been
11 persuaded by someone, who was it that persuaded you
12 that Ms. Ford had changed?
13    A   Well, Ms. Wright was attempting to.  She
14 had a personal relationship, as I understand it,
15 with Ms. Ford, and so she had more knowledge about
16 her, you know, personal situation.  I had no
17 knowledge of it.
18    Q   Okay.  And just for the record, Ms. Wright
19 is Caucasian.  Correct?
20    A   She is, yes.
21    Q   And Ms. Ford is Caucasian?
22    A   She is.
23    Q   Ms. Freeman is African American?
24    A   She is.
25    Q   And for the record -- obviously, it's

35

1  racial discrimination -- Ms. Fisher is African
2  American also.
3     A   She is.
4     Q   It was during that meeting, I believe,
5  that Ms. Fisher made some allegations to you and
6  suggested that -- or stated that she thought it was
7  racially discriminatory.  Do you recall that
8  conversation?
9     A   I don't recall any conversation about
10 racial discrimination.  She was against Ms. Ford's
11 rehiring and Ms. Fisher was right and, I mean,
12 there's just no two bones about it.  I had
13 forgotten.  She reminded me.  She was right.  I
14 agree with her.
15    Q   And was it during that meeting that you
16 made that decision to rethink your decision to hire
17 Ms. Ford?
18    A   Well, I began rethinking the process.  I
19 don't know if I made the decision immediately on the
20 spot or shortly thereafter, but I do remember
21 telling Ms. Wright that -- that Jackie was right and
22 that I wasn't going to change my mind.  She made a
23 good call, she reminded me, and I appreciated it.
24    Q   And when did -- did you, at some point,
25 learn that Ms. Fisher made allegations that that was

36

1  racially discriminatory?
2     A   I'm not sure how to answer that but I'll
3  try to explain the --
4     Q   Okay.  It's not a trick question.  I'm not
5  trying to trick you but --
6     A   I know, but I just want a complete answer.
7  We had talked at length about it and so one day I
8  went to her office and I said to her -- I'm
9  paraphrasing -- "Ms. Fisher, do you think that I
10 have administered this cluster in any way that is
11 racially motivated, discriminatory?" or whatever it
12 was.  And she said, "No, I don't.  But I do have
13 concerns that the decision you made about
14 Ms. Freeman could appear that way."  And I said
15 "Well, please explain."  And she said, "Well, you
16 know, you really didn't hear her side of the story,"
17 and I'm not sure what else she said.  And I said,
18 "Well, I'll think about that and I appreciate your
19 feedback."  And I asked her for a personal favor and
20 she said, "What is it?"  And I said, "If, at any
21 point in time, from here forward, if you see me
22 making any decisions or whatever that you feel could
23 also appear this way, as a personal favor to me,
24 would you please come and notify me of that?"  She
25 said she would.

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

37

1    Q   And did that conversation take place
2  before you had made -- rethought your decision, made
3  the decision not to hire Ms. Ford --
4    A   I'm pretty sure --
5    Q   -- or it was during that process?
6    A   No.  I'm pretty sure at this time, I had
7  already decided Ms. Ford wasn't coming back.
8    Q   And had you announced that decision?
9    A   I --
10    Q   Or was this a discussion with Ms. Fisher
11  that --
12    A   This was -- well, this -- I think I had
13  but I won't -- I'm not certain.  If I had the
14  conversation, it was probably held with Ms. Wright
15  because she was the one seeking the rehire, and I
16  honestly don't remember if we discussed it in detail
17  or not.  I may have.  I don't remember.
18    Q   At that time, it was early 2006 and I
19  think -- I'm not sure how long Ms. Fisher had been
20  in her position as nurse manager of Ferguson,
21  Huntsville, and Goree, I believe.
22    A   Well, at this -- in 2000 -- I think it was
23  August of 2005 when she came to the regional medical
24  facility.  I won't swear to it.
25    Q   August of 2005?

38

1    A   I think so.
2    Q   Okay.  Well, there was something
3  significant in August of 2005 and that was the
4  suicide of an inmate that was -- that hung himself.
5    A   Yes.
6    Q   And that was under the time frame that
7  Ms. Freeman -- Ms. Fisher was the nurse manager of
8  that facility.  Is that correct?
9    A   That is correct.
10    Q   And were you involved in that
11  investigation at all?
12    A   Yes.
13    Q   And how were you involved?
14    A   Well, the -- if I'm remembering correctly,
15  in the case of a death, the death is reviewed at the
16  facility level, it's reviewed at the -- I guess I'll
17  say district or cluster level, again, my level, and
18  then there's at least one more review of that case
19  by the TDCJ mortality review committee.  So I went
20  and investigated it from the -- for the district
21  level.
22    Q   For the cluster level?
23    A   Yes, ma'am.
24    Q   Okay.  And, again, I'm going to represent
25  to you I think was August of 2005 -- '4 -- sorry --

39

1  that that had happened.  So she at least was the
2  nurse manager at that point.
3    A   Oh, yes.
4    Q   Correct?  And who would have investigated
5  that at the facility level?
6    A   I'm not sure.  Normally it would be
7  probably the manager, but in this case, since she
8  was directly involved with patients' care, I don't
9  remember if somebody else may have investigated it.
10    Q   But there would always be a facility level
11  investigation?
12    A   Well, a review.
13    Q   A review?
14    A   Yes, ma'am.
15    Q   And would that be a written report?
16    A   I believe so.
17    Q   At least it should be?
18    A   I -- we're reaching way back in time.  I
19  believe it would be.  I just don't -- I can't
20  envision that they would make some sort of verbal
21  report.  I would -- I just feel very strongly it
22  would be in some sort of written format.
23    Q   And to whom that -- would that report be
24  made?
25    A   Probably to me.

40

1    Q   Okay.
2    A   And to my team, my team.  So it would be
3  me, Ms. Fox, the dentist, the physician, psych
4  person, I believe, is the people.
5    Q   And Ms. Fox's position at that point was
6  what?
7    A   She was the senior cluster practice
8  manager.  It's a mouthful; isn't it?
9    Q   It is.  I'm just thinking, who thought
10  these up?
11    A   Oh, I don't know but they should be shot.
12    Q   Okay.  So there was some sort of
13  investigation done at the facility level and this is
14  concerning the suicide of the inmate who hung
15  himself in some -- in 2004.
16    A   Yes.  Honestly, I don't have a good
17  recollection of the results of the facility level
18  investigation.
19    Q   Okay.  How about the cluster level, then?
20  That was the investigation level you indicated you
21  would be in charge of.
22    A   Um-hmm.  Yeah.
23    Q   And what did you do to investigate that?
24    A   I reviewed the records primarily.  I know
25  I spoke with Ms. Fisher and I think that was

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

---

41

1 probably about it.
2     Q   And what conclusion did you come to after
3 you reviewed it, that incident, at the cluster
4 level?
5     A   Well, regarding the inmate's death, I
6 concluded then, and I stick to the position to this
7 day, that Ms. Fisher had absolutely nothing to do
8 with that individual's death.  She made what I
9 consider, in the big picture of things, a small
10 error and that was she did not call the physician
11 back and inform him that the patient had changed his
12 mind and did not want to go to the, oh --
13     Q   Skyview?
14     A   Yeah.  Well, it could have been Skyview.
15 There's a term for that.  For crisis management, I
16 think it is.  And that if she had have done that and
17 there had been an untoward outcome, then I -- it is
18 my belief that the subsequent fallout would have
19 gone on the doctor, not Ms. Fisher.
20     Q   Okay.  But, in fact, the doctor had --
21 since Ms. Fisher had this conversation with the
22 inmate that -- and he refused treatment, the doctor,
23 physician, subsequently saw the inmate; didn't he?
24     A   Well, not the on-call.  However, over the
25 course of the next, I want to say, about eight days,

---

42

1 just about every psych person on that unit either
2 saw this man in person or at least did a chart
3 review.  In fact, the physician or the psych person
4 did a chart review and I saw multiple entries of
5 other psychiatric nursing staff saying essentially
6 that he showed no sign whatever of being suicidal,
7 was not a risk to himself or others, et cetera.
8     Q   Okay.  Just so I'm understanding, then,
9 the severity of what you call a small error, it was
10 she didn't really follow protocol but it wasn't --
11 it did not result in any -- it wasn't the causation
12 of the problem.
13     A   If I may restate, she made a small error
14 in judgment but I do not feel there was a
15 cause-effect relationship with that offender's
16 death.
17     Q   Okay.  And to whom did you report that?
18     A   I believe to the DON.
19     Q   And that's the director of nursing?
20     A   Yes.
21     Q   And --
22         MR. LIVELY:  D or B, did you say?
23         THE WITNESS:  D, dog.
24         MR. LIVELY:  Okay.
25         THE WITNESS:  Director of nurses.

---

43

1     Q   (BY MS. MILLER)  And who was that?
2     A   That would have been Ms. Gotcher by that
3 time.
4     Q   Ms. Gotcher.  Okay.  So we got level -- we
5 got the facility level, we have the cluster level,
6 and the mortality -- and what kind of time frame was
7 all this taking?  Do you recall?
8     A   Oh, my goodness.  You know, those -- those
9 things could straggle out for, believe it or not,
10 more than a year.  I don't think this one was that
11 long.  Maybe -- I don't know -- four to six months.
12 I just don't recall.  Maybe.
13     Q   But it's something that you would want
14 to -- at your cluster and your facility level, you
15 would want to get on something right away while you
16 have the evidence available.
17     A   If I felt there was something done wrong
18 on the part of nursing, I would have taken action
19 immediately.
20     Q   Okay.  And did you take any action against
21 Ms. Fisher for that incident?
22     A   I didn't take any action against
23 Mrs. Fisher.  I put up -- I wrote -- I wrote a
24 letter and put in her file that addressed it and I
25 believe we developed a corrective action plan,

---

44

1 not -- I don't think it was specifically at her but
2 it was more of a to show something that we realized
3 that maybe there had been a small oversight and we
4 were going to educate the staff and make sure it
5 didn't happen again, and in that letter, I was
6 concerned that after I left, if somebody else
7 reviewed it, that it could be interpreted as
8 punitive and it was not, and I specifically wrote in
9 the letter this was not a punitive letter or a
10 letter of reprimand.  I wanted that to be very
11 clear.
12     Q   And you wrote that in the letter?
13     A   Yes.
14     Q   Was there only one letter or did you write
15 a second letter to fix the first letter?
16     A   My recollection is there was only one
17 letter that went into her file and -- oh, there was
18 something else.  Let me think for just a second.
19 Oh, I remember.  The reason -- the reason that I
20 wrote that letter was, for lack of a better term, to
21 protect her in case TDC took a dim view of this
22 because, by doing so, I could say that it was an
23 internal matter with UTMB, it had been addressed,
24 and then that wouldn't really leave TDC much room to
25 say anything.  Now, if we hadn't taken any action or

---

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

---

45

1  nothing had been done or no letter had been written,
2  I felt like they could come back and say, "Well,
3  what did you do?" Now, once the letter was written
4  and we started some sort of, you know, proactive
5  effort not to make the same mistake again, in
6  general, not Ms. Fisher in particular, that they
7  couldn't really say much. If they said something,
8  we could say, "You know what? We've addressed that.
9  It's an internal matter. You don't need to be
10  concerned about it."
11     Q   And a small matter. Right? A small
12  matter.
13     A   Yeah. I think so.
14     Q   And from there, it goes to the mortality
15  review committee?
16     A   At some point in time, yes.
17     Q   All right.
18     A   They do an independent review. I don't
19  know if they even look at our stuff. I think they
20  just start from scratch.
21     Q   And did they seek out any information from
22  you when that was done?
23     A   I don't recall.
24     Q   And tell me about the mortality review
25  committee. How is that selected, if you know?

---

46

1     A   I suppose one could volunteer for it. I
2  think the -- the nurse managers, the director of
3  nurses or somebody, selects local representatives if
4  they want to and the -- and there's no objection.
5  However, it's a -- it's a multipart committee.
6  There are representatives from Texas Tech. There
7  are representatives from UTMB. There are
8  representatives from TDCJ on the committee and each
9  one of them is responsible for reviewing a certain
10  number of charts, however many they're assigned per
11  month. It wasn't uncommon that I'd get a stack of
12  charts, you know, sometimes to this tall.
13     Q   And were you on the committee?
14     A   I had been at one point in time when I was
15  with TDC. Once I went to UTMB, I was no longer on
16  the committee.
17     Q   And the members of UTMB who were selected
18  were essentially selected by Ms. Gotcher?
19     A   I'm not sure. I don't think that's an
20  unreasonable supposition but I'm just not certain.
21     Q   But -- if you're not sure, that's fine.
22  And did you have any part or any activity involved
23  in the mortality committee review?
24     A   None whatever.
25     Q   All right. And are you aware of the

---

47

1  result of the mortality committee review on this
2  particular instance.
3     A   Can you be more specific?
4     Q   Um-hmm. Was there -- does there --
5         MS. MILLER: It's not protected.
6  It's not peer-reviewed.
7         MR. LIVELY: I'm just trying to
8  figure --
9         MS. MILLER: It's not peer review
10  yet.
11        MR. LIVELY: Yeah. I'm just also a
12  little confused about the question.
13        MS. MILLER: Okay. Well, I can
14  rephrase the question.
15     Q   (BY MS. MILLER) As a result of the
16  mortality review committee, are there
17  recommendations made by that committee?
18     A   Yes. There could be.
19     Q   And in Ms. Fisher's case, was there a
20  recommendation made?
21     A   Yeah, there was a -- excuse me. There was
22  a recommendation to go to peer review.
23     Q   A recommendation that it go to peer
24  review.
25     A   Yes.

---

48

1     Q   Okay. And who makes the decision of
2  whether or not it does go to peer review?
3     A   At that point in time, I don't think there
4  was any decision to be made. It went. In the peer
5  review committee, they would -- they would do a
6  preliminary review of the case, not a formal review,
7  and they would look at it and say, "This doesn't
8  merit peer review," and they won't look at it, or
9  they can look at it and say, "We will peer review
10  this. We have concerns." And there will be a
11  formal process initiated.
12     Q   And you were the facilitator on that peer
13  review committee. Is that correct?
14     A   I was one of two facilitators or two
15  agents.
16     Q   Who were the other facilitators?
17     A   One other facilitator was Kathy Jones, who
18  was a manager at my level in some southern area
19  around Houston, Sugar Land.
20     Q   And by "facilitators," you -- these were
21  not members of the peer review committee. Is that
22  correct? Or these were members?
23     A   They weren't voting members. We --
24  essentially my job as a facilitator was to gather
25  documentation. If the peer review committee looked

---

Bayou City Reporting, Inc.

b63bb072-dd57-43e8-9c38-b0f02f40da32

49

1  at that documentation and decided they wanted more,
2  I would go get it.  I was the keeper -- in this
3  particular instance, the keeper of the records at
4  the -- at the Estelle facility.  They had to be
5  stored behind, I believe it was, two locks.
6      Q   And what was Kathy Jones' role in being a
7  facilitator, if that was your role?
8      A   It was the same as mine but we would take
9  turns and she would -- she might even investigate
10  some of the cases too.
11      Q   Did you investigate cases?
12      A   Well, let me rephrase.  Perhaps not
13  investigate but gather documentation.
14      Q   Did you make presentations of sorts to
15  the -- to the peer review committee in terms of
16  "Here are the documents"?  Any kind of explanation
17  with them?
18      A   I would present the documents to them and
19  give them a brief summary of the case, and if they
20  had any questions, I would try to answer them.
21      Q   Okay.  Now, at some point, Kathy Gotcher had
22  authority over selecting which cases came from the
23  mortality review committee and she had some ability
24  to select and choose those that were gone -- that
25  went to the peer review committee.  Do you recall

50

1  that?
2      A   No.  Not when I was there.  It may have
3  changed since.  I don't think there was any such
4  selection process at that time.  Anything that was
5  sent, I think, went.
6      Q   Anything that was sent from the mortality
7  review committee?
8      A   I believe so, yeah.
9      Q   Okay.  And is that written down somewhere
10  we could verify that?  Is that a written policy
11  or --
12      A   I honestly don't know.  That would be
13  something that would -- you'd have to research.  I
14  don't -- because I believe that take -- took place
15  after I left, so I'm not familiar.
16      Q   What took place after you left?
17      A   If there were changes that you
18  described --
19      Q   Oh, if there were changes.  Okay.
20      A   -- then I don't remember those being in
21  place when I was there.
22      Q   Okay.  Now, there was another instance of
23  an inmate death under -- on Mrs. Fisher's watch at
24  some point.  Do you recall that?
25      A   Not without some background.

51

1      Q   How about a bathtub drowning in 2005?
2      A   I can't call it.
3      Q   Okay.  At some point, the peer review --
4  or the -- or Ms. -- this incident of the hanging
5  suicide was referred to the Board of Nursing
6  Examiners.  Are you aware of that?
7      A   Um-hmm.
8      Q   You're aware that Ms. Fisher was under
9  examination.
10      A   Yes.
11      Q   Do you have an understanding as to whether
12  or not her license was ever encumbered in any
13  manner?
14      A   I do not know.
15      Q   Did you have any communication with the
16  Board of Nursing Examiners?
17      A   Yes.  When I found out this was going to
18  the board, I called one of the investigators, who I
19  cannot name at this point, and explained that I had
20  conducted an investigation and that I was her
21  supervisor and I wanted to know if it would be, I
22  guess you could say, kosher to write a letter on her
23  behalf, in support of Ms. Fisher to the board, and
24  if Ms. Fisher requested it, she said that that would
25  not be -- that would be fine.

52

1      So I approached Ms. Fisher and told
2  her what I had found out and asked her if she would
3  be okay with that and she said she would.  I drafted
4  a letter to the Board of Nurse Examiners.  I showed
5  it to Ms. Fisher.  In fact, I remember very
6  distinctly.  It was right over here on 12th Street.
7  We were sitting in my car and I gave her a copy --
8  it was two or three pages, I think -- and said, "I
9  would like you to look at this.  If you have any
10  concerns of the wording, let me know right now and
11  we'll see if we can't fix it.  I want you to be
12  satisfied with it."  She looked at it and said, "No.
13  It looks okay."  I took the letter, put it on
14  letterhead, signed it, sent her a copy of the actual
15  letter, and then I sent the rest of the letter, the
16  original, to the board.
17      Q   Okay.  Did it help?
18      A   Have no way of knowing that for sure.
19      Q   Okay.  Other than that communication, did
20  you have any communication with the Board of Nursing
21  Examiners in -- regarding Ms. Fisher's cases?
22      A   No.  I don't think so.
23      Q   Did you receive any communication from the
24  Board of Nursing Examiners directly -- directed to
25  you?

b63bb072-dd57-43e8-9c38-b0f02f40da32

53

1    A   There may have been subpoenas.  Subpoenas
2  usually came to me.  But I'm not certain.
3    Q   Okay.  In terms of their findings or
4  follow-up, would you have received a copy of the
5  Board of Nursing Examiners' --
6    A   No.  Because I didn't report --
7    Q   -- findings?
8        MR. LIVELY:  Let her finish the
9  question.
10       THE WITNESS:  I'm sorry.
11   Q   (BY MS. MILLER)  That's all right.
12  Findings.  Would you have received a copy of the
13  findings or the order or any kind of notice of her
14  suspension or nonsuspension?
15   A   No.  That would have been directed to the
16  chairperson of the peer review committee who had --
17  who was in place when it was forwarded to the board.
18   Q   And the peer review committee did forward
19  it to the board?
20   A   I believe so.
21   Q   Do we know that for sure?
22   A   I do know it for sure but I just don't
23  remember how I know it because I knew it was going
24  to the board at some point because that's when I --
25  I wanted to go to her defense and ask her about

54

1  sending the letter.
2    Q   And you have no recollection of the
3  drowning incident that I asked you about.
4    A   Not right off.  I'm sorry.
5        MS. MILLER:  Can we take a second?
6        (Discussion off the record
7         from 11:38 to 11:39)
8    Q   (BY MS. MILLER)  Under what circumstances
9  would a peer review committee decline to consider an
10  instance or an incident?
11   A   I'm not sure I'm qualified to answer that
12  because it would be taken on a case-by-case basis
13  and they would assign that.  I'm not comfortable on
14  giving an answer.
15   Q   Okay.  What's a minor incident?  How would
16  you define that?
17   A   Good Lord, I don't remember anymore.  I
18  think it would be something that would not
19  necessarily put a person at immediate risk of loss
20  of life or serious bodily injury.  It wouldn't fit
21  into that category but, again, it's been a while.
22   Q   Okay.  Now, at some point, you began --
23  strike that.  When you had this discussion -- I'm
24  going back to the rehire discussion of Mrs. Ford --
25  Ms. Ford.

55

1    A   Um-hmm.  Okay.
2    Q   At that point in time, which I'm
3  representing to you is January 4th of 2006, had you
4  had any reason to issue letters of expectation to
5  Ms. Fisher or to reprimand her in any manner?
6    A   I don't think so.
7    Q   And certainly in your position as the --
8    A   Senior cluster manager.
9    Q   -- senior cluster nurse manager, it would
10  have been your responsibility to reprimand and to
11  issue letters of expectation to your nurse managers
12  if it was required.
13   A   Yes.
14   Q   And you wouldn't have any problem doing
15  that.
16   A   Not if I thought it was warranted.
17   Q   And prior to January 4th of 2006, you
18  don't recall the requirement that you do that in
19  Ms. Fisher's behalf.
20   A   Not that I recall.
21   Q   Okay.  Tell me what precipitated the
22  investigation of Ms. Fisher that began on
23  January 9th, 2006.
24   A   Would this be when Ms. Gotcher came to
25  the --

56

1    Q   That -- the whole part of that process.
2    A   Okay.  I had been having conversations
3  with Ms. Gotcher about the RMF and how things --
4    Q   Will you define "RMF" for me, please?
5    A   Regional medical facility?
6    Q   Thank you.  And --
7    A   Also known as the Estelle Unit.
8    Q   And is that in -- is that a unit all
9  self-standing -- self-contained unit?
10   A   Well, the Estelle Unit is -- is kind of a
11  mishmash of different things.  There is a building
12  that is an old-fashioned-type prison which I think
13  preexisted most everything else, and then they
14  created -- I don't know what order, but they created
15  a high-security unit that's on the same campus and
16  it's maybe a few hundred yards away.  And then they
17  created the regional medical facility itself, which
18  is more of a hospital-type environment.  And then
19  somewhere in that mix, they also created a geriatric
20  unit, which is basically one big tin building that
21  had low security inside the building.
22   Q   Okay.  So there was a regional medical
23  facility which was more like a hospital?
24   A   Well, I think of the whole complex -- and
25  maybe not correctly so, but I think of the whole

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

---

57

1   complex as the Estelle unit, the RMF.  But -- but --
2       Q    So the RMF was all that was at the Estelle
3   Unit, including the geriatric unit and what -- what
4   other little specialized units were there?
5       A    Oh, there was also like a drug rehab
6   program over there.  I forgot about that.
7       Q    Was that -- would you consider that part
8   of the RMF?
9       A    Well, from a nursing standpoint, yes,
10  because if someone got sick or there was sick call,
11  then it was the responsibility of the nurses to
12  handle that.  The building had its own nursing
13  staff, but in -- if there were an emergency in the
14  middle of the night and they were shorthanded, then
15  somebody from the RMF may have to go over there and
16  lend a hand.  The RMF crew was also responsible for
17  nursing care at the high-security unit, for staffing
18  it.  And I think that's it.
19      Q    And the high-security unit was different
20  than the hospital.
21      A    Yes.  It was a free-standing facility with
22  its own security fence.
23      Q    And did the nurses -- the same nurses
24  rotate among the -- I'm going to call it the drug rehab
25  hospital and the geriatric unit and the drug rehab

58

1   unit and the high-security unit?
2       A    I'm sorry.  Say it again.
3       Q    Did the same nurses rotate?  Would they
4   have -- they have touched and worked in all those
5   independent subunits, so to speak?
6       A    Probably not so much the building, but the
7   other three, yes, I think so.
8       Q    The building?
9            MS. FISHER:  It's the main building.
10  It's an independent building.
11      Q    (BY MS. MILLER)  And that's different than
12  the hospital?
13      A    It's a different structure, yes.  It's --
14  they got a connected walkway over there to it.
15      Q    All right.  So let's talk -- and the
16  building -- which facilities would the same nurses
17  have worked among?
18      A    The regional medical facility,
19  high-security, and the SAFP, which is -- I forget
20  what it stands for, substance -- substance abuse
21  something program.
22      Q    Right.  And SAFP was the drug rehab.
23      A    I believe so, yes.
24      Q    Okay.  So the same nurses would have had
25  exposure to drug rehab, RMF, and the high-security

59

1   portion.  The building itself and the hospital and
2   the geriatric unit would have been no crossover in
3   the employees other than the nurse manager.
4       A    The building, yes.  The geriatric unit
5   was -- it's hard to describe but it wasn't inside
6   but it was part of the -- it was and it wasn't.  It
7   was kind of a hybrid.  It was a free-standing
8   building right next to the regional medical
9   facility.  Now, as regarding the high security, if I
10  remember correctly, they had nurses that were
11  routinely assigned over there, but if we were
12  short-staffed or whatever, then some nurses may have
13  had to float and help cover.
14      Q    Okay.  And the hospital is different than
15  the regional medical facility.
16      A    They're one and the same, basically.
17      Q    Okay.
18      A    There was 106 or 110 beds.  There was a
19  dialysis unit there, three -- three pods.  I think
20  it was north, south, and something else.
21      Q    And was Ms. -- at this time, was
22  Ms. Fisher in charge of all of these units at the
23  Estelle facility?
24      A    At what time?
25      Q    In January of 2006.

60

1       A    All except the building.
2       Q    Okay.  All except the building.  Who was
3   in charge of the building?
4       A    I believe it was Joyce Bonds.
5       Q    And what went on in the building?
6       A    Oh, they had their own little medical
7   clinic.  I think they a two-bed ER and some exam
8   rooms.
9       Q    And Joyce Bond was a nurse manager?
10      A    She was the only nurse manager.
11      Q    All right.
12      A    And by way of distinction, Ms. Fisher was
13  a cluster nurse manager.  Now, even though the
14  Estelle Unit wasn't scattered out geographically
15  over two or three counties as some of them were, it
16  was so big that it was considered -- or that
17  position was a cluster nurse manager position.
18  Ms. Bonds was a nurse manager position, which would
19  be like a step below.
20      Q    And as a cluster nurse manager, Ms. Fisher
21  didn't have any responsibilities that extended
22  beyond the Estelle Unit at that time.
23      A    She was responsible for everything except
24  the building.
25      Q    Okay.

Bayou City Reporting, Inc.

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

---

61

1    A    On the --
2    Q    At Estelle.
3    A    At Estelle.  I know it's kind of --
4    Q    But she didn't have another facility
5    somewhere else --
6    A    No.
7    Q    -- that she had to drive to and --
8    A    No.
9    Q    Okay.  All right.  So got the RMF and I
10   interrupted my -- your answer to my question was:
11   What precipitated the investigation that was
12   initiated on a -- into Ms. Fisher's work that began
13   on January 9th of 2006?
14   A    Well, as I said, I had been having
15   conversations with Ms. Gotcher fairly regularly and
16   I had discussed with her concerns that I had, so
17   forth, over the preceding few months and she had
18   offered to come down and take a look, if I wanted
19   to, and I declined.  I wanted to try to do
20   everything I could myself to resolve any issues or
21   concerns.  And finally one day, I had a phone
22   conversation with her and she made an offer again
23   and -- and I said, "Sure.  Why not?"  I said, "I
24   need an -- I need just somebody -- maybe I'm too
25   close to the problem.  Maybe I'm not seeing the

---

62

1    forest for the trees but, you know, feel -- come
2    down and have a look and tell me what you think."
3    Q    Well, if you were close to the problem,
4    could you identify the problem?
5    A    I feel like I could --
6    Q    And --
7    A    -- but I wanted, you know, external
8    verification.
9    Q    And what did you identify as the problem?
10   A    Well, there was a general lack of morale.
11   People were leaving, turning over, requesting to
12   transfer.  In fact, I denied two requests from the
13   assistant nurse managers there at Estelle who wanted
14   to leave out from under Ms. Fisher and I told them,
15   no, they needed to stay and try work with her and
16   give her a chance.  And I've had -- I would have a
17   nurse -- in fact, I can remember one incident fairly
18   clearly where two nurses met me in the hallway and
19   they had complaints.  Ms. Fisher wasn't treating
20   them right or whatever.  And I said, "Well, are you
21   willing to put that in writing?"  "No."  I said,
22   "Well, then you're just whining.  I don't want to
23   hear it."  And so the ER nurses were up in arms
24   because Ms. Fisher had made some changes at the ER
25   and the turnover rate was -- was a concern.  I think

---

63

1    that's largely it.
2    Q    And so those were the concerns or the
3    problems that you had identified?
4    A    Well, yes.  And also there was -- in my
5    opinion, there was a problem with the communication
6    between Ms. Fisher and her nurse managers.  I met
7    with them on March 10th and I don't -- I guess it
8    would probably have to be '06, just by process of
9    elimination, and we sat down as a group and they
10   expressed their concerns and she expressed her
11   concerns and I thought, to a large degree, it was a
12   lack of communication.  And I directed them to try
13   to meet at least weekly and keep up with each other
14   on any changes and problems and so forth, and more
15   often, if needed.
16   Q    Okay.  I'm going to stop you there just
17   for a minute because you got ahead of me.  I was
18   back in January and you went to March already,
19   Mr. Watson.
20   A    I'm sorry.  I'll try to slow down.  Just
21   rein me in.
22   Q    Okay.  All right.  So back in January, you
23   said you had spoken -- if I can -- can understand,
24   you had spoken to Ms. Gotcher on a number of
25   occasions about your concerns of -- in the Estelle

---

64

1    Unit.
2    A    Yes.
3    Q    And on January 9th, again, she offered to
4    provide her assistance and that's when the
5    investigation of -- into Ms. Fisher began.
6    A    I'm not sure of the date but -- but, yes,
7    as far as the transaction goes, yes, that's correct.
8    Q    Okay.  And you indicated that you had told
9    Ms. Gotcher that -- about the concerns and that you
10   had done everything you could do and you needed some
11   outside assistance.  Is that -- am I fairly
12   summarizing what you said?
13   A    I just wanted an outside perspective to
14   either come in and look and validate that, "Yes,
15   I've looked at this and I agree with your concerns,"
16   or "No, Mr. Watson.  You're completely off and
17   here's what we think we see."
18   Q    So if we agree that at least this happened
19   in January of 2006 -- let's leave the March
20   conversation till later -- what had you done to help
21   Ms. Fisher or to identify concerns with her or to
22   instruct her or review with her how she might
23   improve?
24   A    Well, I talked about being better
25   communication.

---

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

65

1    Q    And that's a discussion you had with her?
2    A    Well, that was -- we've had the discussion
3  several times but that was a particular discuss --
4  oh, I'm sorry.  That's goes forward to March 10th.
5  I'm sorry.  Let me back up.
6    Q    So at the time this investigation began,
7  what steps had you already taken that you felt were
8  not productive?
9    A    I encouraged better communication.  I
10 talked to Ms. Fisher on several occasions that the
11 staff felt like she was abrupt and a little
12 unapproachable, that there was a lot of e-mails
13 instead of face-to-face conversations, and
14 encouraged her to -- to speak, you know, more in
15 person with the staff and to -- sometimes when she's
16 passionate or motivated, she has a tendency to talk
17 over people and cut them off and I asked her to
18 please be conscious of that.  And also, somewhere in
19 this time frame, had suggested I -- she wanted to
20 make some changes and I had suggested that she
21 approach it more systematically and get buy-in from
22 the staff and help them be part of the solution and
23 lead them and make them be stakeholders and guide
24 them as opposed to just going and making changes.
25    Q    Okay.  And those were verbal conversations

66

1  you had with Ms. Fisher.  Did you have any written
2  expectations or any written consultations with her
3  prior to the time this investigation --
4    A    I don't think so.  I was --
5    Q    -- was begun?
6    A    I don't think so.  I was very motivated to
7  be able to coach and encourage her.  And when I say
8  "coach," I don't mean in a punitive sort of way.  I
9  mean in a, you know, "I know you've got the talent.
10 You can do this.  Let's go get them, you know."
11    Q    And she is very talented.
12    A    She's very talented.
13    Q    And she's pretty no-nonsense; isn't she?
14    A    She can be.
15    Q    So those were the things that you had
16 tried and then Ms. Gotcher got involved.  Is that
17 correct?
18    A    Yes.
19    Q    All right.  Tell me what happened when
20 Ms. Gotcher got involved.
21    A    She came to the unit.  She did some
22 walking around.  I don't know how extensive it was.
23 I don't think I went with her.  She and
24 Ms. Melton -- Ms. Melton from HR came too, which I
25 guess I didn't really know she was coming till at

67

1  the last minute.  And then they set up shop, so to
2  speak.  They had reserved a conference room, and
3  anybody that wanted to come and talk to them was
4  welcome to come and talk, share their views and
5  feelings and so forth.
6    Q    Do you happen to recall the date --
7    A    No, ma'am.
8    Q    -- that this happened?
9    A    I do not.
10    Q    But, yet, you were able to recall the
11 March 10th date.  How can you recall that one?
12    A    It just so happens that I remember that
13 particular e-mail.
14    Q    Okay.  So when Ms. Gotcher came to the
15 unit, how was it determined when she would come?
16    A    I don't recall.  She -- she checked her
17 calendar and said, "Why don't I come on this date,"
18 or that date or this range of dates and said, "Okay.
19 Fine."
20    Q    And it just happened to be a date that
21 Ms. Fisher was out on family medical leave?
22    A    It -- I remember Ms. Fisher was out.  I
23 don't know if the dates --
24    Q    Or bereavement?  I'm sorry.
25    A    I'm not sure.  I just remember she was

68

1  out.  And I don't know if the dates were -- the
2  dates, in other words, may have been determined
3  ahead of time before she went out.  I don't know
4  exactly what the relationship was between when dates
5  were selected and when she went out on leave.
6    Q    And the reason they came to the unit?
7  What was their intended purpose, as far as you knew?
8  You knew they were coming.  Right?
9    A    I -- well, I knew Ms. Gotcher was coming
10 to talk to the staff, allow the staff to talk to
11 them.  If they had anything they wanted to say,
12 good, bad, or indifferent, go share -- go share with
13 Ms. Gotcher their feelings, views.
14    Q    And how was that communicated to the
15 staff?
16    A    I sent an e-mail out to the staff, I
17 thought to everyone at the time.
18    Q    To -- to whom?
19    A    To the entire staff.  There are -- there
20 were one or more e-mail lists in the computer and I
21 picked at least one or more that I thought would go
22 to as many people as possible.
23    Q    And so it went to all the staff at the
24 Estelle Unit?
25    A    I'm not sure.

b63bb072-dd57-43e8-9c38-b0f02f40da32

69

1    Q   Okay.  Was there any pretense or -- strike
2  that.  That's a bad word.  Was there any effort to
3  extend this investigation to Ms. Bonds' employees?
4    A   No.  Because that was a separate staffing
5  over in the building.
6    Q   Okay.  Was that e-mail sent to her
7  employees?
8    A   I don't recall.
9    Q   So this was clearly focused only on
10  Ms. Fisher.
11    A   This was clearly focused on the regional
12  medical facility and the -- yes.  The people that --
13  under her supervision.
14    Q   Okay.  And do you -- they were there for
15  two days?  Is that correct?
16    A   It was at least two, maybe three.
17    Q   Okay.  Did you work with them while they
18  were there?
19    A   No, ma'am.
20    Q   Okay.  Did you -- did you speak with any
21  employees yourself while -- during their visit
22  there?
23    A   I spoke with two.  There was Dr. Vincent.
24  I went to Dr. Vincent personally and said that I was
25  aware that there were certain members of the staff

70

1  who were disgruntled and unhappy and may want to
2  talk to, you know, Ms. Gotcher, but I was also aware
3  of the fact that there were probably some people
4  that were quite happy, and I felt like it was
5  important that both sides of the story be told and
6  would he mind spreading the word to go and speak.
7  If they were happy, go and let Ms. Gotcher know.  He
8  said he would.
9         And then there was another -- there
10  was another lady.  She -- I'm sorry.  I can't think
11  of her name.  She was a med tech, I think, in the
12  pharmacy.  I mean, when I say "I think," I think she
13  was a med tech.  I know she was assigned to the
14  pharmacy.  And in my mind, she had a good reputation
15  for being unbiased and didn't get, as far as I could
16  tell, into petty jealousies.  I thought she would
17  give a good or fair assessment and I went to her and
18  approached her and asked her if she would be
19  interested in going and talking and she said, "As a
20  matter of fact, I just came back."
21    Q   Okay.  And, in fact, there were -- there
22  was a lot of pettiness that went on at the Estelle
23  Unit; wasn't there?
24    A   I'm not comfortable commenting on that
25  without knowing "pettiness."

71

1    Q   Well, you defined "pettiness" and I picked
2  up your word, so -- "petty jealousies," I think, was
3  your expression.  How would you define that?
4    A   I don't remember making that comment.  Can
5  I have her read it?
6    Q   Well, we can have the court read it back.
7         THE WITNESS:  I did say that?  Give
8  me the context.
9         MR. LIVELY:  While you're looking at
10  it, can we take a little break?
11         MS. MILLER:  Let's finish just this
12  question, please.
13         MR. LIVELY:  Okay.  Go ahead.
14         MS. MILLER:  Go ahead and tell him so
15  he knows.
16         (Requested answer was read)
17    Q   (BY MS. MILLER)  So in that context that
18  you used the term "petty jealousies," how would you
19  describe those?
20    A   Well, I would reserve the right to go back
21  and say I may not have characterized that ideally
22  under petty jealousies.  There were -- there were
23  people who were unhappy.  They didn't like
24  Ms. Fisher's style.  They felt like she was -- what
25  is the word I want to say?  She -- favoritism, I

72

1  guess, that she played favorites, and -- and I
2  thought it was important that both sides of the
3  story be told and I thought Ms. Fisher needed to get
4  every benefit of the doubt.
5    Q   Who did Ms. Fisher replace at the Estelle
6  Unit?
7    A   Mary Adams.
8    Q   Okay.  And, in fact, there were complaints
9  against Ms. Adams, too; weren't there?  Similar to
10  those against Ms. Fisher.
11    A   I don't believe they were to the degree.
12  Every nurse manager from time to time, I would get
13  complaints, "I didn't like the way she said this.
14  You know, I didn't like the way she made the
15  schedule out."  But they were -- they tended to be
16  more isolated, and if I detected a pattern, I might
17  look into it more.  I don't remember there being
18  such a pattern with Ms. Adams.
19    Q   And who replaced Ms. Fisher in the Estelle
20  Unit?
21    A   Ultimately it was Judy Upshaw.
22    Q   And in the -- immediately, who was it?
23    A   Ms. McCartney.  I assigned Ms. McCartney
24  to be the front-line supervisor with me backing her
25  up.

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

---

73

1     Q   And there were complaints against
2   Ms. McCartney also; weren't there?
3     A   Not that I recall.
4         MS. MILLER: Okay.  Now you can have
5   your break.
6         MR. LIVELY: Okay.  That's fine.
7         (Recess from 12:01 to 12:09)
8     Q   (BY MS. MILLER) Mr. Watson, we were
9   talking about some of the problems that you had
10  identified and concerns you had with Ms. Fisher that
11  precipitated this investigation in January of 2006,
12  and one of them was the turnover rate concern you
13  had for the Estelle Unit?
14    A   (Moving head up and down)
15    Q   And how did you monitor that?
16    A   HR monitored that for us because they knew
17  who -- who hired and who -- who quit and what dates
18  and so on and so forth.
19    Q   And, in fact, there was a report that was
20  printed regarding that; wasn't there?
21    A   There was, but I don't remember the -- the
22  data anymore.  I just remember there was one done.
23    Q   Sure.  But you would have looked at a
24  report to get some hard data rather than just
25  assuming.  Correct?

---

74

1     A   (Moving head up and down)
2     Q   You have to say "yes" or "no."
3     A   Yeah.  I'm sorry.  Yes.  I'm sorry.  Yes.
4   Yes.
5     Q   Okay.  And the turnover rate is different
6   than vacancy rate, I'm assuming.
7     A   Yes.
8     Q   All right.  And, in fact, the turnover
9   rate was monitored, voluntary turnover and
10  involuntary turnover.  Correct?
11    A   I don't recall that one way or the other.
12    Q   Okay.  And the vacancy rate was how many
13  openings that --
14    A   I don't remember the data specifically.
15    Q   No, I'm not asking for the data.
16    A   Oh.
17    Q   I'm asking for the definition.  The
18  vacancy rate was how many openings in each facility.
19    A   I think so.
20    Q   Okay.  And, now, isn't it true that
21  positions were said to each facility but
22  occasionally those were moved around?  It wasn't a
23  static thing like Estelle had 42 positions and they
24  always had 42 positions and it never changed from 42
25  positions.  Isn't that true?  You might have a

---

75

1   position that was unfilled, you needed it somewhere
2   else, you slid it over to another facility?
3     A   Ms. Box was usually in charge of taking
4   care of those things and I wasn't directly involved.
5   That may, in fact, be the case.  I think we usually
6   lost positions as a result of -- if you had, say, 20
7   positions that were open for X amount of time and
8   there was no possibility of refilling them, they
9   just may delete the positions.
10    Q   They weren't moved to other places?
11    A   I won't say it never happened but I don't
12  know that it was commonplace.
13    Q   So it was my understanding -- and correct
14  me if I'm wrong -- then from what you're saying -- I
15  may be.  I understood that the Estelle might have --
16  and I'll just pick a number -- say 50 positions and
17  at times that might be 54 positions and at times
18  that might be 47 positions that were assigned as the
19  Estelle Unit positions.  Did that happen to that
20  kind of amorphous kind of number?
21    A   I don't recall it being that way.  They
22  were --
23    Q   Okay.
24    A   I thought they were fairly static.
25    Q   Okay.  Was anyone under your particular

---

76

1   supervision and any other nurse manager ever demoted
2   over a turnover rate or vacancy rate?
3     A   Not that I can recall.
4     Q   Okay.  Now, you talked about people
5   that -- people had complained to you prior to this
6   investigation being initiated.
7     A   Yes.
8     Q   All right.  And these were staff members
9   that reported to Ms. Fisher.  Is that correct?
10    A   Yes.
11    Q   Can you tell me specific names of staff
12  members who reported to Ms. Fisher who had directly
13  complained to you?
14    A   Well, Mr. Aguilar was one.  Ms. McCartney
15  was another one.  Ms. Gossett was another one.  I'm
16  sorry.  Am I going too fast?
17    Q   You are.  I can't write very fast.  Okay.
18  Aguilar.
19    A   Um-hmm.
20    Q   McCartney.
21    A   Yes.  Gossett.
22    Q   Gossett.
23    A   Franks, Darby, Moreau, Lauder, Anderson.
24  That was at the Estelle Unit and there may have been
25  more but those are the ones I can recall.

---

b63bb072-dd57-43e8-9c38-b0f02f40da32

77

1    Q   From Estelle?
2    A   Yes, ma'am.
3    Q   And are all these RNs or LVNs?
4    A   I'm not sure what Ms. Franks is.  Yeah.
5  Yeah.  I think that's true.  I think they're either
6  RNs or LVNs.
7    Q   Okay.  And is -- are any, Mr. Aguilar,
8  Ms. McCartney, Ms. Gossett, Ms. Franks, Ms. Darby,
9  Ms. Moreau, Ms. Lauder, and Ms. Anderson, are any of
10  those African Americans?
11    A   Think about that one for a minute.  No.  I
12  don't believe so.
13    Q   Okay.  And I believe that-- you indicated
14  you encouraged two employees to talk to Ms. Gotcher
15  and Ms. Melton when they were there and that was
16  Dr. Vincent and a med tech you didn't recall the
17  name of, but you can probably visualize her in your
18  mind; can't you?  Was she African American?
19    A   Yes.
20    Q   And Dr. Vincent is also African American.
21    A   Yes.
22    Q   Any white employees that you encouraged to
23  go talk to Ms. Gotcher?
24    A   Well, Ms. Franks was one of those that
25  came to me and there was another nurse with her

78

1  whose name I can't recall.  I can -- I can see her
2  in my mind.  And they came to me and said, "You
3  know, we're unhappy," and this, that, and the other
4  thing.  "And I said, "Well, Ms. -- Ms. Gotcher will
5  be here."  We had already set the date.
6  "Ms. Gotcher will be here and if you want to go and
7  register your complaints or concerns with her, feel
8  free to do so."  And they said, "Well, we don't want
9  to do that because we're afraid of retaliation."
10  And I said, "Then don't -- don't come and complain
11  to me.  Here's your chance if you want to do say
12  something."
13    Q   Okay.  And, in fact, during that
14  investigation, it was two days?  Correct?
15    A   At least.
16    Q   Did you get a report on the results of
17  that investigation?
18    A   At some point, I did.
19    Q   Okay.
20    A   I don't remember exactly when it was.  I
21  believe it was at the conclusion.  When I say "at
22  the conclusion," meaning that day, whenever they did
23  it.
24    Q   It was two days, though.  Right?
25    A   (Moving head up and down)

79

1    Q   Okay.  And was that report written or is
2  that oral?
3    A   That report was oral.
4    Q   Do you recall who gave you that report?
5    A   It was Ms. Gotcher and Ms. Melton
6  together.
7    Q   So both -- you got information from both?
8    A   Yes.
9    Q   And what do you recall being their -- the
10  content of their report?
11    A   Their determination was that they heard
12  the same complaints that I heard, that they felt
13  that the conclusions that I had drawn were valid.
14    Q   And what conclusions exactly had you
15  drawn?  I'm -- I don't think we asked that.
16    A   Difficult -- difficulty -- or lack of
17  approachability, ineffective leadership.  They also
18  came up with racism and -- let me think.  What else?
19  I just went blank.  Preferential treatment, I
20  suppose, for a select number of employees would be
21  how it -- "favoritism" would be the word I'm
22  struggling for.
23    Q   So lack of approachability, inferior
24  leadership -- was it inferior leadership?
25         MS. FISHER:  Ineffective.

80

1    Q   (BY MS. MILLER)  Ineffective leadership.
2  I can't read my own writing.  And racism and
3  favoritism.  Anything else?
4    A   That's all that comes to mind.
5    Q   Okay.  And while Ms. Gotcher and
6  Ms. Melton were there, did you develop a plan of
7  action to assist Ms. Fisher?
8    A   I didn't per se, at least not that I
9  recall.  Ms. Gotcher formulated a plan, as I recall
10  it, to -- to talk to the staff, to meet with the
11  staff, and present some sort of resolution.
12    Q   And were you in concurrence with that
13  approach?
14    A   Oh, I didn't object to it.  At that point
15  in time, I didn't really know what else to do.
16    Q   And, indeed, did that happen?
17    A   There was a meeting.  It was held inside
18  the RMF.  Ms. Gotcher was there.  I was there.  I'm
19  not sure who all else was there.
20    Q   And what happened in that meeting?
21    A   I believe she presented a document that
22  basically said, "Okay.  The expectations from the
23  staff are XYZ and the expectation from Ms. Fisher
24  are similar."  I mean, corresponding, if you will.
25    Q   Okay.  And this was a meeting that was

b63bb072-dd57-43e8-9c38-b0f02f40da32

81

1    managed by Ms. Gotcher?
2        A    Yes, ma'am.
3        Q    And you were in attendance.
4        A    Yes, ma'am.
5        Q    Did you have any input in the content of
6    the meeting?
7        A    I don't remember.
8        Q    Did you have any input in the content of
9    the expectations that were assigned to Ms. Fisher?
10       A    I'm sure we discussed it, but as far as
11   specifics or particulars, I don't recall.
12       Q    Okay.  And was there an attendant time
13   frame given to these expectations of the staff and
14   as of -- of Ms. Fisher?
15       A    I feel sure there was but I couldn't
16   articulate what it was.
17       Q    Okay.  And these expectations of
18   Ms. Fisher, were these a -- was this a reprimand of
19   Ms. Fisher?
20       A    In my mind, it was not a reprimand.  It
21   was more along the lines of corrective action or
22   somehow to resolve the issues.
23       Q    Okay.  It was a corrective action.  That's
24   not a reprimand?
25       A    A corrective action could be, I suppose,

82

1    but in this particular case, I didn't -- I didn't
2    feel like it was, in my opinion, no.
3        Q    And if you were a manager and you were
4    given a list of expectations based on complaints of
5    your subordinates and this was given to you in front
6    of your subordinates, you wouldn't take that as a
7    reprimand?
8        A    Well, I've never had it happen, so I don't
9    know if I could -- it would be speculative to
10   answer.
11       Q    Okay.  And were you -- did you speak in
12   these meetings?
13       A    I can't recall.
14       Q    Okay.  So if I represent to you it was
15   these -- these expectations were represented with a
16   90-day -- as a 90-day action plan and a 90-day --
17   with a 90-day review, does that trigger your memory
18   in any way in understanding the time frame attached
19   to it?
20       A    No.  I don't recall.
21       Q    Okay.  After -- do you recall when this
22   meeting took place?
23       A    No.
24       Q    Do you recall reviewing or giving
25   Ms. Fisher her annual performance review shortly --

83

1    about this same time?
2        A    No.  I don't recall it.
3        Q    As long as --
4        A    If you had documents I could review, I
5    would, maybe.
6        Q    Okay.  Well, we'll get to that.  As her
7    supervisor, you were the one responsible for her
8    evaluations, her performance evaluations.  Right?
9        A    Yes.
10       Q    And did you review the notes of the
11   investigation?
12       A    Did not.
13       Q    Okay.  And were there -- was there a
14   written report ever made of the investigation, to
15   your knowledge?
16       A    Not to my knowledge.
17       Q    Now, at some point, you made the decision
18   to demote Ms. Fisher.  Is that correct?
19       A    At some point in time, a decision was
20   made, yes.
21       Q    And tell me how that decision came about.
22       A    It was -- it was made in conjunction
23   between myself, Ms. Gotcher, and I believe
24   Ms. Melton.
25       Q    And Ms. Melton's position was?

84

1        A    It was a fairly new position created.  It
2    was the northern division HR supervisor, I guess.
3        Q    But she was part of the HR --
4        A    Oh, yes.
5        Q    -- contingent?
6        A    Absolutely.
7        Q    So it was a mutual decision among the
8    three of you.  How did you arrive at that decision?
9        A    It was -- it was arrived at by discussion.
10   Ms. Melton wanted to demote Ms. Fisher to a staff
11   nurse.  I didn't agree with that.  I didn't think it
12   was appropriate or fair and I voiced that concern
13   and it was taken under advisement, and I don't think
14   a decision was -- a final decision was made right
15   then.  A day or so later -- because we -- we met in
16   person for this discussion.  So a day or so later, I
17   thought about it and I had looked over Ms. Fisher's
18   evaluations when she was an assistant nurse manager
19   and I didn't see anything in there that I felt like
20   would preclude her functioning in that capacity.  So
21   I called Ms. Gotcher back again and said, "I am not
22   comfortable with this, a staff nurse."  And
23   ultimately, I guess HR signed off on it.
24       Q    Okay.  Did you not issue a letter of
25   expectation telling Ms. Fisher that you intended to

b63bb072-dd57-43e8-9c38-b0f02f40da32

85

1  demote her to a Nurse Clinician III?
2      A    That letter was -- was formulated.  I
3  don't know that I gave it to her.  It was about this
4  point in time, ironically, that I ended up going in
5  the hospital.  So some of this took place in my
6  absence.
7      Q    Okay.  From the time that she -- that you
8  had this meeting with the staff and Ms. Fisher to go
9  over the expectations to the time that she left --
10  or she was given the notice of intent to demote to a
11  Staff Clinician III, she was out on -- a significant
12  amount of time on Family Medical Leave Act; was she
13  not?
14      A    I remember that she went out on Family
15  Medical Leave, but as far as a time goes, I'm not --
16      Q    Okay.  And indeed, we'll talk more about
17  the corrective action, the timing that she was given
18  to take the corrective action of the expectations.
19  She, in fact, was demoted before that time frame
20  ran; wasn't she?
21      A    I don't remember what the time frame was,
22  so I --
23      Q    Okay.
24      A    I'm not sure.
25      Q    Even if you don't, she was demoted before

86

1  the time frame expired.
2      A    Okay.
3      Q    I'm asking you if you recall that.
4      A    I don't know how to answer.  I don't
5  remember what the time frame was but I do recall she
6  was demoted, yes.
7      Q    Okay.  And wouldn't you, in terms of --
8  did you intend to demote her when you had this
9  meeting with the staff and gave her the
10  expectations?
11      A    I didn't.
12      Q    Do you -- did -- as far as you know, did
13  Ms. Gotcher or Ms. Melton?
14      A    Not as far as I know, no.
15      Q    So I want to go through these steps pretty
16  clearly.  You had the meeting with the staff and
17  with Ms. Fisher, and the staff and Ms. Fisher both
18  got expectations.
19      A    That's my recollection.
20      Q    Okay.  And then sometime after that, you
21  and Ms. Gotcher and Ms. Melton had a meeting.
22      A    Correct.
23      Q    And where was that meeting?  Where did
24  that meeting take place?
25      A    There was a series but the one that comes

87

1  to my mind where I didn't agree with the demotion
2  was in Palestine.
3      Q    Okay.  And you had a series of meetings --
4  you had a series of meetings with Ms. Melton and
5  Ms. Gotcher regarding Ms. Fisher?
6      A    Yes.
7      Q    All right.  Did anybody take notes of
8  those meetings?
9      A    Not sure.  I don't think I did.  Ms. --
10  Ms. Melton was very note -- a big note taker.  She
11  may have.
12      Q    Okay.  And what happened in the interim
13  between the time that you had the meeting with the
14  staff and Ms. Fisher and the time that it was
15  determined that she should be demoted to whatever
16  level?
17      A    Um-hmm.
18      Q    What happened in the interim of that time
19  frame to have you take that next step of demoting
20  her?
21      A    There weren't any changes -- there weren't
22  any positive changes at the RMF.  I believe the
23  vacancy rate either remained the same or continued
24  to grow.  The nurse -- assistant nurse managers were
25  consistently unhappy working in that environment.

88

1  In fact, one of them transferred; one of them quit.
2      Q    Aguilar?
3      A    Aguilar transferred --
4      Q    Aguilar?
5      A    -- outside the cluster.  I couldn't stop
6  that.  In fact, he may have promoted.  I'm not sure.
7  Ms. Gossett quit.  There was a concern that the --
8  their RMF could -- could fail at some point in time.
9  Four of the ER nurses came forward and essentially
10  told me that "It's either Ms. Fisher or us, we're
11  going to leave," and --
12      Q    And who were those four nurses?
13      A    Darby, Lauder, Moreau, and Anderson.
14      Q    Do you know if they're still there?
15      A    I know Darby is not.
16      Q    Do you know what happened to Darby?
17      A    She works at the hospital where I work.
18  That's why I know she's not there.
19      Q    Oh, okay.  Do you know what happened to
20  her at UTMB?
21      A    I'm not for sure.  I think she retired but
22  I wouldn't swear to it.
23      Q    Okay.  So four nurses came forward.  They
24  come to you?
25      A    Yes.

b63bb072-dd57-43e8-9c38-b0f02f40da32

89

1    Q   And do you -- did you ask them if they had
2    gone to work with Ms. Fisher on these issues?
3    A   Well, they came to me with a series of
4    complaints about Ms. Fisher and we went through them
5    one by one.  It seemed to me some of those were
6    probably justified but then some of them were not
7    justified, and I told them so.
8    Q   And part -- as part of your meeting that
9    you had with Ms. Fisher and staff where both were
10   issued expectations, did you not reinforce with the
11   staff that they needed to follow the chain of
12   command?
13   A   I can't recall.
14   Q   Well, that's important, isn't it, to make
15   sure that that --
16   A   Oh, I would think it would be important to
17   follow the chain of command, yes, but as far as
18   whether that was specifically ordered, I just don't
19   remember.
20   Q   And in your observation, did Ms. Darby,
21   Ms. Lauder, Ms. Moreau, and Ms. Anderson attempt to
22   follow the change of -- chain of command and work it
23   out with Ms. Fisher?
24   A   My perception was that they felt like they
25   did.  I don't know -- wasn't there firsthand.  I

90

1    basically just dealt with their complaints.
2    Q   You would have wanted to inquire about
3    that.  That would be important; wouldn't it?
4    A   I would want them to try that first.
5    Q   And did you inquire of -- as to what
6    efforts they had made prior to coming to you to
7    complain?
8    A   I don't remember.  I just remember they
9    had a long list of complaints.
10   Q   Okay.  So there were no positive changes
11   that you outlined in the expectations.  Is that
12   correct?
13   A   Not that I recall.
14   Q   And the vacancy rates had remained high?
15   A   I believe so.
16   Q   And you had additional complaints that may
17   or may not have followed the chain of command.
18   A   That's fair, I guess.
19   Q   You said, "Yes"?
20   A   That is fair, I guess.  I -- I'm sorry.
21   My recollection, it's been a while.
22   Q   Okay.  Well, that's why I said may or may
23   not have.
24   A   Yeah.
25   Q   You don't recall --

91

1    A   Okay.  I don't.  I'm sorry.
2    Q   -- if they followed the chain of command.
3    I'm not trying to put words in your mouth.
4    A   Sure.
5    Q   I was trying to give you a little latitude
6    on that one.
7    A   I appreciate it.  I need a lot of
8    latitude.  Old, fat, and I forget more.
9    Q   And so based on those three things,
10   the positive -- no positive changes, vacancy rate
11   remained the same or increased, I believe you said,
12   and then four nurses who had still -- still had
13   complaints might have -- not have or may have
14   followed the chain of command, and I believe
15   Assistant Nurse Managers Aguilar and Gossett both
16   left.
17   A   Yes.
18   Q   All right.  So those four things.  And I
19   missed one the first time.  Those four things were
20   what occurred in the interim time period of the
21   meeting with the staff and the meeting with
22   Ms. Fisher and the decision to terminate her.
23   A   I'm not sure --
24   Q   To demote her.  Sorry.
25   A   I'm not sure exactly where all that fell

92

1    but, yes, as far as the -- I'm -- I believe that the
2    vacancy rate -- I'm -- I'm comfortable with that.
3    The complaints continued to come.  I'm not sure
4    exactly where the meeting between the four -- or,
5    yeah, the four nurses -- in the time line, I'm not
6    clear on exactly where that happened.
7    Q   Okay.  But you did have a meeting with the
8    four nurses or you just had communication --
9    A   Four of them -- four of them wanted to
10   come and meet with me.  Three of them showed up.
11   Anderson, I think it was.  Anderson?  I think she
12   had an appointment.  Ms. Darby, Ms. Lauder, and I
13   think it was Ms. Moreau that showed up.
14   Q   Okay.  And you and Ms. Gotcher and
15   Ms. Melton had the opportunity to meet at least on
16   more than one occasion regarding Ms. Fisher during
17   this time period.
18   A   Yes.
19   Q   Did you and Ms. Gotcher and Ms. Melton
20   ever meet with Ms. Fisher to try to help her?
21   A   I don't recall.  There were a lot of
22   meetings, so I'm --
23   Q   But you don't know if you met --
24   A   I don't know.
25   Q   You met about her, but did you meet with

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

93

1     her?
2         A    I don't remember.
3         Q    Okay.  So initially she was demoted to the
4     Nurse Clinician III and then that -- that decision
5     changed.
6         A    I don't -- I'm under the impression
7     that -- that was never actually fulfilled.  I
8     thought she was just demoted to assistant nurse
9     manager, so I'm a little confused about that.
10        Q    Okay.  And so maybe it never took place
11    that she received the demotion?  She just received
12    the intent to demote?
13        A    That's my understanding.
14        Q    Okay.  And, again, during your tenure
15    there, were there other nurse managers that you felt
16    compelled to demote for various reasons?
17        A    Terminate and demote, as well.
18        Q    Okay.  Anybody for vacancy rates and
19    turnover rates?
20        A    Not that I recall.
21        Q    When Ms. Fisher was demoted -- and, again,
22    do you have any -- sorry.  Strike that.  I jumped
23    backward and I probably confused you because I
24    confused me.
25             Do you have any understanding of how

94

1     many days it was, actually days at work that
2     Ms. Fisher might have had to make some improvements
3     after she received this letter of expectation in
4     front of all of her staff?
5         A    No, because I'm not sure when she went out
6     on leave.
7         Q    But certainly y'all would have given her a
8     fair opportunity to try to make those changes;
9     wouldn't you have?
10        A    That would have been ideal but, I mean,
11    she would have been the one to determine when she
12    went out on leave, not us, and so --
13        Q    So it might have been her fault if she had
14    took Family Medical Leave Act and didn't have a
15    chance to make those changes?
16        A    No, no.  That's not what I'm saying.  I'm
17    just saying that we didn't have any control on when
18    she went out on leave, so I don't know if that makes
19    sense or not.
20        Q    Well, you would have wanted her to have
21    active time in her position to show you that she
22    either could make those changes or could not.
23    Wouldn't you have?
24        A    I would have, yes.
25        Q    Do you know if you permitted her that?

95

1         A    No, because I don't remember the time span
2     and I don't know when she went out.
3         Q    Once she was demoted to assistant nurse --
4     and that certainly carried with it a demotion in pay
5     also; didn't it?
6         A    Yes.
7         Q    All right.  Once she was demoted to that
8     position, where did she go?  Where was she placed?
9         A    I think it was the Wynne Unit.  In fact,
10    I'm almost certain it was.
11        Q    It was the Wynne Unit.  And do you know --
12    do you recall who her nurse manager was at that
13    position?
14        A    Her immediate supervisor was Kim Roddy.
15        Q    Okay.  And actually, Ms. Roddy did not
16    stay in that position the entire time that
17    Ms. Fisher was at Wynne Unit; did she?
18        A    She resigned and moved to Colorado but I
19    don't know what -- exactly at what point in time
20    that happened.
21        Q    And did Nurse Roddy have any letters of
22    expectation in her file against her?
23        A    I don't think so.
24        Q    Okay.  Any complaints about her?
25        A    Just as I had outlined previously, I would

96

1     occasionally get a complaint here and there, but I
2     don't feel like I got a pattern of complaints.
3         Q    And actually, after Nurse Roddy left,
4     Ms. Fisher was the only charge nurse there or the
5     nurse in charge at the Wynne Unit; wasn't she?
6     Ms. Roddy was not replaced as the nurse manager.
7         A    She would have been ultimately.  I just
8     don't recall who it was.
9         Q    Okay.  But there was a time that there was
10    no nurse manager, only Ms. Fisher as the assistant
11    nurse manager, over the Wynne Unit after Ms. Roddy
12    left.  Isn't that correct?
13        A    I wouldn't characterize it that way.
14    Carol Warren was the district person when Ms. Fisher
15    was moved to the Wynne Unit and she went --
16    Ms. Gotcher placed Ms. Fisher directly -- I won't
17    say directly, but in her chain of command and so she
18    would have had somebody to talk to, consult with,
19    and so forth.  And -- and, again, unfortunately I
20    cannot remember, but I don't ever remember a case
21    where we removed or where a nurse manager left that
22    there wasn't some interim put in place to give
23    support to the assistants.  I don't know who that
24    was but --
25             MS. MILLER:  Objection, move to

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

97

1    strike as nonresponsive.
2        Q    (BY MS. MILLER)  Okay.  Mr. Watson, we've
3    been getting along pretty well here, but if I ask
4    you a specific question that's a "yes" or a "no --"
5        A    Oh.
6        Q    -- your attorney or your attorneys here
7    will have the opportunity to clean up things the way
8    you'd like to present them.  But I would appreciate
9    it if you and I can agree that if you'll answer my
10   questions and then you'll get a chance to answer
11   theirs.
12       A    I'll try to do better.
13       Q    Okay.  Thank you.
14            After Ms. Roddy left, there was no
15   nurse manager at the Wynne Unit for a period of
16   time.  Isn't that correct?
17       A    I honestly don't know.
18       Q    Well, when she was first sent to the Wynne
19   Unit, Ms. Fisher reported to Nurse Roddy; didn't
20   she?
21       A    Yes.
22       Q    Okay.  And after she -- after Nurse Roddy
23   left, Ms. Fisher reported directly to Nurse Warren.
24   Is that correct?
25       A    Perhaps.  I --

98

1        Q    Don't recall?
2        A    I'm sorry.
3        Q    Well, do you recall what Ms. Warren's
4    position was?
5        A    Oh, yeah.  She was a cluster nurse
6    manager, as I was.
7        Q    All right.  And as you were.
8        A    I was a cluster -- senior cluster nurse --
9        Q    Okay.
10       A    She was also a senior cluster nurse
11   manager.
12       Q    So she was your peer, not your --
13       A    Correct.
14       Q    Okay.  And what locations did Nurse Warren
15   have responsibilities for as the cluster nurse
16   manager?
17       A    Whatever she was responsible for in the
18   Palestine area, specifically Ms. Fisher.
19       Q    Okay.  And you still had the Huntsville
20   area.
21       A    Yes.
22       Q    Okay.  Now, while Ms. Fisher was on -- was
23   being -- was demoted during that time period, she
24   was removed from eligibility for merit increases.
25   Is that correct?

99

1        A    I'm not sure.  The -- once -- once a
2    disciplinary action has taken place, it is
3    traditional that it will extend for approximately 12
4    calendar months from that point forward, so that is
5    possible.
6        Q    Okay.  So that demotion was a disciplinary
7    action?
8        A    Yes.
9        Q    Okay.  Did you use any less harsh or less
10   intense disciplinary actions prior to the demotion?
11       A    No.
12       Q    Isn't it true that UTMB and TDCJ have
13   progressive discipline policies where you don't
14   start out with the harshest of disciplinary actions?
15       A    There is -- those are options.  However,
16   each of the situations is dealt with --
17       Q    Is that correct?
18       A    Yes.
19       Q    Thank you.
20       A    Sorry.
21       Q    And that's a written policy?
22       A    It's a guideline.  I don't -- I'm not sure
23   if it's a policy or not.  I mean, it's probably
24   contained in a policy.  I'm just saying I'm not sure
25   there's -- I'm not familiar with anything that says

100

1    you have to follow step by step by step.  It's an
2    option.
3        Q    Okay.
4        A    I have a feeling I'm going to need my
5    glasses.
6            (Exhibit 1 marked)
7        Q    You're going to need your glasses.
8        A    Okay.
9        Q    And you're going to need to take a minute
10   and review this.  I'm going to show you what's been
11   marked as Exhibit Number 1 for your deposition and
12   represent to you that this is a written recording of
13   your interview with the EEOC investigator and I want
14   to make sure -- because he's putting down what he
15   heard you say.
16       A    No, that's not correct.  We never met face
17   to face.  We never conversed on the phone.
18       Q    So this is from your written
19   correspondence?
20       A    That's correct.
21       Q    Okay.  So -- well, good.  That makes it --
22   so take a look at this document, and if this is the
23   written correspondence that you provided, then that
24   makes it easier for you to say that, "Yes, indeed I
25   concur with this."  That's what I'm looking.  I'm

b63bb072-dd57-43e8-9c38-b0f02f40da32

101

1    looking to see if there are any -- is there anything
2    in here that would be characterized as your response
3    that, at this point, you would choose to change or
4    identify as not being correct?
5        MR. LIVELY:  Did you -- did you type
6    this out?
7        THE WITNESS:  Yeah.
8        MR. LIVELY:  Okay.  He did.
9        THE WITNESS:  Is there a problem?
10       MS. BERNSTEIN:  No.  I'm just
11   trying -- I was confused.
12       Q   (BY MS. MILLER)  He's trying to understand
13   where it came from.  I misunderstood it also, so --
14       A   She -- she sent me an e-mail and with
15   these -- I believe it was an e-mail with these
16   questions and I responded --
17       Q   Great.  Okay.
18       A   -- to these questions.
19       Q   Fine.  Just make sure it's correct and
20   accurate and you can ignore the writing on the side.
21       MR. LIVELY:  So the heavier print was
22   the question?
23       THE WITNESS:  That's correct.
24       Q   (BY MS. MILLER)  The italics bold is the
25   question from the investigator and then the regular

102

1    Times Roman is how you responded.  Is that correct?
2        A   That is correct.
3        Q   Thank you.
4        MR. LIVELY:  All right.  Did you want
5    to mark it?
6        MS. MILLER:  I did.  1.
7        MR. LIVELY:  Oh, okay.
8        Q   (BY MS. MILLER)  Okay.  And with the
9    exception of the handwritten notes, which apparently
10   are from the investigator, is that a true and
11   accurate copy of what you presented to him during
12   the EEOC investigation?
13       A   It seems to be, yes.
14       Q   Okay.  And if you'd like more time to
15   review it, I'll be happy to get you some more --
16   give you some more time.
17       A   Well, I mean, it's 20 pages.  That could
18   take a while.  Is there -- do you want to go through
19   like section by section?
20       Q   I'm not going to question you about -- I
21   just want to --
22       A   Oh.
23       Q   -- know if I can rely on your answers as
24   you represented them to the EEOC.
25       A   To the best of my recollection, this is

103

1    correct.
2        (Exhibit 2 marked)
3        Q   (BY MS. MILLER)  Okay.  I'm going to show
4    you what's been marked as Exhibit Number 2.  Exhibit
5    Number 2.
6        A   Okay.
7        Q   And ask you to take a minute and read
8    through that.
9        MR. LIVELY:  Is this something you
10   prepared?
11       THE WITNESS:  I didn't read it.
12       MS. MILLER:  I get to ask the
13   questions, Sam.
14       MR. LIVELY:  Oh, I'm just trying
15   to --
16       THE WITNESS:  Good Lord, I wrote all
17   this?
18       Q   (BY MS. MILLER)  Well, that's what I'd
19   like to know.
20       A   Yeah.  Well, I'll require a moment to look
21   through it.
22       Q   Okay.  Let's take a minute and look at it.
23       (Pause from 12:43 to 1:05 while
24   witness reviews exhibit)
25       Q   (BY MS. MILLER)  Can I interrupt just for

104

1    a sec, Mr. Watson?  I mean, I don't want to take any
2    more time if you're going to say you didn't write
3    this but --
4        A   No.  I --
5        Q   You did write it.
6        A   I believe so, yeah.
7        Q   Okay.  All right.  Thank you.  Keep going.
8    I want you to look at it.
9        A   Oh, okay.
10       Q   Yes.  Yes.  I just didn't --
11       A   I just don't remember --
12       Q   If you were going to say --
13       A   No.  I just --
14       Q   -- "I have no idea where this came from,
15   this isn't mine" --
16       MR. LIVELY:  Exhibit 2?
17       MS. MILLER:  Exhibit 2.  Correct.
18       MS. BERNSTEIN:  I'm sorry.  Was
19   Exhibit 1 admitted?
20       MS. MILLER:  Yes.  Well, it's not
21   admitted.  We're not in a trial.
22       MS. BERNSTEIN:  I mean, not -- but
23   Exhibit 1 was attached to the --
24       MR. LIVELY:  Yeah, it was attached.
25       MS. MILLER:  Is it offered as a

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

---

105

1   deposition exhibit?
2           MS. BERNSTEIN:  Right.
3           MS. MILLER:  Yes.  Yes.
4           MR. LIVELY:  But not the handwriting
5   because we don't know whose handwriting that is.
6   It's not yours; is it?
7           MS. MILLER:  It's Ray Batista's but
8   we'll take that off.  We're going to go with that
9   for now.  But we'll take that off for -- if we use
10  it.  I just am trying to get the facts.  I thought
11  it might be faster than a deposition.
12          MR. LIVELY:  No.  I understand.
13          MS. BERNSTEIN:  Sam, can I have a
14  second?
15          MR. LIVELY:  Sure.
16          (Ms. Bernstein and Mr. Lively leave
17          the deposition room)
18          THE WITNESS:  I'm sorry.  I'm not a
19  fast reader.
20          MS. MILLER:  That's okay.  I want you
21  to read it.  I want you to take your time.  I've got
22  all day.
23          (Ms. Bernstein and Mr. Lively return
24          to the deposition room)
25          MR. LIVELY:  Just for the record, we

---

106

1   don't know whose handwriting is on the --
2           MS. MILLER:  We'll take the
3   handwriting off.  That's fine.
4           MR. LIVELY:  Okay.  Yeah, because --
5           MS. MILLER:  And he didn't verify it.
6           MR. LIVELY:  Some of it looks like --
7   there may be two people.
8           MS. MILLER:  Okay.
9           MR. LIVELY:  Some of the
10  handwriting --
11          MS. MILLER:  Yeah.  I didn't ask him
12  to verify the handwriting.  We'll make that clear.
13  I'm sorry if I didn't --
14          MR. LIVELY:  Yeah.
15          MS. MILLER:  That's on Exhibit 1 that
16  Mr. Lively is concerned, and didn't ask any
17  verification on the handwriting.  We don't know
18  whose it is.  I agree.  No problem.  There's no
19  handwriting on 2.
20          MS. BERNSTEIN:  No.  I just want to
21  see what it is.
22          MR. LIVELY:  Oh, I'm sorry.
23          MS. MILLER:  There you go again with
24  demands.
25          MS. BERNSTEIN:  I'm sorry.

---

107

1           MS. MILLER:  I'm teasing.  I said
2   there you go again with demands.
3           MS. BERNSTEIN:  We said earlier
4   nobody in the room was shy.
5           MS. MILLER:  Right.
6           (Discussion off the record
7           from 1:19 to 1:27)
8   Q    (BY MS. MILLER)  You've had a chance,
9   Mr. Watson, in fact, taken quite a bit of time,
10  which we're more than happy to allow you, to review
11  Exhibit Number 2, and is this a document that
12  you wrote?
13  A    Yes.  But I can't remember when, how, or
14  why.
15  Q    Okay.
16  A    But I did -- I do recognize it as mine.
17  Q    As your writing.  Because it's not signed
18  and it's not dated.
19  A    Um-hmm.
20  Q    But apparently it is, at some point in
21  time, looking back on the events that form part of
22  this lawsuit.
23  A    Correct.  Yes.
24  Q    And certainly it was written at a time
25  that's closer in time to the actual events than

---

108

1   today.
2   A    Yes.
3   Q    And it was written at a time that your
4   memory probably was a little better --
5   A    That wouldn't take much, but yes.
6   Q    -- than it might be today.
7   A    Yes.  I agree.
8   Q    Okay.  Anything that you want to correct
9   in that statement specifically that, as you look
10  back, you think, "Oh, my gosh, I don't think that's
11  quite right"?
12          MR. LIVELY:  On Exhibit 2?
13  Q    (BY MS. MILLER)  On Exhibit Number 2?
14  A    I didn't see anything that jumped out at
15  me as glaringly.
16  Q    Okay.
17  A    Now, the pages were a little out of order,
18  so it was a little confusing, but I think it's still
19  a fair representation of my feelings.
20  Q    Okay.  And maybe I asked you this, but do
21  you know why you wrote this?
22  A    I don't remember.
23  Q    Okay.  If it was -- if I represent to you
24  that it was among the documents provided by the
25  EEOC, it might have been something you tendered to

---

b63bb072-dd57-43e8-9c38-b0f02f40da32

109

1   UTMB that they tendered to --
2       A   Could very well have been.
3       Q   -- the EEOC?
4       A   Yeah.  See, I never talked or met with any
5   of the EEOC people directly.
6       Q   Okay.  And without telling me what you
7   talked about, you did have an opportunity to meet
8   with UTMB personnel regarding the EEOC charge; did
9   you not?
10      A   No.
11      Q   You did not.
12      A   If you're asking me, did I have a chance
13  to meet with the EEOC person?
14      Q   No.
15      A   Oh.
16      Q   Did you have a chance to meet with UTMB
17  attorneys or representatives in -- as they formed a
18  response to the EEOC charge?
19      A   I don't recall meeting with the -- with
20  the attorneys, and actually, I don't remember who I
21  met with at --
22      Q   There was an EEO investigator, Mr. Melvin?
23      A   Williams, yes.
24      Q   Mr. Williams?  Melvin Williams?
25      A   Um-hmm.

110

1       Q   Do you recall meeting with him?
2       A   No.
3           All right.  One of the --
4       A   I was going to say, I can say
5   categorically I did not meet with him, or at least
6   we never discussed --
7       Q   Okay.  And categorically you did not meet
8   face to face or speak on the phone with the EEOC
9   investigator.
10      A   Federal?
11      Q   Federal.
12      A   No.
13      Q   Okay.  But Exhibit Number 1 does represent
14  your correspondence with him.
15      A   With Williams, not the federal.
16      Q   With Williams.
17      A   Yes.  Internal.
18      Q   Oh.  I'm glad you clarified that.  So
19  Exhibit Number 1 was not the federal agency but the
20  internal EEO investigator --
21      A   That is correct.
22      Q   -- for UTMB.
23      A   Yes.
24      Q   Thank you.  That does clear up something.
25  So at least, you know, we can say in time it might

111

1   have been an earlier representation than after it
2   went through the channels of the EEOC, the federal
3   investigation.
4       A   I think so, yeah.
5       Q   Okay.  Thank you.  You indicated that some
6   of the conclusions you had drawn were the lack of
7   appropriate communication skills and effective
8   leadership, racism, preferential treatment.  Can you
9   give me examples that were complained about as far
10  as Mrs. Fisher exhibiting racism in her -- in her
11  performance?
12      A   No.  Those were not observations I made
13  personally.  Those were observations that were
14  reported to me by third parties.
15      Q   Okay.  And the third parties, did they
16  have examples?
17      A   I'm sure they did at the time but I can't
18  recall them.
19      Q   Okay.  And how -- and favoritism?  Did
20  they have examples of favoritism?
21      A   One of the examples that I recall -- and I
22  can't tell you precisely who, where; it just sticks
23  in my mind -- is that Ms. Freeman was allowed to do
24  things and Ms. Freeman had allegedly said -- and,
25  again, I never personally heard this -- in the

112

1   absence of Ms. Fisher that they were friends and
2   alluded to the fact that she had the ability to
3   pretty much act the way she wanted.  And I had
4   discussed with this with Ms. Fisher and she just
5   didn't feel like Ms. Freeman would do that, but I
6   kept getting the reports and getting them and
7   getting them.
8       Q   And Ms. Freeman, that's Patricia Freeman?
9       A   Yes.
10      Q   Okay.  I'm going to show you some shorter
11  documents.
12      A   Thank goodness.
13          (Exhibit 3 marked)
14      Q   (BY MS. MILLER)  I show you what's been
15  marked as Exhibit Number 3.
16      A   May I?
17      Q   Please.  Take a look at that.  And the
18  date on this is December 10th, 2004.  It indicates
19  that you're the one that generated this document to
20  Jackie Fisher.
21      A   Okay.
22      Q   Is that correct?
23      A   Yes.
24      Q   And do you recognize this document?
25      A   Just give me one moment to peruse it.

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

113

1   Q   Sure.
2   A   Yes, ma'am.
3   Q   And this was a document that you had
4   written as an interim evaluation to the quarterly
5   evaluation to her annual performance review?
6   A   I believe that's --
7   Q   Is that correct?
8   A   I believe that's correct.
9   Q   And at this point in time, at least as of
10  December 10th of 2004, you would have to admit that
11  your remarks concerning Ms. Fisher and her
12  management and her management achievements are
13  pretty positive.
14  A   Generally speaking. Also, I do note the
15  fact that here in 2004 the -- in the one, two --
16  third paragraph down, she "continues to be
17  challenged with social/professional dynamics of some
18  providers and management staff at various
19  locations."
20       MS. MILLER: Move to strike as
21  nonresponsive. Objection.
22  Q   (BY MS. MILLER) You'd have to agree that
23  overall on December 10th in 2004, your evaluation of
24  Ms. Fisher was overall positive.
25  A   Overall positive.

114

1        MR. LIVELY: Which number was that?
2   Number 4?
3        MS. MILLER: That was 3. 4.
4        (Exhibit 4 marked)
5   Q   (BY MS. MILLER) I'm going to show you
6   Exhibit Number 4.
7   A   Okay.
8   Q   Do you recognize this document? Take a
9   minute to look at it.
10  A   Yes. I had forgotten this document but I
11  remember it now.
12  Q   Okay. And this was a letter of
13  expectation issued on September 17th of 2004 to
14  Ms. Fisher.
15  A   Um-hmm.
16  Q   Correct?
17  A   Yes.
18  Q   And do you recall the incident or the
19  situation that precipitated this letter of
20  expectation?
21  A   I think this was the suicide.
22  Q   And in this, you've indicated, "This is
23  not a written warning." Are letters of expectations
24  sometimes written warnings.
25  A   I don't think so. I believe I would

115

1   characterize a written warning would be just that,
2   yeah. But I suppose --
3   Q   It would have a different tone or it would
4   have a different title?
5   A   I would think. I would think.
6   Q   And by this, you're talking about the
7   suicide of the gentleman, the inmate that hung
8   himself.
9   A   Yes. And this is the one I was talking to
10  you about earlier. I see what you're talking about
11  now in the first paragraph, says, "This is letter of
12  expectation that is intended to clarify some of
13  those issues for future reference. This is not a
14  written warning." That's the one I wanted to put
15  into the file to hopefully make sure that TDC didn't
16  come back and press for something more aggressive.
17  Q   Okay. And, in fact, you reviewed this
18  with Ms. Fisher and she approved it on the second
19  page of Exhibit Number 4. Correct?
20  A   I believe so, yes.
21       (Exhibit 5 marked)
22  Q   (BY MS. MILLER) All right. We had these
23  in order but a little out of -- going backward a
24  little bit. I'm going to show you Exhibit Number 5.
25       MR. LIVELY: 5? Did you say 5?

116

1        MS. FISHER: The number is falling
2   off.
3        MS. MILLER: Oh, the number is
4   falling off. Just rub it harder. There you go.
5   Thank you.
6   Q   (BY MS. MILLER) And Exhibit Number 5 is
7   identified as the December?
8   A   1, 2003.
9   Q   Okay.
10       MR. LIVELY: There's something --
11       MS. MILLER: There's something
12  attached that we need to pull off. It's just a
13  one-page document.
14       THE WITNESS: Then I'll let you.
15       MS. MILLER: I'll do it. Sorry.
16       MR. LIVELY: Okay. Good.
17       THE WITNESS: Is this it?
18       MS. MILLER: Yes.
19       THE WITNESS: Okay.
20       MS. MILLER: Exhibit Number 5.
21       MR. LIVELY: Well, wait a minute.
22  There's two pages, I think.
23       MS. MILLER: I pulled them both off.
24       MR. LIVELY: Is there just one?
25       MS. MILLER: It's just one page.

b63bb072-dd57-43e8-9c38-b0f02f40da32

117

1    THE WITNESS:  Oh, this is 1 of 1.
2  Yeah, I see at the bottom.
3    MS. MILLER:  1 of 1.
4    THE WITNESS:  Okay.
5    MS. MILLER:  My photo copiers got
6  mixed up or maybe I did.
7    Q  (BY MS. MILLER)  But, anyway, do you
8  recognize this document?
9    A  Um-hmm.
10    Q  And this is December 1st of 2003, another
11  quarterly exam of Ms. Fisher or evaluation for
12  Ms. Fisher as -- she's fairly new cluster nurse
13  manager.  Correct?
14    A  Yes.
15    Q  And, again, at least when she started out,
16  her evaluations and her reviews have pretty positive
17  things to say; don't they?
18    A  I concur.
19    (Exhibit 6 marked)
20    Q  (BY MS. MILLER)  I'm going to show you
21  what's been marked as Exhibit Number 6.
22    A  Okay.
23    Q  If you'd take a look at the second page of
24  Exhibit Number 6, which is page 844, is that your
25  signature at the bottom?

118

1    A  Yes, it is.
2    Q  And this represents the salary increase
3  that Ms. Fisher received when she was initially
4  promoted from the assistant nurse manager to the
5  cluster nurse manager position.  Correct?
6    A  I believe so.
7    MR. LIVELY:  That was 6?
8    MS. MILLER:  6.
9    (Exhibit 7 marked)
10    Q  (BY MS. MILLER)  Exhibit Number 7.
11  Recognize this document?
12    A  Yes.
13    Q  And what does this represent?
14    A  It's kind of a little unofficial atta boy,
15  Gem Cards for going the extra mile when we have an
16  opportunity to take a moment to recognize staff that
17  are doing a good job.
18    Q  And, in fact, Ms. Fisher is pretty much
19  known for going that extra mile; isn't she?
20    A  That's a fair assessment.
21    Q  She's a hard worker.
22    A  She's a hard worker.
23    Q  Has the interest of the UTMB facilities at
24  heart?
25    A  Yes.

119

1    (Exhibit 8 marked)
2    Q  (BY MS. MILLER)  I show you what's been
3  marked as Exhibit Number 8, and review that
4  document, if you would, please.
5    A  Um-hmm.
6    Q  And what do you recognize Exhibit Number 8
7  to be?
8    A  I think it was from the interview with
9  Ms. Fisher, record -- written record of the results
10  of the interview when she applied for the cluster
11  nurse manager position.
12    Q  And this is -- is this your writing on the
13  front page?
14    A  Yes.
15    Q  And front page being page number 850 of
16  Exhibit Number 8?
17    A  Um-hmm.
18    Q  And is this your writing on the second
19  page, being 851 of Exhibit Number 8?
20    A  Yes.
21    Q  And your signature?
22    A  Yes.
23    Q  Okay.  And do you recognize the writing on
24  page 852 or -3.
25    A  No, I don't.

120

1    Q  But it would have been from the other
2  people that interviewed also along with you?
3    A  Yes.
4    (Exhibit 9 marked)
5    Q  (BY MS. MILLER)  I'm going to show you
6  what's been marked as Exhibit Number 9.  Look at
7  that, if you would, please.  And is this also,
8  Exhibit Number 9, part of the hire packet, if you
9  will, when she was hired as a cluster nurse?
10    A  I suppose.  A lot of this stuff they just
11  stuck in front of my face and said, "You need to
12  sign it," and I did, so --
13    Q  But page 886 is a UTMB Managed Transfer
14  Request from Ms. Fisher, asking to be transferred
15  from -- actually, from assistant nurse manager
16  from -- to Wynne?
17    A  I need a moment to just -- this is from
18  '02.  I don't think I even came to that area until
19  '03 or so.  I'm not sure.
20    Q  Okay.
21    A  It's not ringing any bells with me.  Is
22  there something I should focus on?
23    Q  Yeah.  You know what?  I'm going to
24  withdraw this exhibit because it's confused.
25    A  I didn't know if I was --

b63bb072-dd57-43e8-9c38-b0f02f40da32

121

1    Q    I thought it --
2    A    Yeah.  I'm -- I thought I was missing --
3    Q    I thought it was all the same issue.
4    A    I'm sorry.  I thought I was missing
5    something.
6         MS. MILLER:  Yeah.  That's fine.  I'm
7    withdrawing Exhibit Number 9.
8         MR. LIVELY:  Okay.
9         MS. MILLER:  It's got too many things
10   going on.
11        (Exhibit 9 withdrawn)
12        (Exhibit 10 marked)
13   Q    (BY MS. MILLER)  I'm going to show you
14   what's been marked as Exhibit Number 10, and if you
15   would take a minute and look at this document,
16   please.  Do you recognize this document?
17   A    Not right off.
18   Q    Okay.
19   A    If I can have a moment to just make sure.
20   Okay.  Do you have a specific question?
21   Q    Do you recognize this document?
22   A    Never seen it before.
23   Q    Okay.  Thank you.
24        (Exhibit 11 marked)
25   Q    (BY MS. MILLER)  I'm going to show you

122

1    what's been marked as 11.  And I'm going to ask you
2    if you recognize that document.
3    A    It's an employee -- I think it's an annual
4    evaluation for Ms. Fisher.
5    Q    Of Ms. Fisher?  And at -- turn your
6    attention to page number 82 of Exhibit Number 11.
7    A    Okay.
8    Q    And that's your signature on the page
9    there as supervisor?
10   A    Yes.
11   Q    And dated 7/8 of '05.
12   A    Yes.
13   Q    Okay.  And back to the front page, which
14   is page 77 of Exhibit Number 11 --
15   A    Um-hmm.
16   Q    -- the PMP date there is 6/25/04.  What
17   significance is that?
18   A    I do not know.  I don't know why there
19   would be such a difference or if this was --
20   actually, I don't even know what "PMP" means, so --
21   Q    Okay.  But this essentially would have
22   been an evaluation from -- an annual evaluation from
23   July of '05 and subsequent months.  Right?
24   A    I'm sorry.  Come again.
25   Q    It would be -- working backward from July

123

1    of '05 --
2    A    My assess -- my assessment would be that,
3    yes, that was correct.  It would -- it would reflect
4    back on the previous 12 months.
5    Q    And when you did this, it was an accurate
6    assessment of her performance at that time.
7    A    As accurate as I could make it, yes.
8         MR. LIVELY:  And we can have the same
9    agreement on the underlining?
10        MS. MILLER:  Yes.
11        MR. LIVELY:  If Ms. Fisher can --
12        MS. MILLER:  Well, we'll do it for
13   trial.
14   Q    (BY MS. MILLER)  But I'm not asking if
15   you're representing anything other than your
16   signature and the typewritten portions that are
17   apparently --
18   A    Yes.  I'm okay with that.
19        (Exhibit 12 marked)
20   Q    (BY MS. MILLER)  All right.  I'm going to
21   show you what's been marked as Exhibit Number 12.
22   Do you recognize this document?
23   A    I recognize it as something I probably
24   wrote but I can't remember the specifics of what I'm
25   talking about here.

124

1    Q    And you can't remember the incident that
2    it --
3    A    No, I don't.
4    Q    -- relates to?  Well, was it often that
5    employees came to you about things they weren't
6    happy with?
7    A    No.  I don't think it was often.
8    Q    Were the -- did you encourage it?
9    A    I had an open-door policy, but if somebody
10   came to me with a problem, I would ask them, "Have
11   you tried to resolve this with your supervisor?"
12   And if the answer was "No," then I would say, "Well,
13   you need to go try that first, and if that doesn't
14   work, then we can talk later."
15        (Exhibit 13 marked)
16   Q    (BY MS. MILLER)  I'm going to show you
17   what's been marked as Exhibit Number 13.
18        MR. LIVELY:  What was that?
19        MS. MILLER:  That was 12 before.
20   Q    (BY MS. MILLER)  Would you take a minute
21   to look at this document?
22   A    I recognize it.
23   Q    Okay.  And this document, was this one you
24   generated?
25   A    It was generated in a combination between

b63bb072-dd57-43e8-9c38-b0f02f40da32

125

1    myself and Ms. Freeman, going back and forth.
2         Q    Okay.  And this was when she asked for the
3    transfer that you denied her.
4         A    Correct.
5         Q    Is that correct?  Okay.  And is this an
6    accurate representation of that communication back
7    and forth between you and Ms. Freeman?
8         A    I think so.
9              (Exhibit 14 marked)
10             THE WITNESS:  You going to have
11   enough of those?
12             MS. MILLER:  I don't know.  It
13   depends on Lorri.  She's in charge of the stickers.
14        Q    (BY MS. MILLER)  Show you what's been
15   marked as Exhibit Number 14, and do you recognize
16   this document?
17        A    This was also one of several that went
18   back and forth between Ms. Freeman and I.
19        Q    During that exchange about her transfer.
20        A    Yes.
21        Q    Okay.
22             MR. LIVELY:  What number?  14?
23             THE WITNESS:  14.
24             (Exhibit 15 marked)
25        Q    (BY MS. MILLER)  Show you what's been marked

126

1    as Exhibit Number 15 and --
2         A    Okay.  Let's see.
3         Q    The offender's name is scratched out, but
4    do you recognize the instance?
5         A    I just need a moment.
6         Q    Sure.
7              MR. LIVELY:  What number?
8              THE WITNESS:  15.
9              MS. MILLER:  15.
10        A    This -- this kind of tickles my memory
11   about what you asked me about the drowning in the
12   bathtub earlier.
13        Q    (BY MS. MILLER)  Um-hmm.
14        A    But honestly, I don't have a detailed
15   recollection of it.
16        Q    Where -- the Death Summary, what would --
17   who would generate that or how would that be
18   generated?
19        A    I think, if this was the facility level,
20   it was probably generated through someone in
21   management.  I don't remember exactly who wrote
22   these, to be honest.  I just don't remember exactly.
23        Q    Where it says "Reviewer:  Aguilar," would
24   that have been Mr. Aguilar that prepared this, then?
25        A    Ah.  Probably so.

127

1         Q    Okay.  So that -- this would have been a
2    facility-level --
3         A    I think so.
4         Q    -- investigation into the death of an
5    inmate.
6         A    It appears to be, yes.
7         Q    And now do you -- recalling the incident a
8    little bit better, do you recall whether or not in
9    any way Ms. Fisher was involved or alleged to have
10   anything to do with this inmate's death?
11        A    I don't recall one way or the other.
12        Q    But it certainly didn't indicate it on the
13   Death Summary.
14        A    I didn't see anything.
15             MS. MILLER:  This has some printing
16   on it too.
17             MR. LIVELY:  Okay.
18             MS. MILLER:  I'll just strike it out.
19   Is that okay?
20             MR. LIVELY:  Yeah.  What's ESRD?
21             THE WITNESS:  End-stage renal
22   disease.
23             MS. MILLER:  What?  Oh.
24             THE WITNESS:  End-stage renal
25   disease.

128

1              MR. LIVELY:  What's IDBM?
2              THE WITNESS:  Insulin-dependent
3    diabetes mellitus.
4              MR. LIVELY:  HTN?
5              MS. BERNSTEIN:  Hypertension.
6              (Exhibit 16 marked)
7         Q    (BY MS. MILLER)  Okay.  I'm going to show
8    you what's been marked as Exhibit Number 16 and
9    there was some writing on that.  I don't expect you
10   to identify that and, if you would, please just
11   ignore that.
12             MR. LIVELY:  16?
13             MS. MILLER:  Yes.
14        A    Yes.
15        Q    (BY MS. MILLER)  Okay.  Tell me what
16   happened -- you recognize this document?
17        A    I don't remember it but I'm -- I mean,
18   that's clearly from me.  I have no issue with that.
19        Q    And to Mary Gotcher and Ms. Rader and
20   Ms. Melton?
21        A    Um-hmm.
22        Q    And do you recall the instance which
23   precipitated you writing this memorandum?
24        A    I do not.  I remember -- one of the people
25   that sticks out in my mind that brought me some

b63bb072-dd57-43e8-9c38-b0f02f40da32

129

1  information and that's this, on first line, "several
2  little birds." I don't remember who those were, but
3  I do remember receiving information. I'm pretty
4  sure it was -- give me just a moment.
5  Ms. McCartney, I think, whoever -- who brought this
6  to my attention but I had heard it from more than
7  one source. I just can't remember the others.
8      Q   And is this the visit that you were
9  talking about where the four of them -- or three of
10 them came, actually, to visit you?
11     A   Not sure. It could have been but I'm
12 not -- I'm not remembering.
13     Q   Okay. And as a habit, you certainly
14 documented everything; didn't you?
15     A   I tried.
16     Q   Okay.
17     A   But I don't recall everything I
18 documented, either.
19     Q   Sure. But, I mean, just in what we've
20 seen generated today, you put things down in fairly
21 good detail.
22     A   I made efforts to do so, but you know what
23 I found out? It's never enough when you go to
24 court. You never remember it all.
25     Q   Okay. Is that a "yes"?

130

1      A   "Yes" to what?
2      Q   Yes, you do try to document?
3      A   Did I document? I tried. Yes, I tried.
4          (Exhibit 17 marked)
5      Q   (BY MS. MILLER) I show you what's been
6  marked Exhibit Number 17 of?
7      A   You're getting these long ones again.
8  Okay. Your question?
9      Q   Okay. And this is a document you
10 generated?
11     A   Yes.
12     Q   And e-mailed on January 12th, 2006.
13 Correct?
14     A   Assuming that's the stamp, yes.
15     Q   After looking at this document, do you
16 recall if this was prepared in -- after the
17 investigation team came to the Estelle Unit or
18 before?
19     A   I think this was before but, again, I
20 don't remember. I know one of the documents cited
21 specifically when the team came to the Estelle Unit
22 and I just didn't retain the date.
23     Q   Okay. Can you tell by looking at it? Can
24 you tell by looking at it, the way it's written,
25 whether or not it was before or after?

131

1          MR. LIVELY:  17?
2      Q   (BY MS. MILLER)  17. I'm getting tired.
3      A   Yeah, me too. Let me think. Not
4  definitively, but I'm leaning towards this was
5  before.
6      Q   Okay. And on 1/10, it indicates you met
7  with Nancy Lauder, Wendy Moreau, and Ann Darby.
8  Would those be the little birds that came to see
9  you?
10     A   Those were the ER nurses that came to me
11 but referencing -- but if you're referencing back to
12 this one other one?
13     Q   Back to Exhibit 16?
14     A   Yeah, I've already addressed that. I just
15 don't remember if they were or not.
16     Q   So apparently you met with -- or your
17 dates are off, but you met with some little birds on
18 1/9 and then you met with these three women on 1/10.
19 Is that correct?
20     A   Yes. That seems to be correct.
21     Q   Okay. And the statements you gave, you
22 took in here or that are stated in here, are the
23 ones that you sent, intending that that be part of
24 the investigation that Ms. Gotcher and Ms. Melton
25 were undertaking?

132

1      A   No. My intent was just to document the
2  meeting with the nurses as best I could.
3      Q   Okay. And did you ask them to review it
4  for accuracy?
5      A   No. I don't think so.
6          (Exhibit 18 marked)
7      Q   (BY MS. MILLER) I show you what's been
8  marked as Exhibit Number 18. Oop. I need the one
9  back with the sticker on it. It's from yesterday's.
10 Sorry. It's the same 18.
11     A   Okay. Okay. Do you have a question?
12     Q   And do you recognize this document?
13     A   I don't remember it particularly. It
14 doesn't stand out in my mind but it appears to be an
15 e-mail sent from Ann -- who did send it? Ann Darby
16 sent it to Mary Gotcher and copied it to me.
17     Q   And that this is dated January 26th of
18 2006.
19     A   Yes.
20     Q   Did you document, in all your extensive
21 documentation, efforts that you made to review these
22 with Ms. Fisher, consistent with the chain of
23 command, "these" being the little birds comments
24 that came to visit you in Exhibit Number 16 and
25 those three nurses that came to discuss with you on

b63bb072-dd57-43e8-9c38-b0f02f40da32

133

1 January 10th in Exhibit 17? Did you document any
2 way or any manner, that you can recall, your
3 attempts to review those with Ms. Fisher?
4     A   Not that I recall. May I ask a question?
5     Q   Off the record, you may.
6     A   Of course, yes.
7          (Lunch recess from 2:09 to 3:06)
8          (Exhibit 19 marked)
9     Q   (BY MS. MILLER) Show you what's been
10 marked as Exhibit 19. Do you recognize that
11 document?
12     A   No memory but, yes, I mean, it's obviously
13 to me. No issues there.
14     Q   Regarding another meeting back at the
15 Estelle Unit with Ms. Gotcher. Correct?
16     A   A meeting. I don't know which one it was.
17 Yes, ma'am.
18          (Exhibit 20 marked)
19     Q   (BY MS. MILLER) Show you what's been
20 marked as Exhibit Number 20. And do you recognize
21 that document?
22     A   I don't remember it. I mean, it's
23 self-evident.
24     Q   Okay. And, in fact, after the
25 investigation that took place by Ms. Gotcher and --

134

1 Ms. Gotcher and Ms. Melton at the Estelle Unit and
2 the subsequent follow-up, there was a meeting with
3 the staff of the Estelle Unit; was there not?
4     A   I'm sorry. Can -- could you say that
5 again?
6     Q   After the investigation that Ms. Gotcher
7 and Ms. Melton undertook and then there was some --
8 what? A follow-up meeting after that, or how many
9 times did Ms. Gotcher come before that she met again
10 with all the staff? Do you recall?
11     A   I -- I don't. I remember there was a big
12 meeting with the staff.
13     Q   Okay. And this would have explained that
14 meeting with the staff? Is that what the purpose of
15 this is?
16     A   I'd have to match dates, but presumably
17 so.
18     Q   Okay. Did you attend those meetings when
19 the staff --
20     A   I think so, yeah.
21     Q   And that -- those are the meetings shown
22 in Exhibit Number 20, the times and dates that
23 Ms. Fisher was given her letter of expectation as a
24 result of the investigation.
25     A   I believe so, yes.

135

1     Q   Okay. And also the staff was given a
2 letter of expectation.
3     A   The document that I remember was -- I
4 guess the answer to your question would be yes. I
5 mean, there was -- I think it said, "Ms. Fisher's
6 expectations" or "Expectations of Ms. Fisher and
7 expectations of the staff," and I believe it was
8 like one on top of the other. That's the one --
9     Q   In the same document?
10     A   Yes. I believe so.
11     Q   And do you -- how was the staff notified
12 do you know? Oh, strike that. That's what this is.
13 Did you attend every meeting or any of the meetings?
14     A   I attended one for sure but I don't
15 remember how many there were. Is that in there?
16     Q   It indicates three different times.
17     A   Oh, okay. I remember one for certain.
18 I'm not sure about the other two.
19     Q   And did you participate in those meetings?
20     A   I don't recall. Ms. Gotcher did most of
21 the talking.
22     Q   Okay.
23          (Exhibit 21 marked)
24     Q   (BY MS. MILLER) I'm going to show you
25 what's been marked as Exhibit Number 21.

136

1     A   Yes. This is a quarterly evaluation.
2     Q   Okay. And you had three quarterly
3 evaluations and one annual evaluation? Is that the
4 way it worked?
5     A   Not sure. I want to say the quarterlies
6 were -- what's the word? Didn't have to do it
7 but --
8     Q   Optional?
9     A   Thank you. Optional. I believe they were
10 optional.
11     Q   All right. And you've chosen this
12 particular instance to give Ms. Fisher a quarterly
13 evaluation.
14     A   Yes.
15     Q   Okay. And on page 69 of Exhibit
16 Number 21, it indicates here that you'd be working
17 with Ms. Fisher over the course of the next two --
18 few months to increase her awareness in the weak
19 areas and increase her areas of strength, and you
20 had confidence that she could improve these to be a
21 more effective manager. Is that correct?
22     A   Which paragraph are you on?
23     Q   On the page 69 at the very bottom before
24 the two bullet points.
25     A   Um-hmm. Yes. I'm sorry.

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

---

137

1    Q   Okay.  And, indeed, how did you work with
2  her over the next few months to improve these areas
3  that she needed to be a more effective manager?
4    A   Well, I attempted to have discussions with
5  her about some of these but my recollection is that
6  she didn't feel like she had areas of deficiency.
7    Q   Is there anything that is documented that
8  would show or is it just your recollection of how
9  you -- how you tried to work with her?
10   A   It's -- I don't believe there's any
11 documentation.  Normally we would have a
12 conversation in my office.  She'd come to my office
13 or I'd go to hers.  Usually she she'd come to mine
14 and we'd chat.
15   Q   But you didn't document those
16 conversations?
17   A   I don't think so.
18   Q   And that semi -- that was a semiannual?
19 Is that it?
20   A   Quarterly.
21   Q   Okay.  Quarterly.
22       MS. FISHER:  Can I say something too?
23       MS. MILLER:  Sure.
24       (Ms. Fisher confers with Ms. Miller)
25       (Exhibit 22 marked)

---

138

1    Q   (BY MS. MILLER)  I'm going to show you
2  what's been marked as Exhibit Number 22.  Take a
3  minute and look at that document, if you would,
4  please.  And I'm going to take that -- the second
5  page back and make it another exhibit.  I'm sorry.
6  The third page.  Excuse me.
7    A   Um-hmm.
8       (Exhibit 23 marked)
9       MS. MILLER:  23.
10   A   Okay.
11   Q   (BY MS. MILLER)  Okay.  Did you prepare
12 this e-mail sent to Sandy Rader and Mary Gotcher?
13   A   Yes.
14   Q   And dated March 25th, 2006.  Is that
15 correct?
16   A   That's the date, yes.
17   Q   And tell me the purpose of this e-mail.
18   A   I guess it was just to express where I --
19 I felt like we were at the time.  I wanted them to
20 be aware of my concerns.
21   Q   And where do you -- where did you feel you
22 were at the time?  On what issue?
23   A   Not any one particular issue.  It was the
24 whole situation.  I felt like -- I felt like I was
25 kind of in a no-win situation and I didn't know how

---

139

1  I was going to continue to keep the RMF working.  It
2  was -- I was running out of things to do.  I didn't
3  know -- one of the points in here, I said if -- I
4  may have to call upon one of the other directors for
5  support, meaning borrowing staff if people continued
6  to leave, if we got to the point where we were
7  basically facing mission failure.
8    Q   It wasn't uncommon for -- strike that.
9       It was -- it did occur in other
10 facilities that staff might be borrowed from time to
11 time.  Isn't that correct?
12   A   If they were available, yes.
13   Q   Well, they weren't available from other
14 facilities?
15   A   Some of the other facilities were also
16 short-staffed.
17   Q   They were having their own problems;
18 weren't they?
19   A   Some were.
20   Q   What do you mean here by the statement
21 from -- if you go the third paragraph from the
22 bottom, the last sentence in that, "Given her single
23 mindedness and her apparent drive to make managerial
24 decision from emotion rather than logical and
25 mission related goals, I feel I should be able to

---

140

1  collect sufficient documentation in a reasonable
2  time and still be able to realistically prevent a
3  catastrophic failure"?  What do you mean by
4  "realistically collect sufficient documentation"?
5    A   Well, as I alluded to above, I didn't feel
6  like there was a sufficient documentation to support
7  action to relieve her of duties.  She didn't feel
8  like she had done anything wrong.  I felt like if
9  she continued to be impulsive and make decisions
10 that I didn't think were in the best interest of the
11 unit or the staff or the spirit of the staff, the
12 morale -- the morale, if you will, that that
13 would -- that would manifest itself.
14   Q   But so far, up to this point, you've
15 relied on feedback from a handful of malcontented
16 employees.  Isn't that correct?
17   A   I relied on feedback from employees, yes.
18   Q   And that were discontent.
19   A   To some degree, yes.
20   Q   And do you have any knowledge as to
21 whether or not those employees who were not content,
22 who were malcontent at the time, are still with the
23 agency?
24   A   I don't know.  I'm sure --
25   Q   Do you have any knowledge as to whether or

---

Bayou City Reporting, Inc.

b63bb072-dd57-43e8-9c38-b0f02f40da32

141

1  not those employees who were not happy with
2  Ms. Fisher made subsequent complaints against their
3  next nurse manager?
4      A  I have no knowledge.
5      Q  And when you say "able to collect
6  sufficient documentation," do you mean get enough
7  stuff so you could demote her?
8      A  To support the demotion.
9      Q  So what happened to these expectations and
10  wanting to work with her and move her along in a
11  positive manner?
12      A  I think I've already kind of touched on
13  that in the fact that Ms. Fisher was fairly adamant
14  and she didn't see that there was a problem.  She
15  felt like the staff was a problem, not her.  Now, if
16  I feel like she's having issues and she tells me,
17  "It's not me," that kind of limits what you can do
18  to help.  So how do you work with that?  I don't
19  know.
20      Q  And here's my problem with your answer and
21  maybe you can shed some light on this.  You seem to
22  be excellent at recording documentation of all kinds
23  of events in great detail.  Wouldn't you agree,
24  based on the quantity that we've looked at here
25  today?

142

1      A  I don't think that's an unreasonable
2  statement.
3      Q  Okay.  Yet, we have no documentation of
4  your conversations with Ms. Fisher for her
5  improvement.  Isn't that correct?
6      A  Correct.
7      Q  And we have no documentation where she has
8  indicated she doesn't think she has anything to
9  learn.  Isn't that correct?
10      A  Yes.  That's correct.
11      Q  If you'd look at Exhibit Number 23.
12      A  Okay.
13      Q  And do you remember seeing this document?
14      A  I do.
15      Q  And I think in one of your previous
16  statements, either to the EEOC or that multiple-page
17  statement that you wrote, you accepted full
18  responsibility for demoting Ms. Fisher.  Isn't that
19  correct?
20      A  I -- I accepted full responsibility for
21  demoting Ms. Fisher, that is correct, in that I
22  thought that was a proper -- proper thing to do,
23  given the circumstances.
24      Q  And -- given what circumstance?
25      A  Well, the circumstances that I feel --

143

1  felt and still feel to this day that the ultimate
2  responsibility fell to HR because if they didn't
3  agree or they didn't sanction whatever move you're
4  going to make, it didn't happen.  My rationale is
5  that if they have the ability to stop it and they
6  have the ability to approve it, without which
7  nothing will go forward, ultimately the
8  responsibility is theirs.  And my decision, what I'm
9  referring is that I chose the demotion.  I thought
10  that was the most effective means to make an impact.
11  It removed Ms. Fisher from the RMF, hopefully before
12  we had a catastrophic failure, and it was the only
13  course of action that I could foresee at the time.
14      Q  And I'm going to represent to you --
15  because you were unclear with the number of days she
16  had to show improvement, I'm going to represent to
17  you that she was demoted in -- within that time
18  period without being permitted the full amount of
19  time to show improvement.  Would you -- I'm not even
20  asking you to agree with that.  I'm going to
21  represent to you that that's correct from the
22  documentation that we have.
23      A  Okay.
24      Q  Where is it -- why would it be that you
25  would cut short her opportunity for improvement once

144

1  you'd given her not even any discipline?  You'd
2  given her expectations to going -- with 90 days to
3  improve.  So why is it that would you go in less
4  than 90 days, part of which she wasn't even there
5  because she was on Family Medical Leave Act, and
6  choose to demote her?
7      A  Because I was concerned if some action
8  weren't taken that the mission of the RMF would, in
9  fact, fail.  I was told in late '05, I believe it
10  was, by Tony Williams that failure of the RMF is not
11  acceptable.
12      Q  And by "failing," what do you mean?
13      A  I mean failing to deliver the level of
14  care that's required to give -- to provide adequate
15  safety and medical care to the patients out there
16  that are pretty sick.
17      Q  Okay.  Now, we've talked a lot about
18  Ms. Fisher's personality but we've not talked about
19  anything where -- other than one hanging where -- a
20  suicide of an inmate and a bathtub incident where an
21  inmate died in the bathtub, we've not talked about
22  anything where the level of care was affected.
23  Isn't there documentation or wouldn't you want to
24  reference that if that's what you thought was
25  imminent failure coming down the pike?

b63bb072-dd57-43e8-9c38-b0f02f40da32

145

1    A  It hadn't failed yet, but if sufficient
2  staff continued to leave, it was foreseeable that it
3  would.
4    Q  And it's your position that more staff was
5  leaving Estelle Unit than any other unit.
6    A  I believe so.
7    Q  And so there would be a way to check that.
8  Right?
9    A  Presumably so.
10   Q  And would it be appropriate to look at
11  sheer numbers of staff or percentage of staff?
12   A  I would probably look at what does it take
13  to run the unit at a minimum and where are we at?
14  Are we close to that?  Could we suddenly slip below
15  it?  By way of example, if the four ER nurses left
16  simultaneously, I would -- it would be a challenge,
17  I think, to cover that.  We were also already using
18  agency staff at the time to cover shortages.
19   Q  And the four ER nurses, had they made the
20  demand that "You fire my boss or we're leaving"?
21  Had they made that demand to you?
22   A  Yes.  They had made that demand.
23   Q  And, again, this chain of command thing,
24  how did that get communicated to Ms. Fisher in the
25  interim?

146

1    A  I don't know that it did.  That was just
2  before Ms. Gotcher came.  The decision for
3  Ms. Gotcher to come had already been made and so I
4  chose at that point in time to just wait and see,
5  let them voice their complaints.
6    Q  When was the decision to demote Ms. Fisher
7  made?
8    A  I honestly couldn't pinpoint it.
9    Q  How long had UTMB been experiencing severe
10  staffing shortages in the -- in the TDC arena?
11   A  I don't consider most of the staffing
12  shortages severe but we did experience staffing
13  shortages pretty much the whole time I was there.
14   Q  Okay.  It was an ongoing problem.
15   A  It was.
16   Q  It was a priority for UTMB to address that
17  issue.
18   A  It was.
19   Q  Across the board, not specific to
20  Ms. Fisher.
21   A  Across the board in general.  There was an
22  example by way of the Ferguson Unit and I forget
23  exactly what we did.  I think we offered some sort
24  of bonus pay for a while to get that staffed.  Then
25  they got an extra percentage.  So we staffed that up

147

1  and it got better and then you move on to your next
2  crisis or whatever your next most-pressing issue is.
3    Q  And are you suggesting that somehow that
4  was Ms. Fisher's mismanagement that caused that
5  problem?
6    A  No.  Not necessarily.
7    Q  And what is Elite?
8    A  It's a staffing agency?
9    Q  And does Bryan Allison work for Elite or
10  he works for Supplemental?
11   A  I don't remember.
12   Q  Okay.  There was at one time some
13  allegation about Ms. Fisher and her relationship
14  with Bryan Allison.  Do you recall that?
15   A  It wasn't a relationship particularly with
16  Bryan Allison.  I was told that the nurses didn't
17  want to work there because they were unhappy with
18  the way Ms. Fisher treated him, and I called Bryan
19  Allison and asked him if that was, in fact, the
20  case.  I had a telephone conversation with him.  He
21  said, yes, that was true.  And later on -- it may be
22  the same day -- Ms. Fisher was in my office and I
23  talked to her about that and basically she said she
24  didn't believe me and said, "Can we get Bryan
25  Allison on the phone?"  I said, "Yes, we can."  We

148

1  proceeded to do that and he repeated for her what he
2  had said to me, that the nurses didn't like the way
3  she was treating him.
4        MS. MILLER:  Move to strike as
5  nonresponsive.
6    Q  (BY MS. MILLER)  There was an issue at
7  some point or an alleged inability of Bryan Allison
8  and Ms. Fisher to work together.  Is that correct?
9    A  I don't recall that.
10   Q  Okay.  Did Ms. Fisher ever discuss with
11  you her concerns about the agency staffing that were
12  provided?
13   A  She con-- expressed to me concerns when we
14  were having discussion about getting the staffing,
15  yes.
16   Q  Thank you.  She was concerned about the
17  competency level of the nurses that were being
18  provided by the staffing agencies; wasn't she?
19   A  No.  My recollection was she was --
20   Q  Was -- "yes" or "no"?
21   A  No.  The answer is no.
22   Q  Okay.
23   A  I don't -- I don't recall that.
24        (Exhibit 24 marked)
25   Q  (BY MS. MILLER)  I show you what's been

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

---

149

1  marked as 24, exhibit number.
2       MR. LIVELY: What number? That?
3       MS. MILLER: 24.
4  A  Okay.
5  Q  (BY MS. MILLER)  Do you recognize this
6  document?
7  A  Yes. I remember.
8  Q  Okay. And is this the instance you were
9  describing with Bryan Allison?
10  A  This was part of that conversation that
11  took place, I believe, over a day or two.
12  Q  Okay. And do you know -- you indicate "We
13  will need to revisit the staffing upon your return."
14  Do you know where she was going?
15  A  Let's see. What's the date? I think that
16  was when she was about to go out on leave, the --
17  was it the FMLA, perhaps?
18  Q  Okay. But in this particular document,
19  you're recapping incidents from March 10 and
20  March 22nd but, yet, you didn't document this until
21  April. Would you agree that that's correct?
22  A  It appears to be correct.
23  Q  Is this part of the collecting enough
24  documentation that you referred to in the other
25  letter to Ms. Gotcher?

---

150

1  A  Yes. I think that's a fair assessment.
2       (Exhibit 25 marked)
3  Q  (BY MS. MILLER)  25, is this the letter of
4  instruct -- or letter of intent that we've been
5  discussing?
6  A  Yes.
7  Q  And at this point, you felt like you had
8  enough documentation that was -- had occurred -- I
9  mean, how far back did you go in collecting
10  documentation to get to this demotion?
11  A  I don't recall. I did -- I do recall that
12  we went back and looked at -- were looking for
13  patterns at previous units which I felt like existed
14  and continued to manifest themselves unabated pretty
15  much at the RMF.
16  Q  Well, at least you went back to August of
17  2005, almost -- a little less than a year but you
18  went back at least a year, went back to January
19  issues. Correct?
20  A  Can you please say the page?
21  Q  Page 69 of Exhibit Number 25.
22  A  Top of the page?
23  Q  Very first sentence.
24  A  Okay.
25  Q  Correct? You went back to --

---

151

1  A  Excuse me. I'm looking right now.
2  Q  Went back to March issues.
3  A  Okay. Sorry. Yes.
4  Q  And on page 70, you went back to February
5  issues. How much of what you demoted her for was
6  based on incidents that occurred subsequent to her
7  letter of instruction?
8  A  I couldn't quantify that.
9  Q  Can you give me an idea?
10       MR. LIVELY: Letter of instruction
11  or --
12       MS. MILLER: Expectations.
13       MR. LIVELY: Expectations.
14       MS. MILLER: Letter of expectations.
15  Thank you.
16       MR. LIVELY: I couldn't remember,
17  either.
18       MS. MILLER: Yeah. Different
19  company, same concept.
20  A  If you'll give me a moment to review it,
21  I'll see if I can quantify that for you. Okay.
22  Now, I'm sorry. Could you repeat your question
23  about --
24  Q  (BY MS. MILLER)  How much of the
25  information upon which you relied in supporting your

---

152

1  documentation had occurred subsequent to her letter
2  of expectation?
3  A  Can I review the letter of expectation
4  or -- yeah, the date?
5       MS. FISHER: Ms. Gotcher? Are you
6  talking about when Ms. Gotcher came and had the
7  meeting?
8       THE WITNESS: That was in February, I
9  think.
10  A  There appears to me about 50 percent or
11  more.
12  Q  (BY MS. MILLER)  Can you identify those
13  instance -- those 50 percent or more that you think
14  occurred subsequent to her letter of expectations?
15  A  Page 70, second paragraph, March 13th,
16  2006. Received -- "your supervisor presented your
17  semi-annual evaluation, you objected to some parts
18  of the evaluation. This document was given with
19  instructions to closely review and offer alternative
20  wording or constructive comments so that we could
21  negotiate what you felt was fair. Ten days later
22  you still had not returned the evaluation and your
23  supervisor had to request it again." "In February
24  2006, your supervisor requested that you meet with
25  him informally two to three times per week in order

---

Bayou City Reporting, Inc.

b63bb072-dd57-43e8-9c38-b0f02f40da32

153

1  that he may keep abreast of problems/issues," so
2  forth. "As of this date, you have failed to adhere
3  to your supervisor's request." So that was
4  approximately two months.
5      Q   Okay.  So she didn't return the evaluation
6  to which she objected.  Right?  That occurred after
7  the letter of instruction -- letter of expectation.
8      A   Again, without seeing the date on that,
9  I'm just going by the fact it was in March.
10     Q   Okay.
11     A   So perhaps it would be close.
12     Q   Give me another example that composes the
13  50 percent that you suggest-- or represent occurred
14  subsequent to her letter of expectations.
15     A   March the 10th, 2006, we talked about her
16  meeting with both managers weekly and keeping them
17  abreast of the actions.  That didn't happen,
18  apparently.
19     Q   Okay.  Could you just tell me what page it
20  is so that I can mark that?
21     A   Oh, I'm sorry.  Page 69, bottom paragraph.
22  May I -- is it permissible to read?
23     Q   Sure.  You're -- this is not an exercise
24  in --
25         MR. LIVELY:  Closed-book test?

154

1         MS. MILLER:  No, it's not.  It's not
2  a closed book.  Right.
3      A   In March 22nd, she was directed to provide
4  an alternate contact for Bryan Allison, whichever
5  agency that was.
6      Q   (BY MS. MILLER)  Tell me what page you're
7  on so I can follow.
8      A   I'm sorry.  Got to find that myself.
9         MR. LIVELY:  Oh, I see.
10     A   Well, I saw it and then I looked over here
11  and now I've lost my reference point.  I can't
12  recall the date on that.  I think it was in March.
13  She was directed to contact another agency to secure
14  temporary nursing staff in the event the second
15  agency was unable to provide nurses.
16     Q   (BY MS. MILLER)  That's page 69 of Exhibit
17  Number 25?
18     A   Yes, ma'am.
19     Q   Okay.  I'm finding that.
20     A   I'm sorry.  Just keep reminding me just to
21  cite.  Okay.  During that same time period, in March
22  '06, she was instructed to -- well, I think that's
23  what I was just talking about.  Oh, no.  There's two
24  different instances.  They're both in about the same
25  period, time period, it appears, that -- to

155

1  contact -- or find alternate agencies or backups for
2  agency nurses.  The other one was to provide an
3  alternate contact for Bryan Allison's agency.  Let's
4  see here.  In March of --
5      Q   And she did not do that.
6      A   No.
7      Q   Okay.
8      A   I don't think she ever did the follow-up
9  about the alternate agencies because I called the
10  agencies and asked if she'd called and inquired and
11  they said she did but she didn't request nurses.
12  And then Supplemental, I had to request it several
13  times before she finally gave me an alternate
14  contact person, and when I contacted the agency,
15  they said that she had not provided that to them.
16     Q   Okay.  And, again, as good at documenting
17  as you are, did you document any of those things, in
18  conversations with the agency and follow-up, that
19  sort of thing?
20     A   They're documented right here.
21     Q   And it's your testimony that those
22  document what you just testified to.
23     A   I believe it to be, yes.
24     Q   Okay.  All right.  I'm still listening.
25     A   That is all I can pinpoint at this time.

156

1      Q   That occurred subsequent to the letter of
2  expectations.
3      A   I believe so, yes.
4      Q   Okay.  Thank you.  And, again, this was
5  your decision to initially demote her to the Nurse
6  Clinician III?
7      A   No.
8      Q   Okay.
9      A   My -- my signature's on the paper and I
10  don't -- I don't know why that is unless we -- I
11  signed that when I was talking to Ms. Melton, which
12  may very well be the case, and then subsequently
13  called back and said, "This -- this doesn't seem
14  right to me."
15     Q   Okay.  Well, starts out, "This letter is
16  to notify you that I intend to request your demotion
17  to Nurse Clinician."
18     A   Right.  Right.
19     Q   But you didn't request that?
20     A   No.  I had --
21     Q   Who came up with the idea?
22     A   Ms. Melton.
23         (Exhibit 26 marked)
24     Q   (BY MS. MILLER)  And you understand that
25  she appealed the demotion, the intent to demote her.

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

157

1     A   Yes.  I believe she did.
2     Q   And, in fact, by then, she'd filed a
3  couple grievances.  Correct?
4     A   I'm not sure of the time line.  I've heard
5  she filed some grievances, yes.
6     Q   Did you get involved in responding to the
7  grievances?
8     A   I don't recall.  It doesn't stick out in
9  my mind.  I don't remember.
10    Q   And how about responding to the appeals?
11    A   I also don't recall.
12    Q   I show you what's marked Exhibit
13 Number 26.
14    A   Okay.
15    Q   Did you write this letter?
16    A   Yes.
17    Q   Okay.  And in this letter, you've
18 indicated that she's -- you've reviewed her response
19 to your intention to demote and you found nothing
20 compelling.  Is that correct?
21    A   Now, is this -- I'm unclear if this is to
22 be demoted to -- read this a second.
23    Q   Read the second paragraph.  I think --
24    A   I'm reading it right now, yeah.  Okay.
25    Q   And you found nothing compelling in her

158

1  response.  Is that correct?
2     A   Yes.  There was nothing that changed my
3  mind.  The decision regarding the nurse manager
4  versus the Nurse Clinician III had already been
5  discussed and rehashed with HR prior to this.  There
6  was nothing in her -- her appeal that I recall that
7  triggered me to make this decision.  I was already
8  uncomfortable with that to begin with.
9     Q   So as a result of the demotion, she was
10 demoted to an assistant nurse manager and she was
11 sent back as assistant nurse manager, which we
12 talked about this morning, to the Wynne Unit.
13 Correct?
14    A   Correct.
15    Q   With a decrease in pay.
16    A   Correct.
17    Q   And essentially a disciplinary on her.
18    A   Correct.
19    Q   And no progressive discipline prior to
20 that time.
21    A   Correct.  If I understand the question.
22    Q   Well, by that, I mean she didn't have any
23 write-ups.  She didn't have any discipline.  Didn't
24 have any --
25    A   Right.

159

1     Q   -- negative employment action prior to
2  that time.
3     A   Yes.  I agree.
4     Q   Now, you are aware that at some point, EEO
5  out of Galveston UTMB undertook an investigation.
6     A   Yes.
7     Q   And with whom -- without telling me
8  what -- well, you can tell me.  With whom did you
9  speak or did you speak to anyone during that
10 investigation?
11    A   I don't recall having a conversation with
12 anyone.
13    Q   Did you work with Melvin Williams at all
14 in the internal investigation completed by UTMB?
15    A   No.  I believe Mr. Williams met me briefly
16 in a conference room and I'm not sure if he was
17 there for that or something else, but we didn't have
18 any face-to-face discussion about any of this.  This
19 was all conducted via --
20    Q   Written communication.
21    A   Yes.
22    Q   And we have an example.  Earlier --
23    A   Yes.
24    Q   -- Exhibit Number 1, that was your written
25 communication with him.

160

1     A   Yes.
2     Q   Did you have any additional communication
3  with Mr. Williams concerning Ms. Fisher's case?
4     A   There were -- we played -- pardon me for a
5  second -- telephone tag.  I called him and left a
6  message on his answering machine, asking him to call
7  me back.  I expressed concern that I felt like he --
8  from his -- I don't remember what triggered me to
9  say this, but I felt like I had done the right thing
10 and, yet, somehow I still felt like I had done
11 something wrong vis-a-vis just the pressure of the
12 investigation.  He called back and left me a
13 telephone message and said, "I don't feel like
14 you've done anything wrong."  And then that was
15 really about it.
16         MS. MILLER:  Move to strike as
17 nonresponsive.
18    Q   (BY MS. MILLER)  Did you have any
19 additional communication with Mr. Williams?
20    A   Not that I recall.
21    Q   Did you have a telephone conversation with
22 him?
23    A   Not that I recall.
24    Q   Okay.  Other than the communication,
25 Exhibit Number 1.

Bayou City Reporting, Inc.

b63bb072-dd57-43e8-9c38-b0f02f40da32

161

1    A   That's all I remember.
2    Q   Okay.  Okay.  We're going back in time a
3  little bit -- or forward in time, I guess.
4        (Exhibit 27 marked)
5    Q   (BY MS. MILLER)  Show you what's marked as
6  Exhibit Number 27.
7        MS. MILLER:  Sorry.
8        MR. LIVELY:  Oh.
9        MS. MILLER:  Don't mean to throw it
10  at you there.
11   A   Oh.  So Ms. Warren took over.  I couldn't
12  remember who took over.  Okay.
13   Q   (BY MS. MILLER)  Okay.  This evidently is
14  an e-mail from you sent August 17th, 2006, to
15  Jacklyn Fisher and she was an assistant nurse
16  manager at the Wynne Unit at that point.  Right?
17   A   Yes.  I believe so.
18   Q   Jamie Williams, what was -- was it a she?
19   A   Yes.
20   Q   What was Jamie Williams' title at that
21  point?
22   A   She was some sort of administrator,
23  practice manager, maybe.
24   Q   And how about Monique Rodriguez?
25   A   Her assistant, if I remember.

162

1    Q   And you've indicated at this point when
2  Ms. Roddy, the nurse manager from Wynne is no longer
3  there, that Jackie is going to report directly to
4  Carol Warren.  Is that correct?
5    A   That's my understanding, yes.
6    Q   As well as Ms. Williams and Ms. Rodriguez.
7    A   No, no.  She didn't report to Ms. Williams
8  or Ms. Rodriguez, or at least not in the nursing
9  chain of command.  She was -- she worked with them
10  but her chain of command as far as reporting would
11  have been to Ms. Warren and up to Ms. Gotcher.
12   Q   Okay.  So was Ms. Williams -- were
13  Ms. Williams and Ms. Rodriguez involved in the Wynne
14  Unit?
15   A   Yes.
16   Q   Gotcha.  And do you recall what they
17  worked -- what area they worked in?
18   A   Well, they worked in medical but they
19  were -- how would you say it?  They were in charge
20  of more like clerical staff, support staff.  It
21  isn't -- it wasn't related to nursing.
22   Q   Okay.  And who was in charge of geriatric
23  at that point?  Do you recall?
24   A   Geriatric was over at the RM.
25   Q   Oh, wait, wait.  Strike that.

163

1        And what was the date that you left
2  UTMB?
3    A   I'm not sure.  It was in, I think,
4  October, October '06 sometime.
5    Q   Was there a time and did you learn of
6  Ms. Fisher's EEOC charge with the federal agency,
7  the EEOC?
8    A   There was a time, yes.
9    Q   And how was that communicated to you?
10   A   I don't remember.
11   Q   But would you --
12   A   Probably -- probably from HR.
13   Q   And you left what date?
14   A   October of '06 is all I recall.
15   Q   Okay.
16   A   Month of October.
17   Q   And as a result of that charge of
18  discrimination, was it shown to you?
19   A   Not that I remember.
20   Q   And who from HR discussed that with you?
21   A   I'm not sure.  Probably would have been
22  Sandy Rader.  She was our local representative.
23   Q   Did anyone -- without telling me what they
24  said, did anybody from the legal department of UTMB
25  discuss that with you?

164

1    A   I know you're tired of hearing this, but
2  I'm sorry.  I don't remember.
3    Q   That's fine.  If you don't, you don't.
4  What was your understanding of the allegations made
5  by Ms. Fisher?
6    A   Discrimination of a racial nature, I
7  believe.
8    Q   And anything else that you can recall?
9    A   No.
10       (Exhibit 28 marked)
11   Q   (BY MS. MILLER)  I'm going to show you
12  what's marked as Exhibit Number 28.  Do you
13  recognize this document?  Take a minute.  It's --
14   A   It's a big one; isn't it?
15   Q   Well, it's not that big, actually.  It's
16  just got some attachments with big print, you'll be
17  glad to know.
18   A   I like big print, especially the older I
19  get.  Orson Wells.
20   Q   Sir?
21   A   Orson Wells.  I'm just a little surprised.
22  It took me aback.  You don't see that name very
23  often.  I'm sorry.  Page 436.
24   Q   Is that a real person?
25   A   It appears.  Yeah, U -- U --

b63bb072-dd57-43e8-9c38-b0f02f40da32

Deposition of David W. Watson

165

1    Q   1980?
2    A   UT --
3    Q   Oh, that's George Orwell.
4    A   UTMB organizational development, yes.  Or
5    outcomes. I'm not sure.  Excuse me.  Do you need me
6    to review this in detail for anything in particular?
7    Q   No.  Was this document shared with you as
8    an upper level management?
9    A   It may have been.  I saw hundreds and
10   hundreds of documents.  It's not ringing -- doesn't
11   bring anything to the surface as --
12   Q   But you would agree that it represents a
13   task force report of recommendations regarding UTMB
14   and critical managed care.  Correct?
15   A   Well, I will have to read it closely.
16   That's probably --
17   Q   Okay.  Well, take a look at it.
18   A   Okay.  Interesting.  Quite a list; isn't
19   it?
20   Q   I could tell you how many but I'm not sure
21   my Roman numerals go up that high.
22   A   I know mine don't.  Charities?  Okay.
23   What's your question?
24   Q   Okay.  Given that this is identified as an
25   executive summary from -- regarding UTMB critical

166

1    managed care, help me understand how broad this is
2    in terms of UTMB.  Critical managed care
3    encompasses --
4         MS. BERNSTEIN:  Correctional managed
5    care.
6         MS. MILLER:  Correctional managed
7    care.  Thank you.
8    Q   (BY MS. MILLER)  Correctional managed care
9    encompasses the entire TDC relationship?  Is that
10   correct?  Or --
11   A   No.  No.
12   Q   Or is it broader than that?
13   A   Well, just for specificity, approximately
14   80 percent of the state, the TDC system, healthcare
15   is provided by UTMB.  The other 20 percent, give or
16   take, the Panhandle and north, West Texas, is
17   provided by Texas Tech University or some equivalent
18   of Texas Tech.  So --
19   Q   So the Texas Tech would be included in
20   this also?
21   A   No.
22   Q   Okay.  This would be unique to --
23   A   UTMB facilities.  UTM --
24   Q   Okay.  UTMB and TDC but not Texas Tech and
25   TDC.

167

1    A   I suppose that's fair.
2    Q   Would it go beyond anything that was
3    related to TDCJ?
4    A   Well, I'm just not sure it includes TDCJ
5    per se.  It keeps referencing UTMB.  TDCJ would be
6    involved, I guess, by virtue of the fact that that's
7    just where we were.
8    Q   Okay.  All right.  The UTMB function that
9    relates to TDCJ.  Is that more accurate?
10   A   Yeah.  I think that's fair.
11   Q   Okay.  And recognizing that TDCJ is a
12   separate agency.
13   A   Yes.
14   Q   Okay.  So if you look -- and this was
15   evidently based -- according to Mr. Raimer's letter
16   dated August 15th, 2006, evidently based on a focus
17   group from employees across the board --
18   A   Yes.
19   Q   -- of correctional managed care.
20   A   It's a mouthful; isn't it?
21   Q   Well, I'm just --
22   A   CMC.
23   Q   -- looking to see if I said that right.
24        MS. BERNSTEIN:  It's Dr. Raimer, not
25   Mr.

168

1         MS. MILLER:  Okay.  Dr. Raimer.
2    Thank you.
3         MS. BERNSTEIN:  Sorry.
4         MS. MILLER:  No.  I should have done
5    that.
6    Q   (BY MS. MILLER)  And wouldn't you agree
7    that you had some of the same problems in the
8    Estelle Unit of excessive work load that is rated as
9    the highest -- on page 438, excessive work load was
10   one of the problems that Ms. Fisher had in her area;
11   wasn't it?
12   A   Yes.
13   Q   And that seems to be a critical issue
14   across the board for CMC.
15   A   I agree.
16   Q   Short staffing was one of the problems
17   that was attributed to her demotion.
18   A   Yes.
19   Q   And that seems to be a critical issue
20   across CMC.  Wouldn't you agree?
21   A   Yes.
22   Q   Processes and protocols seemed to be a
23   problem agencywide.
24   A   That's their finding.  I don't know that I
25   would necessarily concur, but fair enough.

b63bb072-dd57-43e8-9c38-b0f02f40da32

169

1    Q   Okay.  But at least in report by
2    Dr. Raimer or --
3    A   Sure.  Yeah.  Yeah.
4    Q   It would appear that they've recognized
5    that as such.
6    A   I can see.
7    Q   And wasn't that one of the things that
8    Ms. Fisher was demoted for was her processes and
9    protocols for the emergency ward or emergency room?
10   A   Not that I recall.  She specifically went
11   in and moved some stuff around without conveying
12   that to -- pardon me, appropriately other
13   emergency room staff, and so when they came in there
14   and went to looking for some of this, they couldn't
15   find it.  But I don't -- I'm -- right off the bat, I
16   don't recall that being listed as specifically --
17   Q   That was not a process?
18   A   I'm not sure how to answer that.  It was
19   something she just did.  I mean, I'm not a -- I
20   can't recall a process where we systematically went
21   in and, you know, moved things around or whatever.
22   I'm not sure I understand really how to answer your
23   question.
24   Q   Okay.  On page 438 of Exhibit Number 27,
25   you'd have to agree that lack of confidence in

170

1    supervisors and management is certainly an issue
2    that's rated ed very highly as a concern for the CMC
3    report of August of 2006.
4    A   I agree.
5    Q   And that was an issue that Ms. Fisher was
6    demoted for.  Is that correct?
7    A   Partially.
8    Q   Communication?
9    A   Yes.
10   Q   That was an issue that was a concern?
11   A   Yes.
12   Q   And that's certainly a concern agencywide.
13   A   Appears to be.
14   Q   Train -- professionalism, that was
15   identified by you as a concern and evidently a
16   concern agencywide.
17   A   It appears to be.
18        MS. MILLER:  Okay.  Let's take a
19   little break.
20        MR. LIVELY:  Okay.
21        (Recess from 4:03 to 4:04)
22        MR. LIVELY:  The parties have agreed
23   to give the defendants a ten-day extension to answer
24   the recent discovery sent to us.  I think there was
25   some admissions and request for production and

171

1    interrogatories.
2        MS. BERNSTEIN:  Yes.
3        MS. MILLER:  I think there were
4    three, yes.
5        MS. BERNSTEIN:  Yes.
6        MS. MILLER:  Yes.  And I've agreed to
7    give them an extension.  And you can have more than
8    ten days if you need it.  I mean, it's not like we
9    have a trial schedule until January.
10       MR. LIVELY:  January or February.
11       MS. MILLER:  So there's no sense to
12   make yourself crazy over it.  I promise you, I'm not
13   going to look at it for another two weeks or maybe
14   30 days.
15       MS. BERNSTEIN:  Let's say ten, and if
16   it looks like we're going to get jammed up --
17       MS. MILLER:  You can call me.  That's
18   fine.
19       MS. BERNSTEIN:  Thank you very much.
20       MS. MILLER:  You're welcome.
21       MR. LIVELY:  Thank you.
22       MS. BERNSTEIN:  I appreciate that.
23       (Recess from 4:05 to 4:13)
24       MS. MILLER:  We're done.  Pass the
25   witness.

172

1        MR. LIVELY:  Oh, we'll reserve our
2    questions till time of trial.  Thank you,
3    Mr. Watson.
4        THE WITNESS:  Thank you.
5        (Proceedings concluded at 4:13 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

b63bb072-dd57-43e8-9c38-b0f02f40da32

173

1           CHANGES AND SIGNATURE
2      PAGE    LINE    CHANGE    REASON
3      _____
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19     _____
20     _____
21     _____
22     _____
23     _____
24        I, DAVID W. WATSON, have read the foregoing
25     deposition and hereby affix my signature that same

174

1      is true and correct, except as noted herein.
2
3         _____
4              DAVID W. WATSON
5
6
7         THE STATE OF _____)
8         COUNTY OF _____)
9
10        Before me, _____, on
11     this day personally appeared DAVID W. WATSON, known
12     to me (or proved to me under oath or through
13     _____)(description of identity card or other
14     document) to be the person whose name is subscribed
15     to the foregoing instrument and acknowledged to me
16     that they executed the same for the purposes and
17     consideration therein expressed.
18          Given under my hand and seal of
19     office this _____ day of _____,
20     _____.
21
22
23        _____
24          NOTARY PUBLIC IN AND FOR
25        THE STATE OF _____

175

1           IN THE UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF TEXAS
                 HOUSTON DIVISION
3      JACKIE FISHER,          )
                               )
4          Plaintiff,     )
                               )
5      VS.              ) C.A. NO. 4:08-cv-01273
                               )
6      UNIVERSITY OF TEXAS MEDICAL )
       BRANCH and DAVID WATSON,   )
7                               )
           Defendants.     )
8
           REPORTER'S CERTIFICATION
9          DEPOSITION OF DAVID W. WATSON
                AUGUST 28, 2009
10
11         I, Lorri Lucas, Certified Shorthand Reporter in
12     and for the State of Texas, hereby certify to the
13     following:
14         That the witness, DAVID W. WATSON, was duly
15     sworn by the officer and that the transcript of the
16     oral deposition is a true record of the testimony
17     given by the witness;
18         That the deposition transcript was submitted on
19     _____ to the witness or to the attorney for
20     the witness for examination, signature and return to
21     me by _____;
22         That pursuant to information given to the
23     deposition officer at the time said testimony was
24     taken, the following includes counsel for all
25     parties of record:

176

1          Ms. Jo Miller, Attorney for Plaintiff
2          Mr. Sam Lively and Ms. Cari G. Bernstein,
       Attorneys for Defendants
3
4          That a copy of this certificate was served on
5      all parties shown herein.
6          I further certify that I am neither counsel
7      for, related to, nor employed by any of the parties
8      or attorneys in the action in which this proceeding
9      was taken, and further that I am not financially or
10     otherwise interested in the outcome of the action.
11         Certified to by me this 18th day of September,
12     2009.
13
14
15
16
       _____
17     LORRI LUCAS, RMR, Texas CSR 5317
       Expiration Date:  12/31/09
18     Bayou City Reporting, Inc.
       Firm Registration No. 295
19     1135 East 11th Street
       Houston, Texas  77009
20     (713) 861-8589
21
22
23
24
25

Bayou City Reporting, Inc.