**Plaintiff
Jackie Fisher's**

**Response in Opposition
to Defendants'**

# Motion for Summary Judgment

# EXHIBIT 4

## Page 1

```
                 IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
                          HOUSTON DIVISION
JACKIE FISHER,                )
                              )
            Plaintiff,         )
                              )
VS.                           )  C.A. NO. 4:08-cv-01273
                              )
UNIVERSITY OF TEXAS MEDICAL)
BRANCH and DAVID WATSON,      )
                              )
            Defendants.       )


*************************************************

                     ORAL DEPOSITION OF
                       MARY GOTCHER
                     AUGUST 27, 2009

*************************************************

     ORAL DEPOSITION OF MARY GOTCHER, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered
cause on August 27, 2009, from 10:21 a.m. to 3:46
p.m., before Lorri Lucas, CSR in and for the State
of Texas, reported by machine shorthand, at the
offices of TDCJ Conference Center, Huntsville,
Texas, pursuant to the Federal Rules of Civil
Procedure and the provisions stated on the record or
attached hereto.
```

## Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:
    Ms. Jo Miller
    Law Office of Jo Miller, PLLC
    505 North Main
    Carriage House
    Conroe, Texas  77301
    (936) 539-4400


FOR THE DEFENDANTS:
    Mr. Sam Lively
    Assistant Attorney General
    General Litigation Division
    P.O. Box 12548
    Austin, Texas  78711-2548
    (512) 463-2120
    Ms. Cari G. Bernstein
    Department of Legal Affairs
    Rebecca Sealy Hospital, Room 4.254
    301 University Boulevard
    Galveston, Texas  77555-0171
    (409) 747-8735




ALSO PRESENT:
    Ms. Jackie Fisher

## Page 3

                         INDEX
                                    PAGE
Appearances...................................  2
MARY GOTCHER:
    Examination by Ms. Miller................  4
Signature and Changes........................ 137
Reporter's Certificate....................... 139
                      EXHIBITS
NO. DESCRIPTION                             PAGE
 1  Document titled "Mary Gotcher Director    62
    of Nurses, Northern Division"
    Fisher-200690-200692
 2  UTMB Employee General Information         80
    dated 6/25/04 Fisher-10077-10082

 3  E-mail dated 1/12/06 Fisher-200263,       92
    200265, 200267, 200269, 200271, 200273,
    200275, 200277

 4  Memo dated 1/27/06 Fisher-200249-200251   94

 5  Memo dated 3/1/06 Fisher-100526          100

 6  E-mail dated 3/25/06 UTMB-1369-1370      107

 7  Memo dated 4/7/06 UTMB-1351              107

 8  Letter dated 4/11/06 Fisher-200068-200071 116

 9  Letter dated 4/12/06 Fisher-200072       117

10  Letter dated 5/2/06 Fisher-100212        120

11  UTMB-CMC Employee Task Force Report of   131
    Recommendations August 2006 Executive
    Summary Fisher-100435-100442

## Page 4

```
                    MARY GOTCHER,
having been first duly sworn, testified as follows:
                    EXAMINATION
BY MS. MILLER:
    Q    Mary Gotcher.  Right?
    A    "GO-cher."
    Q    "GO-cher."
    A    Um-hmm.
    Q    Would you spell your name for the record,
please?
    A    G-O-T-C-H-E-R.
    Q    M-A-R-Y?
    A    Yeah.
    Q    And, Ms. Gotcher, have you had your
deposition taken before?
    A    Yes.
    Q    Okay.  So you're familiar with the ground
rules or other people's ground rules and you sat
there yesterday during the deposition of Ms. Fisher.
    A    Yes.
    Q    And you heard Mr. Cummings describe his
ground rules for the deposition.
    A    Yes.
    Q    And mine are no different.  If you have a
question you don't understand what I'm asking you,
```

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

5

1  my intent is to get answers to the questions that
2  I'm asking, and so if you don't understand my
3  question, I'm not going to get the answer that's the
4  correct answer, which is your real answer.  So stop
5  me.  Ask me to repeat it.  I don't mind.  I'm pretty
6  flexible about everything.  I just want to make sure
7  we get good answers.
8      A   Yes, ma'am.
9      Q   So how many times have you had your
10 deposition taken?
11     A   Once.
12     Q   Once.  And what was that?
13     A   It was --
14     Q   The subject of that case?
15     A   -- a private lawsuit.
16     Q   Okay.  And that -- we just had an example
17 of where, as Mr. Cummings described yesterday, you
18 kind of anticipated what I was going to say and you
19 started to answer it before.  And it's hard for the
20 court reporter and we like to keep her on our side
21 because we use her on a number of occasions.  So if
22 you let me complete my questions and then I'll try
23 to give you the same courtesy and time and let you
24 complete yours without asking another question on
25 top of your answer.  Okay?

6

1      A   Fine.
2      Q   Great.  Thanks.  Is there any reason that
3  you can't give good and accurate answers today?
4      A   No.
5      Q   You've not taken any medication, any
6  reason that your thinking and your ability to
7  communicate is impaired.
8      A   No.
9      Q   Okay.  And did you have a chance to
10 review -- without telling me what you spoke about,
11 did you have a chance to review and prepare for this
12 deposition with your attorneys, one or the other or
13 both, with the attorneys for UTMB?
14     A   Yes.
15     Q   Okay.  And in that process, again without
16 telling me what you spoke about, did you have the
17 opportunity to review any documents in preparation
18 for today?
19     A   I didn't review anything special for
20 today, no.
21     Q   Well, have you had a chance to review any
22 documents in preparation for this lawsuit?
23     A   I reviewed some documents in preparation
24 for meeting with my attorney.
25     Q   Okay.  And what documents did you review?

7

1      A   Actually, I don't -- it's been some time
2  ago and I don't even remember what they were.
3      Q   Okay.  And in preparation with your
4  attorney, do you have your own attorney --
5      A   No.
6      Q   -- other than the UTMB attorneys?
7      A   With Mr. Lively.
8      Q   Okay.  And you're located here in
9  Huntsville.  Is that correct?
10     A   No, ma'am.
11     Q   Okay.  Where is your -- oh, Palestine.
12 Where's your office?
13     A   In Palestine, Texas.
14     Q   Okay.  Need just a little personal
15 information and we won't put this in the deposition
16 but I'll write it down in case we need to get in
17 contact with you further.  What's your physical home
18 address?
19     A   (Redacted)
20     Q   And do you have a land-based phone there?
21     A   Yes.
22     Q   And what's that number?
23     A   (Redacted)
24     Q   Okay.  And what's the highest educational
25 level you've achieved, Ms. Gotcher?

8

1      A   I have a postmaster's degree with my nurse
2  practitioner's -- my family nurse practitioner's
3  licensure.
4      Q   Okay.  And when you say "postmaster's," is
5  that a master of science?
6      A   Yes.
7      Q   And where is that from?
8      A   University of Texas Medical Branch.
9      Q   And that's at Galveston?
10     A   Yes.
11     Q   When did you achieve that?
12     A   Ten years ago, I got my nurse
13 practitioner's licensure.  12 years ago -- longer
14 than that.  14 years ago, I got my master's degree
15 in nursing administration, specialty in nursing
16 administration.
17     Q   And where was your master's?
18     A   At the University of Texas Medical Branch.
19     Q   Okay.  And if we're saying 14 years ago,
20 is that --
21     A   That's a guess.
22     Q   Okay.  And so if I can do the math, 2009.
23 1995?
24     A   Probably close.
25     Q   Okay.  Around?

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

9

1  A  Around.
2  Q  Okay. That's not critical that we have
3  that exact one. All right. And so you have a
4  master's in nursing?
5  A  Yes.
6  Q  And your post master's, what category is
7  that, would that be?
8  A  Family nurse practitioner.
9  Q  And where did you do -- prior to your
10  master in nursing, where did you go to school?
11  A  Obtained a bachelor's degree in nursing
12  from the University of Texas Medical Branch.
13  Q  Again, in Galveston?
14  A  Yes.
15  Q  Are you from Galveston?
16  A  No.
17  Q  Okay. Are you from Texas?
18  A  Yes.
19  Q  Okay. All right. And where did you go to
20  high school?
21  A  I had an associate's degree before that.
22  Do you want to know about that?
23  Q  Surely. I skipped one. I'm sorry. I
24  want to hear them all.
25  A  I had an associate's degree for my first

10

1  RN licensure and I got it from Brazosport College
2  and Galveston College. It was a cooperative program
3  that they had between the two colleges.
4  Q  And when was that?
5  A  I graduated with that in 1979.
6  Q  I'm ultimately going to get around to
7  getting you to disclose how long you've been doing
8  this. And any other advanced, beyond-high-school
9  education?
10  A  No.
11  Q  Okay. And where did you go to high
12  school?
13  A  Brazoswood High School.
14  Q  Brazoswood?
15  A  Yes.
16  Q  And where is that located?
17  A  Clute, Texas. Clute, Texas.
18  Q  Clute. And what year did you graduate
19  from there?
20  A  1976.
21  Q  Okay. Do you have a family?
22  A  Yes.
23  Q  And what -- who and which --
24  A  I have a spouse that lives with me. I
25  have a daughter that does not live with me.

11

1  Q  And how old is she?
2  A  28.
3  Q  And that's a good thing that she doesn't
4  live with you anymore; isn't it?
5  A  Yes, it is.
6  Q  Okay. Anybody else work for the State in
7  your family?
8  A  No.
9  Q  Okay. Let's talk about your employment
10  history.
11  A  Oh.
12  Q  Well, let me cut that short. Among the
13  things that were provided to the EEOC was an
14  application that you completed when you applied for
15  work at UTMB, and if we would refer to that
16  application, would it be correct, as stated, as to
17  your prior work history?
18  A  I don't remember exactly what's on it but
19  I would assume that it is correct.
20  Q  Okay. And we could rely on that in terms
21  of your past employment history.
22  A  Yes.
23  Q  So let's just limit it to UTMB. How's
24  that?
25  A  That's fine.

12

1  Q  And when did you start at UTMB?
2  A  1999.
3  Q  And what did you start as?
4  A  As a nurse practitioner.
5  Q  On a scale of understanding how the
6  ranking or the pecking order goes, could you start
7  at the bottom of the nursing scale and go up the top
8  for me where -- LVNs and RNs and you've got
9  assistant nurse managers and nurse managers. How
10  does that all work?
11  A  I don't know that I understand your
12  question for sure.
13  Q  Okay. Well, let me try it again. If
14  there were an organizational chart of all the
15  nursing staff of UTMB -- and because it's TDC, we're
16  just going to limit our conversation to the UTMB/TDC
17  structure -- what would be at the very bottom row?
18  What level or what position?
19  A  Well, we can go all the way down to
20  nursing assistants.
21  Q  Okay.
22  A  And then there's -- in our -- in our --
23  Q  Is that an abbreviation that you call
24  these people? Because I've read so many letters, I
25  get confused. When you refer to them in notes or

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

Deposition of Mary Gotcher

---

**13**

1  correspondence?
2      A   We -- they're in a group called unlicensed
3  assistant personnel.
4      Q   Okay.  But -- okay.  So assistant nurses
5  and they're unlicensed.
6      A   Those aren't assistant nurses.
7      Q   All right.
8      A   I did not say assistant nurses.
9      Q   Sorry.
10     A   I said nurse assistants.
11     Q   Nurse assistants.  Okay.  And they're not
12 licensed nurses.
13     A   No.
14     Q   Okay.  Let's start with the ones that have
15 licenses.  That's what I really care about.
16     A   That's an LVN.
17     Q   Okay.  That's the -- would be at the
18 bottom of the license.
19     A   Yes.
20     Q   And "LVN" stands for?
21     A   Licensed vocational nurse.
22     Q   Okay.
23     A   Then the RN is next.
24     Q   And the "RN" stands for?
25     A   Registered nurse.

---

**14**

1      Q   Okay.  And in terms of training among --
2  between these two, what's the difference in the
3  requirement?
4      A   The LVN is very -- the board requires the
5  LVN be trained in task, nursing task procedure,
6  direct care, patient care kind of tasks.  An RN is
7  differentiated by their critical thinking skills and
8  putting more of a cooperative plan, patient care
9  plan together, rather than just doing a task, and
10 coordinating care between the different disciplines.
11     Q   Okay.  And is there an educational
12 difference?
13     A   Yes, there is.
14     Q   And what would that be?
15     A   Well, it depends whether you're getting an
16 associate degree or a bachelor's degree.
17     Q   Okay.
18     A   But both of those pass the same state
19 boards for the RNs.  Educationally, an LVN is only
20 about a nine-month course, nine-month to a year.  An
21 RN is -- at the minimum, is a two-year degree with
22 an associate's.
23     Q   Okay.  So on up the food chain in the
24 structure of UTMB and Texas Department of Criminal
25 Justice.

---

**15**

1      A   There's mid-level providers, is what
2  they're called.
3      Q   Okay.
4      A   And they're PAs.  That's a group of
5  physician's assistants or nurse practitioners.
6      Q   So PAs are physician assistants and nurse
7  practitioners?
8      A   Practitioners or advanced practice nurses.
9  They're licensed by the board of nurses and they can
10 have different specialties:  Adult, family, maternal
11 health, geriatric.  Nurse practitioners can have
12 different specialties.
13     Q   Okay.  And are they noted by what
14 initials?
15     A   NP is all of them but I'm recognized with
16 an FNP, which is a family nurse practitioner.
17     Q   So it would identify your specific
18 specialty?
19     A   Yes.
20     Q   Okay.  Do you have to have a specialty to
21 be a nurse practitioner?
22     A   Yes.
23     Q   Okay.
24     A   You have to choose.
25     Q   All right.  And so after the -- and those

---

**16**

1  would be the mid-level providers.  Correct?
2      A   And after that are the physicians.
3      Q   Okay.  And where do the nurse managers and
4  the assistant nurse managers and that structure,
5  where does that fit in?
6      A   I've just named to you clinical side of
7  how things work clinically.  Assistant nurse
8  managers, nurse managers, medical directors are
9  in -- on the administrative side of the house.  They
10 are RNs for nursing.  The assistant nurse managers
11 and nurse managers are all RNs.
12     Q   And on the administrative side, is the
13 lowest-level administrator an assistant nurse
14 manager?
15     A   In our system, yes.
16     Q   Okay.  Then it would be the nurse manager?
17     A   Yes.
18     Q   And what comes after that?
19     A   There is a district nurse manager and then
20 there is my position, which is nursing director of
21 outpatient services.  There is also a director of
22 inpatient services.
23     Q   And that would be a nursing director of
24 inpatient?  Who --
25     A   Yes.

---

Bayou City Reporting, Inc.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

17

1  Q   Who is that?
2  A   Gary Eubank.
3  Q   Gary?
4  A   (Moving head up and down)  Eubank.
5  Q   Eubanks?  Okay.  And so at the time that
6  the facts of this lawsuit took place, we're speaking
7  really about Ms. Fisher being an assistant nurse
8  manager that she started as.
9  A   Yes.
10 Q   And then she was promoted to a nurse
11 manager.
12 A   Yes.
13 Q   And then she was demoted to an assistant
14 manager.
15 A   Yes.
16 Q   And then she was promoted back to a nurse
17 manager.
18 A   Yes.
19 Q   Okay.  There was some discussion about a
20 clinical nurse III position.  Where does that fall?
21 A   That's the RN.
22 Q   Okay.  And it's not an administrative
23 position.
24 A   No.
25 Q   Okay.  How long have you been the nursing

18

1  director of outpatient services?
2  A   We've reorganized recently and that's a
3  new title for me.  We just reorganized in-service
4  line to inpatient and outpatient within the last six
5  months.
6  Q   Okay.  Prior to that, what was your title?
7  A   We were divided geographically, north and
8  south, and I was the director of nursing for the
9  northern division.
10 Q   And northern division included what?
11 A   Anything Huntsville and north.
12 Q   All right.  And the director of the
13 southern portion of it?
14 A   Was Gary Eubank.
15 Q   Was Gary.  Okay.  So you two still have
16 essentially the same responsibilities, just
17 different divisions, different slice of the pie, so
18 to speak?
19 A   Yes.
20 Q   And at what point were you named director
21 of nursing for the northern division?
22 A   It's been six years.
23 Q   Okay.  Is that 2003?
24    MS. FISHER:  It would be 2003.
25    MS. MILLER:  I have to do the math

19

1  here.  You're making me work.
2     THE WITNESS:  Close.  Close.
3  Q   (BY MS. MILLER)  Is that 2003?
4  A   Yes.
5  Q   All right.
6  A   That's close.
7  Q   Okay.  And were you the director of
8  nursing for the northern division at the time that
9  Ms. Fisher was made -- or was first promoted to be a
10 nurse manager?
11 A   Yes.
12 Q   So --
13 A   I think so, yes.
14 Q   That was under your tenure --
15 A   Yes.
16 Q   -- that she was promoted.
17 A   Yes.
18 Q   Did you have any involvement in that
19 promotion?
20 A   No.
21 Q   You don't approve promotions at that
22 level?
23 A   I'm usually notified that -- of who
24 they're going to put in the facility nurse manager
25 position, but I don't make the decision.  The

20

1  district managers made that --
2  Q   And in that time --
3  A   -- make those decisions.
4  Q   Sorry?  I do that to you.  Were you
5  finished?
6  A   Yes.
7  Q   Okay.  And at the time she was promoted,
8  the decision maker in that promotion was David
9  Watson.
10 A   Yes.
11 Q   Is that correct?  Okay.  So prior to the
12 time that you were promoted to the director of
13 nursing for the northern division, what position did
14 you hold with UTMB?
15 A   I was a nurse practitioner.  I worked
16 as -- in the -- in the facilities.
17 Q   Were you at all a nurse manager?
18 A   Not during that time, no.
19 Q   Okay.  And how long were you a nurse
20 practitioner in the facilities?
21 A   Four years.
22 Q   What facilities did you work in?
23 A   Coffield, Michael.
24 Q   Coffield?
25 A   Coffield and Michael were the major.

Deposition of Mary Gotcher

21

1    Q  Are those up north?
2    A  Yes.
3    Q  Okay.  And at -- prior to those four
4 years, what did you do for UTMB?
5    A  I didn't work for UTMB.
6    Q  All right.  So prior to the management --
7 prior to the time you started working for UTMB, I
8 know I said I have your resume, but tell me about
9 the managerial positions that you held, the ones
10 that would require managing-people skills.
11   A  Throughout my career, I have been -- I've
12 moved back and forth between clinical and
13 administrative roles.  I've held several
14 administrative roles at Brazosport Hospital in Lake
15 Jackson, Texas, over the ICU and over their medical
16 floor.  I've also worked three years at the
17 University of Texas Medical Branch in Galveston as a
18 manager over their urology floor and over their
19 recovery room and over their surgical ICUs.
20   Q  Okay.  I think I can read my writing.  I'm
21 not sure.  Surgical ICUs?
22   A  Yes.
23   Q  And Brazosport -- is that a hospital?
24   A  Yes.
25   Q  All right.  When you were in charge of the

22

1 ICU, how many people reported to you?
2    A  I don't remember.
3    Q  Can you give me a range?
4    A  20.
5    Q  Okay.  And how about on the --
6       MS. FISHER:  Medical floor?
7       MS. MILLER:  Medical floor?  Thank
8 you.  Do you want a job?
9    Q  (BY MS. MILLER)  On the medical floor?
10   A  I probably had close to 40 employees.
11   Q  And how about on -- when you worked for
12 UTMB those three years when you were in urology,
13 number of employees?
14   A  Probably 25.
15   Q  Recovery room?
16   A  Probably close to the same.
17   Q  Okay.  And surgical ICU?
18   A  Probably more like 40.
19   Q  Okay.  Before you came to UTMB, did you
20 have any special training in management and people
21 skills, HR-type training?
22   A  Yes.  I have a master's degree, nursing
23 administration.
24   Q  And what are some of the concepts that you
25 studied in receiving that degree in nursing

23

1 administration, broad concepts?
2    A  I guess broad concepts are going to be
3 budgeting, finance, human resource management,
4 employment management, normal school.
5    Q  Normal school stuff.  Okay.  And then
6 working for Brazosport or UTMB, did you receive any
7 additional training through the companies you worked
8 for to assist you with your management skills?
9    A  I have made myself available for lots of
10 training throughout my 32 years as an RN.
11   Q  Okay.  Well, then let's limit it to when
12 you joined UTMB.  What kind of special training, in
13 addition to that that you came with, have you had to
14 assist you in your management skills?
15   A  Are you talking about the last ten years
16 that I've been here?
17   Q  That's fine.  I can limit it to ten.
18   A  Okay.  That's the time that I've been here
19 at UTMB, so --
20   Q  Yes.
21   A  -- I believe that's what you asked.  I was
22 making sure.
23   Q  Yes.
24   A  UTMB avails us of many management and
25 leadership courses throughout those ten years from

24

1 servant leadership to dealing with difficult people
2 to -- those are still available by our education
3 department and I've availed myself of all those
4 classes that were available there.
5    Q  Are they computer-based classes or --
6    A  Not all of them.  Some of them are
7 classroom classes and some are computer-based
8 classes.
9    Q  And so the record of that is in your
10 personnel file, I'm sure.
11   A  I'm sure.
12   Q  Okay.  And what about Texas Department of
13 Criminal Justice?  Did you get any special training
14 through that or --
15   A  No.
16   Q  -- that interface doesn't provide for
17 additional training for you?
18   A  No.  They're -- we contract through --
19   Q  How do you -- how are -- is the
20 information disseminated from TDCJ to you in terms
21 of that integration, if you need to know TDCJ
22 policies and procedures?
23   A  We have a TDCJ Health Services Division
24 that we work with very closely and we cooperatively
25 do those -- make those decisions with them as a

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

25

1  partner, as a contractual partner, and we have that
2  manual available to us at any time.
3       Q   Okay. How long have you known Jackie
4  Fisher?
5       A   Probably the last six years.
6       Q   And how did you first come to meet
7  Ms. Fisher?
8       A   I met her as one of my employees when I
9  became the district nurse manager or the director.
10      Q   And describe that -- the instance or how
11 you facilitate meeting your employees. What did you
12 do?
13      A   Well, when I first became a nurse manager,
14 I visited each one of the facilities with their
15 managers and with the management teams and visited
16 each facility and spoke with managers about their
17 particular facility and the needs and the mission on
18 the different facilities and what their particular
19 needs were.
20      Q   Okay. And that was in 2003 when you first
21 started?
22      A   Um-hmm.
23      Q   How often did you visit the facilities
24 after that initial get-acquainted visit?
25      A   That's varied depending on the facility

26

1  and what the needs were.
2       Q   Okay. So once a month? Once a year?
3       A   I have no -- there is no -- there are some
4  units that I've been at weekly. There are some
5  units that I have not been at in a year. So that is
6  very different, depending on the needs of each
7  particular facility.
8       Q   Okay. So -- and your office is in
9  Palestine?
10      A   Yes.
11      Q   All right. So a typical week in
12 Palestine, would you be there, primarily, or would
13 you be out in the field?
14      A   I'm out of town from my office at least
15 two to three days a week.
16      Q   And would that have been true in 2006 and
17 2007?
18      A   Yes.
19      Q   And those two to three days a week
20 would -- normally those would be spent visiting
21 on-site locations?
22      A   Sometimes.
23      Q   And what other out-of-the-office kind of
24 activities would you participate in?
25      A   TDCJ Health Services is here in

27

1  Huntsville. I spend time in their offices, as well,
2  and meeting with them for policy and procedure
3  reasons. I spend time in Galveston with our main
4  office location in Galveston, with meetings and
5  functions there, as well. So it could be for
6  various things.
7       Q   Okay. So after you first met Jackie
8  Fisher in 2003, what -- did you have occasion to
9  meet -- or to communicate with her subsequent to
10 that?
11      A   Not usually. Saw her at conferences, knew
12 who she was. But, no. I -- there was a district
13 manager that was her direct supervisor.
14      Q   And so your role would really be to work
15 directly with him, not with --
16      A   Yes.
17      Q   -- Ms. Fisher. Okay. When did you first
18 become aware that Ms. Fisher was complaining of
19 racial discrimination at UT -- by members of
20 management at UTMB?
21      A   I have no idea.
22      Q   Okay. And --
23      A   I do not remember.
24      Q   -- do you remember conceptually what it
25 was that you were made aware of, if you don't

28

1  remember the time?
2       A   No. I don't. I remember her concern.
3  Probably after the on-site visit is when I knew that
4  she was concerned.
5       Q   Okay. And that would be the on-site visit
6  in January of 2006?
7       A   Yes.
8       Q   Let's talk about that specifically and
9  that. What precipitated that particular visit that
10 you -- and I just know from other discussions --
11 that you made and you were accompanied, I believe,
12 by Ms. Melton?
13      A   Yes.
14      Q   Okay. What precipitated that visit?
15      A   Multiple things precipitated that visit.
16 I had been having discussions with Mr. Watson about
17 the performance of Estelle facility. I had received
18 several e-mails from some employees at the Estelle
19 facility that were unhappy. The turnover was
20 increasing at that facility and Mr. Watson felt that
21 he had made all the assessment and done all the
22 changes that he could do, and he and I agreed that I
23 would facilitate continued improvement at Estelle by
24 doing an on-site investigation to see what I could
25 find different.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

29

1    Q   And that was a discussion you had directly
2  with Mr. Watson?
3    A   Yes.
4    Q   Was Ms. Melton involved in that
5  discussion?
6    A   No.
7    Q   How was it that she became a part of the
8  visit?
9    A   After I decided to make a visit -- I don't
10 usually make those type of visits without HR with
11 me.
12   Q   Okay.  And so at this point, the
13 discussion is between you and Mr. Watson and you've
14 invited Ms. Melton.  How did you determine when to
15 go and do this?
16   A   The next time I had available, I went to
17 Estelle, and the next time Georgia had -- Ms. Melton
18 had available time, we planned the trip.
19   Q   And that turned out to be in January, mid
20 January?
21   A   I don't remember.
22   Q   17th and 18th?
23   A   I don't remember.
24       MS. MILLER:  Or January 9th, you're
25 telling -- okay.

30

1    Q   (BY MS. MILLER) And how did you notice,
2  beside how -- who did you notice that you were going
3  to be making the visit?
4    A   Mr. Watson put out the notice that we
5  would be coming and...
6    Q   And was that a written notice?
7    A   He e-mailed it.
8    Q   And do you recall to whom that would have
9  been distributed?
10   A   No.
11   Q   Okay.  You indicated that you had received
12 several e-mails from employees or maybe -- strike
13 that.  You received e-mails.  I added the "several,"
14 so I'll take that back.  You received e-mails from
15 employees who were unhappy.  Who were those
16 employees?
17   A   Don't know that I can remember all of
18 them, but it seemed to be the nurse -- nurses in the
19 emergency room mostly.
20   Q   Okay.
21   A   I remember Ms. Anderson, Ms. Darby,
22 Ms. Lauder, and Ms. Moreau being the ones that I can
23 remember, others that I can't.
24   Q   And Moreau is spelled?
25   A   M-O-R-E-A-U.

31

1    Q   Oh.  Okay.  And we have a cold record here
2  and it's going to be just a plain black-and-white
3  page, but just for the record, you're Caucasian.  Is
4  that correct?
5    A   Yes.
6    Q   And how about Mrs. Anderson --
7  Ms. Anderson?
8    A   She's Caucasian.
9    Q   And how about Ms. Darby?
10   A   She's Caucasian.
11   Q   And Ms. Lauder?
12   A   She's Caucasian.
13   Q   And Ms. Moreau?
14   A   I don't know.
15   Q   And in terms of the turnover increasing,
16 how do you monitor the turnover?
17   A   By the number of people leaving.
18   Q   Okay.  So that's the measure.  Seems like
19 a good way to do it.  How -- do you get a report?
20 Do you print a report?  Do you monitor it monthly?
21 Is it an annual turnover rate?  How do you look at
22 it?
23   A   We look at it monthly.  We get monthly
24 reports, as well as annual reports.
25   Q   And that would be by facility or by

32

1  individual manager?
2    A   By facility.
3    Q   And when Mr. Watson said he felt he had
4  done all he could, did he -- how did he communicate
5  that to you?
6    A   In a conversation on the phone.
7    Q   Okay.  Was there any written
8  memorialization of that conversation?
9    A   Not that I remember or not that I know.
10   Q   And when he said, indicated to you he had
11 done all he could, what did he indicate to you that
12 he had done?
13   A   We had had multiple conversations about
14 the Estelle facility and the fact that things
15 weren't running as smoothly as he felt they should
16 and he was trying to identify where the issues were
17 to improve them and he had been unable to make
18 headway with identifying exactly where the issues
19 were.
20   Q   Okay.  So what had he done?  So he had
21 trouble identifying the issues.  Had he done
22 anything?
23   A   Certainly he had but I don't -- you'll
24 have to ask him.  I don't know.
25   Q   Okay.  So you didn't ask him that.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

33

1    A   No.
2    Q   And did you have any part in communicating
3  notice of your visit to the Estelle Unit?
4    A   No.
5    Q   When you arrived at the Estelle Unit, what
6  did you do?
7    A   Ms. Melton and I told Mr. Watson we were
8  there.  We were -- found us a room, a conference
9  room, that was avail -- that was private so that
10  employees could feel like they weren't overheard.
11  And it was also not out in the hallway on a nursing
12  unit, so people -- it was down in the offices so
13  that people couldn't see, coming and going, if
14  people did not want others to know that they were
15  coming or leaving.
16    Q   And so you had a conference room.  Then
17  what did you do?
18    A   We started having people come in and --
19    Q   How was it determined who would come in?
20    A   They determined who came in.  We made the
21  invite, told them we were here.
22    Q   How did you make that invite?
23    A   Through Mr. Watson's e-mail.
24    Q   So it was kind of like "We're going to be
25  here if you want to stop in"?

34

1    A   Um-hmm.  Um-hmm.
2    Q   Did you contact any specific individuals
3  or initiate any conversation with specific
4  individuals?
5    A   The individuals that came.
6    Q   Other than the ones that, on their own
7  initiative, showed up, did you seek specific
8  employees to speak with?
9    A   No.
10    Q   Did Mr. Watson send specific employees for
11  you to speak with?
12    A   I have no idea.
13    Q   Okay.  And what level were these
14  employees?
15    A   We had all levels of employees.  We had
16  RNs, LVNs, PCAs, and I don't know if we had nursing
17  assistants or not.  We had all levels of employees.
18    Q   Was there an assistant nurse manager at
19  that facility?
20    A   There were two assistant nurse managers
21  that worked for Ms. Fisher at that time.
22    Q   And who were they?
23    A   Mr. Aguilar and -- I'm losing her name.  I
24  don't remember her name.  I see her face.
25    Q   Another --

35

1    A   Still in the system.
2    Q   Another nurse --
3    A   Still work -- yes.
4    Q   Assistant nurse manager.
5    A   Gayle McCartney.
6    Q   And who all came to your room?
7    A   I don't remember who all came.  I did --
8  Ms. Melton conducted the interviews with my -- with
9  me listening and interjecting when I had specific
10  questions, but the interviews were mostly done by
11  HR, Ms. Melton.
12    Q   Okay.  But you were present during the
13  interviews.
14    A   Sure.
15    Q   All right.  And so there would certainly
16  be a record of what these employees said.
17    A   She took notes.
18    Q   Okay.  So there are notes of the --
19    A   I don't know where her notes are.
20    Q   Okay.  Was there any kind of form that was
21  filled out or --
22    A   No.
23    Q   -- any specific questions that were asked?
24    A   Well, no.
25    Q   Any consistent, you know --

36

1    A   Nothing formal.
2    Q   Nothing formal.  Okay.  Were the employees
3  asked to make a statement?
4    A   I don't guess I understand.
5    Q   Were they asked to make a written
6  statement?
7    A   No.
8    Q   No.  So there are no written statements
9  from the employees regarding this meeting.
10    A   No.
11    Q   These meetings.
12    A   Um-hmm.
13    Q   And correct me if I'm wrong, but these
14  meetings lasted for two days or you were there for
15  two days?
16    A   We were there for two days.
17    Q   Okay.
18    A   We were there at different times those two
19  days so we could reach --
20    Q   The different shifts.
21    A   -- and be available to the different
22  shifts.
23    Q   See, I'm -- I did it again.  I knew what
24  you were going to say.  And in the Estelle Unit,
25  there were two nurse managers.  Is that correct?

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

37

1  Ms. Fisher and another nurse manager?
2      A    Yes.
3      Q    Okay.  And so Ms. Fisher was a nurse
4  manager over some of the employees, and who was the
5  other nurse --
6      A    Most of the employees.
7      Q    Most of the employees.  And do you recall
8  how many nurse -- how many employees reported to
9  Ms. Fisher?
10     A    No.
11     Q    Do you recall who the other nurse manager
12 was?
13     A    Joyce Bonds.
14     Q    Joyce Bonds?
15     A    And she was over the geriatric center.
16     Q    Do you recall how many employees reported
17 to her?
18     A    Very few.  The geriatric center was only
19 staffed 12 hours a day, it was not staffed at night,
20 and it was a very small -- it's a very small
21 facility.
22     Q    Okay.  So there was some conversation
23 yesterday that Ms. Fisher had 42 employees that
24 reported to her?
25     A    (Moving head side to side)

38

1      Q    You wouldn't have any reason to doubt
2  that.
3      A    I wouldn't have any reason to doubt that.
4      Q    How many employees came and spoke to you?
5      A    I don't remember exactly.  It's been four
6  years ago.  I don't remember how many came.
7      Q    But certainly we could check Ms. Melton's
8  notes to be sure.
9      A    If you know where they are, yeah.
10     Q    And of the employees that came to visit
11 you, were any of those employees ones that reported
12 to Joyce Bonds?
13     A    I don't think so.
14     Q    And do you know if her employees received
15 the invitation?
16     A    No.  I understand it was sent to them, but
17 I --
18     Q    But you don't know.
19     A    I don't know.
20     Q    Did you walk through the facility while
21 you were there?
22     A    No.
23     Q    And did you speak to Mr. Aguilar?
24     A    Yes.
25     Q    And where did you speak to Mr. Aguilar?

39

1      A    I don't know.
2      Q    Well, was there a time you left this
3  conference room, this private conference room?
4      A    Oh, sure.  Sure.  We --
5      Q    And actually spoke to Mr. Aguilar out in
6  the facility; didn't you?
7      A    It's possible.
8      Q    Did you speak to anyone other than
9  Mr. Aguilar out in the facility?
10     A    Not that I recall.
11     Q    And did you go to the facility where Joyce
12 Bonds was in charge of that particular facility?
13     A    No.  And I did not go to the building that
14 Ms. Fisher was in charge of, also, and I did not go
15 out to the high security that she's in charge of,
16 also.  I stayed only in the one facility.
17     Q    Okay.  And what facility was that?
18     A    The RMF, the regional medical facility.
19     Q    And is that where Mr. Aguilar worked?
20     A    I don't know where she had him assigned.
21     Q    Okay.  And maybe I asked you this but if I
22 didn't -- and did you personally seek out anyone
23 other than Mr. Aguilar?
24     A    No.
25     Q    Okay.  So you had a conference room.  You

40

1  had these people.  People came and talked to you.
2  What else did you do while you were there?
3      A    I have no idea.  Don't remember doing
4  anything else.  It felt like we were in that
5  conference room a long time.
6      Q    Did you, at any time, try to interview
7  Ms. Fisher and get her side of the story?
8      A    She was not there.  She was out on
9  bereavement and we knew we would have to get her
10 when she got back, we would have to discuss with her
11 when she got back.
12     Q    So you went there knowing she wasn't going
13 to be available.
14     A    Yes.  We went there the soonest time we
15 had available and did not know she was going to be
16 out at that time.
17     Q    When did you get with Ms. Fisher to
18 discuss her side of the story and her concerns?
19     A    It was sometime shortly after that.
20     Q    And how did you approach that?
21     A    I don't remember.  I don't remember if she
22 called us or we called her, but we did set up a time
23 to meet with her and did meet with her to hear her
24 side of the story.
25     Q    And do you recall where you met with

Bayou City Reporting, Inc.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

41

1   Ms. Fisher?
2       A   I believe it was at the facility.
3       Q   Okay.  And was Ms. Melton with you again?
4       A   I don't remember.
5       Q   And this conversation that you had, I'm
6   going to go back just a minute.  Ms. Anderson,
7   Ms. Darby, Ms. Lauder, and Ms. Moreau that we spoke
8   with earlier, they're the ones that wrote the
9   e-mails?
10      A   They're some of them.
11      Q   Wrote some of the e-mails?
12      A   (Moving head up and down)
13      Q   That precipitated the on-site visit?
14      A   I had also gotten e-mails from
15  Mr. Aguilar.
16      Q   And among Mr. Aguilar, Ms. Anderson,
17  Ms. Darby, Ms. Lauder, Ms. Moreau, are any of those
18  still working for UTMB?
19      A   Mr. Aguilar still works for UTMB.
20      Q   Okay.  He does?
21      A   Uh-huh.
22      Q   In the TDC facility?
23      A   Uh-huh.  At the Skyview facility.
24      Q   At the Skyview?
25      A   At the Skyview facility.

42

1       Q   But Ms. Anderson, Darby, Lauder, and
2   Moreau are no longer there.
3       A   I don't know about Ms. Moreau.  I know the
4   others are not.
5       Q   And, in fact, the others complained about
6   their subsequent managers to you; didn't they?
7       A   Subsequent manager?
8       Q   After they no longer reported to
9   Ms. Fisher, they didn't like the next one that came
10  along either; did they?
11      A   I don't -- I have not had reason to
12  believe that, that -- Ms. Upshaw may.  The person
13  that's their direct supervisor may.  And I know they
14  went through some disciplinaries with Ms. Upshaw.
15      Q   When you had the meeting with Ms. Fisher
16  on -- how did that go?  Describe that.
17      A   I felt like I gave her a fair
18  summarization of what I had been -- what I had heard
19  from the employees.  I tried to give some specific
20  examples included in that instead of just general
21  summarization.  And I listened to her side, let her
22  tell me what she thought was correct and incorrect
23  and why, and then I told her that we'd be putting
24  together a plan for both her and the staff.
25      Q   What was her side?

43

1       A   Her side was that she felt like she was
2   doing everything she should as a nurse manager, that
3   she was making some changes that the staff were
4   resisting, and they weren't being as cooperative as
5   they could be, that she felt like she was
6   approachable.  She did agree that her communication
7   sometime can be sharp and she would -- she agreed
8   that that could happen and she would improve in
9   that, improve on that, and that she would
10  communicate less with e-mail and more in person and
11  that she would communicate more in general with her
12  staff.
13      Q   Anything else?
14      A   Not that I know of.
15      Q   Okay.  And the specific examples of
16  discontent that you shared with her, do you recall
17  what those were?
18      A   Exactly who said what, no, but one of the
19  specific examples were that someone got to come and
20  go when they wanted in the facility.  There was some
21  favoritism.  They claimed favoritism, that it was
22  one of her favorites, and that they would allow her
23  to work where she wanted to in the facility when she
24  wanted to.  One of the other examples was she had
25  moved some equipment in the emergency room and had

44

1   failed to communicate well with -- or the perception
2   from the ER nurses were that she failed to
3   communicate well with them the changes that were
4   made and where they were.  I saw that as an at-risk
5   opportunity for ER nurses to not feel like they knew
6   where equipment was in the emergency room.  So that
7   was a specific example that I gave her, as well.
8       Q   Okay.  Anything else?
9       A   No.  Not that I remember.
10      Q   And was this meeting just you and
11  Ms. Fisher --
12      A   I believe so.
13      Q   -- or was anybody else present?
14      A   I believe so.  If anybody else was there,
15  it was Ms. Melton, but I don't remember.
16      Q   And you indicated you had developed a --
17  you said you developed a plan for Ms. Fisher and her
18  staff?
19      A   Yes.
20      Q   And would -- that plan was in writing?
21      A   Yes.
22      Q   And you developed that personally?
23      A   With the help of Ms. Melton.
24      Q   Okay.  And did Mr. Watson have any input
25  in that?

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

45

1      A   No.
2      Q   And how was that communicated?
3      A   I met with Ms. Fisher and the staff
4   members.
5      Q   And do you recall when that was?
6      A   No.
7      Q   Are these called expectations?  Is that --
8      A   That's what I call them.
9      Q   Is that what you call them?
10     A   That's what I call them.
11     Q   And when you receive an expectation, is
12  that -- that's a need for improvement; isn't it?
13     A   Sure.
14     Q   Okay.  In other words, saying a need for
15  improvement, essentially, "Here's some
16  expectations," and the implication is "You're not
17  meeting them"?
18     A   Or that you could improve.
19     Q   Or you could improve.  Okay.  All right.
20  So essentially that was -- it was a reprimand?
21     A   No.
22     Q   Okay.  It would be a coaching in -- in the
23  free world, they call it coaching?
24     A   You might consider it a coaching, yes.
25     Q   Okay.

46

1      A   It was...
2      Q   And how did -- you said you communicated
3   this to Ms. Fisher and her staff, and that was a
4   group meeting?
5      A   Yes.
6      Q   How was that -- did that meeting come
7   about?
8      A   I planned it and they came.  What do you
9   mean, how did it come about?
10     Q   How were they noticed?
11     A   I e-mailed them, I do believe.  I don't
12  remember.
13     Q   The entire staff?
14     A   Yeah.
15     Q   All 42 people.  How many people showed up?
16     A   I don't remember.
17     Q   What did their -- would you have had a log
18  of that particular meeting, employee log, to show
19  who attended?
20     A   I don't think so.
21     Q   Okay.  And did you have two different
22  staffs -- staff meetings to cover the different
23  shifts like you did --
24     A   Yeah.  Well, and I had it -- I had it at a
25  time where both could come.

47

1      Q   Okay.  So it is possible to overlap that?
2      A   Yes.
3      Q   All right.  And you communicated to
4   Ms. Fisher, as well as her staff, the expectations
5   you had for her.  Is that correct?
6      A   Yes.
7      Q   Okay.  Have you ever done that to another
8   staff member where you've communicated their
9   expectations to their subordinates?
10     A   Yes.
11     Q   And on what occasion have you done that?
12     A   I've done that in the Gatesville district,
13  as well.
14     Q   And when was that, that you did that?
15     A   I do not remember when.  That's not an
16  unusual way to approach a problem when there's
17  issues between two sets of people.
18     Q   Okay.  But is the Gatesville the only
19  other incident you can recall that you did that?
20     A   On that large of a scale.  Very often I
21  have put together two groups of people, sometimes
22  from two facilities, where they were having trouble
23  with continuity of care or something between two
24  facilities and we meet with the two groups and the
25  expectations of one and the expectations of the

48

1   others.
2      Q   Okay.
3      A   That's not an unusual management tool to
4   use.
5      Q   But in that particular instance, there
6   were not superior supervisor and subordinate
7   relationship.  That would have been an equal
8   relationship.  Right?
9      A   In that particular one.
10     Q   Okay.
11     A   There are others that were not that also
12  had supervisors.
13     Q   And can you think of any other examples
14  for me?
15     A   The Gatesville example.
16     Q   Okay.  And besides the Gatesville example?
17     A   No.
18     Q   Okay.  So you communicated your
19  expectations of Ms. Fisher to her staff.  What were
20  those expectations?
21     A   Pretty much what I've already just
22  answer -- what I just told you I told Jackie her --
23  the issues were.  To e-mail less, she would be
24  communicating more directly, that she would be
25  having staff meetings on a regular basis to

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

49

1  communicate with them. If things were going to be
2  moved, that I expected her to get input from them,
3  so would they please be cooperative in giving her
4  input for things -- for changes that she made of
5  that nature. It was the things I said earlier.
6      Q   And you don't consider that a public
7  reprimand?
8      A   No.
9      Q   What did you convey to the employees that
10  they needed to do, their expectations? I'm sorry.
11      A   Their expectations were that they had a
12  new nurse manager that was going to be doing things
13  differently, and I expected that they be cooperative
14  with her, that they work with her to develop those
15  plans, as requested, that they be flexible in their
16  scheduling and where they were told to work. They
17  were being quite inflexible and they weren't wanting
18  to go to the different areas and cross-train, and
19  that was one of our goals. So I told them that they
20  needed to be more flexible with their scheduling, to
21  follow their chain of command, that when they had
22  issues, they needed to come to Jackie. That's all I
23  remember.
24      Q   Okay. And Ms. Fisher's were written down.
25  Were the employees' expectations also written down?

50

1      A   Yes.
2      Q   And each one received a copy of that, was
3  distributed a copy of that?
4      A   I believe so. I believe I had copies that
5  day.
6      Q   Do you think so or you don't know --
7      A   I don't know.
8      Q   -- for sure?
9      A   I don't know for sure.
10      Q   Okay.
11      A   I sat down with the group and had a long
12  discussion and told them both.
13      Q   Okay. What about the ones that might not
14  have been at the meeting?
15      A   Then I didn't talk to them.
16      Q   Okay. And how were they communicated
17  their expectations?
18      A   I have no idea.
19      Q   And was there any kind of a follow-up that
20  was requested?
21      A   There was going to be follow -- the plan
22  was to follow it in 90 days.
23      Q   And what happened in 90 days?
24      A   By that time, other things had already
25  happened.

51

1      Q   Okay. Well, that wasn't my question. I'm
2  going to go back here a minute. You had
3  expectations for Ms. Fisher, you had expectations
4  for the employees, and did both of them have a
5  90-day review --
6      A   Um-hmm.
7      Q   -- tagged to it?
8      A   Um-hmm.
9      Q   And how did you review Ms. Fisher in 90
10  days?
11      A   I didn't. She was not at the Estelle Unit
12  anymore in 90 days.
13      Q   So what happened in the interim?
14      A   She was given her -- it was decided that
15  the situation was very polarized and that there was
16  no way of retrieval at that particular facility and
17  the decision was made to demote Ms. Fisher.
18      Q   Okay. So just so I'm clear on the
19  sequence of events, she was given a 90-day
20  expectations but, yet, she was demoted before she
21  was allowed to complete that 90-day expectations.
22      A   Yes.
23      Q   And what about the employees that were
24  given expectations? How did you follow up with
25  them? Just let that dissolve?

52

1      A   I did.
2      Q   Okay. Of the 42 employees that reported
3  to Ms. Fisher, how many of them were African
4  American/black?
5      A   I have no idea.
6      Q   You keep that information somewhere,
7  though; don't you?
8      A   HR keeps that information. I don't at
9  all.
10      Q   But it is available.
11      A   I would guess so. I don't keep it.
12      Q   But when you looked at the cross-section
13  of employees that sat there during your meeting
14  where Ms. Fisher was given her expectations and the
15  employees were, lot, a few, not very many, half, a
16  third?
17      A   Have no idea. Don't even remember who
18  came. I remember what I told them but I don't
19  remember who was there.
20      Q   So we still don't know that all employees
21  got those expectations.
22      A   No. All employees didn't have any kind of
23  complaint and many didn't come and weren't
24  interested.
25      Q   Okay. But even if they didn't complain,

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

53

1    they were still invited.
2        A   Yes.
3        Q   Okay.  I think we talked about turnover
4    rates but I think there were also vacancy rates that
5    were discussed.  What are vacancy rates?
6        A   Vacancy rate is how many vacancies you
7    have in comparison to how many appointed positions
8    you have, how many filled and how many vacant
9    positions you have.
10       Q   And turnover has always been a problem at
11   UTMB/TDCJ; hasn't it been?
12       A   I don't know.
13       Q   Since you've been there, since you've been
14   the director of nursing.
15       A   It is something we've focused on, yes.
16       Q   Okay.
17       A   Made much improvement.
18       Q   Okay.  And is it fixed?
19       A   Turnover will never be fixed.
20       Q   Okay.
21       A   It's not fixed nationwide.
22       Q   So it's an ongoing problem.
23       A   (Moving head up and down)
24       Q   All right.  How about vacancy rates?
25       A   Vacancy rate is also an issue.

54

1        Q   Okay.  And you told me that you monitored
2    the turnover rate on a monthly basis?
3        A   Um-hmm.
4        Q   How about vacancy rates?  How did you --
5    did you do the same thing for that?
6        A   Yes.
7        Q   And there is a report printed on that?
8        A   Yes.
9        Q   And so you could compare the vacancy rates
10   of the different facilities?
11       A   Yes.
12       Q   So you would have a historical picture
13   when you made comments like higher turnover rates or
14   higher vacancy rates than other facilities.  You
15   would be able to back that up with statistics.  Is
16   that correct?
17       A   I don't know how long those records are
18   kept.
19       Q   Well, at the time, you would have been
20   able to.
21       A   Yes.
22       Q   Okay.  So did you meet with Joyce Bond as
23   you did with Ms. Fisher?
24       A   No.
25       Q   After the investigation on site?

55

1        A   No.
2        Q   Did she have any expectations as a result
3    of this on-site visit?
4        A   No.
5        Q   All right.  Then you said that there was
6    no need for the 90-day review because Ms. Fisher was
7    demoted.  Tell me how that happened.  Here you've
8    given an employee a 90-day window to improve.  Had
9    she ever had expectations given her before, if you
10   know?
11       A   I don't know.
12       Q   Okay.  But these were from you.  Correct?
13       A   Yes.
14       Q   All right.  So you gave her 90 days to
15   improve but, yet, in the interim, things, you
16   indicated, changed or you made a different decision
17   and went another direction.  Tell me what happened.
18       A   There was some urgency at Estelle because
19   of the staffing, the numbers of vacancies, the
20   numbers of people that were leaving, and the numbers
21   of people that were complaining.  Because it is an
22   acute care regional medical facility, there's some
23   urgency to the flow of that facility because it is
24   also a transient facility where lots of people come
25   and stay, going to and from different facilities.

56

1    And the urgency became very evident that we were
2    having much difficulty staffing and it was beginning
3    to affect patient care.
4        Q   Okay.  And when you say it became evident,
5    did you do more investigation or this was slopover
6    from the first investigation?
7        A   We didn't do a separate investigation.
8        Q   What other facts did you learn after you
9    gave her a 90-day improvement plan that caused you
10   to make a decision to not permit her to improve
11   during those 90 days?
12       A   The human resources department also played
13   a big role here.  They went back and reviewed notes
14   and reviewed some of those interviews and it was
15   with their help and with their direction that I
16   planned the demotion.
17       Q   Okay.  So just so I'm clear on what you
18   just indicated, the HR -- HR went back and pulled
19   the -- started reviewing the information that had
20   already been acted on.  Is that correct?
21       A   They relooked at the interviews.
22       Q   They relooked at the information that
23   you'd already spelled out her expectations for.
24       A   (Moving head up and down)
25       Q   Okay.  So did an investigation -- I'm just

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

57

1  trying to understand the sequence here.  You did an
2  investigation, you came to a conclusion, gave her
3  some expectations, you gave her 90 days to improve,
4  and then you went back behind that 90-day
5  improvement expectations and said, "Oh, no.  We're
6  going to do it worse."  Right?  "We're essentially
7  not going to give her a chance to improve.  We're
8  going to demote her."  Is that what happened?
9  Strike that.  Let me ask another.
10          What other facts that you learned
11 that you didn't know when the expectations were
12 given?
13     A  I just told you, the urgency.  Estelle was
14 failing.
15     Q  Okay.
16     A  Estelle was not --
17     Q  That's a concept but those aren't facts.
18 What facts showed you the urgency that Estelle was
19 failing?
20     A  The number of complaints continued.  The
21 number of people that planned to leave, the number
22 of staffing vacancies that were remaining uncovered,
23 making it dangerous for the patients, caused the
24 urgency.
25     Q  Okay.  So the number of complaints.  These

58

1  were new complaints that you received --
2     A  That continued, yes.
3     Q  -- after -- okay.  So -- but they were --
4  you received new ones after you gave her the 90-day
5  expectation.
6     A  Nothing seemed to settle.
7     Q  Well, that wasn't my question.
8     A  Yes.
9     Q  Okay.  You received complaints that you
10 hadn't acted on previously.
11     A  There were continued complaints, yes.
12     Q  Okay.  And people were planning to leave.
13 What?  Are people calling you up, saying, "I'm going
14 to -- I'm going to quit if you don't fire her"?
15     A  That was what the -- they were saying.
16     Q  And these are subordinate employees
17 that -- and you're listening to them threaten to
18 leave.  Is that correct?
19     A  They didn't say -- they did not say that
20 they were going to leave if I didn't fire her.  They
21 said they had plans to leave.
22     Q  Okay.  Who said that?
23     A  There were several.  I don't remember who
24 all they were.
25     Q  Can you think of any --

59

1     A  No.
2     Q  -- of the several?
3     A  No.
4     Q  Okay.  And did they tell you that in
5  person or --
6     A  It wasn't always just to me.  Some of it
7  was to human resources, to Ms. Melton.
8     Q  Okay.  And the continued complaints, who
9  did those come from?
10     A  Various employees, and they were, again,
11 to Ms. Melton, as well as myself.
12     Q  Okay.  But you -- do you recall any of the
13 names?
14     A  No.
15     Q  And then the vacancy rates, that's a
16 matter of historical data.  Right?
17     A  It's -- okay.
18     Q  Well, I'm asking you.
19     A  It's an ever-changing number.
20     Q  Okay.
21     A  Okay.
22     Q  But historically you can look at the
23 vacancy rates and see if the Estelle Unit indeed was
24 worse than the other units.
25     A  Yes.

60

1     Q  Okay.  And it's your testimony that the
2  vacancy rates at Estelle continued to be worse than
3  the other units?
4     A  No.
5     Q  Okay.
6     A  That they continued to -- the vacancy rate
7  continued to increase and the turnover continued.  I
8  never said it was worse than anywhere else.
9     Q  All right.  Did any other nurse managers
10 get reprimanded or demoted for vacancy rates or
11 turnovers that were high?
12     A  No.  Not in -- to my knowledge.  Not in my
13 division.
14     Q  Okay.  After she received this 90-day
15 improvement plan of expectations and you continued
16 to have some concerns, did you review any of those
17 with her?
18     A  No.  She was out.
19     Q  Okay.  So she was out on medical leave?
20     A  Yes.
21     Q  This is when her son had surgery?
22     A  Yes.
23     Q  All right.  How can you improve if you're
24 not even there to do it?
25     A  I don't know what you want me to say.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

61

1    Q   Well, I'm just questioning.  If you gave
2  her 90 days to improve and she wasn't there, how
3  could she have failed?
4    A   She's still responsible for the facility.
5  I mean, her -- she is the nurse manager of the
6  facility and has assistant nurse managers that she
7  works through to make sure the facility continues
8  to --
9    Q   Okay.  So even though she was out on
10  medical leave and wasn't in the facility to work on
11  her 90-day improvement, she was still demoted, based
12  on the continuing concerns you had.
13    A   Yes.
14        MS. MILLER:  Okay.  Can we take a
15  little break?  It's 11:30.
16        MR. LIVELY:  Sure.
17        (Lunch recess from 11:26 to 12:34)
18    Q   (BY MS. MILLER)  Back on the record.  So,
19  Ms. Gotcher, over the lunch hour, did you have a
20  chance to reflect back on your testimony this
21  morning?
22    A   Yes.
23    Q   And is there anything you'd like to
24  correct or change that you -- that --
25    A   No.

62

1        (Exhibit 1 marked)
2    Q   (BY MS. MILLER)  Okay.  Thanks.  I'm going
3  to show you what's -- maybe.  What's been marked as
4  Exhibit Number 1.
5        MS. MILLER:  And I only have one set.
6  I'm sorry, guys.
7    Q   (BY MS. MILLER)  And give you a chance to
8  read that and I'm going to represent to you that
9  this came out the EEOC investigation and is a recap
10  from the EEOC investigator of his interview with
11  you, and I want to make sure that you're a hundred
12  percent comfortable with what he thought you were
13  saying about this case.  So if -- read it carefully
14  and if there are any -- is anything you need to
15  correct or change as to what you told the
16  investigator that he didn't quite get right, I'd
17  like to have that corrected at this point.
18    A   I don't know that I've seen this document.
19        MR. LIVELY:  Go ahead and read it.
20        THE WITNESS:  And --
21    Q   (BY MS. MILLER)  Yeah, you probably
22  haven't seen it unless you reviewed all of the
23  things we disclosed, or it might have even come from
24  your EEOC files.
25    A   I've finished the document.

63

1    Q   Okay.  And you've had a chance to review
2  what's been marked as Exhibit Number 1 and I'm going
3  to -- as I represented to you, this is Mr. Batista's
4  representation of what you told him.  Is there
5  anything that's not correct in here that you'd like
6  to correct?
7        MR. LIVELY:  I'm going to object to
8  this and the fact that it's unauthenticated,
9  unsigned, and undated, but I'll just ask that
10  objection for this running question, but you can go
11  ahead.
12        MS. MILLER:  Sure.
13        THE WITNESS:  Who's Mr. Batista?
14    Q   (BY MS. MILLER)  He's the EEOC
15  investigator.  Is there -- well, looking at this, is
16  there anything you want to change today that isn't
17  right about what you -- what is represented here?
18    A   Well, I certainly don't remember to this
19  level of detail because this was apparently done a
20  number of years ago, but I don't think I ever said
21  anything about -- on the last paragraph on the first
22  page that talks about (as read) "She thought the
23  offense was serious to be warranted more than a
24  simple verbal warning.  She went on to say there is
25  nothing in her file other than a write-up, which was

64

1  simply meant to get her attention."  I don't
2  remember saying that.  I don't know --
3    Q   Are you on page 200691 now --
4    A   Yes.
5    Q   -- at the bottom of the page?  Okay.
6    A   I don't -- I don't remember the dates, but
7  if those were the dates that I told him, that's --
8  and like I said, some of the details I don't
9  remember.
10    Q   Okay.  Can you -- help me out here.
11  Specifically -- because I'm not trying to put words
12  in your mouth and I just -- if you can't verify it,
13  that's fine.
14    A   Well, I don't -- I don't know that I --
15  "Ms. Gotcher said she told" -- "was told by the
16  employees that Ms. Fisher did things along racial
17  lines or that there were security issues with the
18  way she approached the job."  I don't remember that
19  piece.  The equipment change piece I talked to you
20  about earlier.
21    Q   Yes.  Independently, were there racial
22  complaints made about Ms. Fisher, if you recall?
23    A   I don't recall.
24    Q   Okay.
25    A   And so it's some of those kind of details.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

65

1     Q   All right. Keep going. You're fine.
2  That's exactly what I need you to do, other things
3  that you can't verify or are not able to verify
4  today.
5     A   I don't remember anything about Reagan and
6  Brantley, Ms. Reagan and Brantley. I had said
7  something to you earlier about Ms. Darby,
8  Ms. Lauder, and Ms. Anderson, but I don't remember
9  Reagan or Brantley.
10    Q   Okay. And you're still on page 691 of
11  Exhibit 1.
12    A   Yes. And when it says, "Ms. Gotcher gave
13  Ms. Fisher a letter of expectations," it makes it
14  sound like it was a separate letter. It was the
15  summarization of the -- of the report that -- and I
16  don't know that Ms. Fisher disagreed with it at that
17  time.
18    Q   Okay. You don't recall that.
19    A   Hmm-um.
20    Q   But there was a time she did disagree with
21  the expectations?
22    A   I don't know that she thought they were --
23  I don't know.
24    Q   Okay.
25    A   I don't --

66

1     Q   All right.
2     A   Not to -- not to me, no. And I don't
3  remember speaking with John Pemberton about the case
4  at all. I talked to Georgia Melton but not John
5  Pemberton.
6     Q   And that's page 692 of Exhibit Number 1?
7  Is that the page to which you're referring?
8     A   Yes, ma'am.
9     Q   Thank you.
10    A   I don't remember anything.
11    Q   On page 692?
12    A   With Dr. Vincent.
13    Q   Okay.
14    A   I saw some -- I saw him talk with
15  Dr. Vincent, but other than that, I don't remember
16  anything.
17    Q   So it wouldn't be your position today that
18  there was some intimation of Ms. Fisher having an
19  inappropriate relationship with Dr. Vincent?
20    A   I think there was a report to that in one
21  of the notes Ms. Melton took, that one of the
22  employees said, but I never said it and I -- we
23  never verified any of those.
24    Q   Okay. Okay.
25    A   So I don't -- that didn't come from me. I

67

1  don't know where that came from but I think there is
2  something in -- or was something in some of the
3  notes that was -- one of the employees said
4  something but I don't -- okay.
5     Q   All right. Thank you. Now, at some
6  point, there was a peer review set up for
7  Ms. Fisher. Are you aware of that?
8     A   Yes.
9     Q   Tell me, just in general, what is a peer
10  review?
11    A   The Board of Nursing requires that you
12  have a peer review committee that delineate the
13  rules and regulations, the proceedings, the makeup
14  of the peer review committee, how many RNs and LVNs
15  there will be on the committee, and we have a
16  nursing peer review committee. The board also
17  regulates that anyone can refer to the peer review
18  committee and it is the peer review committee's job
19  to decide whether an incident that's turned in to
20  them is a minor incident under their specified rules
21  or whether it is a major incident that needs to be
22  reported further to the board.
23    Q   Okay. How are the members for a peer
24  review committee selected?
25    A   They're selected by the district nurse

68

1  managers, recommendations, and put on a committee
2  for -- I think it's a two-year term that they're put
3  on. I think that's what our rules now say. And
4  it -- they add new members and rotate members as
5  necessary.
6     Q   So it would be a staggered, always
7  somebody with experience --
8     A   Always somebody.
9     Q   -- as the new ones rotate in? Okay. And
10  the district managers are the ones that select them?
11    A   They recommend the selection.
12    Q   Okay.
13    A   And Mr. Eubank and I approve the final
14  selections.
15    Q   Okay. So the peer review would be -- and
16  what would you look for in selecting someone to
17  serve on the peer review committee?
18    A   When I -- when they make a recommendation
19  to me, I look at their years of experience with the
20  organization. Of course, we have to look at whether
21  or not they're RN or LVNs because you have to have a
22  certain representation from each group on the
23  committee. And I look at their availability with
24  the unit that they're working. If the unit is
25  really one that has a high vacancy rate and is

Bayou City Reporting, Inc.

69

1  short-staffed, then we might not choose a nurse from
2  that particular facility because I want them to be
3  available to hear testimony and come to the
4  meetings.
5      Q   Okay.  So when you select them, do you
6  look at their experience and their reputation in
7  UTMB or --
8      A   They are -- they are not under
9  disciplinary action and have not had, yes.
10     Q   You want good employees with good
11 knowledge.
12     A   Yes.
13     Q   All right.  And you think they serve for
14 two years?
15     A   I think that's what they serve now.
16     Q   And the peer review committee, that would
17 be -- on the nursing peer review, that would be
18 composed of all nurses.  Is that correct?
19     A   Yes.
20     Q   Okay.  And I think you said it's governed
21 by the Board of Nursing?
22     A   They make the rules.
23     Q   They make the rules.  So the rules that
24 would be followed --
25     A   They report -- they report to me -- they

70

1  report to the directors of nurses and they
2  ultimately report to the directors of the
3  organization, is who the peer review reports to.
4      Q   Okay.  So do you -- how would a peer
5  review come about?
6      A   Can come about many different ways.
7  Anyone can refer -- the board says that anyone can
8  refer an instance or a case or a nurse to the peer
9  review committee.
10     Q   Okay.
11     A   And they come about various ways in our
12 system.  They come through TDCJ when they've
13 investigated and find a complaint or from the
14 mortality/morbidity committee that is part of TDCJ.
15 They can come from nurse managers who feel like
16 there's been a serious incident on their -- on their
17 facility.  And another -- any other nurse, any
18 nurse, has the capability of requesting a peer
19 review.
20     Q   Is it discretionary or must the peer
21 review investigate once there's been a referral
22 made?
23     A   The peer review can look at the case and
24 decide whether they're going to hear the case or
25 not, whether it's even a peer review case or not,

71

1  but normally they hear everything that's referred to
2  them.
3      Q   Okay.  So your answer is, yes, it is
4  discretionary?
5      A   Yes.
6      Q   Okay.  You said it could come from the
7  morbidity committee?  Tell me --
8      A   Yeah.
9      Q   -- what that is.
10     A   It's a joint mortality and morbidity
11 committee that is a committee that is required
12 through TDCJ.  It has members that are from TDCJ,
13 Texas Tech, and UTMB on the committee.  We review
14 all deaths on all the -- in all the entities, Texas
15 Tech and UTMB, and we specifically look for -- I am
16 part of that committee.  We specifically look for
17 things we could have done better, improved, care
18 could have been improved upon, something that didn't
19 happen to the standard that we had hoped that it
20 would.  And they then refer -- they then just accept
21 cases or can refer them to many places.  They refer
22 them to nursing peer review, medical peer review.
23 Psychiatric has a whole another way they do theirs
24 but with committee review.  And they could even
25 refer it to security for -- if it's a security

72

1  issue, or a systems problem.
2      Q   Okay.  When you say they -- are they a
3  referral committee?  Is that what happens?
4      A   Yes.  Yes.  They don't -- they don't --
5      Q   And must they refer something?
6      A   No.
7      Q   Okay.  So they're a review committee with
8  referral potential?
9      A   Yes.
10     Q   But their main mission is not to refer.
11     A   Their main mission is to look at the case.
12     Q   Is to evaluate.  Is that correct?
13     A   Yes.
14     Q   All right.  Now, you know that Ms. Fisher
15 had a referral to peer review during the time that
16 some of the other issues were happening.  You're
17 aware of that.
18     A   Yes.
19     Q   Can you tell me the circumstances under
20 which that was referred to peer review?
21         MR. LIVELY:  I think I'm going to
22 object to this.  It's getting into privileged matter
23 and instruct the witness not to answer.
24         MS. MILLER:  The referral.
25         MR. LIVELY:  If you want --

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

73

1        MS. MILLER:  The only thing that's
2   objectionable is the actual -- the report.
3        MR. LIVELY:  Can you go --
4        MS. MILLER:  Can we go off the record
5   just a minute?
6        MR. LIVELY:  Yeah.
7        (Discussion off the record
8         from 12:54 to 12:55)
9        Q   (BY MS. MILLER)  Now, you're aware that
10  Ms. Fisher was referred -- or her actions were
11  referred to a peer review committee.
12       A   Yes.
13       Q   And what procedure happened or how did the
14  procedure stages follow that the actual referral was
15  made to the peer review committee?  I'm not asking
16  you what was referred.
17       A   At that time in the organization when she
18  was -- when that referral was made from mortality/
19  morbidity, all nursing referrals from mortality and
20  morbidity committee were heard -- that were referred
21  to the nursing peer review committee were heard by
22  nursing peer review.
23       Q   Okay.  That wasn't my question.  Going to
24  the mortality committee, that's standard practice
25  when an inmate passes away or an individual passes

74

1   away under the care of UTMB.  Is that correct?
2        A   Or Texas Tech?
3        Q   Or Texas Tech.  Correct?
4        A   Yes.
5        Q   All right.  So is it -- in Ms. Fisher's
6   case, was her case referred by the mortality
7   committee to the peer review?
8        A   Yes.
9        Q   And was then the option of whether or not
10  to review it became a peer review option, to accept
11  it or not?
12       A   Yes.
13       Q   Okay.  And in the peer review process, who
14  is permitted to be in the peer review meetings?
15       A   There's no rules and regulations about who
16  can be in the room.  There are rules and regulations
17  about who serves on the committee as a -- as a
18  committee member and who's -- who can vote in the
19  decision.  The peer review committee often has
20  people in the room that can provide knowledge to the
21  peer review committee, members that need additional
22  knowledge.  Ad hoc members are allowed in the peer
23  review committee for -- as an example, a utilization
24  review nurse was referred to the peer review
25  committee and the nurses in -- on the committee were

75

1   not well-versed in all the duties of a utilization
2   review nurse, so they requested an ad hoc committee
3   member to provide them with the knowledge and
4   specific knowledge about that particular -- the
5   particular processes that go on there.
6        Q   Okay.  And in all cases, that ad hoc
7   member would be a nurse, though.  Is that correct?
8        A   Not always.
9        Q   So the peer review can have a committee
10  member that's not a nurse?
11       A   Not a committee member.  It can have an
12  ad hoc information kind of person.  We can have a
13  pharmacist to help us.  We could have a respiratory
14  therapist come and give information to the
15  committee.  You can have others that there --
16       Q   So that would be a -- I'm sorry.
17       A   So you could have others.  There are --
18  there's a chair person for the committee that is a
19  registered nurse that is a voting member of the
20  committee and then there's usually some sort of
21  facilitator that is there -- not a voting member,
22  that is there to help facilitate gathering of
23  information, copying of paperwork, making sure the
24  stuff gets done, the flow of medical records to the
25  committee members, that they need to see.  It's a

76

1   person that just facilitates the setup of getting
2   what the committee members need.  They --
3        Q   But they're not a committee member.
4        A   But they're not a committee member.
5        Q   Okay.  Who was the facilitator in
6   Ms. Fisher's case?
7        A   At that time, it was David Watson.
8        Q   Was he an ad hoc member also?
9        A   No.  He was a -- he was just a
10  facilitator.
11       Q   And the facilitator, is that -- is that
12  outlined in the Board of Nursing regulations that
13  that's permitted?
14       A   It's not said that it's denied.
15       Q   Well, that wasn't my question.  Is it
16  outlined that it's permitted?
17       A   Not specifically.
18       Q   Okay.  And let's go back to the mortality
19  committee.  Their referral does not go directly to
20  the peer review committee; does it?
21       A   It doesn't now.  It did at that time.
22       Q   Well, isn't it true that the referral went
23  to you and you're the one that made the decision to
24  send Ms. Fisher's case to the peer review committee?
25       A   No.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

77

1    Q   That's not correct?
2    A   No.  They do send them all to me.  They
3  copy me, but they all -- at that time, all of them
4  went to the peer review committee for mortality
5  review.
6    Q   And was that a standard procedure
7  somewhere?
8    A   It was because the paper -- the referral
9  says that it is a referral.  The paper from the
10  mortality and morbidity committee says that it is a
11  referral to the -- they want it to be referred to
12  the nursing peer review committee.  The language on
13  most forms has since changed, at my request.  I
14  can't tell you exactly when it happened, but I
15  requested that the mortality and morbidity committee
16  reword that to ask for it to be reviewed,
17  administratively reviewed, for possible referral to
18  the peer review committee.
19    Q   And you don't know when that changed?
20    A   I don't know when that changed.
21    Q   Okay.
22    A   But it was not at that time.  At that
23  time, they were still all going.
24    Q   And where could we find that information
25  if we needed to verify that?

78

1    A   I have no idea.  Mr. -- Dr. Kelly is over
2  the -- and I don't know when I requested that
3  change.  We did it because of the numbers of cases
4  and some of the small cases that were going to peer
5  review.  Now, peer review always had the capability
6  to -- once a case was referred to them, to say that
7  it was not -- it didn't meet their criteria for
8  referral.
9    Q   On how many other cases was Mr. Watson the
10  facilitator for?
11    A   Many.  He was the facilitator for the peer
12  review committee for several years.  I did it for
13  several years before I became the director and he's
14  done it for several -- he did it for several years
15  and then it moved to Justin Robison, who was the
16  district nurse manager for the San Antonio district,
17  and he's done it for several years.
18    Q   And when did it change to him?
19    A   When Mr. Watson left, I had to find a new
20  facilitator.
21    Q   Okay.  Now, at the time that this
22  happened, at the time that the incident happened
23  that was the subject of Ms. Fisher's peer review,
24  was there anything addressed directly toward her,
25  any kind of expectations, anything that would

79

1  indicate to her that what she did or how she
2  conducted herself during and after that incident was
3  inappropriate or not according to guidelines?
4        MR. LIVELY:  I'm a little --
5        MS. MILLER:  Did you -- did I lose
6  you?
7        THE WITNESS:  I don't know that I
8  understand what you're asking.
9        MS. MILLER:  Okay.
10        MR. LIVELY:  Yeah.  I didn't hear.
11  Are you talking about from a peer meeting or --
12        MS. MILLER:  No.  I'm saying
13  immediately upon it happening.
14        MR. LIVELY:  Okay.  From the UTMB,
15  Ms. Gotcher --
16    Q   (BY MS. MILLER)  From the day of the
17  suicide that Ms. Fisher was involved in, treating
18  this patient, what, if anything, was done to provide
19  her with expectations, consult with her about how
20  she might have handled things differently, review
21  her -- how she -- her conduct?  What was done during
22  the time frame immediately after the incident?
23    A   At that time, Mr. Watson was responsible
24  for upholding the standard of performance and
25  practice on the facilities.  I don't think he

80

1  thought at any point in time that that was -- there
2  was any disciplinary need or any remediation that
3  needed to be done with that incident.  Deaths are
4  reviewed, so I know that the death was reviewed and
5  at that time he didn't find -- he found no nursing
6  issues that needed to be reviewed.
7    Q   Okay.  And how about yourself?
8    A   I didn't review it.
9    Q   Okay.  And --
10    A   I knew there was a death and he told me
11  there were no nursing issues.  That's what's
12  reported to me at my level.
13        (Exhibit 2 marked)
14    Q   (BY MS. MILLER)  Okay.  I'm going to show
15  you what's been marked as Exhibit Number 2, and take
16  a minute and look at that document, if you would.
17    A   This one looks like it's been marked on.
18        THE WITNESS:  See?
19        MR. LIVELY:  Yeah, I noticed that
20  too.
21        THE WITNESS:  Okay.
22        MR. LIVELY:  We'll clean that up if
23  we have to use it as an exhibit unless somebody --
24  we wrote on it.  Do you see that report's
25  underlined?

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

81

1            MS. MILLER:  I do, and I can't tell
2    you where it came from.  I didn't do it.
3            MR. LIVELY:  I didn't --
4            MS. MILLER:  It was on the document
5    when we I got it.
6            MS. FISHER:  I think I underlined
7    that before I gave maybe copies because as I was
8    doing my appeals -- those was things that I had at
9    home, and as I was doing my appeals --
10           MS. MILLER:  All right.  So we can
11   clean it up.
12           MR. LIVELY:  So all that must be --
13   yeah.
14           MS. FISHER:  But HR has them all,
15   actually.
16           MR. LIVELY:  We -- that's no big
17   deal.
18           MS. MILLER:  I just pulled the wrong
19   one from the file, then.
20           MR. LIVELY:  We can clean it up.
21           MS. MILLER:  Okay.
22       Q   (BY MS. MILLER)  Absent the underlining,
23   do you recognize this document?
24       A   It -- yes.  It's a standard evaluation
25   form.

82

1        Q   And it's for Jackie Fisher.  Right?
2        A   Yes.
3        Q   And what does this PMP date mean?
4        A   That's the day the performance measure is
5    performed.
6        Q   Okay.  And then that's 6/25/04.  Then why
7    wasn't it given until -- if you look on page 82 of
8    Exhibit Number 2, wasn't signed off on until July of
9    '05?
10       A   It must mean that Mr. Watson was late
11   giving her her evaluation.
12       Q   (BY MS. MILLER)  Is that the start date?
13           MS. FISHER:  That's the date it was
14   supposed to be --
15           MS. MILLER:  Okay.
16           MS. FISHER:  Actually supposed to
17   be -- we put this date when they sign.  Maybe he did
18   it that day.
19           MS. MILLER:  Okay.
20       Q   (BY MS. MILLER)  All right.  So the PMP
21   date is the date it's supposed to be given?
22       A   Yes.
23       Q   That it's due.  And on page 82, the last
24   page, is the date that the individual employee,
25   Ms. Fisher, signed off on it?

83

1        A   Yes.
2        Q   Correct?  And Mr. Watson signed off on it.
3    Correct?
4        A   Yes.
5        Q   And is that your signature also?
6        A   Yes, it is.
7        Q   Okay.  And you signed off on this
8    particular Exhibit Number 2 on July 15th of '05.
9    Right?
10       A   (Moving head up and down)  Sure.
11       Q   Okay.  And this review was after the
12   incident with the individual that hung himself that
13   was -- became the subject of Ms. Fisher's peer
14   review.  Is that correct?
15       A   Okay.  I don't know.
16       Q   Okay.  Well, if it were done afterward,
17   would not this be an appropriate place -- if she
18   didn't follow protocol and needed some sort of
19   reprimand, wouldn't this be an appropriate place in
20   which to identify that for her?
21       A   If, at the time, Mr. Watson thought that
22   there were performance issues, this would have been
23   the place to put them.
24       Q   Okay.  And you signed off on it, too, so
25   that means you had an opportunity to identify

84

1    performance issues also?
2        A   I have much less knowledge about
3    performance issues for individual nurse managers
4    than my nurse -- my directors of nurses do, my
5    district directors do, but if I had knowledge of a
6    performance issue, I would bring it up before my
7    signature, yes.
8        Q   Okay.  So you -- but you are able to add
9    to these and --
10       A   And change them as I wish.
11       Q   -- if you feel a need to comment, you
12   could.
13       A   Yes.
14       Q   Okay.  So you generally have a lot less
15   knowledge than their immediate supervisors about
16   their performance.
17       A   Sure.
18       Q   Is that fair?  Okay.  But who made the
19   decision to demote Ms. Fisher?
20       A   When?
21       Q   How many times was she demoted?
22       A   Twice.
23       Q   Okay.  Well, you have to tell me about the
24   times.
25       A   Well, no.  She got two letters where she

Bayou City Reporting, Inc.

85

1  was demoted. If you're speaking of the time -- what
2  time are you speaking of that she was demoted?
3      Q   Well, I don't -- I'm confused. You have
4  to tell me. She was demoted twice. Okay. What's
5  the first time she was demoted?
6      A   After her -- after the on-site
7  investigation and review and -- of the data.
8      Q   And she was demoted -- she was demoted to
9  a Nurse Clinician III?
10     A   That was the recommendation that was
11 initially made and was the recommendation from HR.
12     Q   Okay. And that wasn't your
13 recommendation.
14     A   It was a consideration. I did reconsider
15 and tried to look at the entire -- her entire career
16 with us and I identified where she had been
17 successful as an assistant nurse manager prior, and
18 I made the decision with the help of Mr. Watson --
19 it was a -- I never make a decision without getting
20 input from someone else. And I did talk to HR, as
21 well, and I made the decision that her last
22 successful performance was as an assistant nurse
23 manager and I would rather demote her to an
24 assistant nurse manager than to staff nurse.
25         MS. MILLER: Move to strike as

86

1  nonresponsive.
2      Q   (BY MS. MILLER) Who made the decision to
3  promote her -- or to demote her? You said there are
4  two times. Who made the decision the first time?
5      A   I did.
6      Q   Okay. And what -- when was the second
7  time she was demoted?
8      A   There was an intent to demote her when she
9  had Board of Nursing regulations -- stipulations and
10 regulations restrictions to her licensure.
11     Q   And when was that?
12     A   I don't remember the date.
13     Q   Okay. And who made that decision?
14     A   I did.
15     Q   Okay.
16     A   That is also common practice throughout
17 all of UTMB that nursing does not allow managers to
18 have stipulations or restrictions on their
19 licensures.
20     Q   And that's understandable. Sure. And so
21 you made that decision at that point.
22     A   The minute I found out she had -- I was
23 notified through the mail that she had restrictions
24 on her licensure, I went to human resources and
25 recommended her demotion.

87

1      Q   Okay. And what happened with that?
2      A   She wrote and told me -- or e-mailed or
3  called or in some way I found out that she had
4  already met the agreed-upon stipulations from the
5  Board of Nursing and that she had already completed
6  those and that they had already -- she thought they
7  had already cleared her of all requirements.
8      Q   Um-hmm. Um-hmm.
9      A   So I stopped what I was doing. I went and
10 looked on the BON web site on our licensure to see
11 if the restrictions remained. They did not remain.
12 She was correct. They had all been approved by the
13 board and accepted and they had been taken off her
14 license, and I removed my intent to demote her when
15 I found that out.
16     Q   So did you jump the gun on that decision
17 to demote her?
18     A   No.
19     Q   All right. So, what? Did she ever have
20 restrictions?
21     A   Yes.
22     Q   And how were you notified?
23     A   I was notified through the BON through the
24 mail that there were restrictions on her licensure.
25     Q   And so that certainly would be a document

88

1  that would be important in this lawsuit.
2      A   Okay.
3      Q   And you would keep a record of that; would
4  you not?
5      A   I think HR has a record of that.
6      Q   Okay.
7      A   I don't keep a record of that.
8      Q   Okay.
9      A   HR would have.
10     Q   Do you keep personnel files on any
11 individuals?
12     A   The individuals I directly supervise.
13     Q   But not anybody else?
14     A   Yes.
15     Q   Okay. So the first time that the decision
16 was to -- was made to demote her was based on
17 performance.
18     A   Yes.
19     Q   And so you were the one that made the
20 decision. Yet, I think I just indicated with the
21 review or the evaluation that you rely on the --
22 their direct supervisors because they're more
23 knowledgeable. Now, I'm getting a conflicting
24 feedback here. Can you explain that dichotomy to
25 me?

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

89

1    A   Well, I also tried to tell you that I did
2   not make that decision to demote in isolation.  I
3   made that decision with the help of Mr. Watson and
4   human resources.  That was not made in isolation.
5    Q   Was there ever a time that Mr. Watson
6   didn't agree with you?
7    A   He was much more supportive of the
8   assistant nurse manager demotion rather than all the
9   way to staff nurse.  He and I both were, actually.
10  It was human resources that supported the demotion
11  to staff nurse.
12   Q   So back to Exhibit Number 2, had there
13  been any serious concerns about her performance or
14  about the peer review, the findings of the peer
15  review, that could have been noted on her review for
16  that time period.  Is that correct?
17   A   The Board of Nursing considers nursing
18  peer review and disciplinary to be very separate.
19   Q   I just want to interrupt you.  I'm sorry.
20  Because if I ask you a "yes" or "no" question, I'm
21  sure your lawyers have told you I'd prefer that you
22  just answer the question and then he'll get a chance
23  to ask you questions later if you want to expound on
24  it.  Okay?
25   A   Okay.

90

1    Q   We agree on that?  You just answer the
2   questions I'll ask you?
3    A   Yes.
4    Q   Thank you.  So you could have -- in this
5   review that you reviewed and signed off on Exhibit
6   Number 2, had there been any overriding concerns
7   about her performance or the conduct that was sent
8   to peer review, that could have been noted in her
9   review itself, which is Exhibit Number 2.  Is that
10  correct?
11   A   Yes.
12   Q   Now, did you get copies of the
13  communication from the Board of Nurse Examiners, or
14  how were you kept informed on what was happening
15  there?  Once it was -- once Ms. Fisher's case was
16  sent to the Board of Nurse Examiners, how were you
17  informed as to the progress or the result or any
18  feedback from the board?
19   A   The person that refers them to the board
20  normally is the one that gets the correspondence
21  back.  So the peer review chairperson would have
22  gotten a letter back from the BON and then forwarded
23  any information to human resources, who would then
24  forward it to me.
25   Q   So you wouldn't directly have received any

91

1   kind of information from the Board of Nursing
2   Examiners.
3    A   No.
4    Q   Okay.
5    A   It's to the person that refers.
6    Q   And you -- neither you nor Mr. Watson
7   would have received direct communication from them
8   unless you were the referring person.  Is that
9   correct?
10   A   Yes.
11   Q   Now, while Ms. Fisher's examination before
12  the Board of Nursing Examiners was pending, there
13  was another incident that happened on her watch, so
14  to speak.  Are you aware of that?  Another
15  mortality?
16   A   I don't know what you're talking about.
17   Q   Well, you're on the -- you would have
18  reviewed it as being on the board of --
19   A   We review about 60 to 80 cases a month, so
20  I would not have remembered.
21   Q   Is it ever -- would it ever happen that an
22  incident would be referred directly to the Board of
23  Nursing Examiners if it hadn't gone through the peer
24  review, the nursing peer review?
25   A   Yes.

92

1    Q   And how would that procedure work?
2    A   Anyone can report to the Board of Nursing.
3   Their rules require that anyone can fill out a form
4   and report to the Board of Nursing.
5    Q   So anyone can report to the peer review.
6    A   Yes.
7    Q   And anyone can report to the Board of
8   Nursing.
9    A   Yes.
10   Q   It doesn't necessarily have to be a
11  referral from the morbidity committee or from the
12  peer review committee.
13   A   Or from me.
14   Q   Or from you or from Mr. Watson.
15   A   No.
16      (Exhibit 3 marked)
17   Q   (BY MS. MILLER)  Hang on just a second.
18  I'm going to mark -- I'll show you what's been
19  marked as Exhibit Number 3, and take a minute and
20  review that document, if you would.
21      MR. LIVELY:  While you're reading,
22  I'm going to go --
23      MS. MILLER:  Sure.
24      (Discussion off the record
25      from 1:24 to 1:31)

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

93

1     Q    (BY MS. MILLER)  Okay.  You've had a
2  chance to review Exhibit Number 3, Ms. Gotcher?
3     A    Yes.
4     Q    And it's quite a detailed document; is it
5  not?
6     A    Yes, it is.
7     Q    And this represents an e-mail, evidently
8  from Mr. Watson to you, Ms. Rader, and Ms. Melton,
9  on Thursday, December 12th, of 2006.
10    A    No.  January the 12th.
11    Q    January.  Thank you.  January 12th.  That
12  was not a trick.  I'm being dyslexic to some degree.
13  January 12th of 2006.
14    A    Yes.
15    Q    All right.  And in this document, there
16  are eight pages of details that Mr. Watson has
17  delineated, all specific to Ms. Fisher.
18    A    Yes.
19    Q    Correct?  Prior to January 12th of 2006,
20  had he put any of these issues that he raised in
21  writing to you previously?
22    A    Not that I remember, no.
23    Q    Okay.  And you had all of this information
24  at the time that you made the decision to give her a
25  90-day expectations letter; did you not?

94

1     A    Yes.
2          (Exhibit 4 marked)
3     Q    (BY MS. MILLER)  Going to show you what's
4  been marked as Exhibit Number 4, and do you
5  recognize this document?
6     A    Not offhand.
7     Q    Okay.  And we'll take a minute and look
8  through it.
9     A    Okay.
10    Q    You've had a chance to look at Exhibit
11  Number 4?
12    A    Yes, ma'am.
13    Q    And after taking a minute to read through,
14  does that refresh your memory as far as receiving
15  this document?
16    A    I don't remember it but there were lots of
17  documents.
18    Q    All right.  And this is from an Ann Darby
19  and she's one of the ones you mentioned earlier that
20  had e-mailed you or contacted you about Ms. Fisher.
21  Is that correct?
22    A    Yes.
23    Q    What was Ms. Darby's position?
24    A    Ms. Darby's position was that she didn't
25  feel like Ms. Fisher was being fair with some

95

1  employees -- she stated again the moving of the
2  equipment and it continues to be moved -- and her
3  displeasure with Ms. Fisher's management style.
4     Q    Okay.  I guess I didn't ask the question
5  right.  What --
6          MR. LIVELY:  That's what I thought.
7          (BY MS. MILLER)  What was --
8          MR. LIVELY:  What was her job?
9          (BY MS. MILLER)  What was her job
10  position?
11    A    Oh, what was her position?  Well --
12    Q    Well, I know.  You were answering my
13  question, so I didn't interrupt you.
14    A    Her position was an RN in the emergency
15  room at the RMF.
16    Q    Okay.  Thank you.  And she reported to
17  Ms. Fisher.  Is that correct?
18    A    Yes.
19    Q    Do you recall -- well, tell me:  What's
20  the chain of command mean?
21    A    The chain of command means that I would
22  prefer that nurses go up their designated assigned
23  chain when there are issues or concerns that they
24  have with their supervisor, that they solve those at
25  the lowest possible level to their immediate

96

1  supervisor.
2     Q    And essentially, in this particular
3  instance, this would mean if Ms. Darby had a
4  complaint with Ms. Fisher, she should try to deal
5  with Ms. Fisher first.  Is that correct?
6     A    (Moving head up and down)
7     Q    And what was done in particular with -- as
8  far as Ms. Darby, I believe it was Ms. Anderson,
9  Ms. Lauder, and Ms. Moreau to have them work in the
10  chain of command and try to deal with Ms. Fisher
11  directly?  What did you personally do to have -- to
12  facilitate that?
13    A    Personally to facilitate that, I don't
14  answer these.  I don't -- when I get these, I do not
15  answer them.  I let -- if she needs this to be
16  answered, she needs to go to Ms. Fisher with that
17  and so I don't answer these.  I don't answer back.
18    Q    Okay.  So that's the way you respond to
19  the chain of command is that you don't pay any
20  attention to it.
21    A    No.  That's not the way I respond to the
22  chain of command.
23    Q    Okay.
24    A    That's the way I responded to Ms. Darby in
25  this e-mail.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

97

1    Q   But, yet, you did take some e-mails, such
2  as this one, and obviously give them credence.
3    A   When did you hear me say that?
4    Q   Well, you were basing some of your
5  decision-making on complaints from the employees;
6  were you not?
7    A   It was a combination of all of the
8  information, yes, but --
9    Q   Okay.  Some of -- I'm not saying that you
10 relied a hundred percent, but did you rely on
11 complaints from employees in your decision to demote
12 Ms. Fisher?
13   A   Yes.
14   Q   Okay.  And is there anything that you
15 particularly did to reinforce the chain of command?
16   A   Yes.  I put it in the expectations that I
17 gave them when I met with that group.  I verbally
18 told the entire group that I expected them to follow
19 their chain of command.
20   Q   Okay.  And, yet, when you said that you
21 didn't extend the 90-day period to her, that you
22 made the decision in that interim period to still
23 demote her, I believe you said that was based in
24 part from continuing complaints directly to you.
25   A   Not necessarily directly to me.  Continued

98

1  complaints.
2    Q   Okay.  Were those complaints in the chain
3  of command as you had expected them to be?
4    A   I don't know if they had talked to
5  Ms. Fisher about them or not.  I know that they
6  spoke to Mr. Watson about them.
7    Q   And how do you know that?
8    A   That was his report to me.
9    Q   Is that a report in writing to you?
10   A   No.
11   Q   And that's an oral report.
12   A   Yes.
13   Q   So we would have no way of verifying that.
14   A   No.
15   Q   Do you recall, after having time to think
16 about it, what date it was that you went to do the
17 on-site visit?
18   A   It's been stated in several of these
19 documents but I didn't.
20   Q   You don't recall.
21   A   No.
22   Q   And just so I'm clear again, did you go to
23 investigate Ms. Fisher or to investigate the
24 facility?
25   A   The facility, the atmosphere of the

99

1  facility.
2    Q   And that would have included Ms. Bord.
3    A   Ms. Bord?
4    Q   Ms. Boyd.
5        MS. FISHER:  Bond.
6    Q   (BY MS. MILLER)  Bond.
7    A   No.
8    Q   So it was only the facility as it
9  pertained to Ms. Fisher.
10   A   The RMF, not even the building, not even
11 Ms. Fisher's other facility or not high security.
12 The particular facility I went to, the RMF.
13   Q   Okay.  So your investigation was limited
14 to the RMF?
15   A   Yeah.
16   Q   And her 42 employees, are those all RMF
17 employees?
18   A   No.
19   Q   Did you --
20   A   But the employees do float from place to
21 place, so there are times when they work the RMF and
22 other times when they work the building.
23   Q   Okay.  And so your -- the invitation to
24 come and speak with you would have been directed
25 only to the RMF.

100

1    A   Would have been directly to anyone that
2  ever worked in the RMF.
3    Q   Okay.  And that would have been every
4  employee or not?
5    A   Yes.
6    Q   Now, I think we also talked about your
7  follow-up with Ms. Fisher.  Did you recall if you
8  initiated it or if she initiated it?
9    A   What follow-up?
10   Q   The follow-up after you visited the
11 facility when she wasn't there.
12   A   I don't recall.  I just know we met.
13       THE WITNESS:  Can we take a break?
14       MR. LIVELY:  Sure.  We can take a
15 little break.
16       MS. MILLER:  Yeah.  Sure.
17       (Recess from 1:41 to 1:44)
18       (Exhibit 5 marked)
19   Q   (BY MS. MILLER)  I show you what's been
20 marked as Exhibit Number 5.  Take a look at those
21 series of e-mails, if you would, please.  Oh.  I
22 think that second one doesn't belong with the first
23 one.  I'll just give you one page.  Sorry.
24   A   They're not flowing very well.
25   Q   No, they're not flowing at all.  Give me

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

101

1    back the second page, please. Thank you. Okay.
2    Exhibit Number 5, consisting of one page, do you
3    recognize that e-mail?
4        A    Sure. Yes.
5        Q    Okay. And this would have been the
6    meeting where you had the follow-up meeting with the
7    staff and with Ms. Fisher.
8        A    Yes.
9        Q    And did you give her the -- you have
10   five -- three different meetings?
11       A    Yes.
12       Q    To accommodate different times?
13       A    Yes.
14       Q    And did you give her her expectations in
15   every meeting or just the first meeting?
16       A    I would have thought I gave them in all.
17   I would have expected I gave them in all.
18       Q    Okay. So even though she had her
19   expectations at 10:00 a.m., you would have regiven
20   her expectations for the benefit of the employees.
21       A    Yes.
22       Q    And was this a reprimand or not?
23       A    No.
24       Q    No. Okay. So before you demote someone,
25   aren't you supposed to go through some steps of

102

1    disciplinary procedures, progressive discipline?
2        A    I use -- there -- that's not always the
3    case and I use HR to help me determine at what level
4    disciplinary needs to happen when they -- they keep
5    it consistent throughout the entire organization.
6    So, no, there are things and times when we do not go
7    through each step of the disciplinary process.
8        Q    Okay. But you do have a progressive
9    disciplinary procedure.
10       A    Yes, we do.
11       Q    And that would be a step procedure where,
12   before a serious tangible employment detrimental
13   event would happen, that you would try to go through
14   those steps.
15       A    If it's appropriate.
16       Q    Okay. And are you saying that performance
17   issues would not be appropriate for progressive
18   discipline?
19       A    Not always.
20       Q    Why would not Mrs. Fisher's issues have
21   been appropriate for progressive discipline before
22   you demoted her?
23       A    I -- with the reports we were getting from
24   the nursing staff and the urgency of the Estelle
25   facility, the importance of the Estelle facility, it

103

1    was felt that more aggressive action needed to be
2    taken.
3        Q    And when you say "it was felt," you felt?
4        A    Not in isolation. HR and Mr. Watson were
5    in that decision.
6        Q    Okay. And I think you named five people,
7    Mr. Aguilar, Anderson, Darby, Lauder, and Moreau,
8    and you couldn't tell me anybody that came and spoke
9    with you that day -- or those two days. Who else
10   was complaining?
11       A    Well, there was a list in Mr. Watson's
12   e-mail that you gave me in a different exhibit, and
13   I don't remember all of who was complaining. It was
14   a large enough number to cause concern.
15       Q    Okay. And when was it that you got
16   Ms. Fisher's side of the -- of this?
17       A    After the on-site visit, we met with
18   Ms. Fisher.
19       Q    Okay. And so you had -- didn't reprimand
20   her.
21       A    No.
22       Q    But you did give her expectations. What
23   level of progressive discipline are the expectations
24   usually described as?
25       A    This was not a formal written letter of

104

1    expectation. This was a communication that was
2    given to her and the staff in hopes of improving the
3    communication, morale, and atmosphere at the Estelle
4    facility.
5        Q    All right. And can you give me an example
6    of some kind of performance issues that a nurse
7    manager might be presented with that you would use
8    progressive discipline on? Because this apparently
9    wasn't one of them; was it?
10       A    No. This was not one of them. But if a
11   nurse manager has performance issues with time
12   lines, getting things done, with -- there's many
13   times that we give progressive disciplinary action.
14       Q    But not this time.
15       A    No.
16       Q    Who was the nurse manager before
17   Ms. Fisher at Estelle?
18       A    Mary Adams, I believe.
19       Q    Did you have any performance issues with
20   her?
21       A    At points in her career, there have been
22   performance issues with her.
23       Q    And did you have any --
24       A    I wasn't completely aware of them.
25   Mr. Watson dealt with her on most of those.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

105

1    Q   And did you have any employee complaints
2  about Ms. Adams?
3    A   Not that I specifically remember.
4    Q   Okay.  And do you know if Ms. Adams was
5  ever put on any kind of progressive discipline
6  program?
7    A   She may have been given letter of
8  expectations or she may have been -- had some verbal
9  counseling from Mr. Watson that I don't know of.
10    Q   Okay.
11    A   I don't know of any written, formal
12  discipline that came to my attention.
13    Q   But the reason you chose to get involved
14  in Ms. Fisher's issues instead of Ms. Adams' is
15  because --
16    A   Because the Estelle Unit was failing.
17    Q   Okay.  And that was, again, based on
18  vacancy rates and turnover rates.
19    A   And complaints I was receiving from the
20  staff that were being validated some by Mr. Watson
21  and the fact that he was not able to make progress
22  with those complaints or with the morale at their --
23  at the Estelle facility.
24    Q   Who was the supervisor after Mrs. Fisher
25  at the Estelle Unit?

106

1    A   I --
2        MR. LIVELY:  The nurse manager?
3        MS. MILLER:  Nurse manager.  Thank
4  you.  What did I say?
5        MR. LIVELY:  Supervisor.
6        MS. BERNSTEIN:  Supervisor.
7        MS. MILLER:  Oh, yeah.
8    A   Julie Upshaw, maybe.  I don't know.  Or
9  Ms. Hansen.  I don't know whether Judy Upshaw was
10  there in between Ms. Hansen.  Ms. Hansen is the
11  current supervisor.
12    Q   (BY MS. MILLER)  Well, has the Estelle
13  Unit turned around?
14    A   It's better.
15    Q   And how would we know it's better?
16    A   Vacancy rate is better.  Turnover is
17  better.  We don't get the complaints.  We're not
18  getting the same number of complaints from the staff
19  members or from the management staff.  I don't -- I
20  don't hear the same complaints.
21    Q   Okay.  And the vacancy rates and the
22  turnover rates, are they better industrywide or
23  throughout the units or is it just the Estelle Unit
24  that's turned around?
25    A   No.  They're better all over Huntsville.

107

1        (Exhibit 6 marked)
2    Q   (BY MS. MILLER)  Okay.  I apologize for
3  this copy, but this is the best we have.  Let me
4  show you what's been marked as Exhibit Number 6.
5    A   This is a completely different e-mail, the
6  last page of that.
7    Q   Um-hmm.  We can make it a separate
8  exhibit.  That's fine.
9    A   No.  I just -- okay.
10    Q   Okay.  Let's go ahead and make it a
11  separate exhibit so nobody gets confused.  We'll
12  just pull the back page off, make it 7.
13        (Exhibit 7 marked)
14    Q   (BY MS. MILLER)  In looking at Exhibit
15  Number 6, do you recall seeing that document?
16    A   Yes.
17        MR. LIVELY:  Did you pull the last
18  page?
19        MS. MILLER:  I made it Number 7
20  because it's related but it's not the same document.
21        MR. LIVELY:  Not part of the same?
22        MS. MILLER:  No.
23        MR. LIVELY:  Okay.  Sorry.
24    Q   (BY MS. MILLER)  And in reviewing this
25  document from Mr. Watson, did you have a

108

1  conversation with him about this feedback?
2    A   Yes.
3    Q   And what was that conversation?
4    A   That is the consultation I told you that
5  went on between HR and Mr. Watson and myself when we
6  were trying to decide whether to demote Ms. Fisher
7  to staff nurse or to assistant nurse manager.
8    Q   Okay.  And so this was prior to the
9  demotion.
10    A   I think she may have been given her letter
11  but we were -- we were still -- she had appealed and
12  we were looking at our decision.
13    Q   Okay.  So if she already had a letter --
14    A   I don't remember where it came in.
15    Q   Okay.  Look at Exhibit Number 7.
16    A   Yes.
17        MR. LIVELY:  That's the separate.
18        MS. MILLER:  The separate page I just
19  pulled off.
20    Q   (BY MS. MILLER)  And do you recognize this
21  document?
22    A   Yes.
23    Q   Okay.  And did you have a conversation
24  with Ms. Melton about this document?
25    A   Yes.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

109

1    Q   Okay.  And what was that conversation?
2    A   Again, it was with Mr. Watson and human
3    resources and myself and Ms. Melton and we -- HR
4    thought that we needed to demote Ms. Fisher to a
5    staff nurse, and Mr. Watson and I wanted to make it
6    an assistant nurse manager.
7    Q   And when you say "we had a conversation,"
8    did you have a conference call or a series of
9    conversations?
10   A   I don't remember.  I know we talked.
11   Q   Did you ever talk to more than one person
12   at a time about this?
13   A   I don't know that we had a special
14   meeting.
15   Q   A special conference call --
16   A   No.
17   Q   -- or a special meeting?
18   A   I don't know that we had a special
19   meeting.
20   Q   And when Ms. Melton indicated, "We can
21   fight this appeal now or later," how did you
22   interpret what that meant?
23   A   I interpret that to mean that she
24   anticipates an appeal.
25   Q   And did you anticipate an appeal?

110

1    A   Yes.
2    Q   When is the first time that Ms. Fisher
3    complained about racial discrimination by Mr. Watson
4    at UTMB, of which you've been made aware?
5    A   I don't remember.
6    Q   Before all this started happening.
7    A   I don't remember.
8    Q   Now, when you did this investigation, did
9    you get any good feedback about Mrs. Fisher?
10   A   Yes.
11   Q   Yes.  Okay.
12        MR. LIVELY:  You talking about the
13   on-site?
14        MS. MILLER:  The on-site and the
15   subsequent e-mails.
16   Q   (BY MS. MILLER)  Did you get any good
17   letters about her?
18   A   Letters?  I don't remember letters but --
19   Q   E-mails?
20   A   Or e-mails, but I remember good feedback
21   during the on-site interview.
22   Q   Okay.  And who gave you the good feedback?
23   A   I have no idea.
24   Q   Okay.
25   A   I don't remember.

111

1    Q   You can remember the bad feedback but not
2    good feedback?
3    A   No.  I didn't remember the bad feedback,
4    either, if you remember.
5    Q   Well, I think -- I got the names Aguilar,
6    Anderson, Darby, Lauder, and Moreau from you.
7    A   Of the people that -- of the people that
8    had e-mailed me or had some complaints that I
9    remembered, but during the on-site -- I don't even
10   remember who came to the on-site interview.
11   Q   But it -- you think that Ms. Melton took
12   notes.
13   A   I know Ms. Melton took notes.
14   Q   When did you become aware, if you did,
15   that Ms. Fisher filed a charge of discrimination
16   with the Equal Employment Opportunity Commission?
17   A   I don't know the date.
18   Q   Was it shortly after she filed?
19   A   I would assume.
20   Q   And what's the procedure at UTMB?  Have
21   you ever had any charges of racial discrimination in
22   addition to Ms. Fisher's?
23   A   At the same time as Ms. Fisher's?  I --
24   Q   That wasn't my question.  Have you had
25   other charges of racial discrimination in addition

112

1    to Ms. Fisher's?
2    A   Yes.
3    Q   And who are those charges from?
4    A   Ms. Freeman and Ms. Kelly, I think.
5    Q   Ms. Freeman and Ms. Kelly?
6    A   Ms. Freeman and Ms. Kelly, I think, were
7    done at the same time.
8    Q   And are they a similar time frame to
9    Ms. Fisher?
10   A   At the same time.
11   Q   Okay.  And how about anything prior?
12   A   No.
13   Q   Have there been racial discrimination
14   cases filed?
15   A   No.
16   Q   There have been no suits pending against
17   UTMB for racial discrimination?
18   A   That I --
19   Q   Of which you're aware.
20   A   Of which I'm aware or been involved in,
21   no.
22   Q   Okay.  So what's the procedure if
23   someone -- an employee does file an EEOC charge?
24   What would the procedure be for letting you know if
25   it's an employee under your supervision, either

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

113

1 direct or somewhere down the line?
2          MR. LIVELY: Jo, are you talking
3 about one that's filed externally, not internally?
4          MS. MILLER: Yes. Because the --
5 I distinguish that as an EEO.
6          MR. LIVELY: Okay. Okay. That's
7 fine.
8          MS. MILLER: Okay.
9          MR. LIVELY: Just so we're all on the
10 same page.
11          THE WITNESS: I guess I'm not on the
12 same page. So is this the --
13     Q  (BY MS. MILLER) Okay. The EEOC, the
14 external government agency.
15     A  Okay. So not the UTMB EEOC complaints
16 that we get that our HR investigates as EEOC
17 complaints.
18     Q  They're EE --
19     A  We have an EEOC division on campus that
20 comes and investigates and then we have --
21          MS. BERNSTEIN: That's EEO. That's
22 not EEOC.
23          THE WITNESS: Okay.
24          MS. MILLER: But everybody uses it
25 interchangeably, so that's why it got --

114

1          MR. LIVELY: It got a little
2 confusing.
3     Q  (BY MS. MILLER) All right. I'm speaking
4 not of the internal investigatory part of your
5 agency but the governmental agency, the federal
6 agency that investigates from outside your purview.
7 What's was the procedure for you being notified if
8 someone has filed a charge with the EEOC.
9     A  I usually find out -- or the -- this time
10 is the only time I know. I find out -- found out
11 through human resources.
12     Q  And they provide you with a copy of the
13 charge?
14     A  No. They just told me it had been filed
15 and that I would probably be asked to provide
16 documentation and --
17     Q  Okay. And so you didn't see a copy of the
18 charge?
19     A  No.
20     Q  Were you told what the charges were?
21     A  No.
22     Q  So you didn't know anything about it?
23     A  No.
24     Q  You're the director of nursing for all --
25 for all of the northern and you had no idea what was

115

1 in the EEOC charge?
2     A  They did not tell me.
3     Q  At some point, did you learn what was in
4 the EEOC charge?
5     A  No.
6     Q  Were you not curious, even?
7     A  Don't know what's in it.
8     Q  And today do you know?
9     A  No.
10     Q  Okay. At some point, somebody responded
11 to the EEOC, so did you participate in gathering
12 information for that response?
13     A  When I was asked for information or data,
14 I -- or an interview, I gave it to whoever asked.
15     Q  Okay. And you still didn't know what the
16 charges were.
17     A  No.
18     Q  So it could have been age discrimination,
19 for all you know.
20     A  For all I knew.
21     Q  And to this day, for all you know, it
22 could be age discrimination.
23     A  Well, I've seen the pleadings for this
24 case, so I know --
25     Q  So you assume.

116

1     A  Yes.
2     Q  Okay. But you knew that Ms. Fisher had
3 charged Mr. Watson with racial discrimination, not
4 necessarily when the EEOC charge, but you knew she'd
5 made those allegations in the workplace.
6     A  I don't know that it ever came to me -- I
7 guess through the grievances, I knew it, yes.
8          (Exhibit 8 marked)
9     Q  (BY MS. MILLER) Okay. I'm showing you
10 what's been marked as Exhibit Number 8 and ask you
11 if you recognize this document.
12     A  Okay.
13     Q  Do you recognize Exhibit Number 8?
14     A  Yes.
15     Q  And did you have an opportunity to review
16 this with Mr. Watson before it was sent to
17 Ms. Fisher?
18     A  I think I reviewed it actually with HR.
19 HR was also participating in --
20     Q  In preparing it.
21     A  In preparing it.
22     Q  And so as a result of what you indicated
23 was your group consensus with HR and Mr. Watson and
24 yourself, this letter was prepared.
25     A  Yes.

Bayou City Reporting, Inc.

117

1      Q   All right. And you'll note that in
2   Exhibit Number 8, this is when she's been demoted to
3   a Nurse Clinician III, effective April 13th. And
4   was that your recommendation?
5      A   At the time, yes.
6      Q   And did you have an opportunity to help
7   craft some of this language or certainly provide the
8   facts that were put in here for HR?
9      A   Mr. Watson provided the facts and HR does
10  a lot of the crafting. I read it and change it
11  if -- or ask for changes as I feel needed, but I
12  didn't -- I didn't have much input into the
13  document.
14     Q   Just the decision --
15     A   Yes.
16     Q   -- in terms of the first paragraph.
17     A   Yes.
18     Q   Did you read it before it went out?
19     A   Uh-huh.
20     Q   Okay. So to the best of your knowledge,
21  it's accurate in terms of the facts that are
22  presented.
23     A   Yes.
24        (Exhibit 9 marked)
25     Q   (BY MS. MILLER) Show you what's been

118

1   marked as Exhibit Number 9. Do you recognize this
2   document?
3      A   It's a standard document.
4      Q   And that would be the standard way you
5   would handle it when somebody's demoted or when
6   there's some significant employment -- negative
7   employment action?
8      A   This came from HR, yes.
9      Q   Okay. So they always -- you always
10  give --
11     A   Yeah.
12     Q   -- the person an opportunity to respond.
13     A   Yes.
14     Q   Okay. And you know that Ms. Fisher did
15  respond by following grievances; don't you?
16     A   Yes.
17     Q   Okay. Were you involved in any of those
18  grievances and the handling of any of those
19  grievances or an investigation?
20     A   If I needed to answer any of those
21  grievances. At the time that an EEOC charge is
22  filed or they believe it has turned into an EEOC
23  charge or a lawsuit has been filed, HR -- under
24  their direction, we don't answer grievances or
25  appeals at that time and so I did not participate

119

1   after that time when HR instructed me not to.
2      Q   Okay. So at least on 4/12, you were
3   aware -- at least when she filed her grievances,
4   UTMB was aware that there was an EEOC charge filed.
5         MR. LIVELY: On 12?
6      A   HR --
7         MS. MILLER: 4/12. April 12th.
8         MR. LIVELY: Oh, okay. I thought you
9   meant Exhibit 12.
10        MS. MILLER: No. Not there yet.
11     A   HR was made aware first and I'm sure they
12  made me aware at some point in time.
13     Q   (BY MS. MILLER) Okay. Now, you knew that
14  she did file grievances, though, challenging the
15  decision to demote her to a clinician, Nurse
16  Clinician number 3.
17     A   I was told but I didn't always see them.
18     Q   Okay. And the reason you didn't see them
19  was because they weren't responded to because --
20     A   Yes.
21     Q   -- of the EEOC charge.
22     A   Yes.
23     Q   Okay. Looks like we've got two letters.
24  I've got new help and she did pretty good on this
25  one.

120

1         (Exhibit 10 marked)
2      Q   (BY MS. MILLER) I'm going to show you
3   what's been marked as Exhibit Number 10, and do you
4   recognize that document?
5      A   Yes.
6      Q   Okay. And although you weren't copied on
7   it, you were aware of that before it went out.
8      A   Yes.
9      Q   And did you have a chance to review this
10  document also, before it went out to Ms. Fisher?
11     A   Yes.
12     Q   And it indicates there that Mr. Watson
13  said it was his decision to bring her back up to an
14  assistant nurse manager. Is that what this says?
15     A   Yes.
16     Q   And was it his decision solely?
17     A   As I've said previously, it's -- was not
18  made in isolation by any one person.
19     Q   Okay. And you have indicated in this
20  letter or Mr. Watson indicated in this letter what
21  her salary would be as an assistant nurse manager,
22  and that was significantly less than she was making
23  before.
24     A   It was less than, yes.
25     Q   Okay. And, again, she's noticed in

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

121

1    Exhibit Number 10 that she has an opportunity to
2    appeal this.
3        A   Yes.
4        Q   And that's -- would be standard procedure.
5        A   Yes.
6        Q   And she did indeed appeal it; didn't she?
7        A   I believe so.
8        Q   Now, the assistant manager position --
9    could I see that back, please?  10?
10       A   That one?
11       Q   She was assigned to the Wynne Unit?
12       A   Yes.
13       Q   Right?  And who was -- she was the
14   assistant nurse manager at the Wynne Unit, then.
15       A   Yes.
16       Q   Right?  Who was the nurse manager at the
17   Wynne Unit at that time?
18       A   She was going to report directly to the
19   cluster nurse manager, Kim Roddy.
20       Q   My question was:  Who was the nurse
21   manager at the Wynne Unit at that time?
22       A   I don't know.
23       Q   There wasn't one; was there?
24       A   There was -- it must have been Ms. Roddy.
25   She was assigned temporarily over the Wynne Unit as

122

1    the nurse manager, and that's why Ms. Fisher would
2    have reported to Ms. Roddy.
3        Q   Okay.  But Ms. Roddy was temporary?
4        A   Yes.
5        Q   And then she, in fact, left in a few
6    months.
7        A   She did.
8        Q   Didn't she?  And after Ms. Roddy left, who
9    was the nurse manager in charge of the Wynne Unit?
10       A   I don't know who he put in charge of the
11   Wynne Unit.
12       Q   Okay.
13       A   I do know Ms. Warren was put in charge of
14   Ms. Fisher instead of Mr. Watson at the same time.
15       Q   Okay.  And, in fact, after Ms. Roddy left
16   the Wynne Unit, Ms. Fisher was the -- still the
17   assistant nurse manager over the Wynne Unit.
18       A   Yes.  And there was a nurse manager
19   assigned.
20       Q   Let me ask the questions.  And although
21   she reported to -- reported to Ms. Warren, where was
22   Ms. Warren located?
23       A   In Palestine.
24       Q   And, in fact, Ms. Fisher functioned as the
25   nurse manager over the Wynne Unit; did she not?

123

1        A   Ms. Fisher probably -- the duties are very
2    much the same, so, yes, probably so.
3        Q   Although she still had the assistant nurse
4    manager title.
5        A   (Moving head up and down)
6        Q   And she was still making the assistant --
7    the pay of an assistant nurse manager.
8        A   Yes, ma'am.
9        Q   And she was still technically demoted.
10       A   Yes, ma'am.
11       Q   Was she still under disciplinary?  Would
12   that be described as under disciplinary?
13       A   I don't know when a demotion disciplinary
14   stops.  We count it as a demotion for the next -- or
15   as a disciplinary, I would believe, for a policy for
16   the next year.
17       Q   For the full year.
18       A   Yes.
19       Q   And so tell me how these merit raises
20   work.  You know, you -- everybody gets a merit raise
21   unless they're on --
22       A   Not everybody.
23       Q   -- discipline?
24       A   Not necessarily.
25       Q   Okay.  How is it decided who gets a merit

124

1    raise?
2        A   Disciplinary is one of the -- at a written
3    level or above is one of the considerations.  The
4    other consideration is your evaluation status and
5    what you make on your evaluation.
6        Q   Okay.
7        A   And HR normally has a -- we also consider
8    your comp ratio and where you sit in a comp ratio
9    comparison.  HR has a grid that they use and hold us
10   to for evaluation scores, compa-ratio score, and
11   discipline -- if you're in disciplinary status,
12   you're automatically --
13       Q   You just don't get one, period.
14       A   -- demoted, but we use the other two to
15   help determine the amount.
16           MR. LIVELY:  What did you say?  Comp
17   ratio?
18           THE WITNESS:  Compa-ratio.
19           MR. LIVELY:  Comparables?
20           THE WITNESS:  It's kind of a median.
21   It's comp -- how close are you to the median pay for
22   that code.
23           MR. LIVELY:  I just didn't understand
24   that.
25           THE WITNESS:  And that's a

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

125

1  compa-ratio.
2     Q   (BY MS. MILLER)  I think -- I thought I
3  understood it but -- I think I do.  It's a
4  formula --
5     A   Yes.
6     Q   -- that they use and it's a formula, then,
7  that you put their scores in.
8     It's very standard in HR, very standard in
9  the HR employment world.
10    Q   Okay.  Was there anybody that you know of
11 for that particular pay -- is it legislatively
12 defined?
13    A   Not merit.
14    Q   No.  Okay.  But is there a difference in a
15 merit raise and a regular raise?
16    A   A cost of living raise.  We do have cost
17 of living raises that are legislatively mandated.
18    Q   Okay.  And are you eligible for those if
19 you're under discipline?
20    A   I think we have to give those to everyone.
21    Q   Okay.  And so the merit raises are --
22 they're not assigned by the legislature?
23    A   No.
24    Q   Where do those come from?
25    A   They come from our budgeting and planning

126

1  in correctional managed care.
2     Q   And that's set aside every year.
3     A   We try to set aside enough every year.
4  There have been years where we haven't had enough to
5  pay merits.  There are also market increases.
6     Q   And what are market increases?
7     A   UTMB, to include CMC, does market surveys
8  and market studies of different job codes every year
9  and we then compare that -- those results with our
10 current salaries to make sure that our salaries stay
11 within market.
12    Q   So you can be competitive and --
13    A   Yes.
14    Q   -- and keep your vacancy rates down and
15 your turnover --
16    A   Yes.
17    Q   -- rates down.  Is that correct?
18    A   Yes.
19    Q   Okay.
20    A   And nurses just got a market increase, as
21 a matter of fact.
22    Q   Okay.  But the merit increases, what --
23 give me an example of someone who is not on
24 disciplinary but who might not qualify for a merit
25 increase.

127

1     A   If you are well within your compa-ratio,
2  if you're well above the median of what your -- the
3  average pay is and you don't have a -- but a medium
4  or less than score on your evaluation, you might not
5  get a merit increase.
6     Q   Or you might get a lesser one.
7     A   You may get none.  You can get all the way
8  to none.
9     Q   Okay.  Or a lesser one.
10    A   And you can get anywhere from zero to
11 7 percent, I think.
12    Q   Okay.  All right.  Thank you.  Now, did
13 you work directly with Ms. Roddy when you
14 assigned -- or when Ms. Fisher was assigned to
15 Ms. Roddy?
16    A   No.
17    Q   Did anybody work directly with Ms. Roddy
18 on that?
19    A   Ms. Warren.  Ms. Warren.
20    Q   Ms. Warren did?
21    A   If Ms. Roddy needed any assistance with
22 Ms. Fisher, Ms. Warren was her resource.
23    Q   All right.  Did you have -- at that point
24 in time, did you have position descriptions for
25 every position at UTMB/TDCJ?

128

1     A   Yes.
2     Q   And so there would be no need to create a
3  new position description for, say, the position that
4  Ms. Fisher was assigned to.
5     A   No.  Their job descriptions and post job
6  descriptions.
7     Q   I just thought of something I want to ask
8  and I forgot it.  Give me a minute.  I have to think
9  of it.
10        MR. LIVELY:  Why we don't take a
11 little break.
12        MS. MILLER:  That's fine.
13        (Recess from 2:21 to 2:29)
14    Q   (BY MS. MILLER)  Okay.  Mr. Watson is no
15 longer there.  Is that correct?
16    A   No.  Yes.  He's not there.
17    Q   Tell me the circumstances of Mr. Watson's
18 departure from UTMB.
19    A   I don't know the details in that he did
20 resign.  He chose to resign.  I do know that at the
21 time of his resignation, he was not getting along
22 well with his practice manager, one of the other
23 facility management team members, and they had had
24 some difficulty.  He had had some difficulty with
25 his facility management team and decided to resign.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

129

1    Q   Okay.  And, in fact, they wrote some
2    letters and contacted you about their
3    dissatisfaction with Mr. Watson; didn't they?
4    A   The entire divisional team, not just me.
5    Q   Not just you.  Okay.  And was Mr. Watson
6    issued a letter of expectation as a result of that?
7    A   Between the time they told us and they --
8    we asked them to meet with him and the time he left
9    was very short, so, no, there was nothing.
10   Q   Okay.  And so how long had you been aware
11   of Mr. Watson having problems with manager?
12   A   It seemed to happen quite suddenly as far
13   as the -- this last incident and the last
14   dissatisfaction.  Management teams often disagree
15   over certain things and we encourage them to look at
16   different -- and come up with some sort of consensus
17   rather than complaint.  So there had not been any
18   large issues prior to that, that I knew of, other
19   than regular stuff.
20   Q   Okay.  How long had you been aware of
21   regular stuff problems with Mr. Watson --
22   A   Oh, regular stuff?
23   Q   -- and the management staff?
24   A   Regular stuff goes on in management teams
25   from the time they form.

130

1    Q   Okay.  What would you classify as regular
2    stuff?
3    A   Oh, they fuss over what positions they're
4    going to post and the finance, who's going to pay
5    who what, and they fuss over you're not controlling
6    agency as much as you should, and they fuss over
7    various and sundry things, and those go on all the
8    time.
9    Q   And do people complain to you all the
10   time?
11   A   "Complain" is a hard word.  Do they want
12   to vent sometimes?  Yeah.
13   Q   All right.  And how long have people been
14   venting to you, either in writing or in person or on
15   the phone or in any manner of communication, about
16   Mr. Watson?
17   A   Not any more than any other -- none.
18   Q   Okay.
19   A   None.
20   Q   You're not really answering my question,
21   then.  How long had that been happening?
22   A   From the time his management team came,
23   from the time that team was formed, they had the
24   regular issues that went on.  I was not notified of
25   any issues that were not expected.

131

1    Q   Okay.  Issues like he did things that made
2    them unhappy?
3    A   That happens all the time.
4    Q   Okay.
5    A   That is a normal issue.
6        (Exhibit 11 marked)
7    Q   (BY MS. MILLER)  Let me show you what's
8    been marked as Exhibit Number 11.
9    Q   And I just want to know if you recognize
10   this exhibit.
11   A   Yes.  I recognize it.
12   Q   Okay.  And what is this?
13   A   This is the summary report of a
14   correctional managed care initiative for -- of a
15   focus group that we put together, a large focus
16   group, actually, that was supported by the
17   management team to identify what staff level,
18   facility staff level, people thought the largest
19   issues were in our facility.
20   Q   I'm not sure I understand that.
21   A   The leadership of correctional managed
22   care made an effort with this task force to give the
23   facility level, all the facility level staff, to
24   prioritize their issues for us.
25   Q   And that's what's really attached here in

132

1    Roman numeral section?
2    A   Yes.
3    Q   Am I correct in understanding that?
4    A   Yeah.
5    Q   And so it goes from the highest priority
6    to the least highest?  Is that the way I'm to
7    interpret this?
8    A   Certainly wasn't my task force and Fred
9    Huff put this together.
10   Q   But it's a directive from upper -- your
11   upper management.
12   A   Sure.
13   Q   Is it not?
14   A   Sure.  Yes.  And, yes, it goes from upper
15   to lower.
16   Q   Okay.  So things that you were concerned
17   about in demoting Ms. Fisher, this person right
18   here, really that's Recommendation I.  She had --
19   there were excessive work loads on the people that
20   were there.  Is that correct?  Under her -- on her
21   staffing.
22   A   Sure.  Her staffing challenges.
23   Q   Short staffing.  She's -- and process and
24   protocols --
25   A   Um-hmm.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4

## 133

1    Q    -- that they were concerned about.  A
2  Recommendation III, lack of confidence in
3  supervisors and management?
4    A    Um-hmm.
5    Q    That occurred at all levels; didn't it?
6    A    I believe -- I don't think it specified
7  any levels.
8    Q    It wasn't unique to Ms. Fisher; was it?
9    A    Oh, no.  It's throughout our organization.
10   Q    Communication, on Number IV?
11   A    Um-hmm.
12   Q    That was a problem throughout the UTMB.
13  That wasn't unique to Ms. Fisher, either; was it?
14   A    Communication is always number one.
15  You're right.
16   Q    Team work, communication, retention,
17  training.
18   A    Um-hmm.
19   Q    I mean, throughout the system, in the
20  second-tier issues I'm looking at now on page 440 of
21  Exhibit Number 11, that wasn't unique to problems
22  Ms. Fisher had with her staff; was it?
23   A    No.
24   Q    Now, you're aware at some point in time
25  Ms. Fisher was offered a sum of money representing

## 134

1  some of the pay that she had been -- missed.
2    A    That's what I have heard.
3    Q    Okay.  And you were -- were you a party to
4  that decision?
5    A    No.
6    Q    Okay.  Did anybody consult you about that?
7    A    No.
8    Q    Okay.  Anybody consult you about the offer
9  to reinstate her to her managerial position as a
10  nurse manager?
11   A    No.
12   Q    That was done without your input and
13  decision.
14   A    Yes.
15   Q    Okay.  Were you pleased about that?  Did
16  you have an opinion about that?
17       MR. LIVELY:  About the reinstatement?
18   Q    (BY MS. MILLER)  About the reinstatement.
19   A    No.
20   Q    You don't have an -- didn't have an
21  opinion?
22   A    No.
23   Q    Yet, you were the one that decided she had
24  to be demoted?
25   A    (Moving head up and down)  Yes.

## 135

1        MS. MILLER:  Okay.  I'm almost done
2  here.  I need -- just need a couple --
3        MR. LIVELY:  Do you want to take a
4  little break?
5        MS. MILLER:  Can we take a break
6  again, please?
7        MR. LIVELY:  Sure.
8        (Recess from 2:38 to 2:44)
9    Q    (BY MS. MILLER)  We're not sure we got a
10  good answer on one of our questions.  And when I
11  asked about after you had complaints about
12  Mr. Watson, what steps did you take with him?  Did
13  you issue a letter of expectation?  Did you counsel
14  him?  Did you reprimand him?  Did you attempt to
15  demote him?
16   A    What complaints are you talking about?
17   Q    Well, you indicated there were several
18  complaints from his management group.
19   A    There was one complaint from his
20  management group.
21   Q    Okay.
22   A    And I -- he resigned shortly thereafter.
23  I did -- I had -- no disciplinary action was taken.
24   Q    So you didn't take any steps because the
25  time was too short.

## 136

1    A    Yes.
2        MS. MILLER:  Okay.  All right.  Thank
3  you.  I pass the witness.
4        MR. LIVELY:  We don't have any
5  questions.  We'll reserve ours for time of trial.
6        MS. MILLER:  All right.  Thank you.
7        (Proceedings concluded at 3:46 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Bayou City Reporting, Inc.

137

```
 1          CHANGES AND SIGNATURE
 2    PAGE   LINE   CHANGE   REASON
 3    _____
 4    _____
 5    _____
 6    _____
 7    _____
 8    _____
 9    _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24        I, MARY GOTCHER, have read the foregoing
25    deposition and hereby affix my signature that same
```

139

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    HOUSTON DIVISION
 3    JACKIE FISHER,         )
                             )
 4        Plaintiff,         )
                             )
 5    VS.                    ) C.A. NO. 4:08-cv-01273
                             )
 6    UNIVERSITY OF TEXAS MEDICAL)
      BRANCH and DAVID WATSON,  )
 7                             )
          Defendants.    )
 8
                REPORTER'S CERTIFICATION
 9             DEPOSITION OF MARY GOTCHER
                  AUGUST 27, 2009
10
11        I, Lorri Lucas, Certified Shorthand Reporter in
12    and for the State of Texas, hereby certify to the
13    following:
14        That the witness, MARY GOTCHER, was duly sworn
15    by the officer and that the transcript of the oral
16    deposition is a true record of the testimony given
17    by the witness;
18        That the deposition transcript was submitted on
19    _____ to the witness or to the attorney for
20    the witness for examination, signature and return to
21    me by _____;
22        That pursuant to information given to the
23    deposition officer at the time said testimony was
24    taken, the following includes counsel for all
25    parties of record:
```

138

```
 1    is true and correct, except as noted herein.
 2
 3        _____
              MARY GOTCHER
 4
 5
 6
 7        THE STATE OF _____)
 8        COUNTY OF _____)
 9
10        Before me, _____, on
11    this day personally appeared MARY GOTCHER, known to
12    me (or proved to me under oath or through
13    _____)(description of identity card or other
14    document) to be the person whose name is subscribed
15    to the foregoing instrument and acknowledged to me
16    that they executed the same for the purposes and
17    consideration therein expressed.
18        Given under my hand and seal of
19    office this _____ day of _____,
20    _____.
21
22
23        _____
              NOTARY PUBLIC IN AND FOR
24            THE STATE OF _____
25
```

140

```
 1        Ms. Jo Miller, Attorney for Plaintiff
 2        Mr. Sam Lively and Ms. Cari G. Bernstein,
      Attorneys for Defendants
 3
 4        That a copy of this certificate was served on
 5    all parties shown herein.
 6        I further certify that I am neither counsel
 7    for, related to, nor employed by any of the parties
 8    or attorneys in the action in which this proceeding
 9    was taken, and further that I am not financially or
10    otherwise interested in the outcome of the action.
11        Certified to by me this 18th day of September,
12    2009.
13
14
15
16
          _____
17        LORRI LUCAS, RMR, Texas CSR 5317
          Expiration Date:  12/31/09
          Bayou City Reporting, Inc.
18        Firm Registration No. 295
          1135 East 11th Street
19        Houston, Texas  77009
          (713) 861-8589
20
21
22
23
24
25
```

Bayou City Reporting, Inc.

5f14c4cd-59ef-4ba6-b38b-ad18d278f0b4