IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JACKIE FISHER | § | |
|         Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:08-cv-01273 |
| | § | |
| UNIVERSITY OF TEXAS | § | Jury Demanded |
| MEDICAL BRANCH and | § | |
| DAVID WATSON | § | |
|         Defendants. | § | |

**JOINT PRETRIAL ORDER**

**I.**     **Appearance of Counsel**

**Plaintiff, Jackie Fisher**
Jo Miller, Attorney in Charge for Plaintiff
State Bar No. 00791268
Federal I. D. No. 20385
LAW OFFICE OF JO MILLER, P.L.L.C.
505 North Main, Carriage House
Conroe, Texas 77301
Tel: (936) 539-4400
Fax: (936) 539-4409
jmiller@jomillerlaw.com

**Defendants, University of Texas Medical Branch & David Watson**
Sam Lively, Attorney in Charge for Defendants
Texas Bar No. 12435300
Assistant Attorney General
General Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 463-2120
Fax: (512) 320-0667
sam.lively@oag.state.tx.us

## II.     Statement of the Case

**Plaintiff's Statement of the Case**

Jackie Fisher was hired as an Assistant Nurse Manager by Defendant, University of Texas Medical Branch (UTMB) in 2000.  Ms. Fisher was promoted to the UTMB Cluster Nurse Manager in August of 2003.  At all times, until his resignation in October of 2006, Defendant, David Watson, was Ms. Fisher's UTMB Supervisor.  After he initiated several incidents of racially discriminatory conduct toward other Black nurses, in October of 2005, Watson who is white, approached Fisher, who is African American, and asked if she thought he was prejudiced.  Fisher replied that some of Watson's decisions were discriminatory and that he was biased on the exercise of authority.

On January 4, 2006 during staff interviews, Fisher openly challenged Watson's standards for treating black employees and white employees differently.  Within five days, Watson scheduled the Director of Nursing, Mary Gotcher, and the HR Administrator for the Northern Division, Georgia Melton, to Fisher's facility for two days and invited Fisher's subordinates and direct reports to come and discuss Fisher's performance in an "open door" session.  Watson did not subject any other Nurse Manager to such a "witch hunt."  On March 7, 2006, Watson gave Fisher a poor quarterly evaluation.  On March 8, 2006 a follow-up meeting was held at Fisher's facility and Fisher was publicly presented with "expectations" in front of her staff.  Fisher was absent on medical leave from the end of March through April 10, 2006, although during this absence, Watson continued to badger her with written notation of unfounded performance issues.

On April 10, 2006, although she had never before filed any type of complaint, Fisher filed an internal grievance with UTMB claiming that Watson was subjecting her to a hostile environment.  The very next day, April 11, 2006, Watson notified Ms. Fisher of his intent to demote her two steps, from Nurse Manager to Nurse Clinician III.  Watson failed to follow UTMB's progressive discipline policy.  Ms. Fisher again grieved Watson's discriminatory conduct on April 11, 2006.  On April 13, 2006, Fisher was demoted two steps and was reassigned to work a different TDCJ facility as Nurse Clinician III.

Fisher appealed the demotion with UTMB on April 24, 2006.  On that same day, Watson advised Fisher he had sustained a grievance against her about which she had no prior notice nor opportunity to respond.  Watson cited "nothing compelling" in Fisher's appeal to alter his original two-step demotion decision, although he "only" demoted Fisher one step, to Assistant Nurse Manager.  Fisher contacted the Equal Employment Opportunity Commission on April 24, 2006, alleging racial discrimination. On June 2, 2006, Fisher filed an EEOC Charge asserting race discrimination and retaliation.  When the white Nurse Manager of the Wynne Facility quit in August of 2006, Fisher performed the functions of the Wynne Nurse Manger without the title or commensurate pay.   Fisher amended her EEOC Charge on April 3, 2007 to document additional events of discrimination and retaliation, after UTMB noticed her, again, without justification, that it was going to demote her.  That attempt to demote was dropped. On November 6, 2007, the EEOC completed its investigation and issued a Letter of Determination finding discrimination and retaliation. This law suit was filed on April 24, 2008.

**Defendants' Statement of the Case**

Jackie Fisher was hired as an Assistant Nurse Manager by UTMB-Correctional Managed Care in 2000 for work within the health care system for state prison inmates.

In August 2003, Ms. Fisher was promoted to Cluster Nurse Manager over the Goree-Huntsville-Ferguson units.  It was Defendant David Watson who promoted Ms. Fisher to this position.

In 2005, Ms. Fisher was transferred to the Estelle Regional Medical Facility as a Cluster Nurse Manger.  This unit may be known or called the Estelle Unit or RMF.  The RMF is large medical facility for the inmates.  It is a hub medical facility and a very important part of inmate health care.

In 2004, the Mortality and Morbidity Committee referred Jackie Fisher to a nursing peer review for her actions in dealing with an inmate death. This referral was automatic David Watson wrote a letter to Fisher's file defending her.   After the nursing peer review committee reviewed the record, it referred the matter to the State Board of Nursing Examiners (BNE).  This was not considered a common incident.  David Watson did not act in judgment as a peer review committee person, but did gather the requested documents as a "facilitator".  Watson had nothing to do with the decision of the peer review committee to send the matter to the BNE.

After investigation consideration, the BNE entered an Agreed Order encumbering Jackie Fisher's nursing license with certain requirements of taking board approved courses.  Jackie Fisher approved of the state boards finding and conclusion on November 8, 2006

Jackie Fisher completed the required course on March 23, 24 and 25, 2007.

Mr. Watson wrote a letter to the State Board on behalf of Jackie Fisher defending her actions.

Watson noticed problems with Ms. Fisher's management and communication problems as early as 2004 counseled her to work on them.

After her transfer to the Estelle Regional Medical Center, Watson noted the same complaints.

In early 2006 , four (4) emergency room nurses reported to Watson that they were considering quitting due Fisher's poor communication and management style..

Mr. Watson was concerned about the functioning of this hub unit.  He contacted the director of nursing, Ms. Gotcher, in February, 206 about the problems.

Ms. Gotcher decided to go conduct an on-site investigation and Melton accompanied Gotcher as a HR representative. Numerous staff interviews were held by Melton and Gotcher regarding the functioning of Fisher's nursing unit over the course of two days in early march 2006. As a result of this investigation, Human Resources recommended demoting Fisher two levels, to a Nurse Clinician III.

There were also serious concerns about Fisher's dealings with outside nursing staffs.

A notice to demote, not a demotion, was given to Fisher with an opportunity to respond, dated  April 11, 2006.   After consideration, and input from Watson and Gotcher Fisher was demoted to an Assistant Nurse Manger, effective May 2, 2006.  Fisher appealed this demotion.

Because Fisher had alleged race discrimination, the entire affair was sent to the Internal Equal Employment Opportunities office of UTMB-CMC.

Mr. Melvin Williams of the UTMB-CMC EEO office concluded the demotion was not properly supported by or affected under the rules of the institution. The demotion was reversed and Fisher was reinstated in early May 2007and  given her back pay to compensate her lost salary.

Mr. Watson left UTMB-CMC in October 2006.

The problems with Fisher's communication skills have continued.

## III.   Jurisdiction

This Court has full and complete subject matter jurisdiction over the claims in this lawsuit as Ms. Fisher's claims present federal questions which arise under TITLE VII of the CIVIL RIGHTS ACT of 1964 as amended by the CIVIL RIGHTS ACT of 1991, 42 U.S.C. §2000e *et. seq*.;  42 U.S.C. §1981 as amended by the CIVIL RIGHTS ACT of 1991; and 42 U.S.C. §1983 (the Civil Rights Act of 1871) as amended.  There are no unresolved jurisdictional issues.

## IV.   Motions

**Plaintiff's Pending Motions**

1)   Plaintiff anticipates filing Objections and Motion to Exclude specific to some of Defendants' exhibits within the time frame specified by this Court's Procedures.

2)   Plainitff's Motion in Limine

**Defendants' Pending Motions**

    1)    Defendants' anticipate filing Objections and Motion to Exclude specific to some of Plaintiff's exhibits within the time frame specified by this Court's Procedures.

    2)    Defendants' Motion in Limine

## V.    Contentions of the Parties

**Plaintiff's Contentions**

Ms. Fisher contends that she was discriminated against by UTMB and Watson because of her African American race when she was subjected to different terms and conditions of employment because of her race.  Watson set different standards for black nurses than he did for the white nurses under his direction.  Because of her race, Ms. Fisher was discriminated against, disciplined for vacancy and turnover rates when her white peers were not, demoted, given an exceptionally poor quarterly performance evaluation, and transferred when she had only been in her position a limited amount of time, yet the white Nurse Manager with similar tenure was not transferred.  After demoting Fisher, Watson replaced Ms. Fisher with Nurse McCartney, white.  After Nurse Roddey left the Wynne Unit, Fisher was required to perform as the Wynne Unit Nurse Manager without the commensurate title and pay.  Ms. Fisher grieved, but her internal complaints were not adequately nor timely addressed.  UTMB failed to follow its own policies and procedures regarding progressive discipline and the grievance  process. Because of her race, Ms. Fisher was treated less favorably than similarly situated persons who were not members of the protected class.

UTMB is liable to Ms. Fisher under Title VII for racial discrimination.  Watson, acting under color of state law, is liable under 42 U.S.C. §1981, for his acts of racial discrimination toward Ms. Fisher.

Ms. Fisher contends that she was subjected to a hostile work environment by UTMB and Watson because of her African American race.  The racially hostile work environment to which Ms. Fisher was subjected was severe and pervasive, and she, as well as others, perceived it to be. Watson's discriminatory conduct was not aimed merely at Fisher, but also at other African American employees, which was also observed by Ms. Fisher. Watson set different standards for black nurses than he did for the white nurses under his direction. Watson directed Fisher, as a Nurse Manager, to participate in conduct which she believed to be discriminatory toward black nurses. Watson directed Fisher to unfairly discipline other African American employees in an effort to make his discriminatory conduct appear race neutral. Watson made Fisher the subject of an inquisition and facilitated an "open door" for Fisher's direct reports to complain about her.  Watson documented performance issues against Fisher which were overlooked in similarly situated white employees.  Watson unfairly and inaccurately cited vacancy rates and turnover rates to discipline Fisher. Watson unfairly singled out Fisher and continually humiliated her in front of her staff.  Fisher was publically given individual  "expectations" in front of her staff.  Watson undermined her managerial authority with her direct reports and coworkers and the vendors with whom she was required to conduct business.  Watson made Fisher the subject of a grievance, which he sustained against her without notice to her or opportunity to respond.  Fisher was denied the

timely follow up to her own internal grievances.  Fisher  was unnecessarily subjected to a peer review and referral to the BNE, a procedure which was unduly influenced by Watson. UTMB attempted to again demote Fisher without justification.  UTMB is liable to Ms. Fisher under Title VII for subjecting her to a hostile work environment.  Watson, acting under color of state law, is liable under 42 U.S.C. §1981 and 42 U.S.C. §1983 for subjecting Ms. Fisher to a hostile work environment.

Ms. Fisher contends that she was further discriminated against in retaliation for opposing racially discriminatory conduct.  Ms. Fisher opposed discriminatory conduct toward other African American employees, grieved internally about racially discriminatory conduct directed at her, and filed a charge of racial discrimination and retaliation with the EEOC.  After she engaged in protected activity, she was demoted, her wages were reduced, she was subjected to unfair scrutiny, she was subjected to humiliating and demeaning conduct, her authority was undermined with her subordinates and coworkers, she was subjected to an unnecessary peer review which was unduly influenced by her supervisor which resulted in BNE investigation and probation, she was ineligible for raises and promotion.  There is a temporal nexus between her protected activity and the retaliatory conduct.  But for the fact she engaged in the protected activity, she would not have been subjected to the retaliatory conduct.    UTMB is liable to Ms. Fisher under Title VII for retaliation.  Watson, acting under color of state law, is liable under 42 U.S.C. §1981, for his acts of retaliation toward Ms. Fisher.

Watson's conduct violated clearly established statutory and Constitutional rights and

was not objectively reasonable in light of clearly established law.

**Defendants' Contentions**

Defendant UTMB-CMC and Watson deny they discriminated or retaliated against Fisher.  She was not subjected to different terms and conditions because of her race.  Fisher was not demoted because of her race, but because of continued management problems and people skills in a critical hub medical facility.  These included concerns over Fisher's ability to follow instructions, failing to attempt to deal with management's concerns about her dealings with staff under her; staff's feeling about Fishers perceived racial discrimination, rude behavior, lack of caring/listening to their concerns, retaliation against staff and lack of communication with staff, moving ER supplies, and handling outside nursing staff.

Fisher was not required to act as a nurse manager at the Wynne.  These tasks were handled by the district nurse manager after the cluster nurse manager left..

Neither UTMB-CMC nor Watson subjected Fisher to a racially hostile work environment.  Nor were the actions alleged by Plaintiff severe or pervasive to an extent that they constituted a hostile work environment.

Neither UTMB-CMC nor Watson did not treated black or whites nurses differently or direct Fisher to do so.

UTMB-CMC and Watson acted in the best interests of the patients at the Estelle RMF.

Neither UTMB-CMC or Watson submitted Fisher to a peer review or unfair referral to the BNE, this was done automatically by the mortality and morbidity review committee.

Neither UTMB-CMC or Watson had any influence on either of those bodies.

Fisher was not retaliated against by either Defendant for opposing race discrimination. After learning that Fisher had made complaints of racial discrimination, Watson requested an EEO investigation. After learning of Plaintiff's complaints through the grievance and appeal process, UTMB-CMC conducted an internal review. Subsequently, UTMB-CMC reinstated Fisher and paid her back pay. Fisher has not lost a promotion or raise since reinstatement.

Watson's actions were reasonable in light of concerns he had about Fisher and had a reasonable belief that his actions did not violate Fisher's rights.

## VI.    Admissions of Fact

1) Jackie Fisher is African American and belongs to a protected class.

2) Ms. Fisher exhausted her administrative remedies with the EEOC. on June 2, 2006.

3) More than 180 days have elapsed since Ms. Fisher filed her EEOC charge.

4) On November 6, 2007, the EEOC issued a Letter of Determination concluding that Fisher had been subjected to different terms and conditions of employment because of her race and that she had been demoted in retaliation for opposing perceived discrimination. Defendants will contest the admissibility of any document or statement regarding the EEOC's conclusions in this matter.

5) Ms. Fisher filed this lawsuit within 90 days of her receipt of the Notice of Right to Sue issued by the Department of Justice.

## VII.   Contested Issues of Fact

**Plaintiff's Contested Issues of Fact**

1)   Whether UTMB and David Watson discriminated against Jackie Fisher because of her African American race.

2)   Whether UTMB's and David Watson's harassment of Ms. Fisher was sufficiently severe or pervasive to alter the terms and conditions of her employment with UTMB.

3)   Whether UTMB is liable to Ms. Fisher for acts racial discrimination and a racially hostile work environment.

4)   Whether David Watson is liable to Ms. Fisher for acts of racial discrimination and a racially hostile work environment.

5)   Whether Ms. Fisher suffered retaliation for opposing acts of racial discrimination perpetrated by David Watson toward other black employees of UTMB.

6)   Whether Ms. Fisher suffered retaliation for her internal grievances complaining of racial discrimination and hostile environment.

7)   Whether Ms. Fisher suffered retaliation for her exercising her federally protected right to complain to the EEOC about racial discrimination and a hostile environment at UTMB.

8)   Whether UTMB is liable to Ms. Fisher for acts of retaliation.

9)   Whether David Watson is liable to Ms. Fisher for acts of retaliation.

10)  Whether UTMB's supervisors, Watson and others, followed UTMB's policies and procedures as to progressive discipline and grievance procedures with respect to Ms. Fisher's employment and complaints.

11)  Whether in August of 2003, Watson subjected black employees to different terms and conditions of employment when he directed Fisher to prepare a Corrective Action Plan and write up for Nurse Kelly, black.

12)  Whether Watson subjected black employees to different terms and conditions of employment when he demanded that they be written up but did not permit Fisher to discipline the white employees who required attention.

13)  Whether Watson held consistent standards for white and black employees when he demanded that they follow the chain of command.  In February of 2005, Nurse Drake, black, tried to complain to Watson about her Assistant Nurse Manager, Ms.

Pipkin, white.  Watson insisted that the white supervisor be present to defend herself, so he could hear both sides of the story. In April of 2005, another Nurse, Parker, white, attempted to complain to Watson about her white supervisors Nurse Manager Wright and Brophy.  Watson insisted that Parker must first confront her supervisors directly before he would discuss the situation with her.

14)   Whether Watson held consistent disciplinary standards for conduct by white employees and the same conduct by black employees. In May of 2005, Fisher questioned Watson as to the Corrective Action Plan he had directed for an African American Assistant Nurse Manager when a white Assistant Nurse Manager had admitted the same involvement in the activity and yet was not disciplined.

15)   Whether Watson afforded black employees and white employees with equal deference with respect to terms and conditions of employment. Also in May of 2005, African American Nurse Hagan requested a transfer to Fisher's unit and Watson denied the transfer citing current a disciplinary violation for attendance, although Watson permitted white employees with the same pending attendance violations to transfer.

16)   Whether staffing vacancy rates and turnover rates for the Goree-Huntsville-Ferguson Facilities were attributable to Ms. Fisher's performance as the Nurse Manager.

17)   Whether staffing vacancy rates and turnover rates for the ERMF Facility were attributable to Ms. Fisher's performance as the Nurse Manager.

18)   Whether Ms. Fisher staffing vacancy rates and turn over rates were comparatively higher than white nurse managers.

19)   Whether, in August of 2005, Watson evidenced racially discriminatory conduct when he administratively reassigned Fisher and did not reassign Kim Roddey, white, because she was "new."  Roddey had been hired as Cluster Nurse Manager about the same time Fisher had been hired in 2003.

20)   Whether Watson was seeking to neutralize his racially discriminatory conduct when sometime during the week of October 24, 2005, Watson confronted Fisher directly and asked her if she thought he was prejudiced.  Fisher responded that some of his decisions were discriminatory and that he was biased in the exercise of authority. She also added that he focused on the person instead of the problem.

21)   Whether during interviews on January 4, 2006, Watson evidenced disparate treatment between black and white employees

22)  Whether after Fisher publically reminded Watson that he had refused a requested transfer to Nurse Kelly, black, for the same reasons that previously led to Ford's departure, Watson begrudged Fisher's opposition to the discriminatory conduct

23)  Whether Watson solicited mal-contented employees under Fisher's supervision to complain about her and undermine her authority.

24)  Whether any objectives or protocol were established by Gotcher and the HR Administrator of the Northern Region, Georgia Melton, prior to them gathering information for two days, from Fisher's reports, much of it solicited by Watson or Assistant Nurse Manager Aguilera and Watson's informant.

25)  Whether any white Nurse Manager was subjected to a witch hunt inquisition.

26)  Whether any white Nurse Managers were subjected to publically declared "expectations" given in front of their staff.

27)  Whether Fisher's demotion was warranted.

28)  Whether Defendant followed its own policies and procedures when  UTMB didn't turn Fisher's grievances over to its own OEO&D department for several months, even though she complained of race discrimination.

29)  Whether the UTMB check sent March 9, 2007, in the  amount of $3,907.41 for back pay from May 6, 2006 through December 15, 2006 was an adequate resolution for the discriminatory and retaliatory conduct suffered by Ms. Fisher.

30)  Whether the notice of intent to demote Fisher to a Nurse Clinician III dated March 21, 2007 and issued by Mary Gotcher was consistent with the treatment of white employees.

31)  Whether Defendant UTMB employees at least 500 or more employees at all times relevant to the facts of this suit and as Fisher's employer is subject to the maximum damage caps allowable under 42. U.S.C.§ 1981a.

32)  Whether Watson was acting under color of state law as Fisher's supervisor at UTMB when the discriminatory conduct took place.

**Defendants' Contested Issues of Fact**

1)     Whether Watson had concerns regarding Fisher's ability to effectively supervise and manage the nurses in her unit..

2).    Whether Watson had a coaching session with Fisher about not meeting Watson's expectations.

3)     Whether there was discontent and lack of satisfaction with Fisher about not meeting Watson's expectations.

4)     Whether Fisher said that Watson's actions where discriminatory in their conversation during the week of October 24, 2005.

5)     Whether Watson refused the request for rehire Nurse Ford after being reminded by Fisher of Ford's prior behavior.

6)     Whether Watson had a coaching session with Fisher about not meeting Watson's expectations.

7)     Whether there was discontent and lack of satisfaction with Fisher by staff nurses under her supervision.

8)     Whether the concerns Watson had with Fisher's management skills involved racial discrimination, rude behavior, lack of caring/listening to concerns, retaliation, lack of communication with staff, and taking action on complaints without investigating and getting both sides of story.

9)     Whether Watson had concerns about ER nurses dealings with Fisher's actions as a nurse manager, including the reduction or elimination of supplies.

10)    Whether Watson had concerns about Fisher's retaliation for involving "safe harbor"

protections by nurse (s)

11)     Whether Watson had concerns about the number of staff leaving the unit while under Fisher.

12)     Whether Watson had concerns about staff morale after Fisher arrived.

13)     Whether Watson had concerns about sufficient staff meetings by Fisher.

14)     Whether Watson had concerns about Fisher's handling of outside nursing staffs.

15)     Whether Watson had concerns about whether Fisher informed staff about the Obs Bed Project.

14)     Whether Patricia Freeman could supply any reasons for a transfer request she made.

15)     Whether Nurse Manger Roddey had concerns about Fisher's work at Wynne Unit.

16)     Whether Watson had concerns Fisher supervisory skills and her reaction to attempts to correct these problems.

17)     Whether Watson had concerns about Fisher and referring nurses to peer review over minor incidents.

18)     Whether Watson requested an EEO investigation about allegations against him by Fisher.

19)     Whether the actual demotion of Fisher was effective on May 6, 2006.

20)     Whether Watson offered Fisher an opportunity to respond to her performance evaluation in March 2006.

21)     Whether Watson wrote a memo to Fisher's file to protect her possible disciplinary action over the inmate death that led to the peer review and BNE action.

22)     Whether Watson wrote a letter to the BNE on behalf of Fisher over the investigation of her by the BNE.

23)     Whether a referral of an inmate death to a peer review was automatic by the mortality and morbidity committee.

24)     Whether Watson sat as a board member in the peer review of Fisher.

25)     Whether Watson acted only as a records gatherer, a facilitation, for the peer review.

26)     Whether Fisher agreed to the findings and conclusions of the BNE order encumbering Fisher's nursing license.

27)     Whether Fisher informed Watson or UTMB-CMC of the BNE's action against her.

28)     Whether Watson had concerns about Fishers handling of staffing needs at Estelle before she went out on a leave of absence.

29)     Whether Karen Dixon complained of Fisher creating a hostile work environment.

30)     Whether an investigation of Dixon's complaint was done by UTMB-CMC HR.

31)     Whether Ms. Dunn was terminated for being insubordinate to Fisher.

32)     Whether Fisher requested the termination of Dunn of September 2, 2008.

33)     Whether Warren District Nurse Manager took over nurse management duties when Nurse Roddey left.

34)     Whether Fisher was reinstated as Cluster Nurse Manager on May 6, 2007.

35)     Whether Fisher was paid the back pay resulting from her demotion and subsequent reinstatement.

36)     Whether Fisher has lost any promotion or raises since reinstatement.

## VIII.  Agreed Applicable Propositions of Law

1)      EMPLOYER PRACTICES:
It shall be an unlawful employment practice for an employer—
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;....

42 U.S.C. 2000*e*-2(a)(1)
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 as amended.

2)      Whether a hostile work environment exists is determined using the totality-of-the-circumstances test that focuses on the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating . . . and whether it unreasonably interferes with an employee's work performance."  *Baker v. FedEx Ground Package Sys. Inc.*, 278 F. App'x 322, 328 (5th Cir. May 13, 2008) (quoting *Turner v. Baylor Richardson Med. Ctr.,* 476 F.3d 337, 347 (5th Cir. 2007))(ellipsis in *Baker*).

3)      The plaintiff "must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable." *Baker v. FedEx Ground Package Sys. Inc.*, 278 F. App'x 322, 328-29 (5th Cir. May 13, 2008)(quoting *Frank v. Xerox Corp.,* 347 F.3d 130, 138 (5th Cir. 2003)).

4)      DISCRIMINATION FOR MAKING CHARGES, TESTIFYING, ASSISTING, OR PARTICIPATING IN ENFORCEMENT PROCEEDINGS:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter [of Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter [of Title VII].

42 U.S.C. §2000*e* -3 (a)
TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
as amended by the CIVIL RIGHTS ACT OF 1991.

5)   The Plaintiff establishes the *prima facie* elements of a retaliation claims by demonstrating that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and adverse employment action.   *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007).

6)   The temporal proximity between a plaintiff's protected activity and the adverse employment action can provide evidence of the causal link required to make out a *prima facie* case of retaliation. *See Lemaire v. State of Louisiana*, 480 F.3d 383, 390 (5th Cir. 2007); *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).

7)   EQUAL RIGHTS UNDER THE LAW
(a) Statement of equal rights All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
(b) "Make and enforce contracts" defined For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
(c) Protection against impairment The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. §1981 as amended by the
CIVIL RIGHTS ACT OF 1991

8)   The analysis for claims under §1981 and Title VII is identical. *See Hall v. Continental Airlines, Inc.*, 252 F. App'x at 653 (5th Cir. Oct. 26, 2007)(citing *Jones v. Robinson Prop. Group, L.P.*, 427 F.3d 987, 992 (5th Cir. 2005); *Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 468 (5th Cir. 2002)).

9)   AMENDMENT XIV, SEC. 1
"All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

U.S. CONSTITUTION,

AMEND. XIV §1

10)   CIVIL ACTION FOR DEPRIVATION OF RIGHTS
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. §1983

11)   Harassment in public employment can violate the Equal Protection Clause. *See Lauderdale v. Texas Dept. of Crim. Justice*, 512 F.3d 157, 166 (5th Cir. 2007) (citing *Southard v. Texas Bd. of Crim. Justice*, 114 F.3d 539, 550 (5th Cir. 1997)). Although *Lauderdale* and *Southard* involved sexual harassment, the same legal principles apply to racial harassment that creates a hostile work environment. *See, e.g., Bryant v. Jones*, 575 F.3d 1281, 1296 (11th Cir. 2009) (involving discrimination and harassment on the basis of race).

12)   Discrimination and hostile work environment claims brought under the Equal Protection Clause are subject to the same analysis as those brought under Title VII *See Bryant v. Jones*, 575 F.3d 1281, 1296, N. 20 (11th Cir. 2009).

13)   The plaintiff, at all times bears the ultimate burden to demonstrate that the defendant intentionally discriminated. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143 (2000); *Lee v. Kansas City S. Ry Co.,* 574 F.3d 253, 259 n. 13 (5th Cir. 2009)(citing *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

14)   The qualified immunity defense protects from civil liability government officials performing their discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Flores v. City of Palacios*, 381 F.3d 391, 394 (5th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

15)   When determining whether a defendant is entitled to qualified immunity, the Court views the facts in the light most favorable to the party asserting the injury and determines "(1) whether the defendant's conduct violated the plaintiff's constitutional rights, and (2) 'whether the defendant[']s conduct was objectively reasonable in light of clearly established law.'" *Goodson v. City of Corpus Christi,* 202 F.3d 730, 736 (5th Cir. 2000).

**Plaintiff's Contested Issues of Law**

1) The Plaintiff establishes the *prima facie* elements of race discrimination by demonstrating that she: (1) is a member of a protected class; (2) was qualified for the position in question; (3) was the subject of an adverse employment action; and (4) was replaced by someone outside the protected class or was treated less favorably than similarly situated persons who were not members of the protected class. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009); *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

2) The Plaintiff establishes the *prima facie* elements of a hostile work environment claim involving her supervisor, by demonstrating that: (1) she belonged to a protected group; (2) she was subjected to unwelcome harassment; (3) such harassment was based on race; and (4) the harassment complained of affected a term, condition, or privilege of employment. *Baker v. FedEx Ground Package Sys. Inc.*, 278 F. App'x 322, 328 (5th Cir. May 13, 2008) (citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

3) The Plaintiff establishes the *prima facie* elements of a retaliation claims by demonstrating that: (1) she engaged in protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and adverse employment action.   *See Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 348 (5th Cir. 2007).

4) The temporal proximity between a plaintiff's protected activity and   the adverse employment action can provide evidence of the causal link required to make out a *prima facie* case of retaliation. *See Lemaire v. State of Louisiana*, 480 F.3d 383, 390 (5th Cir. 2007); *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997).

5) A plaintiff's *prima facie* case, combined with the fact finder's disbelief of the defendant's proffered reasons, may suffice to show intentional discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147 (2000)(citing *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511 (1993)).

6) For a Plaintiff's hostile work environment claim to actionable, the environment created by the challenged conduct must be of such a nature that it is both objectively and subjectively offensive, "one that *reasonable person* would find it hostile or abusive and one that the victim in fact did perceive to be so."   *Lauderdale v. Texas Dept. Of Criminal Justice,* 512 F. 3d 157, 163 (5th Cir. 2007)(citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998)(quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993)).

7)      Whether the harassment is severe or pervasive - is stated in the disjunctive.  A single isolated incident can be so egregious that it alters the terms, conditions or privileges of employment and may satisfy the forth prong of the hostile work environment elements. *Lauderdale v. Texas Dept. Of Criminal Justice,* 512 F. 3d 157, 163 (5th Cir. 2007)(citing *Harville v. Westward Communs., LLC,* 433 F.3d 428, 434-35 (5th Cir. 2005).

8)      The test for severe or pervasive is an "or" and not an "and," which is not a irrelevant distinction. *Harville v. Westwood Commcn'ns,* 433 F. 3d 428, 434-35 (5th Cir 2005). Harassment need not be severe *and* pervasive, one or the other will do. *Hostetler v. Quality Dining, Inc.,* 218 F. 3d 798, 808 (&th Cir. 2000).

9)      Frequent incidents of harassment, while not severe, can reach the level of pervasive and can indeed alter the terms, conditions or privileges of employment such that the forth prong is also meet by pervasive conduct.  "Thus, the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct." *Lauderdale v. Texas Dept. Of Criminal Justice,* 512 F. 3d 157, 163 (5th Cir. 2007)(quoting *Ellison v. Brady,* 924 F. 2d 872, 878 (9th Cir. 1991).

10)    *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 147-48 (2000) holds that intentional discrimination may be inferred from the falsity of the employer's explanations.  While the ultimate burden of persuading the trier of fact remains at all times with the plaintiff, it is clear that the ultimate fact of discrimination or retaliation may also be inferred from the falsity of the explanation.  *Gee v. Principi,* 289 F. 3d 342, 348 (5th Cir. 2002)(citing *Reeves,* 530 U.S. at 146-48).

11)    In *Reeves,* the Supreme Court resolved and eliminated the confusing pretext plus standard which had emanated from its holding in *Hicks.  Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 223 (5th Cir. 2000)(citing *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993)).  Shortly after *Reeves* was announced, this Court confirmed that generally proof of pretext and a *prima facie* case is sufficient to survive a sufficiency of the evidence challenge.  *Russell,* 235 F.3d at 222-23.  There may be narrow exceptions in which a *prima facie* case and pretext will not suffice to establish intentional discrimination such as when the record conclusively reveals some other non-discriminatory reason, but these instances are rare.  *Id.* at 229.

12)    Proof that the employer's explanation is unworthy of credence is only one form of circumstantial evidence and it is quite probative of intentional discrimination. *Reeves,* 530 U.S. at 147.  Proof that the employer's explanation is false can be quite persuasive and offers considerable assistance to the fact finder in concluding that real

reason for the conduct was intentional discrimination.  *Id.*

13)   Once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to articulate the actual reason for its decision.  *Id.* at 146-48 (2000)*;  Gee v. Principi,* 289 F. 3d 342, 348 (5th Cir. 2002).  This circumstantial method of proving discrimination is not only sufficient, but can be more "certain, satisfying, probative and persuasive" than direct evidence of discrimination.  *Costa v. Desert Palace, Inc.*, 539 U.S. 90 (2003)(citations omitted).

14)   When an employer offers inconsistent explanations for its employment decisions at different times, the fact finder may infer that the employer's reasons are pretextual.  G*ee,* 289 F.3d at 347-48.  In *Burrell v. Dr. Pepper,* 482 F.3d 408, 413-15 (5th Cir. 2007), the Fifth Circuit considered Dr. Pepper's inconsistent attempts to clarify its initial requirement of "purchasing experience" with its subsequent requirement of "purchasing experience in the bottling industry," as evidence of pretext.  This Court concluded that these inconsistent arguments demonstrated a genuine issue of material fact from which a jury could infer that Dr. Pepper's proffered rationale was pretextual.  *Id.*

15)   The Fifth Circuit has repeatedly held that EEOC findings and determinations are highly probative.   *Lindsey v. Prive Corp.,* 161 F.3d 886, 894 (5th Cir. 1998).  It has been established for years in the Fifth Circuit that findings and determinations made by the EEOC are admissible in civil proceedings.  In the Fifth Circuit, "EEOC determinations and findings of fact, although not binding on the trier of fact, are admissible as evidence in civil proceedings as probative of a claim of employment discrimination at issue in the civil proceedings."  *McClure v. Mexia Indep. Sch. Dist.,*750 F. 2d 396, 400 (5th Cir. 1985).

16)   The *Proud* opinion held that "where the hirer and firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Proud v. Stone,* 945 F. 2d 796, 797 (4th Cir. 1991). In *Haun v. Ideal Industries, Inc.,* 81 F. 3d 541, 546 (1996), the Fifth found that evidence of the same hirer and firer within a relatively short time span is relevant to the determination of whether discrimination occurred but the court declined to establish a rule that no inference of discrimination could arise in the case where the same actor was the hirer and firer.   The *Haun* court, instead, looked at the whole situation, keeping in mind the ultimate issue as to whether the protected trait was a

factor in the employment decision. *Haun v. Ideal Industries, Inc.,* 81 F. 3d 541, 546 (1996).

17)    (a) Right of recovery
    (1) Civil rights
    In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5, 2000e–16] against a respondent who engaged in unlawful intentional discrimination ....and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b) of this section, in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.....
    (b) Compensatory and punitive damages
    (1) Determination of punitive damages
    A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.
    (2) Exclusions from compensatory damages
    Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964 [42 U.S.C. 2000e–5 (g)].
    (3) Limitations
    The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—
    ....(D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.
    (4) Construction
    Nothing in this section shall be construed to limit the scope of, or the relief available under, section 1981 of this title.

42 U.S.C. §1981a

**Defendants' Contested Issues of Law**

1)    Whether Defendants are entitled to a "same actor" instructions in the jury charge?

    "If you find that the same person who promoted Defendant is also one of the people

who allegedly discriminated against her, you may consider it inherently inconsistent that an

individual who is willing to hire or promote a person who is a member of a protected class will discriminate against that same individual because she is a member of that class."

> *Stoker v, Hattiesburg ACED*, 549 F. 3d 985, (5th Cir. 2008).

2)      Whether the EEOC determination and file are admissible.

Defendants ask the court to keep the EEOC finding and any testimony about it out of evidence. This is a matter left to the sound discretion of the court.  See *Cortez v. Magus Exploration Co.*, 977 F. 2d 195 (5th Cir: 1990).

In this case, the EEOC letter is simply a conclusory finding with little probative value and should be excluded under Rule 403.

Defendants ask that the court follow the reasoning set forth in *Price v. Federal Express Corp.*, 283 F. 3d 715 (5th Cir. 2002) wherein the court concluded that a single determination letter was a different matter than a full fledged investigation and, as a matter of discretion, need not be considered.  Indeed, following this line of reasoning, in *McNeal v. Kansas City Railway*, 2007 U.S. Dist. Lexis 31207, the United States District Court of the Western District of Louisiana, Lake Charles Division, ruled that a EEOC letter was inadmissible because of its conclusory nature, its ability to create a presumption in favor of the Plaintiff, a presumption disallowed by law, and unfair prejudice to the Defendants.  See also; *Cambra v. The Restaurant School*, 68 Fed. R. Evid. Serv. (Callaghan) 850 (E.D. Pa. 2005).

Accordingly, Defendants request that the court exclude the EEOC determination letter and any testimony about it.

_____Further, Plaintiff has offered the EEOC entire file. Defendants object to this in so far as the entire file contains hearsay; sources of information or lack of information that indicate lack of trustworthiness and lastly, its prejudicial effect far outweighs it probative value. Indeed, in *McClure v. Mexia ACED*, 750 F.2d. 396, the Fifth Circuit stated bluntly that the "admission into evidence of the entire EEOC file... was erroneous." *Id*. At 402.

3)   If the EEOC determination is admissible, are the Defendants are entitled to limiting jury instruction.

"EEOC findings are only background and are not conclusive of any factual issue."

*Blanton v. University of Florida*, 273 Fed. Appx. 797 (11th Cir 2008)

4)   Whether the defendants are entitled to a mixed motive jury instruction or question.

"If you find that defendant's treatment of the plaintiff was motivated by both [race] and lawful reasons, you must decide whether the plaintiff is entitled to damages. The plaintiff is entitled to damages unless the defendant proves by a preponderance of evidence that the defendant would have treated plaintiff similarly even if the plaintiff's [race] had played no role in the employment decision."

*Desert Palace. Inc. V Costa*, 549 U.S. 90, 96-97 (2003)

4)   Whether Plaintiff is entitled to recover back or front pay.

5)   Whether burden shifting criteria and prima facie elements of a claim should be part of the jury's instructions.

"When a case has been fully tried on the merits, the adequacy of the party's showing at any particular stage of the *McDonnell Douglass* ritual is

unimportant." *Molnar v. Ebasco Constructors, Inc.*, 986 F.2d 115 (5th Cir 1993) (citation omitted) A Title VII plaintiff bears the burden of proving not only that the employer's purported reasons for taking an adverse employment action are pretextual, but also that the employer engaged in illegal discrimination or retaliation. *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742. Thus, applying sufficiency of the evidence standards , this Court must examine whether the plaintiff has met his ultimate burden of proving hat the adverse employment action complained of resulted from retaliatory intent. *Rubinstein v. Administrators of Tulane Educational Fund,* 218 f.3d 392, 402 (5th Cir. 200)

## X.    Attachments

###    A.    Plaintiff's Exhibit List

###    B.    Defendants Exhibit List

###    C.    Plaintiff's Witness List

###    D.    Defendant's Witness List

## XI.    Settlement Statement

The parties have mediated and all settlement efforts have been exhausted.

Plaintiff's current settlement demand is $210,000.00 including all fees and costs and the current offer from UTMB and Defendant Watson combined is $20,000.00.

The case cannot reasonably be expected to settle.

## XII.    Trial Statement

This is a Jury trial.  The parties expect the trial to take no more than four days including voir dire, charge conference, openings and closings.

Defendant UTMB has stipulated that it will accept subpoena on behalf of its current employees and make them available as requested by Plaintiff without the necessity and expense of subpoena service.

**XIII.   Additional Required Attachments**

      **E.**      **Plaintiff's Motion in Limine**

      **F.**      **Defendants' Motion in Limine**

      **G.**      **Plaintiff's Proposed questions for the venire panel.**

      **H.**      **Defendants' Proposed questions for the venire panel.**

      **I.**      **Joint Proposed Jury Charge**

      **J.**      **Plaintiff's Memorandum of Law**

Date_____, 2010.

                                             _____
                                           **THE HONORABLE NANCY F. ATLAS**
                                           **UNITED STATES DISTRICT JUDGE**

**APPROVAL**:

/s/ Jo Miller                             /s/ Sam Lively
_____         _____
Counsel for Plaintiff                    Counsel for Defendants