I rang Bryan back on the phone and advised him we would be in touch and thanked him for his time. I told Ms. Fisher to check with Elite (the other agency) and let me know if they had viable candidates and if not let me know we would act accordingly.

As previously mentioned Ms. Fisher was to go out on LOA on 3-28. By 3-24 I had received no updates regarding staffing. I was growing uncomfortable. I called Elite myself. They reported to me that Ms. Fisher had called them but they had only two RNs and no LVN that could work the RMF. She stated that Ms. Fisher had not requested the LVN begin security clearance process. Essentially we were now completely dependant upon Supplemental to meet our needs.

I emailed Ms. Fisher on 3-24, a Friday, and requested an update on the situation. I asked her specifically if Elite could provide the nurses and if not who was to be her point of contact with Supplemental. Her response to this email was to be evasive and talk about budget concerns and avoided answering my question about a contact person. She eventually provided me with a point of contact person (Ms. MacCartney) late on 3-27 her last day to work before the LOA started.

On Wednesday, 3-29-06 I received a message to call Bryan at Supplemental. When I contacted him at about 3PM he stated he was growing concerned as he had received no word about supplying any nurse t the RMF and he needed to make scheduling arrangements as he had other obligations to meet for other clients. I advised him someone would be in touch by Friday. I asked him if he had been given a contact at the RMF besides Ms. Fisher. He listed Ms. MacCartney if Ms. Fisher was not available. I asked him if that was what Ms. Fisher had stated specifically, if she was not available? He confirmed this. I amended that to three contact staff, myself, Ms. MacCartney or Mr. Aguilar.

By now it was readily apparent that Ms. Fisher was pursuing her own agenda as she had previously and had totally disregarded my directions. There is no way there was any misunderstanding as she and I had a very detailed conversation in my office regarding this. It was also very apparent she felt distaste at being removed from the loop, even if it was for the apparent benefit of the operations.

On 3-29-06 I met with Ms MacCartney and informed her of what I had advised Supplemental regarding contact persons now being myself, Mr. Aguilar and her. I asked her how the schedule was looking for the month of April. She said there were various holes in it toward the middle of the month. She also pointed out there was no relief factor in the schedule whatever. I asked her to contact Supplemental and determine what they might have to offer.

During our conversation she mentioned to me that a staff nurse had requested three hours off for a dental appointment and that she had approved it. However Ms. Fisher had disapproved it citing a lack of staffing. This was a day shift position and the staff is already working over and stretched very thin. I felt it was very doable to provide an

EXHIBIT
D-34
CA 4:08-cv- 01273

UTMB-593

She initially stated that she was not the problem but rather the problem was their nurses wanting to work no weekends and no holidays etc. She said it wasn't fair to our staff to hire agency nurses and give them the preferred shifts over our own personnel. I agreed, but pointed out that was not what I was told by Bryan. She said if she had to do that she would just not use the agency's nurses. Once again, as with the Huntsville provider situation, she was willing to risk a potentially catastrophic failure than accept responsibility and direction from another source. I told her that was not an option. She was about to go out on two weeks leave, I was not sure what ANM Aguilar might do and we were short staffed as it was. I advised her that the RMF failing was just not an option. This is not the first time I advised her that failure of the RMF was not an option.

She asked me if we could call Bryan back and speak with him on my speaker phone. I said no problem and called him immediately.

When Bryan came on the phone she stated that she was aware of his concerns and told him that the reasons he gave her for not getting nurses was they didn't want to work the schedules she had. He told her that was originally *partly* true but that since they had last spoken he had located other possible nurses. She went on to tell him that the two disgruntled nurses were Ms. Tune and Ms. Rogers and that she didn't want them back. He agreed that might be a part of the problem but that his nurses talked to one another and the word was out that she was not a nice person and now other potential nurses didn't wish to come based upon the reports from their co-workers.

She asked him what was said. He said that Ms. Fisher was "Very, very rude and forceful" and that she was "hard to work under". I asked him specifically if it was that and not the schedule issues and he confirmed to me this was the problem (Ms. Fisher's behavior).

Ms. Fisher asked for names of the nurses that were making the allegations. Bryan was uncomfortable with this request and I told him it was not necessary and not to worry about it. The concerns were what they were and that was that. In my view this was not the time to get into finger pointing it was a time to focus on the mission of the RMF which was patient care. The perception had already been created and determining the specifics of who and what and attempting to justify her actions was not in anyone's best interest or the interests of the ongoing problem, i.e. staffing.

I placed Bryan on hold while I spoke with Ms. Fisher. She said she didn't want to appoint another contact person. I asked her why not? If the problem was truly the nurses and they had problems with our other staff she could be vindicated by that. She didn't want to do this but never provided a specific reason. She asked me if we designated someone else to deal with the agency nurses would she retain control the schedule? I stated that she would control the schedule but they would just deal with someone else in person and on the phone like Mr. Aguilar and/or Ms. MacCartney. She asked if she would have no dealing with those agency nurses at all. I said not unless there was an emergency and then I would expect her to intervene as appropriate. She stated she would rather call the other agency (Elite).

I recently received a grievance from a staff nurse complaining of being demeaned and embarrassed publicly by how she was treated by Ms. Fisher. Following my investigation I spoke with three witnesses to the events described in the grievance. Their responses to me fully supported the complaints in the grievance. Two of the three witnesses don't even work for UTMB. A forth witness (also not a UTMB employee) related how she had seen Ms. Fisher display a complete lack of tact when dealing with staff and furthermore allowed her personal dislike of some employees to publicly exhibited in her interactions with them. This seems to lend even more support the pattern of poor interpersonal skills.

On Wednesday March 22, 2006, the Nurse Managers were assembled for interviews. Ms. Fisher was to leave for an LOA for approximately 10 days effective the 28th. She reported to me that due to more recent departures of staff that she would require additional agency nurses to maintain the operation of the RMF. A total of three agency nurses would be needed, for 40 hours per week each, according to her. That represents a rough cost of approximately $15,840 per month. She went on to say that if she didn't get the staff she wasn't sure how she was going to be able to meet staffing needs. She also added that she had called Supplemental Staffing and they had no nurses available.

I was disturbed to say the least. I had heard previously that there was friction between her and the agency nurses from Supplemental. When I called supplemental back on January 9, 2006, I spoke with Geneva, Senior Staffing Manager. I asked her if her agency had any recorded problems from their employees working at the RMF. She informed me that there were problems with Ms. Fisher. According to her nurses Ms. Fisher was rude to them and assigned a patient load that was too high.

I called Supplemental at 12:07 PM and spoke with Bryan Allison who is the Recruiting Manager. I identified myself and asked him if they were having problems finding nurses for the RMF he stated that yes they were. I asked him if he could tell me why. He stated that he was glad that I called. He was aware of a problem here and had made several attempts to speak with Ms. Fisher. He had complaints from 2-3 of his nurses who did not wish to return to the RMF due to their treatment from Ms. Fisher. He said the RMF in general had a poor reputation in his agency and Ms. Fisher in particular as being "hard to work for".

I asked him if I assigned another point of contact person for his agency would that help matters. He readily agreed that might improve his ability to recruit and retain agency nurses who could work here.

On this same date at approximately 3 PM I spoke with Ms. Fisher in my office. I informed her that I had a problem. I advised her that subsequent to speaking with her and being told that Supplemental was unable to provide additional nurses I contacted them and talked to Bryan to see what the situation was. I related to her that he told me of concerns by his staff nurses and we agreed another point of contact was preferred. I asked her who she wanted to designate.

knowledge then it seems to be more of a power and control issue and not leadership ability. This is the trend I think I perceive in these circumstances

During a nurse managers meeting in November I held a long discussion on process change and how to deal with and implement it. They were all to attempt one process change with the guidance I had given them. At the following nurse managers meeting I went around the room and asked the managers to share at least one of the efforts they had attempted. Most of the managers related one situation that came out with success. Ms. Fisher related telling her staff that PAR levels were not being kept and they were to address this. When such time passed that it wasn't addressed to her satisfaction she made the changes herself. She went on to say that she made the ER nurses angry with her changes. It was painfully obvious that she made no attempt to work with the staff or empower them. She simply made assignments and stepped back and watched till her patience were exceeded, then acted on her own, just as she had done with the supply room at Goree. It is a small wonder the staff in the ER was upset. Even the other nurse managers tried to explain the difference, but she crossed her arms and legs and looked off in the distance and certainly appeared to me that her attentiveness to other opinions and points of view was not what she makes it out to be in her rebuttal statement.

During this meeting I had asked another Cluster Nurse Manager to share with the rest her approach to management. I had seen this in the past and it struck me as particularly personable and empowering. She seems to have pretty good responses from her employees. When she began relating how she works with her staff Ms. Fisher comments were that her staff was just "different" from hers in Huntsville. As she talked Ms. Fisher just kept shaking her head and repeating that her staff was different. I asked Ms. Fisher if that was so could it be because of the management or in spite of it? Which came first, the behaviors of the managers or the staff? Yet again it was obvious to the average observer that Ms. Fisher had made up her mind and was not the least interested in even considering other possibilities.

Her response also stated that her ANMs are essentially useless and show no willingness to take initiative to correct problems. I do not agree with this and even if I did it is painfully obvious from my conversation with both ANMs that they are reluctant to take any actions without her express consent or face the consequences. As I mentioned above which led to the other? She points out that one of the ANMs is new and doesn't understand the needs of the pods. There is no mention whatever of what she has done to help him improve on this or how she has supported him or empowered him. She is critical of others but fails to demonstrate how she has attempted to offset these deficiencies to help them improve their performance. For example simply meeting with them on a regular basis. That had to be mandated by me and even then apparently it was not followed. Ms. Fisher seems to pursue directions when it suits her.

She talks about how most staff does not have a problem with her people skills. Is that a fact or merely her perception? It has already been demonstrated that many of the staff take her abuse and are afraid to speak up otherwise. How accurate is her feedback from the staff?

this. She has said many times, in my presence as well as that of others, that if someone doesn't want to work there then they needed to just leave. While that attitude is sometimes understandable, it is not appropriate when the staffing is critical and one loses focus on our ability to meet our mission.

She goes on to say that I have shown a lack of support for her and a lack of empowerment. Between January and the end of February, I noted that Ms. Fisher was very stressed. I told her that I wanted to assist her and that it was my desire that we meet and talk at least 1-2 times per week. I invited her into my office any time she was in that area of the building and we could just chat about the problems she was facing and I would try to help with suggestions or just listen to her vent or whatever she needed. Since that time she has yet to come by for one discussion. I have made it well know to all of my staff I have an open door policy.

She states that it is undesirable for me to circumvent her authority. I have no idea what she refers to. She states that it is undesirable for me to solicit information from both her assistants and other employees and that what is gained is not used constructively. That is an interesting observation. One such solicitation was that she had been on the property for over 2 months and still had held no staff meetings. She points out that she came in mid August and that the hurricane and other things hampered her ability to hold meetings. It is difficult to use the information fro the staff with a clear conscience when they tell me they are afraid for me to do so out of fear of retaliation from Ms. Fisher. She points out that she has repeatedly told me that she is responsible for the unit, which is true. However, she seems to overlook the fact that I am ultimately responsible for this and all of the other units in my division above and beyond her local responsibility. How am I to gauge how things are going on any unit without interaction with the staff, including her ANMs. Am I not to speak to the staff without her permission? Are the ANM's off limits? I make it a habit of asking staff how things are going. If I have a reason to believe there is a specific problem I would be remiss not to ask about it and just ignore it. Ms. Fisher's performance is my direct responsibility but it seems she would have no means for me to determine that absent her own reports. I find that totally and completely unacceptable. I utilize the same process to gauge operations and employee sentiments on all of the facilities, not just hers. I walk the units and chat with the staff. I have been told many times that the staff enjoy and appreciate this contact. I have even been chastised for a lack of doing so from time to time.

She also states that, "unless taken advantage of empowerment is useless." I could not disagree more. Empowerment is never useless. I suspect that Ms. Fisher doesn't even know what empowerment is. It is not simply telling the employees to do something, it is showing them they are valued as individuals and encouraging them to do things and solve their own problems. If they don't have problem solving skills they need to be led to those skills and allowed/encouraged to succeed. Not all employees are going to be outstanding performers just because they are "empowered". Micromanaging and acting on the behalf of the employees will never succeed in doing anything but ensuring that they remain dependent upon you. If a manager makes all of the decisions and fails to share

change of assignment and the ANM had denied it. The PCA went to Ms. Fisher and she approved it without speaking to the ANM. She also stated that several schedules had been altered after the fact and the RN staff was not consulted. I have not been able to verify this at this point but will be looking into it further. It seems that Ms. Fisher's treatment of staff has not changed appreciably as supported by the investigation of the grievance cited elsewhere in this document.

It seems that the same general concerns I have expressed throughout this document were essentially independently supported by the investigation of Ms. Melton and Ms. Gotcher.

On March 26, 2006, I received an email from Mr. Aguilar who announced that he was accepting a promotion to Cluster Nurse Manager in a southern division district. I later spoke with him on the phone and discussed his reasons for transfer. Among other things he cited that he felt Ms. Fisher was trying to run him off. On March 10, 2006 I had met with him and Ms. MacCartney and Ms. Fisher. Ms. Box was also present for the meeting. One of the underlying and consistent themes that had revealed itself with this groups dynamic was that there was insufficient communication between the ANMs and Ms. Fisher. Among other topics I discussed was better communications. I directed that Ms. Fisher meet with the ANMs at least once per week if not more. The meetings didn't have to be either long or elaborate, but they needed to discuss views and what was happening in the facility and maintain good communications and a focused direction. I made several assignments and made known a change of bed allocation based upon acuity was coming to the RMF and we would be taking on observation beds soon. I felt that should give them more than enough to discuss and work toward as a team. I felt it gave Ms. Fisher a fresh opportunity to step up as a leader with a small intimate group she could at least attempt to mold into a cogent team. As of March 30th I spoke with both ANMs and they both agreed there had been on meetings.

During this same meeting I advised them to acquire two EKG monitors for the obs beds and to form a Corrective Action Team (CAT) for the unit. As of 3-24-06 no monitors had been sought and no CAT team members had been selected. Neither of these assignments would have taken long to either accomplish or delegate. I had to revisit this with Ms. Fisher and amazingly enough when I did both were accomplished in less than 24 hours.

On 3-13-06 I met with Ms. Fisher and was also joined by Ms. Box regarding Ms. Fisher's semi-annual evaluation. I gave it to her to read. In short order she became unhappy with the evaluation and began questioning it. I didn't feel it was overly critical or accusing but her reaction seemed to indicate that she felt it was. At that time, after lengthy discussion I suggested that she take the evaluation with her and look it over and make suggestions for amendments if she felt something was not agreeable to her. She elected to do so. As of 3-23 the evaluation was still not returned. I emailed her to please return it by 3-24. She eventually returned it by 3-27.

In the evaluation I made mention of the fact that turnover at the RMF had been steady, but that it *could be attributable to many reasons and it bore watching.* In her response she felt the need to list why each employee left. I felt she was overly defensive about

Since that meeting Ms. Fisher has approached me with disciplinary actions for several staff nurses, among which was Mr. Aguilar. She wanted to give him a written warning for a sharps count that was off. I asked her why a written as opposed to a coaching or an oral reminder. She stated that she felt the needed to be consistent and that she had done the same thing at the Huntsville unit and people had missed merit raises as a result and that she had "faded heat" for her decision to do that. Upon further reflection I recalled that those were done in light of a missing instrument. A missing instrument is a big deal and could result in the lockdown of an entire facility. When I called this to her attention she stated that there were also instruments missing at the RMF as well. As we discussed it further she finally admitted that she was not sure if anything was actually missing or if it was just a mathematical error and had said as much to security.

So in my analysis this was not actually a confirmed case of a missing instrument. Yst despite this she was prepared to hand out written disciplinary action to several staff, knowing already that the morale is suffering here over an issue that is not even certain. She wants to be "consistent" when it suits her. She seems to have overlooked that there was a lesser step in the PREP process for an oral reminder. When I reviewed Mr. Aguliar's statement regarding the count being off I could plainly see that I could well have been written up over the same thing for performing the same actions as he did. In the count process the other nurse counted the actual sharps and he merely verified that number with the log. How can he have been at fault for certain? If her count matched what was in the book how can you pinpoint where the error even occurred?

Ms. Fsiher wanted to refer several staff, again including Mr. Aguilar, for a written disciplinary for failing to move a suicidal patient to direct observation pending transfer to crisis management. The patient was an in-patient whose room was directly across from the nurses station. He was either bed bound or wheelchair bound. It ultimately took about 24 hours to get him to crisis management. When he arrived he was physically so ill that Crisis management failed to accept him. He later died from his illness. Ms. Fisher wanted to discipline approximately four nurses for failing to place the patient in direct observation. She later admitted to me she wasn't even sure how one of the nurses was even accountable for the process, but yet she was willing to discipline her anyway. She didn't seem to be overly concerned that the patient died from clinical, not mental health issues and this was not caught by the staff during assessments. She stated that she was motivated to take actions because she was sent to peer review for a similar situation and her former ANM was disciplined for failing to monitor another suicidal patient. There were considerable differences in these cases.

I contacted MHS services for a second opinion and they were familiar with these case. They agreed that while this was a technical violation of the MHS portion of the policy that it was making a mountain out of a mole hill in light of the eventual outcome and that more focus needed to be on clinical processes.

During my investigation of the grievance by the staff nurse one of the things she reported to me was that subordinate staff still bypass the RNs and ANMs and get special consideration from Ms. Fisher. One such thing she cited was that a PCA had requested a

Since that meeting Ms. Fisher has approached me with disciplinary actions for several staff nurses, among which was Mr. Aguilar. She wanted to give him a written warning for a sharps count that was off. I asked her why a written as opposed to a coaching or an oral reminder. She stated that she felt the needed to be consistent and that she had done the same thing at the Huntsville unit and people had missed merit raises as a result and that she had "faded heat" for her decision to do that. Upon further reflection I recalled that those were done in light of a missing instrument. A missing instrument is a big deal and could result in the lockdown of an entire facility. When I called this to her attention she stated that there were also instruments missing at the RMF as well. As we discussed it further she finally admitted that she was not sure if anything was actually missing or if it was just a mathematical error and had said as much to security.

So in my analysis this was not actually a confirmed case of a missing instrument. Yst despite this she was prepared to hand out written disciplinary action to several staff, knowing already that the morale is suffering here over an issue that is not even certain. She wants to be "consistent" when it suits her. She seems to have overlooked that there was a lesser step in the PREP process for an oral reminder. When I reviewed Mr. Aguliar's statement regarding the count being off I could plainly see that I could well have been written up over the same thing for performing the same actions as he did. In the count process the other nurse counted the actual sharps and he merely verified that number with the log. How can he have been at fault for certain? If her count matched what was in the book how can you pinpoint where the error even occurred?

Ms. Fsiher wanted to refer several staff, again including Mr. Aguilar, for a written disciplinary for failing to move a suicidal patient to direct observation pending transfer to crisis management. The patient was an in-patient whose room was directly across from the nurses station. He was either bed bound or wheelchair bound. It ultimately took about 24 hours to get him to crisis management. When he arrived he was physically so ill that Crisis management failed to accept him. He later died from his illness. Ms. Fisher wanted to discipline approximately four nurses for failing to place the patient in direct observation. She later admitted to me she wasn't even sure how one of the nurses was even accountable for the process, but yet she was willing to discipline her anyway. She didn't seem to be overly concerned that the patient died from clinical, not mental health issues and this was not caught by the staff during assessments. She stated that she was motivated to take actions because she was sent to peer review for a similar situation and her former ANM was disciplined for failing to monitor another suicidal patient. There were considerable differences in these cases.

I contacted MHS services for a second opinion and they were familiar with these case. They agreed that while this was a technical violation of the MHS portion of the policy that it was making a mountain out of a mole hill in light of the eventual outcome and that more focus needed to be on clinical processes.

During my investigation of the grievance by the staff nurse one of the things she reported to me was that subordinate staff still bypass the RNs and ANMs and get special consideration from Ms. Fisher. One such thing she cited was that a PCA had requested a

were not consulted about the changes. Ms. Fisher's position was that she had warned them previously that the PAR levels needed to be addressed and when she felt sufficient time had passed and the opportunity arose she made the adjustments herself. She didn't give them a specific time span to make the changes. She didn't consult with them to ascertain if the PAR levels themselves might not be need to be adjusted upwards as opposed to adjusting the stock downwards. She gave them no reason to believe she would make the changes if they failed to do so. She happened to be working one night that was slow and made said changes. When the nurses that work there on a regular basis retuned they were at a loss as to what had happened and where to find certain supplies. This was one of the change processes Ms. Fisher refers to as a success at empowering people. I could not disagree more. One theme I have literally harped on since my coming to this area is to make your expectations known to the staff. I cannot recall how many times I have said this to all of the nurse managers and how important I feel it is.

Prior to his meeting with the ER nurses I had already concluded there were problems at the RMF which I didn't feel totally adequate to assess. I was concerned that my close proximity to the issues might be a case of not seeing the forest for the trees. I contacted my supervisor, Northern Region DON Mary Gotcher and shared with her my concerns. She asked if it would be helpful for her to come tot eh RMF and talk with the staff and see if she could make a more objective assessment. I readily agreed this might be productive.

Ms. Gotcher and Ms. Melton came to the RMF on the 17th and 18th of January and met with the staff. I was ware there were some staff who had an axe to grind, either real or imagined, with Ms. Fisher. I made it a point to contact certain members of the staff and request that supporters as well as opponents had an opportunity to speak. I wanted a balanced story told whatever that might be. I was approached by some staff who said that they wanted to talk to the DON but were afraid that if they did so they might be retaliated against by Ms. Fisher. I assured them that would not be allowed and furthermore if they truly felt the need to be heard this was a good opportunity and if they chose not to take advantage of it and not to be passive aggressive and complain without taking actions of their own. If they truly felt there were problems this was their chance to do something. In addition, it was decided by mutual agreement that I would not be present for any of the interviews. Neither I nor Ms. Gotcher wanted there to be any question regarding influence of opinions or reports by staff.

Following these meetings Ms. Gotcher and Ms. Melton met with Ms. Fisher and covered all of the areas of concern. I was not present for this meeting.

Within a few weeks Ms. Gotcher returned to the RMF and shared her expectations with the staff. Among her expectations for Ms. Fisher were that all of Ms. Fisher's communications with staff be professional. That she would seek advice from the Estelle staff before making any significant changes. That Ms. Fisher treatment of all employees and staff is fair and equal. She further stipulated that the chain of command not be bypassed.