February 15, 2007

John D. Allen, Assistant Vice President
  and Chief Operation Officer
Correctional Managed Care
Frost National Bank
22nd and Market
Galveston, Tx 77551

        **RE:**    **Jacklyn Fisher, ANM**
                     **Complaint of Discrimination (Race)**

Dear John,

The purpose of this correspondence is to inform you of the findings of the investigation relative to the above reference complaint, i.e., Jacklyn Fisher's complaint of racial discrimination. This investigation has gone on for several months as a result of my inability to devote full time to the investigation and the difficulty of getting to all the witnesses in a timely fashion.

I have drawn conclusions based on the information I received from the people with whom I spoke. Needless to say there were a number of other individuals with whom I could have spoken but it is my opinion that I would have gotten essentially the same information from these individuals that I had already generated, of which some would have supported the allegations of Ms. Fisher, others would have supported the position of David Watson, the person identified in the complaint as the perpetrator of the discrimination.

My conclusions are based on factual information I was able to generate in writing and from the interviews of individuals who I felt had pertinent information regarding the issues at hand. Additionally, based on supporting materials I have reach some conclusions that cannot be fully substantiated and could be debated but in the interest of attempting to ensure that we are considering both sides of the problem as objectively as possible, these conclusions are presented to you for your review and consideration.

**ALLEGATIONS**

Jacklyn Fisher claims that she has been illegally demoted from Cluster Nurse Manager and that the action taken against her was retaliatory for her complaints in January, 2006 and on other occasions when she raised questions about racial discrimination by Mr. Watson. Furthermore, she states that her demotion was not done according to

EXHIBIT
**D-43**
CA 4:08-cv- 01273

UTMB/CMC human resource policies, i.e., there was no progressive discipline to correct any perceived problems with her performance.

## FACTS

Ms. Fisher was demoted from Cluster Nurse Manager to an Assistant Nurse Manager on a different unit. The letter of intent to demote sent to Ms. Fisher dated April 11, 2006 stated in part: "This letter is to notify you that I intend to request your demotion to Nurse Clinician III effective April 13, 2006 due to your continued failure to meet minimum performance expectations. A pattern of performance has been identified that represents significant areas of deficiencies in your performance. Those areas are: 1) Ineffective communications with subordinate staff; 2) Insubordinate attitude toward your supervisor; 3) Failure to follow your supervisor (sic) instructions; and 4) Ineffective management/leadership.

This letter was sent to Ms. Fisher signed by Mr. Watson. Mr. Watson continued his letter by indicating he was presenting the factual basis for his decision.

**Ineffective communication with staff:** Mr. Watson indicated there had been numerous complaints from her staff made to the Senior Cluster Nurse Manager's office. He indicated that she was counseled regarding her communication in 2005 and that she demonstrated the same type behavior when he was speaking to her and that she had decided to set a goal for the following year to improve her communication skills. Mr. Watson states that when Ms. Fisher moved to the ERMF in August 2005 the same type of communication complaints were reported to him; he goes on to state that Mary Gotcher, Northern Region Director of Nurses and Georgia Melton Northern Region Human Resources Administrator received similar reports of Ms. Fisher's poor communication from a number of staff members during their investigation of complaints of staff dissatisfaction. He indicated that a grievance was filed on March 9, 2006 alleging that she spoke to one of her employees in a demeaning and demoralizing way in front of patients and correctional staff and the grievance had been upheld.

**Insubordinate attitude toward your supervisor and Failure to follow your supervisors instructions:** Mr. Watson indicated that Ms. Fisher refused to follow his instructions relative to obtaining agency nurses and as a result indicated that she was willing to allow "...a potential disaster to befall the operations of the unit because you didn't wish to follow my instructions." At a meeting held March 10, 2006, Mr. Watson says that Ms. Fisher was explicitly advised that she should meet with her Assistant Nurse Managers at a minimum of once per week or more if needed and as of March 27, 2006 she had yet to meet with them which he considered to be a direct violation of his instructions.

He goes on to state that Ms. Fisher refuses to meet with him 2-3 times per week as instructed; that when presented with her evaluation on March 13, 2006 he gave her 10 days to provide a response and 10 days later she still had not responded and that she used an accusatory tone in her response to the evaluation when she did respond.

2

**Ineffective management/leadership:** Mr. Watson states that in August 2003 when Ms. Fisher became Nurse Manager over the Goree, Huntsville, Ferguson cluster she was told to give her Assistant Nurse Manager, Ms. Kelly, a Corrective Action Plan (CAP) and that Ms. Fisher refused to do so and that she refused to accept any accountability for not doing so for approximately 18 months. He goes on to state that attempts were made to implement a provider assisted sick call process at the Huntsville Facility and that she resisted the change so intensely that the management team asked that she be removed from the team and that the issue was not resolved until he stepped in. Mr. Watson goes on to state that in 2004 during the cold and flu season there was a large number of sick call requests (70) with symptoms that appeared "...to be flu or other acute respiratory infection." He says there was not a mid-level provider so the medical director agreed to see patients; without consultation with the medical director, Ms. Fisher ordered the patients dismissed from the clinic due to only two nurses being available, which caused the medical director to intervene so that the patients could receive care. Mr. Watson ends his letter to Ms. Fisher informing her that she admitted to not having staff meetings between August 2005 and November 2005 even though he had expressed his expectations to all of his Nurse Managers regarding the need for regular staff meetings.

Ms. Fisher's complaint has grown to cover much more than her original allegation and the information generated during the investigation covers a great deal more than the original allegation and what the "Letter of Intent" covers but the decision has been made to concentrate on the above two items i.e, the allegation as presented by Ms. Fisher initially and the "letter of intent" which brought forth the allegation; because that was the crux of the original complaint and resolving that issue really addresses all other concerns.

The information generated regarding the above is based on interviews and documents secured during the investigation. Each item in Mr. Watson's letter of intent will be addressed.

## INVESTIGATORY FINDINGS

**Ineffective Communication with staff:** Mr. Watson was accurate in stating there had been a number of complaints voiced by staff regarding Ms. Fisher's communication with them. The staff in question, in this particular instance, were ER nurses who worked at the ERMF. These nurses voiced concerns to Mr. Watson and also to Mary Gotcher. The nurses concerns prompted Ms. Gotcher to solicit help from Georgia Melton to conduct an "investigation" into what might be happening at the unit. Ms. Gotcher and Ms. Melton spoke with a number of employees; I was informed they did not have a plan as to how they would approach the investigation other than to make it known that they would be interested in talking with people who were interested in talking to them.

Mr. Watson informed me that he had received complaints in the past regarding Ms. Fisher's communication skills and the complaints he received in August 2005 were very similar to the previous complaints. Looking through Ms. Fisher's file I could find nothing regarding communication problems Mr. Watson had with Ms. Fisher. Her evaluations, given to her by Mr. Watson, all indicated she scored "consistently meets" are

3

above in all areas dealing with communication, this would include professionalism. (Please see attached evaluations, Attachment 1) Ms. Fisher did receive a quarterly evaluation (Attachment 2) from Mr. Watson, on March 13, 2006 that indicated the following:

- Ms. Fisher's goals...responding to disagreements in order to increase objective and constructive responses. This will enhance her communication skills and produce better interpersonal relationships and related outcomes.
- Ms. Fisher needs to make a more pronounced effort to communicate her goals and expectations to the staff at all levels and be sensitive to the feedback this produces. **I have little doubt her final judgment calls tend to be correct**, but providing the feedback to the staff as to why she makes some of the decisions may help prevent issues later on. (My emphasis)

Ms. Fisher's response to Mr. Watson included the following statement: "There is a small percent of this staff that do not appreciate the fact that I am not wavered by their complaining nor easily persuaded by excuses. I do listen and hear them out, but it is still not satisfying unless the outcome is favorable to them."

Persons interviewed on the unit, none of the ER nurses were interviewed and this was done quite consciously since they had been identified as the ones with the complaints I believed I had their story, e.g., Mr. Watson told me that four of the ER nurses came to him and essentially said that he had to choose between them or Ms. Fisher and if he chose her they would quit. Those I interviewed, a majority of them indicated there was not a problem with Ms. Fisher's communication skills and they indicated she did a good job of communicating what she wanted done and how she wanted it done. This group of individuals also included the other members of the management team for that unit, i.e., the Practice Manager and the Medical Director. They went on to say that many of the things she communicated to staff indicated that things were going to be done differently than they had been done in the past and several persons took offense to this because it meant the party would be over. The small minority that said she had a communication problem indicated she talked down to them was belittling and rude. This minority was made up of persons who were all white; whereas, the majority included whites, blacks and a Hispanic. Later in this document I will explain why I have given this breakdown.

**Insubordinate attitude toward your supervisor and Failure to follow your supervisor's instructions:** Mr. Watson states that he told Ms. Fisher to provide an alternate contact for Supplemental Healthcare, the agency that supplies nurses to the units. According to Mr. Watson, representatives of Supplemental Healthcare reported that they were having problems recruiting nurses to work at the ERMF because of the "unprofessional behavior towards the temporary nurses" by Ms. Fisher. He went on to state that he contacted the agency and they informed him that Ms. Fisher told them to contact the alternate only if she were not available and he said this was in direct violation of his instructions. He later indicated that he informed Ms. Fisher to meet with her Assistant Nurse Managers at least once a week and this occurred at a meeting with her on March 10 and as of March 27 she had not met with them and he considered this to be a direct violation of his instructions to her. He says she was given her semi-annual evaluation and that she objected to some parts of the evaluation and he told her she could

4

make her comments and gave her 10 days to do so. The fact that she did not return it in 10 days, he says she failed to adhere to her supervisor's request. Additionally he told her he wanted to meet with her informally 2-3 times per week so that he could keep abreast of problems and provide her with assistance and that she failed to do that, again refusing to adhere to his instructions. And lastly, he says that her response to the evaluation was in an accusatory tone and that displayed "...an insubordinate attitude towards your supervisor."

Much of this is he said/she said. Ms. Fisher disputes much of what Mr. Watson states and there does not exist much documentation for the accusations brought forward by Mr. Watson. I did speak to an individual at Supplemental Healthcare to try and determine if he could recall having a problem with Ms. Fisher. I spoke with Brian Allison and he said he thought there may have been a problem but he didn't have anything documented. He said the best that he could remember is that a couple of nurses said that she was difficult to work with, that she was demanding and overworked them. He went on to say that he could not pinpoint anything nor did he have any documentation. Ms. Fisher did provide emails indicating that she informed Mr. Watson about the schedule during her absence and her schedule indicated additional nurses would not be needed but that she had spoken with Supplemental Healthcare and informed them that Ms. McCartney was to be the contact person in her absence and she would contact them if nurses were needed. According to Mr. Watson, his instructions were that Ms. Fisher was to provide a contact person whether she was there or not. (Attachment 3)

**Ineffective management/leadership:** According to Mr. Watson, Ms. Fisher was running staff off because of her poor leadership abilities and her inability to be objective on the job. He also stated that he believed she created racial strife and that she favored the black employees over the white ones. Mr. Watson also indicated that Ms. Fisher used intimidation as a management tool and as a result her assistant nurse managers were frightened of her and would not do anything they felt might provide her ammunition to discipline them. He also alleged that Ms. Fisher would discipline white employees but would not discipline blacks. Mary Gotcher also informed me that the white employees relayed to her that Ms. Fisher gave special privileges to the black employees which gave them an advantage over the whites.

Mr. Watson provided as an example the provider assisted sick call process that was instituted at the Huntsville unit. He said the process was not working well regardless of what he attempted to do. Therefore he decided to go to the clinic one day to see how he could make things better; he indicated that he spoke to the PA and asked her what could he do and he says she told him there needed to be coordination between herself and the nurses and he says he pulled the staff together and everything worked smoothly. He returned the following day and repeated the exercise and they had a good operation. He says Ms. Fisher deliberately did not do what she had been told so that the operation would fail; this in an effort to get rid of the PA. He says this is further documentation that she manipulates things "...to meet her own personal agenda even if it damages the system and staff and does not meet the mission of the organization."

5

According to the emails I received, the above incident occurred in 2004 and according to Ms. Fisher it was the Practice Manager and the Physician Assistant who were implementing procedures without discussing the possible changes with the nursing staff, particularly the nursing supervisor who was Ms. Fisher. Mr. Watson seems to lay blame on Ms. Fisher for difficulties with the medical staff, especially the PA, Ms. Lawson, when the emails that are attached seem to indicate that Ms. Fisher was communicating with Mr. Watson about the difficulties she was having with the medical staff and him supporting her efforts. (Attachment 4)

This appears to be contradictory to the information Mr. Watson presented to me and what he presented to Ms. Fisher in her letter of intent. When I asked about documentation regarding the issues of her management style and her lack of communication skills, he informed me that most of what he had was verbal and when I pushed him on this point he indicated that simply because the complaints were not in writing didn't invalidate them. The accusations regarding Ms. Fisher giving preferential treatment to blacks was another allegation that was not in writing and could not be substantiated; again raising questions regarding exactly what was wrong with her management style.

## SUPPORTING INFORMATION

It has been difficult to separate this investigation from the complaints filed by two other black females who alleged that David Watson was discriminating against them because of their race (black). I have attempted to separate the three and will provide conclusions for each of the cases separately but there definitely are links between the three.

Utilizing the evaluations as my foundation, I have also considered emails and interview information to provide my conclusion to this particular investigation. I will touch on the issues raised by Ms. Fisher and provide information regarding how I reach my conclusion.

I believe I must give my opinion based on what I have been told and what I have read. It does appear that Mr. Watson was a strong supporter of Ms. Fisher's until the first part of '06. I have truly tried to be as objective as possible regarding my opinion relative to this timeframe because it seems so trivial and hard to believe that a person would go to such lengths simply because they were asked to follow an ongoing practice of the facility, i.e., not to rehire or transfer any individual who had attitude and behavior problems. Mr. Watson approved the rehire of an individual (white) who had been separated from the organization because of problems; Ms. Fisher pointed out to Mr. Watson that she had been told that an employee (black) could not be transferred because she had a bad attitude and problems. Ms. Fisher said she explained to Mr. Watson that he was using a different standard and that the policy should be applied uniformly. She felt it was discriminatory to allow a white to be rehired but not let a black transfer when both had the same types of problems. He later rescinded his approval, stating Ms. Fisher was correct, that he had simply forgotten about the difficulties they had had with the person they were considering for rehire.

6

The timeline of events relative to the demotion of Ms. Fisher appear to have begun earnestly after the above event, e.g., the "investigation" by Ms. Gotcher and Ms. Melton occurred after January 4, 2006; the Supplemental Healthcare issue came up after the January 4th date; the meeting between Ms. Fisher, Ms. Gotcher, and Ms. Melton after Jan. 4th; Mr. Watson's meeting with Ms. Fisher to discuss her semi-annual evaluation occurred after Jan. 4th; the meeting with Ms. Gotcher, Ms. Rader, Ms. Fisher and staff of the Estelle unit; and the eventual demotion in April.

Additionally, Mr. Watson indicated that on March 9, 2006 a grievance was filed against Ms. Fisher and that it was upheld; I could not find anything in her history jacket to substantiate this claim. It is possible that the information had not been entered but I would thin that after six months, something this important would have made its way to her file.

I have attempted to validate the concerns raised by Mr. Watson, Ms. Gotcher and Ms. Melton and I cannot document the accusations they have brought forward. The accusations brought forward by the nurses on the Estelle Unit can not be verified, though I have no doubt they did tell Ms. Gotcher and Ms. Melton they were having difficulties with Ms. Fisher and that Ms. Fisher was not fair and that she did not communicate with them in a fashion that was professional.

Mr. Watson's evaluation of Ms. Fisher before she transferred to the Estelle Unit, signed July 8, 2005 by Ms. Fisher and Mr. Watson is the complete opposite of the person who is painted in the six month evaluation of March 2006, additionally there is no documentation to substantiate the problems that are identified in the March evaluation.

The persons I interviewed at the Estelle Unit were selected anonymously based on job title and race, were supportive of Ms. Fisher for the most part. I was told such things as: "…heard that a lot of people got together because Ms. Fisher was trying to get them to do what they were expected to do and they did not want to do those things, at least not the way Ms. Fisher expected things to be done." This from a Hispanic employee. She went on to say that she believed Ms. Fisher was trying to make things better but indicated right now things are bad; this interview took place after Ms. Fisher's demotion and move to another unit.

I spoke with two white employees, a nurse and a PCA, both of whom informed me they had limited contact with Ms. Fisher. The PCA said she purposely stayed away from controversy and simply tried to do her job and had neither good nor bad to say about Ms. Fisher. The nurse indicated that she believed that Ms. Fisher did not respect her and she did not respect Ms. Fisher because of unprofessional behavior, including foul language and flirtatious behavior with physicians. She indicated she had no open disagreements with her but she stayed away from her. This and one other person, Ms. Gotcher, were the only persons who ever said anything to me about possible inappropriate sexual behavior on the part of Ms. Fisher.

7

By happenstance I interviewed a black pharmacy manager and Mr. Watson also later told me that I should interview this individual because he felt she was a very fair minded person and would be straight with me. This individual indicated to me that she believed Ms. Fisher to be a good manager, that unlike others who had been at the unit, she had no favorites, she treated everyone fairly and that this riled some because everyone had not always been treated fairly in the past, specifically blacks. She went on to say she believed the unit had been running smoothly as a result. She also said there were several nurses who did not want to work and Fisher was making them work and they did not like that.

I spoke to the assistant nurse manager of the unit who said she had a rocky relationship with Ms. Fisher because she spoke to her like she was an "idiot and that she did not encourage questions." She also said that Fisher encouraged employees to go around the ANMs and when she was confronted by the two ANMs she told them the staff did not trust them. She went on to say that when staff questioned Ms. Fisher about certain processes and would mention that they did it a certain way when Ms. Adams was the supervisor, Ms. Fisher would simply say they are not doing it that way any longer. She says the ER nurses really had a problem with Ms. Fisher, saying they were tired of being talked down to by her. When asked if she believed Fisher was racial in her treatment, she said she did not believe she did anything because of race.

My conversation with the balance of the management team, William Samarneh, Practice Manager, and Bobby Melvin Vincent, M.D. Medical Director was very pro Ms. Fisher. Mr. Samarneh stated that he had very limited interactions with Mr. Watson and that was different than from the past when he interacted with the Cluster Nurse Manager constantly. He indicated he spoke with Ms. Fisher often and that seemed to create tension among some of the employees on the unit. He indicated he had worked with Ms. Fisher on the Wynn Unit and he had no problems with her there either. He said from his observations, there were two standards on the unit before Ms. Fisher arrived, one for blacks and one for whites. He says that when Ms Fisher came she eliminated or at least was trying to eliminate the different treatment, saying her expectation was that everyone was to be treated equally and she expected everyone to do their job. He believes that was the foundation for her problems.

He did not understand why Ms. Gotcher and Ms. Melton came on the unit to conduct an investigation and did not include him in the proceedings. He said he forced himself on them to determine what was going on and was eventually told that Fisher was creating polarization on the unit. He says he attempted to have a meeting with Dr. Vincent, Ms. Gotcher, Ms. Melton and Mr. Watson but they refused to have such a meeting. He said he was told that Ms. Gotcher met with staff the middle of March, including Ms. Fisher, and told them that Ms. Fisher was going to change some of her management style and that staff needed to compromise and also make some changes and it was his impression that everyone who attended the meeting left thinking things had been resolved.

Mr. Samarneh believes this all stemmed from the ER nurses who he says he believed wanted to do as little as possible and Ms. Fisher was requiring them to work. He said one

8

of them came to him to complain and he called Ms Fisher and the three of them talked and after the meeting everyone left with a better understanding. The accusation that she was causing staff to leave, he indicated that all units are short of staff and that staff had been leaving Estelle for years and that Ms. Fisher was not there long enough to impact the vacancy rate of that unit.

Dr. Vincent also said that they made an attempt to have a meeting with Mr. Watson and the others but were refused. He said he met with Ms. Fisher only when necessary and that could mean several times a week or maybe only once a week. He said Ms. Fisher was a pretty straight forward woman and a lot of the old school nurses who wanted to do their own thing did not like her. He said that these same nurses would avoid talking to her and would go around her and request things from the assistant nurse manager or would call the on call nurse.

Dr. Vincent said Mr. Watson came to his office one day and wanted to talk about Ms. Fisher, he said he asked if the relationship could be mended and Mr. Watson indicated he did not think so, because he really didn't know how to make it better. Dr. Vincent said he told him he needed to communicate with her and support her but Mr. Watson said he didn't think that would work. It is his belief that the polarization that took place was not Ms. Fisher's doing but that of the nurses who then manipulated Mr. Watson. He says the problems could have been resolved but only if Mr. Watson would have forced the nurses to go through the chain of command.

I asked him about the alleged affair and he said that was the most ridiculous thing he had heard. He would never do anything that dumb and that in all his years with TDC and CMC no one could ever accuse him of such a thing, at least they would not have a foundation for such an allegation.

My meeting with Mary Gotcher revealed that her recollection of events included a conversation she had with Mr. Watson when he told her that things were not good at the Estelle Unit and that he had had meetings with the staff and with Ms. Fisher but things were not getting any better relative to morale amongst the staff. Mr. Watson never indicated to me that he held such meetings, at least with Ms. Fisher and the staff together; no one else indicated this happened either.

Ms. Gotcher said that employees told her that Ms. Fisher did things along racial lines and that there were security issues with the way she approached the job. She says they went on to tell her that Ms. Fisher made changes without consulting the staff; that black employees were allowed to call her at home and that she promised them things that she did not provide to white employees. I asked Ms. Gotcher about the racial makeup of the people who came to her complaining, she told me she did not see people by race and could not tell me the racial makeup.

After getting all of the complaints she and Ms. Melton decided to meet with Ms. Fisher and according to Ms. Gotcher she said Ms. Fisher had many of the same complaints against the employees. Ms. Gotcher gave Ms. Fisher a letter of expectations, she says

9

Ms. Fisher disagreed with it but accepted it. According to this letter of expectations, which was given to her approximately March 14, 2006, was to be revisited in 60 to 90 days. Ms. Fisher received a six month evaluation from Mr. Watson shortly after the letter of expectations, 13 days after receiving the evaluation Ms. Fisher went on sick leave until April 12, 2006 and upon her return was given a letter of demotion, indicating she was being demoted to a Nurse Clinician III.

An email I received dated March 25, 2006 from David Watson to Sandy Rader and Mary Gotcher indicates that he did not believe Ms. Fisher should be given a CAP (Corrective Action Plan) because he didn't believe one could be drafted that would address the problems he was experiencing with Ms. Fisher because, "The things that she does are subtle…" He goes on to state that he did not believe that a complete relief of "…managerial duties based upon solid supporting documentation and/or objective evidence" could be supported. Watson informed the two that he believed it would be difficult to defend in appeal or litigation a decision to demote. (Attachment 5)

Based on documents presented to me, the decision to demote her to a Nurse Clinician III was made by Ms. Melton and John Pemberton, in spite of the letter from Mr. Watson indicating he did not believe there was enough evidence to demote her. (Attachment 6) After conversing with Mr. Watson and Ms. Rader, the decision was made to change the demotion from Nurse Clinician III to Assistant Nurse Manager.

Ms. Gotcher went on to state that since they moved Ms. Fisher the turnover had slowed down and that the turnover they had experienced at the unit was contributed to Ms. Fisher's management style. Ms. Gotcher did not know why there was never a meeting with the management team of the unit to discuss perceived problems and address the issue.

## CONCLUSIONS

Based on the evidence presented from interviews, documents received and questionnaires answered it is my conclusion that the foundation does not exist for the demotion of Ms. Fisher. A lot of papers have appeared after the fact that seem to be very self serving to support the actions but these papers did not exist before the actions were taken. Additionally, I believe we have not followed the progressive discipline that should have been followed for such a drastic step to have been taken. I have questions as to why the management team was not consulted in this particular instance. Ms. Fisher was not allowed to confront her accusers, nor were her accusers expected to take their complaints to her, i.e., the chain of command; nor were they required to document any of their complaints. And to complicate matters, no one saw the merit of actually investigating the allegations being made.

A number of individuals have handled this situation poorly and have caused Ms. Fisher to face professional embarrassment for unjustified reasons. I believe efforts need to be put into action to correct an injustice. I would very much like to meet with you and Dr.

10

Raimer to discuss this in more detail and see if we can't come to a resolution that is in the best interest of UTMB/CMC.

                                       Sincerely,

                                       Melvin Williams

Cc:    Ben Raimer
        Kathy Shingleton